# *Deposition of Tara Taylor*

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF SOUTH CAROLINA

3                    GREENVILLE DIVISION

4           CIVIL ACTION NO.: 6:17-CV-01875-DCC

5

6   TARA TAYLOR,                          )

7                    PLAINTIFF,           )

8       VERSUS                            )

9   FLUOR FEDERAL GLOBAL PROJECTS, INC.,  )

10                   DEFENDANT.           )

11

12        ****************************************

13                   DEPOSITION OF

14                    TARA TAYLOR

15        ****************************************

16

17     PURSUANT TO NOTICE OF DEPOSITION AND/OR AGREEMENT

18   IN THE ABOVE-ENTITLED CASE, THE DEPOSITION OF TARA TAYLOR

19   WAS TAKEN ON THE 26TH DAY OF APRIL, 2018, COMMENCING AT

20   THE HOUR OF 9:22 A.M., IN THE OFFICES OF JACKSON LEWIS,

21   ATTORNEYS AT LAW, 15 SOUTH MAIN STREET, SUITE 700,

22   GREENVILLE, SOUTH CAROLINA.

23

24   REPORTED BY:  KAREN E. HOLLEY, CVR-M

25



```
 1   APPEARANCES:

 2

 3        BRIAN P. MURPHY, ESQUIRE

 4        STEPHENSON MURPHY, LLC

 5        207 WHITSETT STREET

 6        GREENVILLE, SOUTH CAROLINA 29601

 7             ATTORNEY FOR PLAINTIFF,

 8

 9        T. CHASE SAMPLES, ESQUIRE

10        JACKSON LEWIS, P.C.

11        15 SOUTH MAIN STREET, SUITE 700

12        GREENVILLE, SOUTH CAROLINA 29601

13             ATTORNEY FOR DEFENDANT.

14

15   ALSO ATTENDING:

16        ROB WELLS

17        ROSHELLA JAMES SMALLS

18

19

20

21

22

23

24

25
```



```
 1                              INDEX

 2

 3    STIPULATIONS, WAIVER AND OATH........................   5

 4    EXAMINATION BY MR. SAMPLES..........................   5

 5    EXAMINATION BY MR. MURPHY.......................... 192

 6    EXAMINATION BY MR. SAMPLES......................... 193

 7    CERTIFICATE OF REPORTER........................... 195

 8

 9    EXHIBITS:

10    DEFENDANT'S EXHIBIT NUMBER ONE (RESIGNATION LETTER)...  57

11    DEFENDANT'S EXHIBIT NUMBER TWO (LETTER)..............  62

12    DEFENDANT'S EXHIBIT NUMBER THREE (DIGNITY & RESPECT &

13    DISCRIMINATION - 3 PAGES).............................  95

14    DEFENDANT'S EXHIBIT NUMBER FOUR (EMAILS BETWEEN MS.

15    TAYLOR AND MR. SMITH - 2 PAGES)...................... 125

16    DEFENDANT'S EXHIBIT NUMBER FIVE (EMAILS BETWEEN MR.

17    RILEY AND MS. TAYLOR)................................ 129

18    DEFENDANT'S EXHIBIT NUMBER SIX (PAY STATEMENTS

19    PAGES)............................................... 146

20    DEFENDANT'S EXHIBIT NUMBER SEVEN (SALARY INFO - 2

21    PAGES)............................................... 147

22    DEFENDANT'S EXHIBIT NUMBER EIGHT (EEOC - 4 PAGES)..... 158

23    DEFENDANT'S EXHIBIT NUMBER NINE (EEOC - 4 PAGES)...... 159

24    DEFENDANT'S EXHIBIT NUMBER TEN (CHRONOLOGY OF

25    EVENTS - 13 PAGES)................................... 161
```



1   DEFENDANT'S EXHIBIT NUMBER ELEVEN (FAX WITH 1 - 10

2   ATTACHMENTS - 36 PAGES)............................... 163

3   DEFENDANT'S EXHIBIT NUMBER TWELVE (EEOC UPDATES -

4   2 PAGES)............................................. 168

5   DEFENDANT'S EXHIBIT NUMBER THIRTEEN (COMPLAINT - 9

6   PAGES).............................................. 169

7   DEFENDANT'S EXHIBIT NUMBER FOURTEEN (FLUOR HR

8   POLICY - 7 PAGES)................................... 174

9   DEFENDANT'S EXHIBIT NUMBER FIFTEEN (W-2S - 6 PAGES)... 178

10  DEFENDANT'S EXHIBIT NUMBER SIXTEEN (INTERROGATORIES -

11  17 PAGES)........................................... 179

12

13

14

15

16

17

18

19

20

21

22

23

24  (THIS TRANSCRIPT MAY CONTAIN QUOTED MATERIAL.  SUCH

25  MATERIAL IS REPRODUCED AS READ OR QUOTED BY THE SPEAKER.)



```
 1   Stipulations:

 2   It is agreed by and between the counsel for the parties as

 3   follows:

 4   1.    That this deposition is being taken pursuant to the

 5         Federal Rules of Civil Procedure;

 6   2.    That the deponent reserves the right to read and sign

 7         the deposition transcript.

 8              *****    *****    *****    *****

 9   Tara Taylor, being duly sworn to tell the truth, the whole

10   truth, and nothing but the truth of her own knowledge

11   concerning the matter herein, testified as follows:

12              *****    *****    *****    *****

13   Examination by Mr. Samples:

14   Q.    Please state your full name for the record.

15   A.    Tara Denise Taylor.

16   Q.    Ms. Taylor, good morning.  Again, my name is Chase

17         Samples.  I represent the Fluor defendants in this

18         case.  Here with me is Rob Wells, who I think you've

19         met before, on behalf of the company.  One of the

20         company attorneys is going to be joining us a little

21         bit later, but she's running behind, so when she comes

22         in, I'll introduce you to her as well.  Her name is

23         Roshella James Smalls.

24         Have you ever given a deposition before?

25   A.    No.
```



```
 1   Q.   I'm sure that your attorney, Brian Murphy, has
 2        explained the basic rules, but I'll go over a few
 3        things just for the record.  We're here today to ask
 4        you some questions about the lawsuit that you brought
 5        against Fluor; you understand that, right?
 6   A.   Yes.
 7   Q.   And we've got a court reporter here who is going to be
 8        making a record of everything we say and so it's
 9        important that we try not to speak over each other, and
10        so far you're doing a great job of that, so I would ask
11        that you just continue to do that; do you agree?
12   A.   Yes.
13   Q.   If you have any questions about my questions, don't
14        understand my questions, don't hear my questions,
15        please ask me to repeat it or rephrase it; I'll be glad
16        to do that.  Do you agree to do that?
17   A.   Yes.
18   Q.   And, again, you're doing an excellent job of doing this
19        so far, but try to avoid head nods or saying uh-huh and
20        uh-uh because that really doesn't translate well in the
21        transcript if we're looking at this later on; does that
22        make sense?
23   A.   Yes.
24   Q.   If you answer my questions, I'm going to assume that
25        you've heard them and understood them; is that fair?
```



```
1   A.   Yes.
2   Q.   Now, under the local rules, you're not permitted to
3        discuss the substance of your testimony with your
4        attorney during the deposition today; do you understand
5        that?
6   A.   Yes.
7   Q.   Now, throughout the day we're going to take breaks, and
8        we will be here for a while, so if you need to take a
9        break at any point, just let me know.  I think you've
10       found the restrooms already.  We've got drinks, coffee,
11       snacks available, so, you know, I want you to be
12       comfortable while you're here, so just let me know if
13       you need a break at any point and we'll take one.  I
14       typically try to take breaks about every hour, hour and
15       a half, but if we get to a point and you need to take a
16       break, just let me know; do you agree to do that?
17  A.   Yes.
18  Q.   Your attorney may occasionally object to some of my
19       questions.  He's doing that just to preserve the record
20       for later on if we have to put this in front of a judge
21       and ask the judge to rule.  But, obviously, there's no
22       judge here in the room right now, so if he objects, you
23       still have to answer my questions unless he tells you
24       not to; does that make sense?
25  A.   Yes.
```



TARA TAYLOR                                                     April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                          8

1    Q.    Do you have any questions about the instructions I've

2          given you?

3    A.    No.

4    Q.    Are you ready to move forward?

5    A.    Yes.

6    Q.    Ms. Taylor, are you currently taking any medications?

7    A.    Yes.

8    Q.    What are you taking?

9    A.    I take high blood pressure medication; I had recent

10         surgery, so I'm taking medication for that; and vitamin

11         D.

12   Q.    What's the medication you're taking for your surgery?

13   A.    Mobic.

14   Q.    The blood pressure medication or the Mobic or the

15         vitamin D, would any of those impair your ability to

16         testify today?

17   A.    No.

18   Q.    Any of those impair your ability to understand my

19         questions today?

20   A.    No.

21   Q.    They don't make you drowsy or anything like that?

22   A.    No.

23   Q.    Do you have any physical or mental condition that would

24         affect your ability to testify truthfully today?

25   A.    No.



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                          9

```
 1   Q.   Is there any other reason you might be unable to
 2        respond completely or truthfully to my questions?
 3   A.   No.
 4   Q.   You understand that you're under oath today and that
 5        the court could impose penalties against you if you
 6        don't tell the truth, correct?
 7   A.   Yes.
 8   Q.   Ms. Taylor, did you do anything to prepare for your
 9        deposition?
10   A.   Yes.
11   Q.   What did you do?
12   A.   I read over my notes.
13   Q.   Did you do anything else to prepare?
14   A.   I spoke with my attorney.
15   Q.   Anything else?
16   A.   Nothing that I can think of now.
17   Q.   Other than speaking with your attorney, have you
18        discussed your testimony today with anybody else?
19   A.   Yes.
20   Q.   Who have you discussed it with?
21   A.   Several people; my husband, mother, sister, best
22        friend, couple of -- or past co-workers.
23   Q.   Who are the co-workers that you discussed your
24        testimony with?
25   A.   Kelvin Johnson, Nikoletta Klimak.
```



1    Q.    Anyone else?

2    A.    Kimberly Johnson.

3    Q.    Are Kimberly and Kelvin related?

4    A.    No.

5    Q.    When is the last time you spoke with Kelvin Johnson?

6    A.    Last week.

7    Q.    What did you discuss with him?

8    A.    His trip to the Dominican.

9    Q.    And anything specific to your testimony today that you

10         discussed with him?

11   A.    No.

12   Q.    Anything about your claims against Fluor that you

13         discussed with him?

14   A.    No.

15   Q.    So the two of you stay in touch, I take it?

16   A.    Yes.

17   Q.    Would you say y'all are friends?

18   A.    Yes.

19   Q.    How often do you communicate with Mr. Johnson?

20   A.    Maybe once or twice a month.

21   Q.    Where is he working now?

22   A.    He works at Dallas/Fort Worth for a Dime Corp.

23   Q.    You said you also spoke with Nikoletta Klimak about

24         your testimony; when did you last speak with her?

25   A.    I'm not certain of the exact date that I spoke with



```
 1         her.
 2    Q.   Has it been within the last several weeks?
 3    A.   No.
 4    Q.   More than a month ago?
 5    A.   Yes.
 6    Q.   When you spoke with her, did you discuss your
 7         testimony?
 8    A.   No.
 9    Q.   Did you discuss this lawsuit and your claims against
10         Fluor?
11    A.   No.
12    Q.   Have you asked Ms. Klimak to be a witness for you in
13         this case?
14    A.   Yes.
15    Q.   Do you expect her to be a witness for you?
16    A.   Yes.
17    Q.   Would you say that you and Ms. Klimak are friends?
18    A.   Yes.
19    Q.   And y'all have stayed in touch, I take it, after you
20         left the project?
21    A.   Sporadically.
22    Q.   How often do you communicate with her?
23    A.   Not often.
24    Q.   So, fair to say you probably stay in touch better with
25         Mr. Johnson than Ms. Klimak?
```



```
 1    A.   Yes.
 2    Q.   What about Kimberly Johnson, have you discussed this
 3         case with her?
 4    A.   Yes.
 5    Q.   What did you discuss with her about this case?
 6    A.   She knew that I had filed an EEOC claim, she knew that
 7         I had obtained -- I told her that I had obtained an
 8         attorney and that we were moving forward with a
 9         lawsuit.
10    Q.   Have you spoken with her recently about the case?
11    A.   What do you consider recently?
12    Q.   Within the past month.
13    A.   Yes.
14    Q.   What did you discuss with her within the past month
15         about this case?
16    A.   I told her that I was going to be going to a
17         deposition.
18    Q.   Does Ms. Johnson still work for Fluor?
19    A.   Ms. Johnson?
20    Q.   Yes.
21    A.   Yes.
22    Q.   Where does she work?
23    A.   In Afghanistan.
24    Q.   What is her current position; do you know?
25    A.   She's a Contracts manager.
```



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                          13

```
 1   Q.   Have you asked her to be a witness for you in this
 2        case?
 3   A.   No.
 4   Q.   Anyone -- any other current or former Fluor employees
 5        who you've spoken with about this case?
 6   A.   I spoke with Fred Coburn.
 7   Q.   Anybody else?
 8   A.   Karen Jack.
 9   Q.   Anyone else?
10   A.   Paul Gentry.
11   Q.   Anybody else?
12   A.   No one else that I can think of at this time.
13   Q.   Have you discussed the case with anybody who you
14        currently work with at Fluor?
15   A.   Yes.
16   Q.   Okay, who have you discussed the case with?
17   A.   My project manager.
18   Q.   Who's that?
19   A.   Henry Fuentes.
20   Q.   What have you told Henry about the case?
21   A.   I told him that I had a lawsuit with Fluor for
22        retaliation that happened while I was in Afghanistan.
23   Q.   And did you tell him any details or anything else about
24        the case?
25   A.   He knows of any appointments that I had when I had to
```



```
 1        come for -- to see EEOC; he knows of every appointment

 2        when I have to come and see my attorney.

 3   Q.   Okay, so you've had -- obviously, you've had to

 4        coordinate your schedule and let him know why you're

 5        going to be out of the office; is that why you told him

 6        about the case?

 7   A.   Yes.

 8   Q.   Did he have any issues with you being here today?

 9        Mr. Murphy:  Object to the form.  You were doing so

10        well, too.

11   Examination resuming by Mr. Samples:

12   Q.   Did he express to you any concerns about your coming

13        today or missing work related to the case?

14   A.   No.

15   Q.   Going back to Fred Coburn, you probably know what my

16        questions are going to be, but when did you last speak

17        with Mr. Coburn?

18   A.   I can't tell you the exact date, but it wasn't this

19        year.

20   Q.   Have you asked him to be a witness for you in this

21        case?

22   A.   No.

23   Q.   Is he somebody you stay in touch with?

24   A.   No.

25   Q.   What about Karen Jack, when did you discuss the case
```



TARA TAYLOR                                        April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS              15

1       with her?

2   A.  Yesterday.

3   Q.  What did you discuss with Ms. Jack about the case?

4   A.  Just talked to her about my trying to get prepared for

5       the deposition.

6   Q.  Did you ask her any questions or did she give you any

7       information?

8   A.  No.

9   Q.  Is Ms. Jack somebody you stay in touch with?

10  A.  Yes.

11  Q.  Does she still work for Fluor?

12  A.  Yes.

13  Q.  Would you consider her a friend?

14  A.  Yes.

15  Q.  What about Paul Gentry, when is the last time you

16      discussed the case with him?

17  A.  Some time last year.

18  Q.  Do you consider Mr. Gentry to be a friend?

19  A.  Yes.

20  Q.  Do the two of you stay in touch?

21  A.  No.

22  Q.  Does he still work for Fluor?

23  A.  I'm not sure.

24  Q.  Did he work for Fluor the last time you talked to him?

25  A.  Yes.



TARA TAYLOR                                             April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS              16

1   Q.   Have you asked him to be a witness for you in this

2        case?

3   A.   No.

4   Q.   You mentioned earlier that you reviewed your notes in

5        preparation for today; did you review anything else?

6   A.   Yes.

7   Q.   What else did you review?

8   A.   Information online about depositions, a video about

9        depositions.

10  Q.   Anything else?

11  A.   Not that I can recall.

12  Q.   All right, Ms. Taylor, have you ever been known by any

13       other names?

14  A.   Yes.

15  Q.   Okay, what names?

16  A.   Tara Denise Neal.

17  Q.   Is that N-e-a-l?

18  A.   That's correct.

19       And Tara Denise Bridgewater.

20  Q.   Was Neal your maiden name?

21  A.   Yes.

22  Q.   And Bridgewater is a name from an earlier marriage?

23  A.   Yes.

24  Q.   What's your birth date?

25  A.   January 2, 1967.



1  Q.  And what's your current address?

2  A.  The address that I reside at?

3  Q.  Yes.

4  A.  11508 Juliette Falls Drive, Jacksonville, Florida

5      32258.

6  Q.  You hesitated a bit; I assume you still have your home

7      in Union City?

8  A.  Yes.

9  Q.  What's the address there?

10 A.  8554 Lake Meadow Drive, Union City, Georgia 30291.

11 Q.  And is that where your husband lives?

12 A.  Yes.

13 Q.  Do the two of you own that property?

14 A.  Yes.

15 Q.  What about the place in Florida, do you own that or are

16     you renting there?

17 A.  Renting.

18 Q.  Is that an apartment, a house, a condo?

19 A.  House.

20 Q.  How big is the house?

21 A.  Approximately 2,300 square feet.

22 Q.  Does anybody live there with you?

23 A.  No.

24 Q.  How often do you visit your husband in Georgia?

25 A.  Twice -- at least twice a month.



```
 1   Q.   Does he come and visit you as well?

 2   A.   Yes, but not much.

 3   Q.   Do you and your husband have any other family that

 4        resides with you at either residence?

 5   A.   No.

 6   Q.   And what's your husband's name?

 7   A.   Andrew.

 8   Q.   Do you and Andrew have any children?

 9   A.   No.

10   Q.   Do you have any children from a prior marriage?

11   A.   No.

12   Q.   And your ex-husband, what's his name?

13   A.   Tony.

14   Q.   Tony Bridgewater?

15   A.   Yes.

16   Q.   Where does he live?

17   A.   In Savannah, Georgia.

18   Q.   Your husband, Mr. Taylor, does he work anywhere?

19   A.   Yes.

20   Q.   Where does he work?

21   A.   For the City of Atlanta.

22   Q.   What does he do for the City?

23   A.   A deputy solicitor.

24   Q.   I know solicitors in Georgia are different than in

25        South Carolina; is he an attorney?
```



1    A.    I'm not sure I understand the question.

2    Q.    Is your husband an attorney?

3    A.    Yes, he is.

4    Q.    How long has he been a deputy solicitor for the City of

5          Atlanta?

6    A.    Approximately 15 years.

7    Q.    What's your current monthly rent for your residence in

8          Florida?

9    A.    $1,990 monthly.

10   Q.    How long have you been in this -- the residence at

11         Juliette Falls?

12   A.    Little over three years.

13   Q.    You've been there the entire time that you've been in

14         Jacksonville?

15   A.    Yes.

16   Q.    And has your rent been about the same the entire time?

17   A.    No.

18   Q.    How has it changed?

19   A.    It goes up approximately $80 to $90 a year.

20   Q.    Do you and your husband have a mortgage on your home in

21         Union City?

22   A.    Yes.

23   Q.    Do you know what your monthly mortgage payment is?

24   A.    No.

25   Q.    Has your husband ever considered transferring to



```
 1        Florida or looking for a job in Florida?
 2   A.   No.
 3   Q.   Why not?
 4   A.   Because he has a career with the City of Atlanta.
 5   Q.   Have you considered looking for a job around Atlanta?
 6   A.   Yes.
 7   Q.   Have you done anything to look for a job around
 8        Atlanta?
 9   A.   Yes.
10   Q.   What have you done?
11   A.   Applied for jobs online.
12   Q.   What jobs have you applied for?
13   A.   HR positions, distributions type positions.
14   Q.   Did you get any interviews with any of those
15        applications?
16   A.   Yes.
17   Q.   Who interviewed you?
18   A.   I interviewed with Home Depot.
19   Q.   What was the position you were interviewing for with
20        Home Depot?
21   A.   Regional HR manager position.
22   Q.   About when was that interview?
23   A.   I can't remember the exact date.
24   Q.   Has it been within the last six months?
25   A.   Yes.
```



```
 1   Q.   Any other interviews besides with Home Depot?

 2   A.   Yes, I interviewed with, I can't recall the company's

 3        name, I think it's Interline or something like that,

 4        but it's a subsidiary of Home Depot.

 5   Q.   What position did you interview for there?

 6   A.   An HR manager position.

 7   Q.   When was that interview?

 8   A.   I don't know the exact date.

 9   Q.   Has it been within the last six months?

10   A.   Yes.

11   Q.   Have you received job offers from either of those

12        interviews?

13   A.   Yes.

14   Q.   Who gave you a job offer?

15   A.   Interline.

16   Q.   Did you accept that offer, do you plan to accept it, or

17        did you turn it down?

18   A.   I turned it down.

19   Q.   Why did you turn it down?

20   A.   Because the -- I initially thought the job would be in

21        Jacksonville, but the job -- they needed someone to go

22        to the west coast.

23   Q.   So you got a job offer to be an HR manager on the west

24        coast?

25   A.   Yes.
```



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                      22

1  Q.  Did they tell you specifically where they wanted you to
2      go?
3  A.  It was San Francisco.
4  Q.  How much were they going to pay you for that position?
5  A.  $85,000.
6  Q.  Have you had any other job interviews?
7  A.  Not that I can recall.
8  Q.  When you go to visit your husband in Atlanta, do you
9      typically drive there or fly there?
10 A.  Drive.
11 Q.  Has anyone lived in your home with either you or your
12     husband in the last five years?
13 A.  No.
14     Mr. Murphy:  What was the question?
15     Mr. Samples:  Has anyone lived in your home with either
16     you or your husband in the last five years.
17     Mr. Murphy:  With them?
18     Mr. Samples:  Yes.
19 Examination resuming by Mr. Samples:
20 Q.  Do you have any relatives who live in South Carolina?
21 A.  Yes.
22 Q.  Any that live in the upstate?
23 A.  No.
24 Q.  The reason I'm asking is I just -- I want to make sure
25     we don't put your cousin on the jury if we get to that



```
 1        point, so...
 2   A.   Oh.
 3        Mr. Murphy:  I've got plenty of cousins; don't worry
 4        about it.
 5   Examination resuming by Mr. Samples:
 6   Q.   Do you have a cell phone number, Ms. Taylor?
 7   A.   Yes.
 8   Q.   And what is your cell phone number:
 9   A.   (404) 274-5297.
10   Q.   I recognize that's an Atlanta number; is that a number
11        you've had for a while?
12   A.   Yes.
13   Q.   Did you have that the entire time you were working at
14        Fluor?
15   A.   Yes.
16   Q.   Do you have a personal computer?
17   A.   Yes.
18   Q.   Do you -- have you used that computer in any way
19        related to this lawsuit or your claims in this case?
20   A.   Yes.
21   Q.   Do you have a personal email address?
22   A.   Yes.
23   Q.   What is that?
24   A.   tarataylor9@yahoo.com.
25   Q.   How long have you had that email address?
```



```
 1   A.   A very long time.
 2   Q.   Did you have that while you were working on the LOGCAP
 3        project?
 4   A.   Yes.
 5   Q.   Do you use social media?
 6   A.   Yes.
 7   Q.   What kind of social media do you use?
 8   A.   Facebook.
 9   Q.   Are you very active on Facebook?
10   A.   No.
11   Q.   Have you posted anything on Facebook related to this
12        lawsuit?
13   A.   No.
14   Q.   Posted anything on Facebook related to your employment
15        with Fluor?
16   A.   No.
17   Q.   Do you use LinkedIn?
18   A.   No.
19   Q.   Twitter?
20   A.   No.
21   Q.   Any other social media?
22   A.   No.
23   Q.   Ms. Taylor, do you have any audio or video recordings
24        related to this case?
25   A.   No.
```



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                          25

```
1    Q.   Are you a member of any civic organizations?

2    A.   No.

3    Q.   Are you a member of any religious organizations?

4    A.   No.

5    Q.   Are you a member of or do you attend church anywhere?

6    A.   No.

7    Q.   Where did you go to high school?

8    A.   Lakeshore High School in College Park, Georgia, and I

9         went to high school in Riverdale, Georgia, North

10        Clayton Senior High School.

11   Q.   Which one did you graduate from?

12   A.   North Clayton Senior.

13   Q.   Did you go to college after that?

14   A.   Yes.

15   Q.   Where did you go to college?

16   A.   West Georgia State University.

17   Q.   Did you get a degree from West Georgia?

18   A.   Yes.

19   Q.   What degree was that?

20   A.   Mass Communication.

21   Q.   A Bachelors of Arts in Mass Communications?

22   A.   Yes.

23   Q.   Did you go to a grad school at any point?

24   A.   Yes.

25   Q.   Where did you go to grad school?
```



```
 1   A.   Central Michigan University.
 2   Q.   Did you go there in person or was that a distance
 3        learning?
 4   A.   Distance.
 5   Q.   What degree did you get, if any, from Central Michigan?
 6   A.   MSA in Health Administrative Services.
 7   Q.   Do you have any degrees in Human Resources?
 8   A.   No.
 9   Q.   Do you hold any professional licenses or
10        certifications?
11   A.   PHR.
12   Q.   When did you get your PHR certification?
13   A.   I can't -- it was a long time ago.
14   Q.   So you had that before you worked on the LOGCAP
15        project?
16   A.   Yes.
17   Q.   Do you have any other degrees or certificates?
18   A.   No.
19        Mr. Samples:  Ms. Taylor, I told you a moment ago that
20        Roshella James Smalls would be joining us.  She's an
21        in-house attorney for Fluor, so she just walked into
22        the room.
23   Examination resuming by Mr. Samples:
24   Q.   Ms. Taylor, have you ever declared bankruptcy?
25   A.   No.
```



1   Q.   Other than your residence in Union City, do you own any

2        other real property?

3   A.   Yes.

4   Q.   Where is that property located?

5   A.   It's Atlanta, downtown Atlanta.

6   Q.   What property do you own in downtown Atlanta?

7   A.   It's a condo at the Twelve Centennial.

8   Q.   How long have you owned that property?

9   A.   Maybe five years.

10  Q.   Do you rent that?

11  A.   No.

12  Q.   What do you use that property for?

13  A.   My husband stays downtown during the week.

14  Q.   I assume that's close to his work?

15  A.   Yes.

16  Q.   Ms. Taylor, have you been involved in any prior

17       lawsuits or have you been a party to any lawsuits,

18       other than this one?

19  A.   No.

20  Q.   Have you ever testified under oath before in connection

21       with a lawsuit or any type of court proceeding?

22  A.   No.

23  Q.   Have you ever filed an EEOC charge or any other similar

24       type claim against an employer before --

25  A.   No.



1    Q.    -- this case?  Okay.

2          Have you ever filed a workers' compensation claim?

3    A.    No.

4    Q.    Have you ever filed any other complaints with any

5          federal or state agency?

6    A.    Other than EEOC?

7    Q.    Yes.

8    A.    No.

9    Q.    Have you ever been charged with a crime?

10   A.    No.

11   Q.    I want to spend a little time now talking about the

12         employment that you had before you came to Fluor.

13         Where did you work before you came to Fluor?

14   A.    With Kellogg Brown and Root, KBR.

15   Q.    How long did you work with KBR?

16   A.    Approximately two years.

17   Q.    Was that from about 2007 to 2009?

18   A.    Yes.

19   Q.    What did you do with KBR?

20   A.    I was a Senior Operations Specialist.  I was also a

21         Liaison Officer.

22   Q.    I want to talk about each of those.  What is a Liaison

23         Officer?

24   A.    I was the middle person between the customer and the

25         company.



```
 1   Q.   Who was the customer?

 2   A.   The Army.

 3   Q.   What were you doing as the middle person between the

 4        Army and the company?

 5   A.   Basically dealt with the customer to determine their

 6        needs, determine if there were any issues or helped to

 7        resolve issues, kept up with the pulse of the customer,

 8        and then relayed all the information back to my boss.

 9   Q.   What was KBR doing with the Army?

10   A.   They were -- they had a contract where they basically

11        took care of everything for the Army.  They were in the

12        dining facilities, they did construction, water,

13        wastewater, all the trades.

14   Q.   Where was this job located?

15   A.   In Iraq.

16   Q.   Who was your supervisor at KBR?

17   A.   I don't recall.

18   Q.   When you were working at KBR, did you make any

19        complaints to HR about the way you were treated?

20   A.   No.

21   Q.   Bring up any complaints of retaliation?

22   A.   No.

23   Q.   You said you also worked as a Senior Operations

24        Specialist with KBR?

25   A.   That's close to the term.  I can't remember the exact
```



```
 1        term.
 2   Q.   What did you do in that position?
 3   A.   Basically worked in an -- they would call an operations
 4        cell; was responsible for all reporting to the
 5        government, keeping up with people coming, the total
 6        number of people on site, briefed the military on
 7        operation statuses, such as, you know, where -- how
 8        much water was produced, wastewater, things such as
 9        that.
10   Q.   Was this part of the same project in Iraq?
11   A.   Yes.
12   Q.   How long did you work in that position?
13   A.   Maybe a little over a year.
14   Q.   When you were working at KBR, did you work with any of
15        the same people who you later worked with at Fluor?
16   A.   Yes.
17   Q.   Who do you recall working with at KBR that worked with
18        you at Fluor?
19   A.   Dexter Hooks.
20   Q.   Anybody else?
21   A.   I can't recall anyone else.
22   Q.   What was your working relationship with Dexter Hooks
23        like at KBR?
24   A.   It's very minimum.  It was more of an introduction to
25        him because he worked in Contracts.
```



1    Q.    You didn't do any contracts work with KBR?

2    A.    No.

3    Q.    What did you do before you worked with KBR?

4    A.    I worked for Home Depot.

5    Q.    And what positions did you hold with Home Depot?

6    A.    An assistant distribution center manager, a

7          distribution center manager, transportation manager, HR

8          manager.

9    Q.    How long did you work for Home Depot?

10   A.    Almost eight years.

11   Q.    And it looks like that was from about 1999 to 2007; is

12         that right?

13   A.    Yes.

14   Q.    Why did you leave Home Depot to go to KBR?

15   A.    Just an opportunity that presented itself.

16   Q.    Did you leave Home Depot voluntarily?

17   A.    Yes.

18   Q.    It sounds like the work you were doing at KBR was very

19         different from the work you were doing at Home Depot;

20         is that fair to say?

21   A.    Yes.

22   Q.    What lead you to make that kind of change in your

23         career path?

24   A.    I guess I didn't consider it -- I didn't consider it a

25         change for me, only because I would be working with the



1      military and I had served in the military.

2  Q.   When you were working at Home Depot, did you work in

3       Atlanta or other places?

4  A.   Other places.

5  Q.   Where did you work when you were working for Home

6       Depot?

7  A.   I started in Savannah, Georgia, then went to Minnesota,

8       and went to New York, then went to Louisiana, and then

9       came back to Atlanta.

10 Q.   And during this time period, did your husband still

11      live in Atlanta?  I assume he had the job at the

12      solicitor -- as the assistant solicitor?

13 A.   I was not married at --

14 Q.   Okay.

15 A.   I was not married to my current husband.

16 Q.   When did you marry Andrew?

17 A.   We were married in 2003, so I met him while I lived in

18      New York.  And then we got married and I eventually

19      moved to Atlanta.  So I was married to him, yeah, only

20      when I moved back to Atlanta.

21 Q.   You mentioned a moment ago that you also spent time in

22      the Army?

23 A.   Yes.

24 Q.   How long were you in the Army?

25 A.   A total of 11 and a half years with reserve and active



1        duty time.

2   Q.   During what time period was this?

3   A.   I was in the reserves throughout -- right after high

4        school and college, and then I went on active duty

5        after I graduated from college.

6   Q.   So when you were in college, did you participate in the

7        ROTC program?

8   A.   I did.

9   Q.   When you went on active duty, what was your rank?

10  A.   A second lieutenant.

11  Q.   What was the highest rank you obtained in the Army?

12  A.   Captain.

13  Q.   Why did you leave the Army?

14  A.   I never planned to retire.

15  Q.   Were you honorably discharged?

16  A.   Yes.

17  Q.   Did you see any combat action when you were in the

18       Army?

19  A.   No.

20  Q.   What was your job in the Army?

21  A.   I was an Ordnance Officer.

22  Q.   What do you do as an Ordnance Officer?

23  A.   It was the maintenance side of Ordnance and you're

24       basically in charge of soldiers that do maintenance on

25       weapon systems, tanks, generators, vehicles, and



```
 1          support other classifications in the military.
 2    Q.    Where were you based when you were working with the
 3          Army?
 4    A.    I was based in Germany and Maryland.
 5    Q.    Did you receive any medals or any kind of recognition
 6          from your service with the Army?
 7    A.    Yes.
 8    Q.    What recognition did you receive?
 9    A.    I can't recall the name of them.
10    Q.    Have you ever been terminated, fired, or asked to leave
11          involuntarily from any prior employment?
12    A.    No.
13    Q.    Going back to your job at KBR, did you receive any
14          hazard pay or hardship allowance by virtue of working
15          in Iraq?
16    A.    Yes.
17    Q.    What was that pay like?
18    A.    I can't remember the percentages.
19    Q.    But it was a percentage above your base pay?
20    A.    That -- yes.
21    Q.    Was it similar to the hazard pay and hardship allowance
22          that you later received at Fluor?
23    A.    What do you mean by similar?
24    Q.    Was it a similar percentage?
25    A.    No; Fluor's percentage -- I remember that Fluor's
```



TARA TAYLOR                                          April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS              35

1         uplift percentage was higher.

2    Q.   I want to talk now about your employment with Fluor.

3         When did you start working with Fluor?

4    A.   April 2007 -- wait a minute, no, April 19 -- I can't

5         remember now.

6    Q.   April 2009?

7    A.   Thank you.

8    Q.   And so did you leave KBR to go to Fluor?

9    A.   Yes.

10   Q.   Was there any break in your employment between KBR and

11        Fluor?

12   A.   No.

13   Q.   What lead you to apply for the job at Fluor?

14   A.   They were phasing out the Liaison Officer position and

15        I had an opportunity to either go back in operations

16        and I decided to apply for the position -- positions

17        elsewhere.

18   Q.   So the job that you had at KBR was going to be

19        eliminated; is that correct?

20   A.   That's correct.

21   Q.   How did you hear about Fluor and what lead you to apply

22        there?

23   A.   There was a gentleman that worked for KBR that had

24        gotten a position there at Fluor and told me about

25        Fluor.



```
 1   Q.   Who is that?

 2   A.   I can't recall his name.

 3   Q.   When you started working at Fluor, what was your first

 4        position?

 5   A.   Operations.

 6   Q.   Do you remember what --

 7   A.   Operations Specialist.

 8   Q.   What did you do as an Operations Specialist?

 9   A.   At that time, they had just -- they were looking to be

10        awarded a contract, so I really didn't do much more

11        than support the project manager.

12   Q.   Was it similar to the type of work you were doing with

13        KBR?

14   A.   It would have been similar had I remained in Operations

15        once the project came on -- once the project started.

16   Q.   Was it similar to any of the kind of work you did at

17        KBR?

18   A.   It would have been similar if I had stayed in

19        Operations.

20   Q.   So you didn't have any background in Operations from

21        KBR?

22   A.   Yes.

23   Q.   You started in Operations and then you went to the

24        Liaison position; is that right?

25   A.   Yes.
```



1   Q.   So the initial position you had with KBR, was that

2        similar to what you were doing initially at Fluor?

3   A.   No, because we -- the project had -- they were waiting

4        for the -- to be awarded a project, so it was more of a

5        build up.

6   Q.   Now, Fluor uses the terms tier one and tier two to

7        refer to different types of positions; the initial

8        position you had with Fluor, was that a tier one or a

9        tier two position?

10  A.   Tier two.

11  Q.   And what's your understanding of the difference between

12       tier one and tier two?

13  A.   Tier two, you are basically a contractor; tier one,

14       you're actually an employee of the company.

15  Q.   Is it fair to say that tier one employees have better

16       benefits?

17  A.   No, that's not fair to say.

18  Q.   At some point, you moved from a tier one to -- a tier

19       two, rather, to a tier one, right?

20  A.   Yes.

21  Q.   When you did that, did you -- did your benefits change?

22  A.   The only -- well, one, I became an employee of the

23       company and two, the only thing I can think of now is

24       401k; I had an opportunity to participate in the 401k.

25  Q.   And that wasn't something you had as a tier two?



1  A.   That's correct.

2  Q.   As far as your ability to move within Fluor, who would

3       you say has more flexibility and mobility within the

4       company, tier ones or tier twos?

5       Mr. Murphy:  Object to the form.

6  Examination resuming by Mr. Samples:

7  Q.   You still have to answer.

8       Mr. Murphy:  Yeah, if I do that and you understand the

9       question, you just continue to answer.

10 A.   Can you repeat the question?

11 Q.   Yeah.  Based on your experience, who has more mobility

12      within Fluor, tier one or tier two?

13      Mr. Murphy:  Same objection.

14 A.   Well, what do you mean by mobility?

15 Q.   The ability to move to different projects within the

16      company?

17      Mr. Murphy:  Same.

18 A.   I would say the same because you still have to apply

19      for a position.

20 Q.   Had you rather be a tier one or a tier two?

21 A.   A tier one.

22 Q.   Why do you say that?

23 A.   Because I am offered a 401k and I am considered an

24      employee of the company.

25 Q.   Would you say that carries with it a certain status



```
 1         that tier two doesn't?
 2   A.    I wouldn't say that, no.
 3   Q.    In your experience in working with other people and in
 4         working with HR, do people typically want to be tier
 5         ones or do they want to be tier twos?
 6         Mr. Murphy:  Object to the form.
 7   A.    I'd say tier one.
 8   Q.    So the position you started in, you said it was an
 9         Operations Specialist position; is that right?
10   A.    Yes, I believe that's the term.
11   Q.    And this was on the LOGCAP project, correct?
12   A.    Yes.
13   Q.    Just tell us in your own words what the LOGCAP project
14         is?
15   A.    It's a project that the company was awarded by the
16         government, by the U.S. government, to take care of
17         soldiers in Afghanistan.
18   Q.    So it was basically civilian workers who are supporting
19         the military effort in Afghanistan?
20   A.    Yes.
21   Q.    Now, when you were on the LOGCAP project, the number of
22         civilian workers fluctuated a lot, didn't it?
23   A.    Yes.
24   Q.    During your tenure on the LOGCAP project, at what point
25         and time was the number of civilian employees or
```



1         workers the greatest?

2    A.   I'm not sure.

3    Q.   Do you know at what point the number of workers was the

4         lowest?

5    A.   No.

6    Q.   Wasn't the number of civilian workers at its lowest at

7         the time you left the project in September 2014?

8    A.   I really can't answer that because I don't know what it

9         was when I left.

10   Q.   Let me ask it this way; were there more people, more

11        civilians, working on LOGCAP when you started or when

12        you left?

13   A.   When I started.

14   Q.   And throughout the time you were working on the LOGCAP

15        project, generally speaking, the number of civilian

16        workers went down, correct?

17   A.   It fluctuated.

18   Q.   But in looking at the general picture, it went down --

19        it went down a lot between the time you started and the

20        time you finished, right?

21   A.   Yes.

22   Q.   And there were bases that were open when you started

23        that were closed when you finished, right?

24   A.   Yes.

25   Q.   And there weren't any new bases that opened up during



```
 1          the time that you were on the project; is that right?
 2   A.   No, that's not right.
 3   Q.   Okay, how many bases opened when you were working on
 4        the project?
 5   A.   I don't recall how many.
 6   Q.   But you recall at least one?
 7   A.   I don't recall.  I -- yes.
 8   Q.   Do you know how many bases closed while you were on the
 9        project?
10   A.   I don't know the exact number.
11   Q.   It was at least two dozen, wasn't it?
12   A.   Yes.
13   Q.   And significantly less than that number of new bases
14        opened while you were there, right?
15   A.   Yes.
16   Q.   So the total number of bases that was open on the
17        project declined between the time you started in 2009
18        and the time you left in 2014?
19   A.   Yes.
20   Q.   And -- well, instead of telling you, why don't you tell
21        me, do you know why the number of bases went down?
22   A.   Yes.
23   Q.   Why was that?
24   A.   Because the government made decisions to start closing
25        some of the bases.
```



1  Q.  And as the government closed bases, the number of

2      military personnel in Afghanistan declined, correct?

3  A.  Yes.

4  Q.  And that was part of the stated policy of the Obama

5      administration to reduce the number of troops that were

6      in Afghanistan, correct?

7  A.  Yes.

8  Q.  Do you know how many bases closed between January 1,

9      2013 and September 2014?

10 A.  No.

11 Q.  There were some that closed during that period, though,

12     right?

13 A.  I'm sure there were.

14 Q.  Any idea how many Fluor employees were let go during

15     the time period between 2009 and 2014?

16 A.  No.

17 Q.  Would it surprise you to hear that that number was in

18     the thousands?

19 A.  No.

20 Q.  Did you know people who were laid off?

21 A.  I know of people that were laid off.

22 Q.  Anybody that you worked closely with who was laid off?

23     Mr. Murphy:  What's your time period, Chase?

24     Mr. Samples:  Throughout the entire project.  That's a

25     fair point.



TARA TAYLOR                                          April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                43

```
 1   Examination resuming by Mr. Samples:
 2   Q.   So during the entire time you were on the project, did
 3        anybody that you worked closely with get laid off?
 4   A.   I can't recall.
 5   Q.   Do you recall anybody in Prime Contracts who was let go
 6        because of a base closure?
 7        Mr. Murphy:  Can we confer just a second?
 8        Mr. Samples:  Sure.  Let's go off the record.
 9   (Off the record at 10:14 a.m.)
10   (On the record at 10:18 a.m.)
11   Examination resuming by Mr. Samples:
12   Q.   All right, Ms. Taylor, we're back on the record after a
13        short break.
14        I want to clarify something that we were talking about
15        before we went on the break because I want to make sure
16        my words are clear.  When I say let go, I mean released
17        from the project, or laid off from the project; does
18        that make sense?
19   A.   Yes.
20   Q.   Okay, so with using that definition, more -- you would
21        -- did you know anybody who was released from the
22        project who worked with you in Prime Contracts during
23        the entire time you were on the project?
24   A.   Okay, define released for me.
25   Q.   Again, released would be let go from the project, so --
```



1          and I understand, some people were let go from the

2          project and remained with the company on other projects

3          or got transferred to another project, others were just

4          let go and went somewhere else entirely.  So do you

5          know anybody -- let's just take each of those; do you

6          know anybody who was released from the project and then

7          went to work on another project?

8     A.   Yes.

9     Q.   Do you know anybody who was released from the project

10         and then never worked -- or didn't go to work for Fluor

11         after that?

12    A.   Yes.

13    Q.   Who?

14    A.   I can't recall the names at this time.

15    Q.   Would those have been people who worked with you in

16         Prime Contracts?

17    A.   There was at least one that I can recall that worked in

18         Prime Contracts.

19    Q.   And do you know the reason why that person was released

20         from the project?

21    A.   No.

22    Q.   Now, sometimes Fluor would restructure departments,

23         even if there wasn't a base closure; is that right?

24    A.   Yes.

25    Q.   And sometimes Fluor would restructure departments based



1    on the needs of the customer, the government customer,

2    correct?

3  A.  Yes.

4  Q.  As part of that restructuring, people would be moved

5    around, right?

6  A.  Yes.

7  Q.  Were you ever moved around as part of any

8    restructuring?

9  A.  Not that I can recall.

10  Q.  Did you ever move around to different bases during your

11    time on the project?

12  A.  Yes.

13  Q.  And just walk me through that; when you started in

14    2009, where were you working?

15  A.  I was working in Bagram.

16  Q.  How long did you stay in Bagram?

17  A.  I was only there for a short period of time when I

18    first started and left and then returned and was in

19    Bagram when I returned.  I can't remember the exact

20    amount of time that I was there.

21  Q.  Let me -- I guess I'm getting ahead of myself a little

22    bit so let's just pause on that question; we'll come

23    back to that.

24    Just sticking with that initial period of employment

25    that you had with Fluor in 2009, did you receive any



1    |        training when you started?

2    | A.    What training?  I don't --

3    | Q.    Training in terms of how to do the job or what to

4    |        expect from working at Fluor or anything like that; any

5    |        kind of orientation?

6    | A.    Yes.

7    | Q.    What did that orientation consist of?

8    | A.    Just talked about the -- trying to prepare you for the

9    |        conditions in Afghanistan, safety type training; mostly

10   |        that.

11   | Q.    Do you know who provided that training?

12   | A.    What do you mean by who?

13   | Q.    Do you remember the person that did the training?

14   | A.    I remember one person, Janet, but I can't think of her

15   |        last name.  I also remember Jeff Uribe giving a course

16   |        while we were in training.  I can't think of anyone

17   |        else.

18   | Q.    Were you given copies of any Fluor policies when you

19   |        started working?

20   | A.    I can't recall.

21   | Q.    Were you given an employee handbook or a policy manual?

22   |        Mr. Murphy:  Are you referring to when she started

23   |        working in Afghanistan in 2011?

24   |        Mr. Samples:  Well, I was referring to 2009.

25   |        Mr. Murphy:  Oh.



1          Mr. Samples:  But I can ask the question more broadly.

2     Examination resuming by Mr. Samples:

3     Q.   Either in 2009 or 2011, when you started working with

4          Fluor, did you receive a copy of an employee handbook?

5     A.   No.

6     Q.   What about a policy manual or anything similar to that,

7          either in 2009 or 2011?

8     A.   I can't recall receiving any type of policy manuals.

9     Q.   At any point when you were working on the LOGCAP

10         project, did anybody provide you with a policy manual

11         or employee handbook?

12    A.   At any time that I was working on the project?

13    Q.   Yes.

14    A.   I can't recall.

15    Q.   Are you familiar with policy HR 705?

16    A.   Yes.

17    Q.   Were you ever given a copy of that policy when you were

18         working on the LOGCAP project?

19    A.   I don't recall being given a copy of the policy.

20    Q.   Did you have access to that policy?

21    A.   Yes.

22    Q.   How could you access that policy?

23    A.   If you went to HR, and I'm sure if you went on the

24         Fluor LOGCAP portal that you'd have access to policies.

25    Q.   Did you ever try to access policy HR 705?



```
 1   A.   Yes.

 2   Q.   When?

 3   A.   When I was -- when I was being retaliated against.

 4   Q.   Okay, anytime before that did you try to access that

 5        policy?

 6   A.   Not that I can recall.

 7   Q.   When you started working at Fluor, either in 2009 or in

 8        2011, did you receive any training on Fluor's anti-

 9        harassment or anti-retaliation policies?

10   A.   Yes.

11   Q.   What training did you receive on those?

12   A.   Just classroom training.

13   Q.   What did it consist of?

14   A.   They talked about Fluor's stance on harassment and the

15        different types of harassment; reporting -- making any,

16        you know, reports of harassment; and they also talked

17        about the hotline being available to employees if you

18        had a complaint; and they discussed Fluor's stance on

19        retaliation.

20   Q.   What was Fluor's stance on retaliation?

21   A.   That it was not tolerated.

22   Q.   And you understood, and I think based on what you just

23        told me, that there were procedures in place if you

24        wanted to report harassment or retaliation, there was

25        an avenue or avenues to do that, right?
```



```
 1   A.   Yes.
 2   Q.   And you mentioned the hotline; were there any other
 3        avenues to report harassment or retaliation?
 4   A.   You could -- and this is in Afghanistan?
 5   Q.   Yes.
 6   A.   You could go to HR directly.
 7   Q.   Any other avenues that you were aware of?
 8   A.   You had your chain of command.
 9   Q.   During your time on the LOGCAP project, I know you made
10        some hotline calls; did you also complain up the chain
11        of command at any point about retaliation?
12   A.   No.
13   Q.   Did you complain directly to HR in Afghanistan about
14        retaliation?
15   A.   At what point?
16   Q.   At any point when you were on the project?
17   A.   Yes.
18   Q.   When did you do that?
19   A.   After I called the hotline.
20   Q.   And -- okay, the HR folks you spoke with, were those
21        the ones who came -- who were doing an investigation in
22        connection with the hotline or did you speak to some
23        local HR person about your concerns?
24   A.   One local HR person.
25   Q.   Who was that?
```



1  A.   Pete Irvin.

2  Q.   What did you discuss with Pete Irvin?

3       Mr. Murphy:  Win, right?  Irwin or Irvin?

4       Ms. Taylor:  I can't -- I think it's Irvin.

5  Examination resuming by Mr. Samples:

6  Q.   What did you discuss with Pete Irvin?

7  A.   I talked to him about the treatment from Ron Riley.

8  Q.   When was this?

9  A.   I can't recall exactly when it was.

10 Q.   This would have been after you made the hotline call?

11 A.   Yes.

12 Q.   What did Mr. Irvin tell you?

13 A.   He told me that he had spoken with Ron Riley and he

14      said -- and that Ron Riley had made -- had told him

15      about some concerns that he had with Niki and I and he

16      told me that he had advised Ron Riley on a couple of

17      issues.

18 Q.   Did he tell you what those issues were?

19 A.   One issue was Ron wanting to write Nikoletta Klimak --

20      wanted to discipline Nikoletta Klimak, and the other

21      issue was Ron Riley making decisions for the Bagram

22      office that wasn't made for the other offices.

23 Q.   Okay, what did -- did Mr. Irvin tell you specifically

24      what he told Mr. Riley about those two things?

25 A.   I can't recall exactly what he said about Nikoletta,



1      only that I know that she was not disciplined for what
2      he wanted her disciplined for, and for the -- making a
3      policy or giving guidelines or instructions to the
4      Bagram office and not other offices, he told him that
5      he advised him that if he wanted to make that policy
6      that he needed to -- he needed to put it out to
7      everyone.
8  Q.  Was this just a single conversation you had with Pete
9      Irvin?
10 A.  No.
11 Q.  You had more than one conversation with him?
12 A.  Yes.
13 Q.  How many conversations did you have with him?
14 A.  Maybe three.
15 Q.  Did the two of you discuss anything else besides what
16     you described to me?
17 A.  We discussed the night that I was being RIF'd.
18 Q.  Was he the person who met with you to talk about that?
19 A.  Yes.
20 Q.  We'll talk about that a little bit later.
21     You said you had three conversations; one related to
22     the RIF, one related to the concerns about Ms. Klimak's
23     discipline and the Bagram office being treated
24     differently; do you remember what the other
25     conversation was about?



```
 1   A.   I don't.
 2   Q.   Going back now, we're getting ahead of ourselves a
 3        little bit, but I want to spend a little bit of time
 4        going through the different positions you held on the
 5        LOGCAP project and you foreshadowed this a minute ago,
 6        but you said your initial position, you didn't stay in
 7        very long; is that right?
 8   A.   Yes.
 9   Q.   You started in April 2009, I believe you said; is that
10        right?
11   A.   Yes.
12   Q.   When did you leave?
13   A.   It was shortly after, I'd say no more than three months
14        after.
15   Q.   Does July 2009 sound right?
16   A.   Yes.
17   Q.   And did you decide to leave on your own?
18   A.   Yes.
19   Q.   Why did you leave?
20   A.   My father was sick and he had cancer, so I went home
21        for him.
22   Q.   All right, eventually you decided to come back to
23        Fluor; is that right?
24   A.   Yes.
25   Q.   When were you rehired?
```



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                        53

```
 1   A.   It was towards the end of the year, the same year.
 2   Q.   November 2009, does that sound right?
 3   A.   That sounds correct.
 4   Q.   And were you rehired back into the same position you
 5        had when you left?
 6   A.   Yes.
 7   Q.   Why did you decide to come back to Fluor?
 8   A.   Because I enjoyed working for the company.
 9   Q.   Were your job duties any different when you came back
10        than they were when you started?
11   A.   Yes.
12   Q.   How were they different?
13   A.   A lot of the procedures had been -- a lot of procedures
14        had been put in place that weren't there when I first
15        started, so I started doing reports and attending
16        government meetings.
17   Q.   And you were still in the Operations Coordinator
18        position?
19   A.   Yes.
20   Q.   Were you working at Bagram?
21   A.   Yes.
22   Q.   Do you recall what your pay was in that position?
23   A.   No, I can't recall right now.
24   Q.   Does annual salary of $54,000 sound right?
25   A.   Yes.
```



1   Q.   And then you had uplifts on top of that?

2   A.   Yes.

3   Q.   Do you recall what those were?

4   A.   To the best of my knowledge, it was 80 percent and then

5        -- which included hazard pay and things such as that.

6   Q.   When you came back in November of 2009, who was your

7        supervisor?

8   A.   Norman McCullom.

9   Q.   Is that who you reported to before, before you left?

10  A.   No.

11  Q.   How long did you work as an Operations Coordinator?

12  A.   I can't recall, but not long.

13  Q.   Was it until May of 2010?

14  A.   I'm not sure, but that -- that's possible.

15  Q.   And when you were an Operations Coordinator, were you

16       based at Bagram the entire time?

17  A.   Yes.

18  Q.   Why did you leave that assignment?

19  A.   Because I was promoted into a Contract Specialist

20       position.

21  Q.   So you went from an Operations Coordinator to a

22       Contract Specialist?

23  A.   Yes.

24  Q.   When was that?

25  A.   That would have been in 2010.



1    Q.   The position you had with Operations, was that a tier

2         two position?

3    A.   Yes.

4    Q.   What about the new position as a Prime Contract

5         Specialist, was that also a tier two position?

6    A.   Yes, initially.  Yes.

7    Q.   And you said you started that position in early 2010?

8    A.   I started it in 2010.

9    Q.   And this was your first position in Prime Contracts?

10   A.   Yes.

11   Q.   What lead you to transfer over to the Prime Contracts

12        department?

13   A.   I spoke with the project manager and I told him that I

14        wanted more of a challenge and he spoke with the

15        Contracts director at the time and they allowed me to

16        go into that position.

17   Q.   Do you recall who those people were who you spoke with?

18   A.   Yes.

19   Q.   Who was that?

20   A.   George Rabb was the country manager or project manager,

21        and Helen Tyrone was the director of Contracts.

22   Q.   Who did you report to when you started in Prime

23        Contracts?

24   A.   Helen Tyrone.

25   Q.   Were you working at Bagram?



```
 1    A.    Yes.

 2    Q.    How long did you remain in that Principal Specialist

 3          position at Bagram?

 4    A.    I'm not sure.

 5    Q.    Was it for about a year?

 6    A.    I'm not sure of the amount of time.

 7    Q.    Okay, let me ask you this; what did you do after that;

 8          did you have another promotion within the company?

 9    A.    At some point I became a tier one while in that

10          position.

11    Q.    And did you become a tier one in Afghanistan or

12          somewhere else?

13    A.    In Afghanistan.

14    Q.    At some point you transferred to Greenville; is that

15          right?

16    A.    Yes.

17    Q.    Why did you do that?

18    A.    It was a short-term assignment for me to be in

19          Contracts at the home office.

20    Q.    How did that differ from the Contracts work you were

21          doing in Afghanistan?

22    A.    I didn't deal with the military.

23    Q.    Okay, who did you deal with?

24    A.    I had a Contracts manager and we dealt with the

25          administrative contracting officer.
```



1  Q.  Do you recall when you left to take the position in

2      Greenville?

3  A.  Not exactly.

4  Q.  Ms. Taylor, throughout the day I'm going to show you

5      some documents and these are going to be marked as

6      exhibits and I'm just going to refer to them by their

7      exhibit number.  This is the first one we'll look at.

8      The court reporter is marking it as Exhibit Number One.

9          (Defendant's Exhibit Number One is marked.)

10  Examination resuming by Mr. Samples:

11  Q.  Do you recognize this document?

12  A.  Yes.

13  Q.  This is your resignation letter indicating that you had

14      accepted a tier one position with Fluor in Greenville,

15      correct?

16  A.  Yes.

17  Q.  And it's dated -- it looks like you signed it on March

18      10, 2011, right?

19  A.  Yes.

20  Q.  And that is your signature?

21  A.  Yes.

22  Q.  And it was to become effective March 21, 2011, correct?

23  A.  Yes.

24  Q.  Is that when you started working in Greenville?

25  A.  I don't remember the exact date that I started.



1   Q.   Was it around that time period?

2   A.   Yes.

3   Q.   And the position in Greenville had a higher base salary

4        than the position you had before; is that right?

5   A.   Yes.

6   Q.   Do you recall what your base salary was?

7   A.   I do not.

8   Q.   Does $75,000 sound right?

9   A.   Yes.

10  Q.   Who did you report to in Greenville?

11  A.   Karen Jack.

12  Q.   How long did you work in Greenville?

13  A.   Not long; maybe six months.

14  Q.   Until about October 31st; does that sound right?

15  A.   Yes.

16  Q.   Why did you leave Greenville?

17  A.   I was finished with my assignment there and wanted to

18       go back to the field.

19  Q.   So your -- I think you said earlier it was a short-term

20       assignment to come to Greenville?

21  A.   Yes.

22  Q.   And that term ended at the end of October; is that

23       right?

24  A.   Yes.

25  Q.   And you went back to Afghanistan after that?



1    A.   Yes.

2    Q.   Why did you want to go back to Afghanistan?

3    A.   Because I like working in the field.

4    Q.   When you went back to Afghanistan, what base were you

5         assigned to?

6    A.   I can't recall for -- I can't recall.  I think it was

7         Shank, but I can't recall.

8    Q.   You were still a Prime Contracts Principal Specialist?

9    A.   Yes.

10   Q.   Did your pay change when you went back to Afghanistan?

11   A.   No.

12   Q.   How did the job duties in Afghanistan in your new

13        position in October 2011 compare to what you were doing

14        in Greenville?

15   A.   I dealt more directly with the customer.

16   Q.   Who did you report to when you went back to

17        Afghanistan; do you remember?

18   A.   No, I don't.

19   Q.   From October 2011 until about February 2014, you worked

20        in Afghanistan on the LOGCAP project as a Principal

21        Specialist; is that right?

22   A.   Yes.

23   Q.   Did your job duties change much during that time

24        period?

25   A.   No.



1  Q.  Did you move around to different bases during that time

2      period?

3  A.  I'm sorry, could you please go back to the question

4      before that?

5  Q.  Yeah, your job duties between October 2011 and February

6      2014, --

7  A.  Oh.

8  Q.  -- you said you were working as a Principal Specialist,

9      right?

10 A.  Yes.

11 Q.  My question was, did your job duties change very much

12     during that time period?

13 A.  No.

14 Q.  Did your supervisor -- who were your supervisors during

15     that time period?

16 A.  A gentleman by the name of David Minton, temporarily,

17     Ron Riley, Dexter Hooks, oh, Alan Boege or Boege.

18 Q.  How do you spell Alan's last name?

19 A.  It's B-o-e-g-e.  I'm not sure.

20 Q.  Okay.  Anybody else who you can recall?

21 A.  What names have I given you?

22 Q.  You've given me Ron Riley, Dexter Hooks, Alan Boege,

23     and think I think you said David Millon.

24 A.  Minton.

25 Q.  Minton; okay.  I can't read my own writing.



```
 1   A.   I can't think of anyone else.

 2   Q.   What bases did you work on during that time period?

 3   A.   I recall working on Shank, I recall working on Salerno

 4        and Bagram during that time period.

 5   Q.   You said Ron Riley was one of your supervisors; do you

 6        recall when he became your supervisor?

 7   A.   I don't recall.  No, I don't recall when.

 8   Q.   Prior to February 2014, did you raise any concerns

 9        about discrimination or retaliation?

10   A.   Prior to February 2014?

11   Q.   Yes.

12   A.   No.

13   Q.   And I assume that's because you didn't experience any

14        discrimination or retaliation?

15   A.   That's correct.

16   Q.   In February of 2014, you were promoted to the position

17        of Prime Contracts Supervisor; is that right?

18   A.   Yes.

19   Q.   Do you know who recommended you for this promotion?

20   A.   Yes.

21   Q.   Who is that?

22   A.   Ron Riley.

23   Q.   So Ron Riley was your supervisor at least by February

24        of 2014?

25   A.   Yes.
```



1    Q.   Do you know about how long he had been your supervisor

2         at that point?

3    A.   I'm sure over a year.

4         Mr. Samples:  Let's mark this as Exhibit Two.

5              (Defendant's Exhibit Number Two is marked.)

6    Examination resuming by Mr. Samples:

7    Q.   Ms. Taylor, you've been handed what's been marked as

8         Exhibit Number Two.  Do you recognize this as the

9         letter informing you of your promotion to the Prime

10        Contracts Supervisor position?

11   A.   Yes.

12   Q.   And, according to this document, your salary was going

13        up to a base salary of $85,574; is that right?

14   A.   Yes.

15   Q.   And that was up about $5,000 from your base salary

16        before.

17   A.   Yes.

18   Q.   Is that right?  Okay.

19        And you were also eligible for a salary uplift in this

20        position, correct?

21   A.   Yes.

22   Q.   And was it 80 percent at that time?

23   A.   Yes.

24   Q.   And a portion of that is attributed to a hardship

25        allowance and a portion is attributed to hazard pay,



```
 1        right?
 2   A.   Yes.
 3   Q.   And is the hardship allowance, is that because you're
 4        working away from home?
 5   A.   And the austere conditions.
 6   Q.   And the hazard pay, is that pay you get by virtue of
 7        working in a military zone?
 8   A.   It's pay you get for working in a war zone.
 9   Q.   And you were also eligible for four R and R periods
10        each year, correct?
11   A.   Yes.
12   Q.   How long could you take for each period of R and R, how
13        many days?
14   A.   21 days.
15   Q.   So you could be on R and R for a total of 84 days a
16        year?
17   A.   Yes.
18   Q.   In this new position, Prime Contract Supervisor, did
19        you have any direct reports?
20   A.   No.
21   Q.   With this promotion, did your supervisor change?
22   A.   No.
23   Q.   You still reported to Ron Riley?
24   A.   Yes.
25   Q.   Did your job duties change in any way related to this
```



1        promotion?

2   A.   No.

3   Q.   You did get to move up to the second floor following

4        the promotion, right?

5   A.   Yes.

6   Q.   And did you prefer working on one floor over another?

7   A.   Yes.

8   Q.   Which floor did you prefer working on?

9   A.   On the second floor.

10  Q.   And the Prime Contracts office, that was on the first

11       floor, right?

12  A.   Yes.

13  Q.   Why did you prefer the second floor over the first

14       floor?

15  A.   So I think I need to make a correction.

16  Q.   Okay, go ahead.

17  A.   I think you asked me did my job duties change when I

18       was promoted to supervisor?

19  Q.   Yes.

20  A.   And I said no, but when I moved to the second floor, I

21       had additional duties.

22  Q.   And I'm glad you corrected that; I was going to ask you

23       about those.  So what additional duties did you take on

24       when you went to the second floor?

25  A.   I took on close-out duties.



1    Q.   And what are close-out duties?

2    A.   Trying to get -- duties where you were preparing to

3         close the project out.

4    Q.   And that wasn't anything you had ever done as a

5         Principal Specialist, was it?

6    A.   No.

7    Q.   Going back to the question I asked you a minute ago,

8         was there a reason you preferred the second floor over

9         the first floor?

10   A.   Because I took on those additional duties and I felt it

11        was a promotion for me.

12   Q.   Did you have a sense that being on the second floor

13        gave you more status?

14   A.   No.

15   Q.   So with these close-out duties, you had

16        responsibilities that members -- other members of the

17        Prime Contracts team in Bagram did not have; is that

18        correct?

19   A.   Yes.

20   Q.   Other than the close-out duties, did you have any other

21        job duties that other members of your team did not

22        have?

23   A.   No.

24   Q.   In your role as supervisor, did you fill in for the

25        manager if the manager was on R and R?



```
 1   A.   Yes.

 2   Q.   And at this time, in February 2014, your manager was

 3        Kelvin Johnson; is that right?

 4   A.   Yes.

 5   Q.   How long had you worked with Kelvin?

 6   A.   I'm not really sure.  I'm not sure of the time -- the

 7        amount of time.

 8   Q.   Okay.  Had you worked with Kelvin before you came to

 9        Fluor?

10   A.   No.

11   Q.   Didn't know him before you came to Fluor?

12   A.   No.

13   Q.   How would you describe your relationship with Kelvin

14        Johnson?

15   A.   We had a good relationship.

16   Q.   Did you guys spend any time together away from the

17        office?

18   A.   Go to the gym.

19   Q.   Did y'all have any meals together?

20   A.   Yes.

21   Q.   And I think you told me earlier, you've stayed in touch

22        with Mr. Johnson, right?

23   A.   Yes.

24   Q.   You consider him to be a friend?

25   A.   Yes.
```



```
 1   Q.   Did you consider him a friend at the time you were
 2        working with him?
 3   A.   He became a friend.
 4   Q.   Did you have any other friends in the Prime Contracts
 5        department at Bagram?
 6   A.   Yes, everyone that worked in Prime Contracts in Bagram.
 7   Q.   Okay, who would that be?
 8   A.   John Cahill, Matthew Sanai.
 9   Q.   How do you spell Matthew's last name?
10   A.   S-a-n-a-i; I think that's it.
11        Nikoletta Klimak, Alan Krapa.
12   Q.   Any other friends in Prime Contracts?
13   A.   Any other friends?  Oh, Dexter Hooks, Kimberly Johnson,
14        Alan Boege was a friend.
15   Q.   Anybody else?
16   A.   I'd say that Ron Riley was a friend.
17   Q.   The witnesses who you've identified, I know we talked
18        about some of them earlier on in your deposition, of
19        these you've listed, have you asked any of these folks
20        to be witnesses for you?
21   A.   No.
22   Q.   Okay.
23   A.   And I want to make a correction.  John Cahill, I did
24        speak with him about the case.
25   Q.   What did you discuss with Mr. Cahill?
```



1  A.   EEOC charge, obtaining an attorney.

2  Q.   When did you speak with Mr. Cahill?

3  A.   The last time I spoke with him was day before

4       yesterday.

5  Q.   Does he still work for Fluor?

6  A.   No.

7  Q.   What does he do now?

8  A.   He works in construction, like a construction manager.

9  Q.   Is he located in the U.S. or does he work

10      internationally?

11 A.   In the U.S.

12 Q.   Do you know where he works?

13 A.   He's in Houston, Texas, that's all I know.

14 Q.   Do you know who he works for?

15 A.   No.

16 Q.   What did you tell Mr. Cahill about the case?

17 A.   He was aware of what -- he's aware of what was

18      happening while I was in Afghanistan.  He's aware that

19      I filed a complaint in Afghanistan that I was RIF'd.

20      He was aware -- he's aware of going -- me going through

21      the EEOC process, aware of me having an attorney.

22 Q.   Do you still consider him to be a friend?

23 A.   Yes.

24 Q.   And you've stayed in touch with him, obviously, since

25      you left?



1    A.    Yes.

2    Q.    About how often do you talk to him?

3    A.    Not often.  I might reach out, you know, some time,

4          checking on you every, you know, month, month and a

5          half.

6    Q.    Have you asked him to be a witness for you in this

7          case?

8    A.    No.

9    Q.    Any of the other folks that you've listed, I know we've

10         talked about some of them already, but any new people

11         who you stayed in touch with on a regular basis.

12   A.    Can you read the names that I gave you?

13   Q.    Yeah, that's a good point; I was going to do that

14         because I know that's a confusing question.  I'll just

15         go through each one.  Have you stayed in touch with Ron

16         Riley?

17   A.    No.

18   Q.    Stayed in touch with Alan Boege?

19   A.    No.

20   Q.    Kimberly Johnson, I think you said earlier --

21   A.    Yes.

22   Q.    -- you have stayed in touch with her.

23         Have you stayed in touch with Dexter Hooks?

24   A.    No.

25   Q.    Nikoletta Klimak, you've stayed in touch with her?



1   A.   Yes, but minimal.

2   Q.   Alan Krapa, have you stayed in touch with him?

3   A.   No.

4   Q.   When is the last time you talked to him?

5   A.   When I left the project.

6   Q.   And I think Matthew Sanai, is that the other one you

7        said?

8   A.   Yes.

9   Q.   Have you stayed in touch with him?

10  A.   No.

11  Q.   When is the last time you talked to him?

12  A.   Since he left the project years ago; before I left.

13  Q.   I want to get a sense of what -- sort of what your

14       daily job was like on Prime Contracts.  First of all,

15       what was your schedule like; did you have regular

16       hours?

17  A.   The regular hours were basically from 7:00 to 7:30.  I

18       typically came in around 5:00, went through emails,

19       responded to government concerns, managed letters of

20       technical direction to ensure that our folks were

21       getting them completed in a timely manner; went to

22       government meetings.  And then dealt with any new type

23       of projects; dealt with change orders.  And then, you

24       know, helped -- assisted with resolving issues that

25       perhaps we were having with the customer government.



TARA TAYLOR                                            April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS            71

1    Q.   So you said the normal hours were 7:00 to 7:30; you

2         would come in about 5 o'clock; why would you come in at

3         5:00?

4    A.   Because that would be the time that I could call home.

5         That would be -- give me the opportunity to get through

6         all of my emails and any actions that I had prior to

7         everyone else coming in to work.

8    Q.   If your job was like mine, you've got to get to work

9         early to get anything done.

10   A.   Yes.

11   Q.   What time would you typically leave work each day?

12   A.   7:30, 8:00.

13   Q.   7:30 or 8:00?

14   A.   Yeah, to 8 o'clock.

15   Q.   When you got there at 5 o'clock, was anybody else

16        working in the office with you?

17   A.   In the Prime Contracts office?

18   Q.   Yes.

19   A.   No.

20   Q.   What time did most people arrive?

21   A.   7:00; around 7:00.

22   Q.   How many days a week were you working those hours?

23   A.   Seven days a week.

24   Q.   I think you were -- at this time, you were based on --

25        was it an 84 hour work week?



```
 1   A.   Yes.

 2   Q.   Did you have to punch in and out?

 3   A.   No.

 4   Q.   Could you leave work early if you'd finished your work

 5        for the day?

 6   A.   I don't know because there was no end, really, to a

 7        day.

 8   Q.   Is it fair to say you were expected to be in the office

 9        during those normal hours?

10   A.   Yes.

11   Q.   Did you have very much down time?

12   A.   Each day was different.

13   Q.   So you had some down time some days?

14   A.   Yes.

15   Q.   What would you do during the down time?

16   A.   Go next door and talk to the people over in the

17        materials office; if we, you know, had to make a PX

18        run, we'd jump over, go to the PX.

19   Q.   What's a PX run?

20   A.   It's like going over to the -- going to the shopette

21        where you could buy toiletries and things --

22   Q.   Okay.

23   A.   -- things like that.  Go drop off your laundry; read a

24        book; get on the internet; things like that.

25   Q.   What kind of things would you do on the internet?
```



| | |
|---|---|
| 1 | A.   Shop at Amazon. |
| 2 | Q.   Okay, anything else? |
| 3 | A.   Not really.  I mean, more so maybe a celebrity gossip |
| 4 |      site or something like that. |
| 5 | Q.   Did y'all play any games, you know, either on the |
| 6 |      internet or board games, anything like that, in the |
| 7 |      office? |
| 8 | A.   I did not. |
| 9 | Q.   Did others? |
| 10 | A.   Yes. |
| 11 | Q.   Who played games in the office? |
| 12 | A.   Let's see, Nikoletta played games or watched movies in |
| 13 |      the office, or downloaded movies in the office; |
| 14 |      Rachelle Weber, when she came through, going through to |
| 15 |      go on her R and R, she would play games; Ron Riley |
| 16 |      would play games on the internet or download apps; |
| 17 |      Matthew Sanai played games.  I never downloaded any to |
| 18 |      play. |
| 19 | Q.   Why not? |
| 20 | A.   That's not my thing. |
| 21 | Q.   Did you watch any TV? |
| 22 | A.   Yes. |
| 23 | Q.   What kind of things would you watch on TV? |
| 24 | A.   Typically, we just had the news on. |
| 25 | Q.   Was it on all the time? |



1    A.   No.

2    Q.   About how much time would you spend in a given week

3         watching TV in the office?

4    A.   Not much during work hours.

5    Q.   What is not much?  Less than 5 hours, more than 5

6         hours?

7    A.   Definitely less than 5 hours.

8    Q.   How much down time would you say you had a week?

9    A.   I don't know.  I can't really guess at that because no

10        day was the same.

11   Q.   Right; I'm sure some days you didn't have any down time

12        and other days were slow and you had lots?

13   A.   Yes.

14   Q.   Is that fair?  All right.

15        From your experience, was there a lot of turnover on

16        the LOGCAP project?

17        Mr. Murphy:  Object to the form.

18   A.   No.

19   Q.   And by turnover, I mean people leaving, new people

20        coming on the project?

21   A.   It's kind of hard for me to answer that because, you

22        know, I wasn't in HR, so I wouldn't have --

23   Q.   Okay, well let's just focus on your department, Prime

24        Contracts, in Afghanistan; was there a lot of turnover

25        in your department?



```
 1   A.   No.
 2   Q.   But there were some people who would -- I think you've
 3        told me there were people who worked with you that
 4        weren't working with you when you left, right?
 5   A.   Yes.
 6   Q.   Did people like Matthew Sanai, did somebody replace him
 7        or was that position just eliminated?
 8   A.   Matthew Sanai left; after he left, Paul Begnaud came
 9        back and my understanding is that after I left, Matthew
10        -- Paul Begnaud left and Matthew Sanai came back.
11   Q.   Did you ever get homesick?
12   A.   No.
13   Q.   Ever wish you could transfer back to the U.S.?
14   A.   No.
15   Q.   Did you ever apply for any positions back in the U.S.,
16        either with Fluor or some other company?
17   A.   No.
18        Mr. Murphy:  What's your time frame?  When she came
19        back to the end?
20   Examination resuming by Mr. Samples:
21   Q.   So just to clarify that question, between October 2011
22        and, let's just say, May of 2014, did you apply for any
23        other jobs within Fluor --
24   A.   No, not that I can recall.
25   Q.   -- or any other jobs with another company?
```



1   A.   Not that I can recall, no.

2   Q.   During the time that you were working in Prime

3        Contracts, there were a number of base closures; is

4        that correct?

5   A.   Yes.

6   Q.   And you don't recall how many?

7   A.   No.

8   Q.   Any -- a rough idea of how many closed?

9   A.   No.

10  Q.   I think you told me it was more than two dozen, right?

11  A.   Yes.

12  Q.   And why were those bases closing?

13  A.   Because the President decided to decrease the head

14       count in Afghanistan of soldiers.

15  Q.   As the soldier head count went down, the civilian head

16       count had to go down as well?

17  A.   Yes.

18  Q.   Did most of the bases that were closed have Prime

19       Contracts employees working at them?

20  A.   No.

21  Q.   Did some that were closed have Prime Contracts

22       employees?

23  A.   Yes.

24  Q.   Do you know what happened to those employees when the

25       bases closed?



```
 1   A.   I know what happened with one employee when the base

 2        closed.

 3   Q.   Who is that?

 4   A.   Alan Krapa.

 5   Q.   Okay, what happened with Alan when his base closed?

 6   A.   He was brought to Bagram.

 7   Q.   Anybody else who worked in Prime Contracts who worked

 8        at a base that closed that you're familiar with?

 9   A.   I can't recall.

10   Q.   Were you ever concerned that one of the bases you were

11        working at would close?

12   A.   No.

13   Q.   In 2014, there were discussions about closing Bagram at

14        some point, right?

15   A.   Yes.

16   Q.   Were you concerned that your job might go away if the

17        base closed?

18   A.   No.  In 2014?

19   Q.   Yes.

20   A.   No.

21   Q.   What about at any time when you were working in

22        Afghanistan, were you concerned about Bagram or any

23        other base you were working at closing?

24   A.   No.

25   Q.   Ms. Taylor, did you receive any kind of discipline or
```



1       corrective actions during your employment with Fluor?

2   A.   No.

3   Q.   Did you experience any form of discrimination when you

4        were working on the LOGCAP project in Afghanistan?

5   A.   I did not experience any discrimination.

6   Q.   Prior to the Kelvin Johnson investigation, did you make

7        any calls to the hotline to complain or report anything

8        to HR?

9   A.   No.

10  Q.   Why not?

11  A.   Because there was nothing to report.

12  Q.   You never made any anonymous complaints prior to the

13       Kelvin Johnson complaint?

14  A.   No.

15       Mr. Samples:  We've been going for another hour, so why

16       don't we take another five minute break?

17       Ms. Taylor:  Okay.

18  (Off the record at 11:11 a.m.)

19  (On the record at 11:21 a.m.)

20  Examination resuming by Mr. Samples:

21  Q.   All right, Ms. Taylor, we are back on the record.

22       I want to spend some time now talking about the Kelvin

23       Johnson complaint.  In April 2014, he submitted a

24       Dignity and Respect complaint; were you familiar with

25       that?



1    A.    Yes.

2    Q.    First of all, what is a Dignity and Respect complaint?

3    A.    By whose definition?

4    Q.    Your definition; how would you define it?

5    A.    I would define it as something was said or done that

6          offended a person.

7    Q.    And that was a terminology used within Fluor to refer

8          to a certain type of complaint that you could raise

9          either through the hotline or HR?

10   A.    Yes.

11   Q.    Do you know what Kelvin Johnson's initial complaint was

12         about?

13   A.    I -- he complained about something that was said and

14         done by a gentleman by the name of Tom Roy.

15   Q.    What was done by Tom Roy that he was complaining about?

16   A.    Some comments that he felt were racial in nature and

17         were stereotypical to African Americans and gestures

18         that he was making that was -- would be considered, to

19         him, stereotypical to African Americans.

20   Q.    Do you remember what the comments were?

21   A.    No; the only thing that I know is that it was about --

22         that the comments started because Kelvin was wearing a

23         hat that had a tag that was hanging from the hat.

24   Q.    Okay.

25   A.    I don't know exactly what was said.



1    Q.   So Tom Roy made some comment about his hat; is that

2         your understanding?

3    A.   Yes.

4    Q.   And you said you don't know what was said because you

5         weren't a witness to that incident; is that right?

6    A.   That's right.

7    Q.   Did Kelvin Johnson discuss his complaint with you,

8         either before he made it or after?

9    A.   He -- before he made it.

10   Q.   Okay, what did he say to you?

11   A.   He came in the office upset and went into -- said that

12        Tom Roy was, you know, making these gestures, you know,

13        and he made some comments about African Americans or

14        that would be stereotypical for African Americans and

15        that he was going to -- he was going to file a

16        complaint.

17   Q.   Had he already made up his mind to file a complaint or

18        did y'all discuss whether he should file a complaint?

19        Mr. Murphy:  Object to the form.  Go ahead.

20   A.   He made up his mind to file a complaint; that really

21        hadn't --

22   Q.   Did you express an opinion one way or another as to

23        whether he should file a complaint?

24   A.   No.

25   Q.   Fluor did an investigation of that complaint, correct?



```
 1   A.   Yes.
 2   Q.   And as part of that investigation, you were
 3        interviewed; is that right?
 4   A.   No.
 5   Q.   You weren't interviewed in connection with the Tom Roy
 6        issue?
 7   A.   I was not interviewed when -- for the complaint that
 8        Kelvin made with HR; he made the initial complaint.  I
 9        was not interviewed in that complaint.
10   Q.   Okay.  Were you interviewed in connection with a later
11        complaint?
12   A.   Yes.
13   Q.   Going back to the Tom Roy issue, you don't recall being
14        interviewed by Steve Shank or Pete Irvin in connection
15        with that --
16   A.   No.
17   Q.   -- incident?
18        Did Kelvin Johnson tell you he was going to identify
19        you as a witness in connection with that?
20   A.   In connection with his initial complaint?
21   Q.   Yes.
22   A.   No.
23   Q.   You don't recall being interviewed and then bringing up
24        an incident, another incident, involving Tom Roy in
25        which he came into the office and was dominating the
```



1    conversation over Kelvin?

2  A.  I do recall a little of that, yes.

3  Q.  Who was that conversation with?

4  A.  I can't recall who that was with.

5  Q.  So you do recall, though, being interviewed at some

6      point in connection with the Kelvin Johnson complaint;

7      is that right?

8  A.  No, I don't, not the initial complaint.

9  Q.  Was there a later one that you are referring to that

10     you do remember?

11 A.  Yes.

12 Q.  Tell me about that one.

13 A.  After the Tom Roy complaint, I guess, was closed out

14     and decisions had been made, things -- there were folks

15     that were considered friends of Tom Roy that started

16     treating differently -- started treating the folks in

17     Prime Contracts differently, and Kelvin filed another

18     complaint because of he felt as though he was being

19     retaliated against because he filed a complaint against

20     Tom Roy.

21 Q.  Do you know if he identified anybody specifically who

22     he felt was retaliating against him?

23 A.  Ron Riley, Steve Whitcomb, Mark Cofer.

24 Q.  Do you recall how soon after the first complaint this

25     second complaint was made?



```
 1   A.   No, I don't.  It wasn't too long after, but I don't
 2        recall how long.
 3   Q.   Did you and Mr. Johnson have any discussions about that
 4        second complaint?
 5   A.   Yes.
 6   Q.   What did the two of you discuss about that second
 7        complaint?
 8   A.   The difference in how our office was -- I'm sorry, ask
 9        that question again.
10   Q.   Yeah, what did you and Mr. Johnson discuss about the
11        second complaint that he made?
12   A.   The difference in how our office was being treated from
13        him making the first -- after the made the first
14        complaint.
15   Q.   What was different about it?
16   A.   People that would speak to us stopped speaking.  I know
17        Kelvin wasn't being invited to meetings that he
18        typically attended.  Completely just -- I guess the
19        office was just completely ostracized after the initial
20        complaint.
21   Q.   How was it ostracized?
22   A.   People that would have -- again, people coming in to
23        speak to you or coming by the office, Mark Cofer
24        stopped, Ron Riley stopped, didn't speak to -- didn't
25        speak to Kelvin, and like I said, Kelvin being not
```



TARA TAYLOR                                         April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS           84

```
 1        invited to meetings that he had typically attended,
 2        things such as that.
 3   Q.   Anything else that you can recall that was different
 4        between how things were before he complained and how
 5        things were after?
 6   A.   Yes.  I guess just the main thing was that he -- I mean
 7        that we weren't being involved as much as we were
 8        before the complaint.  He typically -- he wasn't being
 9        involved at all.
10   Q.   Who is he?
11   A.   Kelvin.  Meaning when, you know, someone would come
12        into the office, they wouldn't even speak or recognize
13        him.
14   Q.   Who would not speak or recognize him?
15   A.   Mark Cofer, Ron Riley.
16   Q.   Before the incident, would they speak and recognize
17        him, or before the complaint?
18   A.   Yes.
19   Q.   How often was Mark Cofer in your office?
20   A.   Almost every day.
21   Q.   What about Ron Riley, how often was he in the office?
22   A.   Every day half the day.
23   Q.   The concerns that Mr. Johnson expressed, did you agree
24        with him about those differences?
25   A.   Yes.
```



```
 1    Q.   So you noticed that -- or you perceived some
 2         differences in treatment from before and after?
 3    A.   Yes.
 4    Q.   Did you perceive anything different, other than what
 5         you've already described to me, that Mr. Johnson was
 6         concerned about?
 7    A.   Not that I can recall.
 8    Q.   Did you have any personal concerns with how Mark Cofer
 9         was treating you?
10    A.   Not at that time.
11    Q.   What about Ron Riley, did you have any concerns with
12         how Mr. Riley was treating you?
13    A.   And this is before the second -- this is right after
14         the first investigation?
15    Q.   Yes.
16    A.   Not at that time.
17    Q.   What about Steve Whitcomb, did you have any concerns
18         with Steve Whitcomb at that time?
19    A.   Not at that time, no.
20    Q.   Did you have much interaction with Steve Whitcomb?
21    A.   If Kelvin wasn't in the office or Ron was out, I would
22         have interaction with him.  It wasn't every day.
23    Q.   So you would have more interaction with him if you were
24         filling in for Kelvin or for Ron?
25    A.   Yes.
```



1   Q.   Okay.

2   A.   And other than the greeting of the day.

3   Q.   What's the greeting of the day?

4   A.   Meaning good morning, good afternoon.

5   Q.   Okay.  How often would you fill in for Kelvin or Ron?

6   A.   Whenever they went on R and R.

7   Q.   Did you ever actually fill in for Ron Riley?

8   A.   No, not in -- not in full capacity.

9   Q.   So in connection with the second complaint, HR

10       conducted an investigation; is that right?

11  A.   Yes.

12  Q.   Were you interviewed in connection with that

13       investigation?

14  A.   Yes.

15  Q.   Do you recall when that interview was?

16  A.   It was in spring 2014.

17  Q.   Was it on May 29, 2014?

18  A.   I'm not certain of the exact date, but --

19  Q.   Who conducted the interview?  Who interviewed you?

20  A.   Rob Wells.

21  Q.   Did you know Rob Wells before the interview?

22  A.   When you say know him, what do you mean?

23  Q.   Had you met him before, prior to the interview?

24  A.   I think I recall seeing him in Greenville.

25  Q.   But you didn't work closely with him in Greenville?



```
 1   A.   No.
 2   Q.   He was the HR person that -- he came from the home
 3        office; he wasn't based in Afghanistan, was he?
 4   A.   No.
 5   Q.   Did you just meet with Mr. Wells on one occasion?
 6   A.   Yes.
 7   Q.   And that was at Bagram?
 8   A.   Yes.
 9   Q.   Was anybody else present for that interview?
10   A.   No.
11   Q.   What did you tell Mr. Wells?
12   A.   I just basically told him how -- we talked about Ron
13        Riley, about his -- about him being -- you know, not
14        really being a good manager; we talked about his
15        treatment of Kelvin since he returned from his R and R;
16        we talked about Steve Whitcomb and Steve Whitcomb's
17        treatment of Kelvin.  I'm sure I made mention of Mark
18        Cofer as well.
19   Q.   Anything else you can recall telling Rob Wells?
20   A.   I told him that I did feel that Kelvin was being
21        retaliated against because of his -- him putting in a
22        -- you know, his concerns with Tom Roy.
23   Q.   Anything else you can recall telling him?
24   A.   No, not at this time.
25   Q.   Going back to -- I guess we should get a little more
```



```
 1        details of what you told him; you mentioned you told

 2        him about Ron not being a good manager; did you give

 3        him any specifics to support that claim?

 4   A.   I told him that he was a horrible communicator; that he

 5        was -- that he could be -- or something to the effect

 6        that he could be -- he didn't -- he wasn't -- he wasn't

 7        a nice person, or something to that effect; he could be

 8        rude to people.

 9   Q.   That was --

10   A.   I may --

11   Q.   Sorry.  That was true before Kelvin complained, though,

12        wasn't it?

13   A.   Yes.

14   Q.   Okay.

15   A.   I told him that he was unprofessional.

16   Q.   How was he unprofessional?

17   A.   By being rude to people.

18   Q.   How was he rude; what did he do or not do?

19   A.   Just his -- just his demeanor.  I mean, he would -- I

20        mean, he would -- he cursed at, you know, one of my

21        teammates, my co-workers, called him out of his name.

22        If he didn't -- if he didn't like you, I mean he made

23        -- I mean, he could make your life not so good, meaning

24        being rude to you in a meeting or snapping at you and

25        things like that.
```



```
 1   Q.   Did he do those kind of things to people that he liked?

 2        Mr. Murphy:  I'm sorry?  Excuse me.

 3   Examination resuming by Mr. Samples:

 4   Q.   Was he rude to people that he liked?

 5        Mr. Murphy:  Object to the form.

 6   A.   I don't know how he was to people that he liked.  He

 7        wasn't -- he wasn't like that with me.

 8   Q.   Would you say --

 9   A.   Meaning rude to me; he was not rude to me.

10   Q.   Okay.

11        Mr. Murphy:  One at a time.

12   Examination resuming by Mr. Samples:

13   Q.   You also mentioned that you raised some issues with

14        Mark Cofer; what did you tell Rob Wells about Mark

15        Cofer?

16   A.   Just that he had stopped speaking; wasn't coming to the

17        office anymore and he stopped speaking, or something to

18        that effect.

19   Q.   Stopped speaking to Kelvin or to others as well?

20   A.   All of us pretty much.

21   Q.   What was Mark Cofer's position at this time?

22   A.   I can't remember what his position was titled, but he

23        was --

24   Q.   He wasn't in Prime Contracts, was he?

25   A.   No, he was not.
```



TARA TAYLOR                                                       April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                        90

1  Q.   You didn't have any kind of reporting relationship to

2       him, did you?

3  A.   Not reporting, no.

4  Q.   You said you also mentioned Steve Whitcomb; what did

5       you tell Rob Wells about Steve Whitcomb?

6  A.   That he stopped speaking with -- speaking to Kelvin.

7  Q.   It sounds like your concerns that -- the concerns you

8       expressed to Rob Wells focused on Kelvin's treatment

9       and not on your own treatment; is that fair to say?

10 A.   I was a witness for Kelvin.

11 Q.   Okay.  During your conversation with Rob Wells, did you

12      raise any concerns that you had experienced in terms of

13      you feeling like you weren't treated with dignity and

14      respect?

15 A.   I didn't -- I don't recall raising any concerns about

16      me not being treated with dignity and respect.

17 Q.   Do you recall mentioning to Ron some grey water issue

18      and your treatment over that?

19      Mr. Murphy:  Ron?

20 Examination resuming by Mr. Samples:

21 Q.   Rob.  I'm sorry.

22 A.   I don't recall; I don't recall that.

23 Q.   When you met with Rob Wells, you understood at that

24      time that Fluor had a non-retaliation policy, right?

25 A.   Yes.



```
 1   Q.   Did Rob Wells say anything to you about non-

 2        retaliation?

 3   A.   I don't recall him saying anything about it.

 4   Q.   And he didn't give you anything in writing to the

 5        effect that if, you know, if you speak to me, you won't

 6        be retaliated against, did he?

 7   A.   I don't recall receiving anything from him.

 8   Q.   Prior to your discussions with Rob Wells in May of

 9        2014, did you have any issues with how you were treated

10        by Steve Whitcomb?

11   A.   Can you please ask that question again?

12   Q.   Yeah.  Prior to your discussion, or your interview,

13        with Mr. Wells, did you have any concerns about your

14        treatment by Steve Whitcomb?

15   A.   Prior to Rob Wells arriving, Steve Whitcomb did

16        discontinue speaking to the folks in the Contracts

17        office --

18   Q.   Who were --

19   A.   -- in Bagram.

20   Q.   Okay.  I think earlier you said he discontinued

21        speaking to Kelvin; did that -- did he stop speaking to

22        you, too?

23   A.   Yes.

24   Q.   But you didn't have that much interaction with him to

25        begin with, right?
```



```
 1   A.   No.

 2   Q.   How about Ron Riley, did you have any issues with how

 3        you were treated by Ron Riley before you were

 4        interviewed by Rob Wells?

 5   A.   No.

 6   Q.   After you met with Mr. Wells, you followed up with him

 7        to give him some additional information; do you recall

 8        doing that?

 9   A.   No, I don't remember that.

10   Q.   Do you recall giving him some information about how

11        this grey water incident was being handled and how

12        Steve Whitcomb wanted Ron Riley to be the barking dog

13        on that issue; do you remember that?

14   A.   Yes.

15   Q.   Tell me about that issue.

16   A.   I don't remember much about it; I do remember that I

17        was offended by the way that Steve Whitcomb handled

18        this situation.  I remember that, you know, typically I

19        was -- being in Bagram and a Bagram issue, I also -- I

20        always referred to Ron if something was happening prior

21        to me putting anything out to the government, which is

22        why I sent the information to the folks upstairs and

23        when -- I was just offended by the way he -- he came

24        back at me after I sent it upstairs.  I knew not to

25        send it out, I've never done that, so I was just
```

TARA TAYLOR
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS

1      offended by how he handled that.

2  Q.  And by he, you mean Steve --

3  A.  Steve Whitcomb.

4  Q.  -- Whitcomb?

5      And you actually prepared a Dignity and Respect

6      complaint related to that, correct?

7  A.  I'm sure that when I filed my complaint that Steve

8      Whitcomb was included in that complaint.

9  Q.  But do you recall preparing a Dignity and Respect

10     complaint, a written complaint, related specifically to

11     the grey water issue and your treatment by Steve

12     Whitcomb?

13 A.  I don't recall.

14 Q.  You never actually submitted that complaint to Fluor,

15     did you?

16 A.  I don't recall submitting that to Fluor.

17 Q.  So just so I understand the issue, you had -- you were

18     working on a problem with grey water, you had sent, I

19     guess, your recommendation to the folks upstairs; is

20     that right?

21 A.  I sent the issue to the folks upstairs.

22 Q.  And Steve Whitcomb responded and said we want Ron Riley

23     to be the barking dog on this issue, right?  Meaning we

24     want him to be the person who pushes this to the

25     government?



1      Mr. Murphy:  Object to the form.

2  A.   Yes.

3  Q.   And that Steve Whitcomb's email wasn't just sent to

4       you, was it?

5  A.   I don't recall who it was sent to, but I'm certain that

6       he -- he's never just emailed -- I don't know of him

7       just emailing me.

8  Q.   Okay.  He sent it to, I guess, all the folks who were

9       involved on that project?

10 A.   I would imagine so.

11 Q.   And explain to me again how you were offended by Steve

12      Whitcomb's email?

13 A.   If I can recall correctly, it -- and now that I'm

14      thinking about that situation, it wasn't just -- it was

15      the email and then he -- he also came downstairs and

16      said something to me about it when -- and I spoke with

17      Ron about being offended by it, that, you know, he had

18      already put it in an email and then -- and then he had

19      to come downstairs and basically bark out the order to

20      me downstairs; it was something to that effect.

21 Q.   Who is the one who came downstairs and told you, was it

22      Ron Riley or Steve Whitcomb?

23 A.   It may have been Ron; I may stand corrected.  I'm not

24      certain, but I know that someone came downstairs and

25      said something to be about it.



1   Q.   So you were offended by the fact that you had received

2        an email and had been told to do this in person?

3   A.   Yes.

4   Q.   You didn't think it was necessary to tell you twice; is

5        that the gist of your concern?

6   A.   I didn't think it was necessary to tell me at all.

7        Mr. Samples:  Let's mark this as Exhibit Three.

8            (Defendant's Exhibit Number Three is marked.)

9   Examination resuming by Mr. Samples:

10  Q.   Ms. Taylor, you've been handed what's been marked as

11       Exhibit Number Three, and this document is Bates

12       numbered Defendant's 1647 through 1649.  Let's start on

13       the last page because that's what we were just talking

14       about.  Is this the email that we were talking about

15       that Steve Whitcomb sent about Ron Riley being the

16       barking dog?

17  A.   Yes.

18  Q.   Who received this email?

19  A.   Robert Stamps, Christopher Waechter, Kelvin Johnson,

20       Nikoletta Klimak, Peter Provost, Ron Riley and myself.

21  Q.   And it looks like it was sent directly to Robert Stamps

22       and everybody else was just cc'd on it; is that right?

23  A.   Yes.

24  Q.   Let's go to the first two pages now; this document is

25       entitled Dignity and Respect and Discrimination.  Is



1         this a document that you prepared?

2    A.   Yes.

3    Q.   When did you prepare this document?

4    A.   I'm not exactly certain of the day I prepared it, but

5         the date that the information references was 20 May.

6    Q.   So the issue with the email, and I guess we can see it

7         on the email, it was sent on May 20th, correct?

8    A.   Yes.

9    Q.   In the second paragraph of that email, you say that on

10        May 20th at approximately 3:15 Ron Riley entered your

11        office, and I'm just paraphrasing, but it says that Ron

12        Riley told you to -- told you that Steve Whitcomb had

13        told him that he didn't want you sending out any more

14        emails about the grey water because it needed to be

15        handled by himself and Bob Stamps; is that right?

16   A.   Yes.

17   Q.   So according to this, it was actually Ron Riley and not

18        Steve Whitcomb who came down and talked to you; is that

19        -- is that consistent with what you recall?

20   A.   Yes, if I said it was Ron, then it was Ron.

21   Q.   And down in the last paragraph on that page, you talk

22        about how this was disrespectful, you think this was

23        disrespectful of Steve and you feel that you're being

24        treated differently than he would treat other people.

25        And then you go on to say, in the last sentence, "I



TARA TAYLOR                                              April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS              97

1       can't help but think it has something to do with my
2       race and gender."
3   A.  Uh-huh.
4   Q.  Why did you think that?
5   A.  Well, one, because I didn't know of anyone else that he
6       had -- he had done that to; two, because it was
7       completely unnecessary.
8   Q.  So you just assumed because he hadn't done it to
9       anybody else and because it was unnecessary that it
10      must be caused by your race and gender?
11  A.  He hadn't -- yes.
12  Q.  You testified earlier that you were interviewed by Rob
13      Wells on May 29th; is that correct?
14  A.  I testified that I was interviewed by Rob in May; I'm
15      not certain which day.
16  Q.  This email incident, I think you told me you shared
17      this with Rob Wells; is that right?  Did you
18      communicate this concern with Rob -- to Rob Wells?
19  A.  I told you that I didn't recall.
20  Q.  You don't remember if you mentioned it to Rob Wells or
21      not?
22  A.  I don't recall and -- I don't recall mentioning this to
23      him.
24  Q.  Did you do anything with this document, Exhibit Three?
25      Do you recall sending it to Rob Wells?



1   A.   I don't.

2   Q.   Do you recall giving it to the EEOC or anybody else?

3   A.   I don't recall giving this to the EEOC.

4   Q.   Sticking with the Kelvin Johnson investigation, did you

5        share anything else with Rob Wells related to the

6        Kelvin Johnson investigation that we haven't discussed?

7   A.   I can't think of anything else at this time.

8   Q.   You also submitted your own hotline complaint after you

9        were interviewed by Rob Wells; is that correct?

10  A.   Yes.

11  Q.   Why did you do that?

12  A.   Because there was a significant difference in Ron's

13       behavior towards the office as a whole after the --

14       after I interviewed, or after we interviewed, with Rob

15       Wells than there was prior to that.

16  Q.   I think you testified earlier that you considered Ron

17       Riley a friend before this incident; is that right?

18  A.   Yes.

19  Q.   Did you ever hang out with Ron Riley outside of work?

20  A.   We had meals together; that was pretty much it.

21  Q.   Did you also testify that he was in the office about

22       every day?

23  A.   Yes.

24  Q.   What about when you were working on the second floor,

25       where was your office in connection with -- to Ron



```
 1        Riley's?
 2   A.   It was on the other side of -- he was on one side of
 3        the hall, I was on the other side of the hall, and
 4        maybe he was two doors down on the other -- opposite
 5        side of the hall.
 6   Q.   So his office was close to yours?
 7   A.   Yes.
 8   Q.   How often would you see him when you were working on
 9        the second floor?
10   A.   Every day.
11   Q.   How many times a day?
12   A.   Multiple.
13   Q.   I think you said this earlier, but is it fair to say
14        that Ron Riley is not a particularly friendly person?
15   A.   He is not friendly to some.
16   Q.   And that was true before Kelvin Johnson and before you
17        complained, right?
18   A.   Yes.
19   Q.   You've described him as a vindictive person; what did
20        you mean by that?
21   A.   I meant that if -- if he didn't -- if he didn't like
22        you or felt like you -- you did something to him, he
23        would -- he would -- he would try to -- he couldn't --
24        he wouldn't let it go; he'd try to get -- get back at
25        you.
```



1   Q.   Can you think of any examples where he did that prior

2        to the Kelvin Johnson complaint?

3   A.   Yes.

4   Q.   Give me an example.

5   A.   A gentleman by the name of Jose Lopez worked in

6        Contracts and I -- for -- I don't know the reason that

7        he did not like Jose and Jose had expressed that he

8        never wanted to go to a particular site because of the

9        heat that was at that particular site and, basically,

10       he had to -- he had to go over to Africa to assist with

11       the project and Ron definitely did not like him and he

12       said that when he returned he was going to send him to

13       that site.  I mean -- and Jose had expressed that he

14       would quit if he ever had to go to that particular

15       site.  So in turn, he stayed in Afghanistan -- I'm

16       sorry, in Africa on the Africa project.

17  Q.   Okay, I was a little confused by that; I'm not sure I

18       fully followed you.  So Jose didn't want to come back

19       to Afghanistan and work at a particular base and Ron

20       told him if he came back he was going to work at that

21       base?

22  A.   Yes.

23  Q.   And so he just decided not to come back?

24  A.   He asked could he be released and stay on the African

25       project.



```
 1   Q.   Was he released?

 2   A.   Yes.

 3   Q.   Any other examples you can think of with him being

 4        vindictive prior to the Kelvin Johnson complaint?

 5   A.   I can't recall at this time.

 6   Q.   After you met with Rob Wells, did Ron Riley's attitude

 7        and actions toward you change in any way?

 8   A.   He stopped -- he stopped coming to the office and

 9        didn't communicate with us as much.

10   Q.   Did his actions or attitude change in any other way

11        that you observed?

12   A.   He started getting on to Kelvin about things that were

13        never -- that were not significant before.

14   Q.   Like what?

15   A.   He got on to Kelvin in reference to a meeting that we

16        had in the Contracts office and he said that Niki was

17        not engaged during the meeting and said that she was on

18        her personal email or something of the sort and then

19        basically he was telling Kelvin that, you know, he

20        needed to make sure that she was engaged.

21   Q.   Any other ways that you can recall that he changed?

22   A.   Started sending out -- sending out more emails, started

23        talking to -- started at least coming in and giving a,

24        how do I want to say this, I can't think of the word,

25        he would at least -- you know, at that point, he did
```



1    come in and communicate with Kelvin about anything that

2    -- or something -- if he was going to go out on R and

3    R, kind of back brief him on what was going on and that

4    had never occurred before.

5  Q.  You think that was a helpful thing for the department,

6    for him to require -- or start doing those back briefs?

7  A.  That was helpful.

8  Q.  What about sending more emails; why was he sending more

9    emails?

10    Mr. Murphy:  Object to the form.

11  Examination resuming by Mr. Samples:

12  Q.  What was he sending more emails about?

13  A.  Just more -- I would say more work related things.

14  Q.  Was it -- is it fair to say that he was more involved

15    and taking a more active role in the department?

16  A.  No.

17  Q.  I mean, he was pretty hands off before the complaint,

18    wasn't he?

19  A.  Yes.

20  Q.  And, you know, you talked about him telling Niki to be

21    more engaged, doing -- you know, requiring that Kelvin

22    back brief him, and sending more emails; I mean those

23    sound like ways of him becoming a more active

24    supervisor; do you disagree?

25    Mr. Murphy:  Object to the form.



1   A.   I didn't see it that way.

2   Q.   How did you see it?

3   A.   I saw it as a way of him trying to cover some of the

4        complaints that was made against him.  I saw it as a

5        way for him to start indirectly documenting things with

6        Kelvin.

7   Q.   Okay, so you were a little more skeptical of what he

8        was doing?

9   A.   I didn't see it as him trying to figure out a way to

10       benefit the department.

11  Q.   Do you think that his change in actions and attitude

12       had anything to do with his meeting with Rob Wells?

13  A.   Yes.

14  Q.   Why do you think that?

15  A.   I'm certain that after Rob Wells spoke with us, he

16       spoke with him about -- he'd had to speak with him

17       about our concerns.

18  Q.   And by him, you mean Ron Riley?

19  A.   Yes.

20  Q.   But you don't know what Rob Wells said to Ron Riley, do

21       you?

22  A.   I was not there during their interview.

23  Q.   And you haven't discussed with Ron Riley what Rob Wells

24       told him, have you?

25  A.   No.



TARA TAYLOR
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS

April 26, 2018
104

1  Q.  Have you discussed with Rob Wells what he told Ron

2      Riley, if anything?

3  A.  No.

4  Q.  Couldn't Ron Riley's change in actions just be

5      attributed to the fact that he was coached by Rob Wells

6      about how to better do his job?

7  A.  I can't answer that.

8  Q.  You don't know?

9  A.  I can't answer that.  I don't -- I just don't know how

10     I would answer that.

11 Q.  You don't know why Ron Riley started acting

12     differently?

13 A.  I -- he started acting differently after he met with

14     Rob Wells.

15 Q.  You mentioned that he started back briefing Kelvin

16     Johnson; this was to bring him up to speed after the R

17     and R, right?

18 A.  Yes.

19 Q.  And it was basically to help him transition back into

20     the job more smoothly, correct?

21 A.  Yes.

22 Q.  So what was wrong with him doing that other than the

23     fact that he hadn't done it before?

24 A.  There was nothing wrong with him doing that.

25 Q.  Three days after you were interviewed by Rob Wells, you



1      filed a hotline through -- or a complaint through the

2      employee hotline; do you recall doing that?

3  A.   Yes.

4  Q.   Why did you complain to the employee hotline?

5  A.   My concern was because Ron had issue with Kelvin and

6      the email that he wrote Kelvin referenced to Niki not

7      being engaged, my concern was him trying to get back at

8      Kelvin that Ron would go -- he would do whatever he had

9      to do, even if that meant, you know, targeting Niki or

10     myself.

11 Q.   At the point and time when you made the hotline

12     complaint, had he done anything to specifically target

13     you, as far as you were concerned?

14 A.   No.

15 Q.   You were more concerned about what he -- what you

16     perceived him doing to Mr. Johnson and Ms. Klimak; is

17     that right?

18 A.   I was more concerned about what he could possibly do to

19     me in effort to get back at Kelvin.

20 Q.   But at that time, he hadn't done anything to you, had

21     he?

22 A.   No.

23 Q.   Were you aware that Nikoletta Klimak also filed a

24     hotline complaint at the same -- about the same time

25     you did?



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                         106

```
 1   A.   Yes.
 2   Q.   Did the two of you discuss making those hotline
 3        complaints?
 4   A.   Yes.
 5   Q.   Did y'all talk about it before you actually called the
 6        hotline?
 7   A.   Yes.
 8   Q.   What did the two of you discuss?
 9   A.   Our concern with him doing whatever he needed to do to
10        get back at Kelvin.
11   Q.   Whose idea was it to call the employee hotline?
12   A.   Both of ours.
13   Q.   Did one of you come up with the idea and share it with
14        the other?
15   A.   I don't -- I don't know.  I don't recall that.
16   Q.   You don't --
17   A.   I don't know how --
18   Q.   Okay, that's fine.
19        What were the two of you hoping to accomplish by making
20        a hotline complaint?
21   A.   I can't speak for Niki; I was hoping to accomplish not
22        having to worry about walking around on eggshells or
23        being concerned that I would make -- you know, me
24        making an error would now be something that would be
25        documented to Kelvin as him not doing his job, but yet
```



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                        107

1        you're still documenting something that -- that I've

2        done, that you would not have documented before.  So I

3        was more concerned about what he would do to me in

4        effort to get back to Kelvin.

5    Q.  Did you ever -- I understand you were concerned that

6        that might happen; did that ever happen where Ron Riley

7        documented something that you did wrong that you think

8        he shouldn't have?

9    A.  No.

10   Q.  When you filed your hotline complaint, you requested

11       that somebody outside of the LOGCAP investigate; is

12       that right?

13   A.  Yes.

14   Q.  Why did you do that?

15   A.  Because I felt that there were -- because of Ron's

16       actions after speaking with Rob Wells, I did -- I did

17       not want him to have to do the next investigation, so I

18       wanted it to be someone outside of LOGCAP because I

19       thought that that person perhaps could be -- that did

20       not have -- did not know everybody in LOGCAP or deal

21       with everyone in LOGCAP, would come in and be -- could

22       be more -- or could be unbiased; I won't say more;

23       could be unbiased.

24   Q.  Willard Smith reached out to you the same day you

25       submitted your complaint; is that correct?



1    A.    I don't remember the exact day he reached out.

2    Q.    Shortly after you submitted the complaint, he reached

3          out to you, right?

4    A.    Yes.

5    Q.    And did he tell you he would be the person doing the

6          investigation?

7    A.    Yes.

8    Q.    And he wasn't associated with the LOGCAP project, was

9          he?

10   A.    Not to my knowledge.

11   Q.    Do you know where he was from or where he was based?

12   A.    I thought it was the Dallas office.

13   Q.    And you spoke to -- well, let me ask you this; did Mr.

14         Smith come to the project or did he do his

15         investigation by phone?

16   A.    By phone.

17   Q.    Okay, so you never actually met with Mr. Smith?

18   A.    No.

19   Q.    What did you tell him when you first spoke to him?

20   A.    I don't recall what I told him when I first spoke to

21         him.  I expressed the concern about the investigation

22         that Ron had with -- the investigation that Kelvin had

23         and Rob Wells investigating it and my concern about

24         what may have been disclosed when Rob Wells spoke with

25         Ron.  I expressed that I felt as though this was more



TARA TAYLOR                                                April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                    109

```
 1        of a hostile work environment now that that
 2        investigation or complaint was made.
 3   Q.   What made it a hostile work environment?
 4   A.   Because of -- I felt as though, you know, now I had to
 5        walk on eggshells in the office.  It was just very,
 6        very uncomfortable.
 7   Q.   And the reason you were walking on eggshells was
 8        because you felt like if you made a mistake that Ron
 9        Riley would write you up for it or try to take action
10        against you; is that right?
11   A.   No.
12   Q.   Why were you walking on eggshells?
13   A.   I felt that I was walking on eggshells because in Ron's
14        effort to get back at Kelvin, he would -- he would
15        point out, you know, any errors or, you know, basically
16        to hurt or to say that Kelvin is -- you know, to hit
17        Kelvin's managerial skills of some sort.
18   Q.   You were concerned that in his efforts to get back at
19        Kelvin he would do something to you?
20   A.   Yes.
21   Q.   How did Willard Smith respond when you spoke to him?
22   A.   I'm not sure how to -- can you ask that --
23   Q.   Do you remember anything Willard Smith said to you
24        during that initial conversation?
25   A.   No, only that he would -- he would look into the -- my
```



TARA TAYLOR                                                   April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                       110

1        concerns.

2  Q.    Did you tell him any witnesses you think he ought to

3        speak with?

4  A.    Yes, I'm sure I mentioned Niki's name.

5  Q.    And did he tell you he would speak with Niki and other

6        witnesses?

7  A.    I don't recall if he told me he would speak with them.

8  Q.    Do you know if he spoke to any other witnesses?

9  A.    I know that he spoke with -- I know he spoke with Niki

10        because she filed a complaint as well.

11 Q.    Do you know if he spoke to anybody else?

12 A.    Yes, I know he spoke with Paul Gentry.

13 Q.    How do you know that?

14 A.    Because Paul told me that he called him.

15 Q.    Anybody else that you're aware of that he spoke with?

16 A.    Not that I can recall at this time.  I can't remember.

17 Q.    Do you recall him saying anything to you about the

18        confidentiality or the confidential nature of the

19        investigation?

20 A.    Yes.

21 Q.    What did he say about that?

22 A.    To keep it confidential, what was said.

23 Q.    Did he say he would keep it confidential or anything

24        like that?

25 A.    Did he say that?



1  Q.  Yes.
2  A.  Yes, I'm sure he did.
3  Q.  Are you sure he did or you're just assuming that he
4      did?
5  A.  I assume he did.
6  Q.  Did he say anything to you about non-retaliation?
7  A.  I don't recall.
8  Q.  After you spoke with Mr. Smith, you followed up with
9      him by sending him an email; do you recall doing that?
10  A.  I probably sent him a few emails.
11  Q.  And we'll kind of go through each of those, but the
12      first email you sent him related to Steve Whitcomb.
13  A.  Okay.
14  Q.  Do you recall sending him that email?
15  A.  I don't know which email you're referencing.
16  Q.  Okay.  Do you recall sending him an email about Steve
17      Whitcomb's failure to hold his direct reports
18      accountable?
19  A.  I know that we had -- we had those discussions and I
20      don't recall sending an email, but I'm sure I did.
21  Q.  What discussions do you recall having about Steve
22      Whitcomb's direct reports, or him not holding them
23      accountable?
24  A.  Just that he -- he basically -- that there were
25      complaints that have been filed against people that



1        report directly to him and that nothing -- nothing came

2        of the -- nothing came of the complaints.

3    Q.   Did you mention anybody in particular?

4    A.   I'm sure I mentioned Mark Cofer.

5    Q.   What was the issue with Mark Cofer?

6    A.   He had gotten into it with, I think, it was John Lumas,

7        and a complaint was filed and Mark boasted that nothing

8        happened to him.

9    Q.   Do you recall mentioning anything about Ron Riley?

10   A.   Yes.

11   Q.   What did you say about Ron Riley?

12   A.   That he had -- there was an incident with Ron Riley

13       and, I think it's Robert Page, and Ron boasted about

14       nothing really happening to him.

15   Q.   Did that -- were you involved in that incident at all?

16   A.   I wasn't involved in the incident, but you know, I did

17       -- I do recall when Ron came and boasted about it, I do

18       recall telling him that basically it's about his

19       delivery.

20   Q.   What do you mean it's about his delivery?

21   A.   That he needs to -- in so many words, and I can't

22       remember exactly how, so I'm paraphrasing, but in so

23       many words that it's really not about what you say,

24       it's how you say it and it was his delivery of what he

25       said to Robert Page that made Robert Page file a



1        complaint.

2   Q.   When was that?

3   A.   I don't remember.

4   Q.   Was this well before the Kelvin Johnson complaint and

5        your own hotline complaint?

6   A.   I don't know if I would say it was well before, but it

7        was before.

8   Q.   Do you recall expressing any concerns about Rachelle

9        Weber?

10  A.   Yes, I've expressed concerns about her.

11  Q.   What were your concerns about her?

12  A.   That she had been -- there had been several complaints

13       on her and nothing had happened to her because her and

14       Ron were friends.

15  Q.   You didn't make any of those complaints, did you?

16  A.   No.

17  Q.   None of the issues involving Rachelle Weber involved

18       you personally, did they?

19  A.   No.

20  Q.   How do you know that nothing -- that no action was

21       taken against Rachelle Weber?

22  A.   Because, in most cases, all that was done is that she

23       just -- they would move her to -- so they just moved

24       her to another -- to another FOB.

25  Q.   So she would be moved as a result, right?



1  A.  I don't know if that was necessarily the result.

2  Q.  What about Tom Roy; did you have any concerns about Mr.

3      Whitcomb's treatment of Tom Roy?

4      Mr. Murphy:  Mr. Whitcomb's treatment of Tom Roy?

5      Mr. Samples:  Yeah, in terms of not holding him

6      accountable.

7  A.  Yes.

8  Q.  What was your concern there?

9  A.  My concern was that if someone had complaints against

10     him or corroborated complaints against him and the type

11     of complaints that he had against him, that nothing was

12     done.

13  Q.  Did you make any complaints against Mr. Roy?

14  A.  Complaints against Mr. -- no.

15  Q.  These issues that you raised about Steve Whitcomb's

16     failure to hold his direct reports accountable, none of

17     those failures to hold people accountable involved you

18     personally, did they?

19     Mr. Murphy:  Object to the form.

20  A.  Eventually it did.

21  Q.  What do you mean?

22  A.  Ron Riley wasn't held accountable for retaliating

23     against me, so yes.

24  Q.  But at the time you were expressing this concern about

25     Steve Whitcomb not holding Ron Riley accountable, or



1      Tom Roy or Rachelle Weber, the underlying issues did

2      not involve you, did they?

3  A.  Not at that time.

4  Q.  To ask it another way, you didn't have any issues that

5      you had brought to Steve Whitcomb's attention with

6      respect to any of these individuals that you thought he

7      had not held them accountable for; is that correct?

8  A.  Ask it --

9  Q.  You hadn't raised any issues to Steve Whitcomb about

10     his failure to hold anybody accountable, had you?

11  A.  No.

12  Q.  And all these concerns that you raised to Willard Smith

13     occurred prior to your participation in the Johnson

14     investigation, correct?

15  A.  Yes.

16  Q.  After you submitted your hotline complaint and spoke to

17     Mr. Smith, did you have any other issues with Ron

18     Riley?

19  A.  Yes.

20  Q.  What other issues did you have with him?

21  A.  He began to retaliate against me.

22  Q.  How did he retaliate against you?

23  A.  He returned from his R and R after I had filed the

24     complaint and I was still working upstairs, he stopped

25     speaking to me altogether and then he -- he made me



TARA TAYLOR
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS

April 26, 2018
116

1      move back -- he removed responsibilities from me and

2      made me move back down -- made me move back downstairs.

3      And eventually he -- I was RIF'd from the project.

4   Q.  I want to spend a little bit of time talking about each

5      one of those things.  You said he stopped speaking to

6      you; when was that?

7   A.  The day that he returned from R and R.

8   Q.  Was that on July 3rd?

9   A.  I know that it was beginning of July; on or about.

10  Q.  When -- you say he stopped speaking to you altogether;

11     if you spoke to him, how would he respond?  He didn't

12     just ignore you, did he?

13  A.  In some cases he did.

14  Q.  Give me an example of when you spoke to him and he

15     didn't -- he just ignored you?

16  A.  Walking to the -- Niki and I walking to the dining

17     facility and him walking -- or say he was coming back

18     or we were -- and we were leaving and in passing we'd

19     say hi or whatever and he'd just keep on walking.

20  Q.  How many times did he do that?

21  A.  I have no idea.

22  Q.  Can you recall any other examples, other than that?

23  A.  No.

24  Q.  And you've already told me he wasn't a particularly

25     friendly person; is that right?



```
 1   A.   Yes.

 2   Q.   Did you express your concern to Mr. Smith about how --

 3        I guess about this, we'll call it silent treatment, for

 4        lack of a better word?

 5   A.   I expressed the difference in his behavior.

 6   Q.   You told him he'd stopped speaking to you?

 7   A.   I told him about his overall behavior.

 8   Q.   You also told him that you had heard that someone had

 9        made comments from Ron about him being mad about the

10        two -- about -- let me start again; that's a convoluted

11        question.  You had heard from somebody that Ron was

12        upset that you had complained; is that right?

13   A.   Yes.

14   Q.   What were you specifically told that Ron Riley had

15        said?

16   A.   I was told that he was upset because when he returned

17        he had to take a urinalysis and in the entire time that

18        he had been in Afghanistan he had never had to take a

19        urinalysis and that it must be because of the

20        investigation.  I was told that he said that -- that he

21        was upset with Niki and I because we were -- he called

22        us ungrateful bitches for all the things that he --

23        that he had done for us.

24   Q.   Who told you that?

25   A.   Paul Gentry.
```



1  Q.  And did Paul say that this was something that Ron had

2      told him or something that he had overheard Ron tell

3      somebody else?

4  A.  At the time -- well, he -- I remembered hearing it that

5      he had said it to -- in front of Mark Cofer and Paul

6      and himself.

7  Q.  So this wasn't something that Ron said to you

8      personally, right?

9  A.  No, he did not say that to me.

10 Q.  It wasn't something that he said to Niki, either,

11     correct?

12 A.  I'm not sure what he said to Niki.

13 Q.  Do you know of him saying anything like that to her?

14 A.  She never -- no, I don't know of anything.

15 Q.  Do you know if anyone else was present for that

16     conversation besides Paul Gentry and Mark Cofer and Ron

17     Riley?

18 A.  I don't recall.

19 Q.  And you didn't witness that conversation or hear him

20     say that, correct?

21 A.  No.

22 Q.  Mr. Smith asked you to identify who the person was that

23     overheard this and told you that; do you recall him

24     doing that?

25 A.  Yes.



TARA TAYLOR                                                       April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                         119

1   Q.   And do you recall being reluctant to identify --

2   A.   Yes.

3   Q.   -- that person?

4        And, in fact, you never did identify that person to Mr.

5        Smith, did you?

6   A.   I don't recall identifying the person.

7   Q.   Why were you reluctant to identify this person?

8   A.   Because Paul had a relationship with Ron and Mark and I

9        didn't want him to have to go through what I was going

10       through because he came back and said that -- you know,

11       that he repeated something that he said.

12  Q.   You also mentioned that you were moved downstairs; is

13       that right?

14  A.   Yes.

15  Q.   And you -- from your perspective, this was a

16       retaliatory act, right?

17  A.   Yes.

18  Q.   I think you also said that you no longer had any close-

19       out duties, correct?

20  A.   Yes.

21  Q.   And you've testified earlier that the reason you were

22       moved upstairs was because of those close-out duties,

23       correct?

24       Mr. Murphy:  Object to the form.

25  A.   I was moved upstairs to -- yes, as an additional duty



```
 1        and perform close-out duties, yes.

 2   Q.   So if you no longer had close-out duties to do, I guess

 3        did you have any reason to be on the second floor?

 4   A.   No.

 5   Q.   And the Prime Contracts office was on the first floor,

 6        right?

 7   A.   Yes.

 8   Q.   And you had worked in the first floor office during

 9        most of your time at Bagram, right?

10   A.   Yes.

11   Q.   And from a day-to-day work standpoint, from your

12        perspective, did it make more sense to be with the team

13        in the office rather than being upstairs on the second

14        floor?

15   A.   No.

16   Q.   Why not?

17   A.   Because I performed the exact same duties upstairs in

18        the office that I did downstairs in the office with

19        them.

20   Q.   Who told you you were being moved from the second floor

21        to the first floor?

22   A.   Ron Riley.

23   Q.   Did he tell you why?

24   A.   Yes.

25   Q.   What did he tell you?
```



1   A.   He told me that he was moving me back downstairs

2        because of the abrupt departure of Kelvin Johnson.

3   Q.   Do you know if Ron made the decision to move you

4        downstairs or somebody else did?

5   A.   I don't know that.

6   Q.   Your office on the second floor, was that a private

7        office or did you share it with somebody?

8   A.   On the second floor?

9   Q.   Yes.

10  A.   It was a private office.

11  Q.   Where was that office in location to Steve Whitcomb's

12       office?

13  A.   Steve would have been -- Steve's office was right next

14       door to Ron's.

15  Q.   Three doors down from yours?

16  A.   Yes.

17       Mr. Samples:  Why don't we take a lunch break?

18  (Off the record at 12:30 p.m.)

19  (On the record at 1:37 p.m.)

20  Examination resuming by Mr. Samples:

21  Q.   Okay, Ms. Taylor, we are back on the record after a

22       lunch break.

23       Before we went to lunch, we were talking about the

24       treatment you received from Ron Riley after you filed

25       your hotline complaint.  And we talked about -- you



1        talked about how he stopped speaking to you and about

2        the move downstairs.  You mentioned earlier that you

3        were eventually let go or RIF'd, we'll talk about that

4        later, but was there anything else Ron Riley did to you

5        that was -- you thought was retaliatory?

6   A.   Yes.  He made -- started making rules, or least made a

7        rule for -- specifically for the Bagram office that

8        wasn't made for any other office on the project.

9   Q.   What was that rule?

10  A.   He said that there was no -- you couldn't use your --

11       we had mini iPads, we couldn't use that, nor could we

12       watch television in the office, or have the television

13       on in the office.

14  Q.   And did Mr. Riley tell you why he was implementing that

15       rule?

16  A.   He did not tell me why he was implementing that rule.

17  Q.   Did you hear why he was doing it?

18  A.   I heard that he said that the reason he was doing it

19       was because of the type of traffic that came into the

20       Bagram office.

21  Q.   And by type of traffic, you mean high ranking military

22       officials that came through?

23  A.   Yes.

24  Q.   And the military was Fluor's customer on that project,

25       right?



```
 1    A.   Yes.

 2    Q.   That rule was put -- or that new policy was put in

 3         place while you were on R and R; is that correct?

 4    A.   I'm not exactly sure when.  I know that it was -- I'm

 5         not sure exactly when.

 6    Q.   When you heard about the new rule, you thought that

 7         sounded like a reasonable request, right?

 8    A.   No.

 9    Q.   You didn't think it was reasonable?

10    A.   No.

11    Q.   Why not?

12    A.   Because nothing had changed in the five years that I'd

13         been in Afghanistan and however long I had been in

14         Bagram, the traffic that went through that office never

15         changed in that...

16    Q.   Didn't you think that -- rather the issue you had with

17         the rule was not that he was prohibiting iPads and

18         watching television, but that the rule didn't apply to

19         all FOBs; was that not your primary concern?

20    A.   No, that was not my -- that was a concern, one concern,

21         with that decision.

22    Q.   What were your other concerns?

23    A.   The other concern was that this had been something that

24         had never been requested of that office and something

25         that he himself would come into the office and do all
```



1    the time, meaning being on his personal electronic

2    gadgets or watching television, and it was never an

3    issue until the investigation.

4    Q.   So your issues with this were that this was a policy

5         that only applied at Bagram, as far as you knew, and

6         this was different from the way things had been before;

7         is that right?

8    A.   That's two of the issues.

9    Q.   Did you have any others?

10   A.   That the rule, when speaking with my direct supervisor,

11        Dexter Hooks, the rule was only applicable to Niki and

12        I.

13   Q.   How do you know that?

14   A.   Because he brought in his television that he'd had at

15        another site and he kept his personal laptop and iPad

16        up on his desk and he was able to use those, and when

17        questioned, he said "That was for you all.  I told Ron

18        I'd be watching television and watching the game."

19   Q.   You're talking about Dexter Hooks there?

20   A.   Yes.

21   Q.   So Dexter Hooks was still allowed to watch television?

22   A.   He was still allowed -- yes, he was still allowed to

23        watch his television and use his personal gadgets.

24   Q.   When was Dexter allowed to use his devices and watch

25        television?



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                        125

```
 1   A.   He rarely turned on the television, but whenever he
 2        wanted he used his iPad or personal laptop.
 3   Q.   Was there ever a time where he stopped using his, his
 4        iPad?
 5   A.   Not to my knowledge.
 6   Q.   Did you have a personal laptop?
 7   A.   I had an iPad.
 8   Q.   After this new policy was implemented, did you continue
 9        to use your iPad or did you stop?
10   A.   I stopped.
11   Q.   What about the television, did you continue to watch
12        television or did you stop?
13   A.   I stopped watching the television, the main television,
14        in the office.
15   Q.   Did you ever ask Ron Riley directly why he made this
16        change?
17   A.   No.
18   Q.   Why not?
19   A.   We were not having any communication during that time.
20   Q.   So all the information you got about this policy came
21        secondhand?
22   A.   Yes.
23        Mr. Samples:  Let's mark this.
24           (Defendant's Exhibit Number Four is marked.)
25   Examination resuming by Mr. Samples:
```



1    Q.   Ms. Taylor, you've been handed what's been marked as

2         Exhibit Number Four.  This is an email that you sent to

3         Willard Smith and then his response, and you sent this

4         on July 21, 2014; is that right?

5    A.   Yes.

6    Q.   Just for the record, this is Bates number Defendant's

7         322 and 323.

8         You indicate in this email that you've just returned

9         from R and R, right?

10   A.   Yes.

11   Q.   And that you were informed by Niki and Ron -- by Niki

12        that Ron has told Dexter that we're not permitted to

13        turn the television on in the office nor are we able to

14        have any of our personal computers in the office,

15        correct?

16   A.   Yes.

17   Q.   You say in the next sentence this would appear to be a

18        reasonable request if it was something that was

19        implemented throughout the Contracts department and not

20        just the Bagram Contracts office.  Is that what you

21        said?

22   A.   That's what's typed here, yes.

23   Q.   Do you think it was a reasonable request or no?

24   A.   No.

25   Q.   Even though you said here you think it was reasonable?



1    Mr. Murphy:  Object to the form.

2  A.  I also said if.

3  Q.  You think it would have been reasonable if it was

4      implemented throughout the entire department?

5  A.  I couldn't have questioned it then.

6  Q.  Who else worked in the Bagram office besides you and

7      Niki and Dexter?

8  A.  During that time, we were the only -- well, I take that

9      back.  We were there by ourselves for a while, but then

10     Paul Begnaud began to work in that office for some time

11     and Alan Krapa came into the office for a limited time.

12 Q.  In your email to Willard Smith, you don't indicate that

13     Dexter Hooks was permitted to watch television, do you?

14 A.  No, it's not mentioned in this email.

15 Q.  Did you ever tell Willard Smith that this TV policy

16     only applied to you and Niki?

17 A.  I don't recall if I told him or not.

18 Q.  Did you have any other -- experience any other issues

19     with Ron Riley that you considered to be retaliatory?

20 A.  No, not at this time.  I can't think of anything.

21 Q.  When did you first learn that your position as

22     supervisor in Prime Contracts was being eliminated?

23 A.  The beginning of September.

24 Q.  2014?

25 A.  Yes.



```
 1   Q.   How did you learn that?

 2   A.   I was visited by Pete Irvin; he came to the Contracts

 3        office and asked Dexter and I to come to the HR

 4        building and he told me.

 5   Q.   Was anybody else present for that meeting?

 6   A.   No.

 7   Q.   So it was you and Dexter and Pete?

 8   A.   Yes.

 9   Q.   Do you know if Dexter knew that your position was being

10        eliminated?

11   A.   He did not know.

12   Q.   How do you know that?

13   A.   He said that he didn't know.

14   Q.   What specifically did Pete Irvin tell you?

15   A.   In paraphrasing, we got to his office and he says I

16        don't know how to tell you this, I was just asked to

17        come to Steve Whitcomb's office and Ron Riley was in

18        the office and I was told that I had to RIF you

19        tonight.

20   Q.   Did he say why?

21   A.   No, he did not.  I don't recall him saying why.

22   Q.   Did you ask why?

23   A.   I didn't ask anything.

24   Q.   How did you respond?

25   A.   I just sat there quietly.  There was nothing I could
```



1       do.

2   Q.  Did you have any indication or suspicion that your

3       position might be eliminated or that somebody would be

4       let go from the project?

5   A.  I had heard a rumor that there was an inquiry some

6       months before, but other than that, no.

7   Q.  Ron Riley had informed you and the other folks on your

8       team, I believe it was in early June, that they were

9       looking at the plan for next year and wanted to know

10      who was interested in sticking around and who wasn't;

11      do you remember that --

12  A.  Yes.

13  Q.  -- communication?

14      I think he indicated in that email that there would be

15      -- there might need to be some reductions; do you

16      remember that?

17  A.  I don't recall that email saying that specifically.

18  Q.  I know I have a copy of it and I'll find it before we

19      finish, but did you get a sense from Mr. Riley's email

20      from June that there would be some -- there could be

21      some reductions in the workforce?

22  A.  I didn't get that sense.

23          (Defendant's Exhibit Number Five is marked.)

24  Examination resuming by Mr. Samples:

25  Q.  Ms. Taylor, you've been handed what has been marked as



April 26, 2018
                                     130

1        Exhibit Number Five; is this the email you were

2        thinking about, the June email from Ron Riley?

3   A.   Uh-huh.

4   Q.   That was a yes?

5   A.   Yes.  I'm sorry.

6   Q.   That's fine.

7        In this email, Mr. Riley says "In anticipation of

8        another refresh of the OY4 proposal based on the

9        President's speech request from RICC and the PCO, can

10       each of you reaffirm your plans for the duration you

11       are planning on staying?  I will try to accommodate the

12       requests as much as I can, but as always, I cannot

13       promise anything.  Please respond back to me with your

14       plan as soon as possible but NLT 6 June 2014."  Did I

15       read that correctly?

16  A.   Yes.

17  Q.   He said in this email he couldn't promise anything,

18       right?

19  A.   Uh-huh.

20  Q.   That was a yes?

21  A.   Yes.

22  Q.   And you responded back and said you plan to stay until

23       the end of the project, correct?

24  A.   Yes.

25  Q.   And that was on June 6th, right?



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS              131

```
 1   A.   Yes.
 2   Q.   And on the same day, Mr. Riley responds -- or you tell
 3        me, how did he respond to you?
 4   A.   He said "Thanks for the reply.  Will be happy to have
 5        you."
 6   Q.   And this email was sent on June 6, 2014?
 7   A.   Yes.
 8   Q.   And that was after you had been interviewed by Rob
 9        Wells, right?
10   A.   Yes.
11   Q.   And it was also after you had filed your own hotline
12        complaint, right?
13   A.   Yes.
14   Q.   Were you ever given any reason why your position was
15        eliminated?
16   A.   I was never given a reason why my position was
17        eliminated.
18   Q.   Do you know why your position was eliminated?
19        Mr. Murphy:  Object to the form.
20   A.   No.
21   Q.   Do you know why you were selected to be let go as
22        compared to somebody else in the department?
23   A.   No.
24   Q.   During this time period, the military was still closing
25        bases, wasn't it?
```



1    A.    Yes.

2    Q.    And there were still troop draw downs that were taking

3          place, right?

4    A.    Yes.

5    Q.    In your position, you weren't privy to all the

6          discussions between the government customer and Ron

7          Riley and Steve Whitcomb and others about staffing

8          needs in Prime Contracts, were you?

9    A.    No.

10   Q.    You didn't attend the bi-weekly meetings with the

11         government, did you?

12   A.    No.

13   Q.    And you weren't responsible for ensuring that Prime

14         Contracts stays within its budget and its projections,

15         were you?

16   A.    No.

17   Q.    And do you have any evidence that there was not a need

18         to eliminate your position --

19         Mr. Murphy:  Object to the form.

20   Examination resuming by Mr. Samples:

21   Q.    -- based on the costs and the needs of the customer?

22         Mr. Murphy:  Same objection.

23   A.    Define evidence.  I don't know what evidence would be.

24   Q.    Well, I'm just asking if you had anything that would

25         indicate that there wasn't a need to eliminate your



TARA TAYLOR                                                              April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                              133

 1         position based on the needs of the customer?
 2  A.     No.
 3  Q.     And you never asked Mr. Riley why your position was
 4         being eliminated?
 5  A.     No.
 6  Q.     Were you aware that there was a push by the government
 7         to reduce management positions at Bagram -- rather on
 8         the project?
 9  A.     No.
10  Q.     Do you agree that Bagram had more people working in its
11         Prime Contracts office than any of the other bases?
12  A.     Yes.
13  Q.     Do you also agree that the other bases had just one
14         manager and one principal specialist?
15  A.     Yes.
16  Q.     What did you do once you learned your position was
17         being eliminated?
18  A.     At what point?
19  Q.     Well, I guess once you got -- once you got the -- let's
20         go back to the conversation you had with Pete Irvin.
21         So you said you didn't say anything.  What happened
22         next?
23  A.     Went back to the office with Dexter and informed Niki
24         that my position was being eliminated and I left for
25         the evening because it was later in the evening when I



```
 1        was called.  I went to my room, sat in the middle of
 2        the floor and cried.
 3   Q.   What did you do the next day?
 4   A.   Went back to the office, immediately started looking
 5        for jobs online and continued to do my job.
 6   Q.   When you had your meeting with Pete Irvin, were you
 7        told how much time you had to remain on the project?
 8   A.   I was told I had 30 days.
 9   Q.   So you had 30 days to try to find another job?
10   A.   Yes.
11   Q.   Did you look just internally with Fluor or did you look
12        outside of Fluor?
13   A.   I looked outside of Fluor.
14   Q.   During that time period, did you receive any
15        interviews?
16   A.   I received -- I did not interview with anyone, but I
17        had an interview set up.
18   Q.   Who was that with?
19   A.   It was with Target.
20   Q.   Why did you not go forward with that interview?
21   A.   Because the day before -- the evening before the
22        interview, I received a phone call from Greenville
23        requesting that I take a position there at the
24        corporate office with Fluor.
25   Q.   What position was that?
```



1    A.   There was really no title for the position.

2    Q.   Was it a position that you had applied for or expressed

3         interest in?

4    A.   No.

5    Q.   Who reached out to you about that position?

6    A.   Jeff Uribe.

7    Q.   And why was he contacting you?

8         Mr. Murphy:  Object to the form.

9    Examination resuming by Mr. Samples:

10   Q.   Do you know why he was contacting you?

11   A.   He stated that he was contacting me because he'd heard

12        that I was on the RIF list and that I was too good of

13        an employee to let go and that they could get me

14        something, perhaps he could find me something in

15        Greenville.

16   Q.   When was that conversation with Jeff, and what was --

17        I'm sorry, what was Jeff's last name?

18   A.   Uribe.

19   Q.   How do you spell that?

20   A.   U-r-i-b-e.

21   Q.   Okay.  How soon after you had the conversation with

22        Pete Irwin did you have -- Irvin, did you have the

23        conversation with Jeff?

24   A.   Maybe -- it was within a week later.

25   Q.   Did he tell you when your job in Greenville would



1    start?

2    A.   He told me after -- to go on R and R, go home for three

3         weeks and then I would start the job then and then

4         asked me what day I wanted to start and to get back

5         with Karen Jack, who was also on the call, and let her

6         know which day I wanted to start.

7    Q.   Was this a position in Prime Contracts?

8    A.   No.

9    Q.   What department was this in?

10   A.   It was just a position in Contingency Ops.

11   Q.   Did you already -- did you already have an R and R

12        scheduled?

13   A.   I had an R and R scheduled prior to finding out that I

14        was being RIF'd.

15   Q.   So you went ahead and took that R and R as scheduled?

16   A.   No, I cancelled it.

17   Q.   So you stayed in Afghanistan?

18   A.   Yes.

19   Q.   How long did you stay in Afghanistan?

20   A.   About three weeks after I found out.

21   Q.   Why did you cancel the R and R?

22   A.   Because I didn't want to go and -- knowing that I was

23        losing my job and didn't have one, I didn't want to go

24        and spend any money on R and R.

25   Q.   What did you do the three weeks that you stayed on the



1        project?  Was it business as usual or was it different?

2   A.   I packed every evening and went to the post office

3        every day to start shipping things home and I continued

4        to do my day-to-day job after I found out that I would

5        have a position in Greenville.

6   Q.   And you actually requested to leave the project earlier

7        than the 30 days, correct?

8   A.   Yes.

9   Q.   And that was because you had this option in Greenville?

10  A.   I had -- not only because of that.  Because I had the

11       option in Greenville and I just -- after what happened,

12       I just didn't want to be there.

13  Q.   When did you leave Afghanistan?

14  A.   I can't remember the exact day.

15  Q.   It was some time in September?

16  A.   That sounds right.

17  Q.   And did you take any time off between leaving the

18       project and starting in Greenville?

19  A.   Yes.

20  Q.   How much time off did you take?

21  A.   About three weeks.

22  Q.   And that was your choice to take that time off?

23  A.   No.

24  Q.   Let me ask it a different way; could you have started

25       in Greenville as soon as you got back from Afghanistan?



```
 1   A.   No.

 2   Q.   Why not?

 3   A.   During the conversation, Jeff Uribe told me to take

 4        about three weeks off and let them get everything

 5        together there and figure out what my role was going to

 6        be and then to come on in to work.

 7   Q.   And you said it was going to be a position in

 8        Contingency Ops?

 9   A.   It was a position in Contingency Ops.

10   Q.   Did you ever start working in that position?

11   A.   Yes.

12   Q.   How long did you work in that position?

13   A.   Almost six months.

14   Q.   And you started in October of 2014?

15   A.   Yes.

16   Q.   What was your position in Contingency Ops?

17   A.   I assisted Tony Lorusso with communications.

18   Q.   What kind of communications?

19   A.   Writing -- help -- assisting with writing speeches for

20        the vice-president of Contingency Ops, participating in

21        -- I was almost like an admin in some sort.

22   Q.   Did your pay -- was your base pay the same in that role

23        or did it change?

24   A.   It was the same as it was in Afghanistan upon my

25        initial arrival.
```



1   Q.   Did the base pay stay the same through the six months?

2   A.   No, I believe I received an increase in that following

3        year, early that following year.

4   Q.   Early in 2015, you got a pay raise?

5   A.   Yes.

6   Q.   How about your benefits; did your benefits stay the

7        same?

8   A.   No.

9   Q.   How did they change?

10  A.   Well, the health benefits are different in Afghanistan

11       than they are in -- at the corporate office.

12  Q.   How are they different?

13  A.   Just different.  I think it was different companies or

14       something like that.

15  Q.   As far as the benefits you received, the health

16       benefits you received, would you consider them to be

17       about equal?

18  A.   I don't know, only because I wasn't on Fluor's health

19       benefits.

20  Q.   You weren't on them in Afghanistan or you weren't on

21       them when you came to Greenville?

22  A.   I'm really not sure about Afghanistan, if I was or was

23       not, but I was not on them in Greenville.

24  Q.   Did you have health insurance through another source?

25  A.   Yes.



1    Q.    What was that?

2    A.    My husband's insurance.

3    Q.    So you had his insurance through the City of Atlanta?

4    A.    Yes.

5    Q.    Other than the health insurance, were you aware of any

6          other differences in the benefits between the two

7          positions?

8    A.    The pay was different.

9    Q.    How was the pay different?

10   A.    There was no more hazard pay or uplift; vacations

11         different.

12   Q.    How are the vacations different?

13   A.    I wasn't --

14   Q.    You didn't get the four periods of R and R?

15   A.    Right.

16   Q.    Did you get any vacation time?

17   A.    I accrued vacation time.

18   Q.    Were you given any when you started or did you have to

19         earn it over time?

20   A.    Earn it over time.

21   Q.    Do you know how much vacation -- or do you know what

22         rate it accrued?

23   A.    No, I can't recall what the rate was.

24   Q.    You mentioned the uplift; the uplift was only available

25         to those who were in Afghanistan, right?



```
 1    A.   Yes.
 2    Q.   I mean, there wasn't anybody in Greenville who was
 3         getting the uplift?
 4    A.   Not to my knowledge.
 5    Q.   Who did you report to in Greenville?
 6    A.   Tony Lorusso.
 7    Q.   Did you have any further interactions with Ron Riley
 8         after you came to Greenville?
 9    A.   No.
10    Q.   Have you had any interactions with him since leaving
11         the project?
12    A.   No.
13    Q.   Did you have any interactions or encounters with him
14         between the time you were notified that you were being
15         RIF'd and your departure from the country?
16    A.   No.
17    Q.   You never saw him or talked to him?
18    A.   I saw him, but never talked to him, or not really.
19    Q.   And you never sought him out to try to find a reason
20         why your position was being eliminated?
21    A.   No.  And I want to correct -- I talked to him about
22         business related things, like there's a couple of
23         emails back and forth, questions referencing business
24         stuff, but no, I never sought him out.
25    Q.   So you never had any non-work related conversations
```



1           with him after you learned you were being let go?

2    A.    That's correct.

3    Q.    Business dealings you had with him, what was his

4          attitude like at that point and time when you were

5          dealing with him?

6    A.    He was very short with me.

7    Q.    Is that how he had been prior to that, though?

8    A.    No.  Prior to what?

9    Q.    Prior to you learning that your position was being

10         eliminated, he had been short with you before?

11   A.    We -- he didn't speak to me -- yes.

12   Q.    Do you have any evidence that Ron Riley was trying to

13         limit your ability to get any other jobs?

14         Mr. Murphy:  Object to the form.

15   A.    Yes.  Limit my ability?

16   Q.    Yes.

17   A.    No, I don't have any evidence that he tried to limit my

18         ability.

19   Q.    Any evidence of him trying to interfere with your

20         ability to get some other job with the company?

21         Mr. Murphy:  Object to the form.

22   A.    No.

23   Q.    You said you worked in Greenville for about six months?

24   A.    Yes.

25   Q.    Did you apply for other positions while you were



1       working in Greenville?

2   A.  No.

3   Q.  Why did you leave the job in Greenville?

4   A.  I was offered an HR manager position in Jacksonville.

5   Q.  Did you apply for that position?

6   A.  No.

7   Q.  How did you get that job?

8   A.  I assisted HR with a project; during that time they

9       found out that I had worked in HR and they were getting

10      ready to make a move of the HR manager in Jacksonville,

11      and I was offered the position.

12  Q.  So the two jobs you had after LOGCAP, you didn't

13      actually apply for, they just sort of landed in your

14      lap?

15  A.  They were given to me.  I did not apply.

16  Q.  That's good.  I mean, that's great.

17      Was there any break in your employment between the time

18      you left Greenville and starting in Jacksonville?

19  A.  No.

20  Q.  You said it was an HR manager position?

21  A.  Yes.

22  Q.  Is that for a particular project?

23  A.  Yes.

24  Q.  And what's the project?

25  A.  It's a Jacksonville RBOS 1 project.



1   Q.   RBOS 1?

2   A.   Yes, R-B-O-S 1.

3   Q.   What is the goal of that project or the objective or

4        the mission?

5   A.   It's a contract that Fluor has with the government to

6        basically take care of the bases in Jacksonville, their

7        tradesmen, all trades that are there, and take care of

8        any service call type issues.

9   Q.   And with this job in Jacksonville, you started working

10       for a different Fluor entity; is that right?

11  A.   Yes.

12  Q.   What's the entity you're working for --

13  A.   Fluor --

14  Q.   -- in Jacksonville?  Go ahead.

15  A.   Fluor Federal Solutions.

16  Q.   What are your primary responsibilities as HR manager?

17  A.   I recruit, I hire; any HR issues that arise there; I

18       deal with the union, dealing with all grievances,

19       responses to grievances; assist with payroll issues;

20       discipline; training.

21  Q.   How many employees are on that project?

22  A.   Last count was 256.

23  Q.   Are you the only HR person on the project?

24  A.   Yes.

25  Q.   Who do you report to?



1    A.    I have a -- on site, Henry Fuentes, he's the project

2          manager, and then I have a, for lack of a better term,

3          a functional manager and her name is Amanda Cook, and

4          she's here in Greenville.

5    Q.    Do you work with anybody in Jacksonville who you worked

6          with in Afghanistan?

7    A.    No.

8    Q.    And you're still in that HR manager position today,

9          right?

10   A.    Yes.

11   Q.    How is your current job going?

12   A.    Great.

13   Q.    Good.

14         When you started your job as the HR manager, do you

15         know what your base salary was?

16   A.    It was $92,000.

17   Q.    And that was more than your base salary in Greenville,

18         right?

19   A.    Yes.

20   Q.    And it was more than your base salary as a Prime

21         Contracts supervisor, right?

22   A.    Base?  Yes.

23   Q.    Have you received any pay raises since you started in

24         that position?

25   A.    Yes.



TARA TAYLOR
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS

April 26, 2018
146

1    Q.    Do you know how many?

2    A.    One pay raise.

3    Q.    What's your current annual salary?

4    A.    $99,910.

5    Q.    Have you had any breaks in your employment since you

6          started working on that project in 2015?

7    A.    No.

8    Q.    And that position is a tier one position; is that

9          right?

10   A.    I don't know if it's called a tier one position?

11   Q.    But you're considered a Fluor employee, right?

12   A.    Yes.

13   Q.    Did your benefits change between the position in

14         Greenville and the position in Jacksonville?

15   A.    No.

16   Q.    I want to take a look at your pay records.  I'll just

17         put those in the record.

18              (Defendant's Exhibit Number Six is marked.)

19   Examination resuming by Mr. Samples:

20   Q.    Ms. Taylor, you've been handed what's been marked as

21         Exhibit Number Six.  This is Bates number Taylor 511

22         through 525.  What is Exhibit Six?

23   A.    It's my pay stubs.

24   Q.    These are your pay stubs from Fluor Federal Solutions?

25   A.    Yes.



1  Q.  So these are the pay stubs from the Jacksonville

2      position, correct?

3  A.  Yes.

4  Q.  Do these appear to be your accurate pay stubs that you

5      provided to your counsel?

6  A.  Yes.

7      Mr. Samples:  Let's mark this as Exhibit Seven.

8          (Defendant's Exhibit Number Seven is marked.)

9  Examination resuming by Mr. Samples:

10 Q.  Ms. Taylor, make sure I didn't give you two of those.

11 A.  You did.

12 Q.  I'll take one back.

13     This has been marked as Exhibit Seven.  This is a

14     spreadsheet reflecting your recent pay, your more

15     recent pay, since you provided us with those pay stubs.

16     Just take a minute and look at these numbers and make

17     sure that it accurately reflects your more recent pay

18     with Fluor Federal Solutions.

19 A.  I have no knowledge of any of the numbers except the

20     net number is correct.

21 Q.  So the net pay is correct.  What about the gross pay,

22     is that what you actually received?

23 A.  Honestly, I'm not sure about the gross.

24 Q.  So the gross pay is $1,921.36 and then the net is

25     $1,464.07; is that how much you receive each week?



1    A.   Yes.

2    Q.   And you're paid weekly?

3    A.   Well, that's not how much I'm receiving now, but this

4         number -- these numbers are correct.

5    Q.   Okay, good question.  Thank you for catching that.  So

6         the net pay numbers are correct in Exhibit Seven?

7    A.   Yes.

8    Q.   And it looks like you're currently receiving $1,433.07

9         a week --

10   A.   Yes.

11   Q.   -- in net pay?

12   A.   Yes.

13   Q.   And I assume your position of HR manager is an exempt

14        position?

15   A.   Yes.

16   Q.   Since you've been in Jacksonville, have you applied to

17        work in any other positions with Fluor?

18   A.   Yes.

19   Q.   What positions have you applied for?

20   A.   I applied for an HR manager position that was in

21        Afghanistan.  I also applied for a Contract Specialist

22        position that was in Afghanistan.

23   Q.   Any other positions that you applied for?

24   A.   No, not that I can think of.

25   Q.   When did you apply for the HR manager position in



1       Afghanistan?

2    A.   It was some time last year.

3    Q.   Does June 2017 sound about right?

4    A.   I'm not exactly sure when.  I know it was last year.

5    Q.   What about the Contract Specialist position, did you

6         apply for that one at the same time?

7    A.   I'm not sure if I applied for them at the same time,

8         but -- I'm not sure if I applied for them at the same

9         time.

10   Q.   Did you apply for that one last year as well?

11   A.   Yes.

12   Q.   Do you know specifically when you applied for that

13        position?

14   A.   No.

15   Q.   Did you apply for any positions at Fluor between

16        October 2014 and 2017 when you applied to these two

17        positions?

18   A.   No.

19   Q.   Did you apply -- let me ask you this; based on that, is

20        it fair to say you were happy with your job during that

21        time period?

22   A.   Yes.

23   Q.   Why did you apply to these two positions in Afghanistan

24        in 2017?

25   A.   Well, one -- well, I applied because I was -- I was



1    told -- how can I say this -- I was -- I applied, one,

2    because I definitely wanted the HR position, but two,

3    because I was informed that there was a question about

4    me not applying for jobs.

5   Q.   So you wanted to make it look like you were trying to

6        find other work.

7        Mr. Murphy:   Object to the form.

8   Examination resuming by Mr. Samples:

9   Q.   Is that fair to say?

10  A.   No.

11  Q.   Why was -- well, you just said you hadn't applied to

12       any jobs between October 2014 and when you applied for

13       these jobs, right?

14  A.   Yes.

15  Q.   Did you apply for any jobs outside of Fluor between

16       October 2014 and when you applied for these two jobs?

17  A.   Yes -- not when I applied for those two jobs.

18  Q.   Well, my question is, between October 2014 and then the

19       time you applied to these two jobs, I think it was June

20       2017, but --

21  A.   Okay.

22  Q.   -- all you recall is 2017, did you apply to any other

23       jobs outside of Fluor?

24  A.   Yes.

25  Q.   What did you apply to?



1   A.   I don't remember the jobs, but the majority of them

2        would have been in Atlanta.

3   Q.   Do you recall when you applied for those jobs?

4   A.   No.  I mean, periodically, I've just...

5   Q.   Do you have any documentation related to your

6        application for those jobs?

7   A.   No.

8   Q.   Did you have any interviews associated with any of

9        those jobs?

10  A.   No.

11  Q.   Do you have any evidence, other than your testimony,

12       that you've applied for those jobs?

13  A.   No.

14  Q.   And you don't remember what those jobs were?

15  A.   No.

16  Q.   You don't remember the company they were with or what

17       the position was for?

18  A.   No.

19  Q.   How do you know you applied for a job then?

20  A.   Because I applied for jobs in Atlanta.

21  Q.   During that time period or just generally?

22  A.   I'm not sure I understand --

23  Q.   During the --

24  A.   -- the question.

25  Q.   -- 2014 to 2017 time period or you just generally



```
 1        applied for jobs in Atlanta?

 2   A.   I just generally applied for jobs in Atlanta.

 3   Q.   I know you told me early on in the deposition that you

 4        applied for some positions with Home Depot, and then I

 5        guess a contractor of Home Depot; are those the jobs

 6        that you're thinking about or have there been others?

 7   A.   There were definitely others.

 8   Q.   Any others that you can recall?

 9   A.   No.

10   Q.   So the two positions in Afghanistan, you applied for

11        those in 2017?

12   A.   Yes.

13   Q.   And you did so because there was a question as to

14        whether you had applied for any jobs or not, right?

15   A.   That's not the only reason.

16   Q.   But that was one of the reasons?

17   A.   That was one of the reasons.

18   Q.   And do you understand what that issue was with you --

19        what the problem was with you not applying for any

20        jobs?

21        Mr. Murphy:  Object to the form.

22   A.   No.

23   Q.   Were you acting on the advice of counsel in doing that?

24        Mr. Murphy:  Hold on a minute.  Okay, you can answer

25        that -- you can answer just that question.
```



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                        153

```
 1   A.   Yes.
 2   Q.   You mentioned earlier that you had some discussions
 3        with your supervisor, I think Henry Fuentes is his
 4        name; is that right?
 5   A.   Yes.
 6   Q.   You had some discussions with him about this lawsuit;
 7        is that right?
 8   A.   Yes.
 9   Q.   When did you first have those discussions?
10   A.   I don't remember exactly when.
11   Q.   Has it been recently or was it a while back?
12   A.   It was a while back.
13   Q.   And that came up -- I guess, why did it come up and why
14        did you bring that up with him?
15   A.   Because I had to have some days off to come here to
16        meet with the EEOC.
17   Q.   I think we may have talked about this earlier, but have
18        you asked to be released from your current project?
19   A.   Yes.
20   Q.   Okay.
21   A.   I --
22   Q.   Go ahead.
23   A.   Yes.
24   Q.   Have you been released to apply for other jobs?
25   A.   No.
```



1   Q.   Even though you haven't been released from the project,

2        you can still apply for other jobs within Fluor, right?

3   A.   Yes.

4   Q.   And you've obviously applied to some other jobs within

5        the company, right?

6   A.   Yes.

7   Q.   I think we covered this earlier, but have you had any

8        job interviews, either with another Fluor project or

9        with some outside company, other than the interviews

10       that you've mentioned with Home Depot, and then I

11       forget the name of the other company; what was it

12       called, for the San Francisco job?

13  A.   Interline.

14  Q.   Interline.  Any interviews besides those?

15  A.   Yes.

16  Q.   What interviews have you had?

17  A.   I had an interview with Home Depot in Atlanta for an HR

18       regional position.

19  Q.   When did you interview for that position?

20  A.   Within the past six months.

21  Q.   Did you get an offer for that position?

22  A.   No.

23  Q.   Did they give that position to somebody else?

24  A.   No.

25  Q.   What happened with that position?



```
 1   A.   They restructured.

 2   Q.   So they no longer needed somebody for that position?

 3   A.   Correct.

 4   Q.   Any other interviews besides the Interline and the Home

 5        Depot interviews?

 6   A.   No.

 7   Q.   Have you received any job offers --

 8   A.   Oh --

 9   Q.   -- I'm sorry, other than the Interline offer?

10   A.   I -- correct.  I need to make a correction.

11   Q.   Okay, go ahead.

12   A.   Yes, there was another interview; it was an HR manager

13        position and it was in Savannah.

14   Q.   Who was that with?

15   A.   I don't remember the company.

16        And then one other interview with Dime Corp.

17   Q.   Was that for an HR position?

18   A.   Yes.

19   Q.   Where was that position based?

20   A.   It would have been -- it was overseas; I can't recall

21        exactly where.

22   Q.   Did you receive job offers for either of those

23        positions?

24   A.   For which ones?

25   Q.   Either the HR manager position in Savannah or the Dime
```



TARA TAYLOR                                                        April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                          156

```
 1        Corp --
 2   A.   No.
 3   Q.   -- job?  Okay.
 4        And I think I had asked you this question, but I don't
 5        think you've answered it yet, have you received any job
 6        offers, other than the job offer for the Interline
 7        position?
 8   A.   No.
 9   Q.   Do you have any current applications outstanding?
10   A.   Yes.
11   Q.   Any leads on other jobs?
12   A.   No.
13   Q.   What are your outstanding applications that you haven't
14        heard from yet?
15   A.   Amazon.
16   Q.   What have you applied for with Amazon?
17   A.   HR manager positions and operation manager positions.
18   Q.   Where are those positions?
19   A.   Jacksonville.  I don't know where the other ones are; I
20        know the main one is in Jacksonville.
21   Q.   What are your -- I mean, I know you mentioned earlier
22        that you were looking for jobs around Atlanta, but it
23        sounds like you've also applied to some jobs in other
24        places; what are you looking for when you're looking
25        for a new job?
```



1   A.   I'm not sure I understand that question.

2   Q.   Are you looking for a specific location, specific type

3        of job or what -- what kinds of jobs are you applying

4        for?

5   A.   I'm applying for jobs that I have experience in.

6   Q.   It doesn't matter where they are?

7   A.   It does.

8   Q.   But you're limiting yourself to certain areas; is that

9        fair to say?

10  A.   No, I wouldn't say that.

11  Q.   I mean, you said you had the job offer for the San

12       Francisco job, but you didn't take it because it was in

13       San Francisco, so I assume you're limiting yourself to

14       certain areas?

15  A.   No, I wouldn't say that I'm limiting myself.

16  Q.   Why didn't you take the San Francisco job?

17  A.   Well, one, it's on the west coast and they offered

18       $85,000 and I was making more than that.

19  Q.   Do you have any reason to believe your current job is

20       not going to continue?

21  A.   Yes.

22  Q.   And why do you say that?

23  A.   Because the contract is up officially June 30th of this

24       year.

25  Q.   Is that why you're applying for other positions?



```
 1   A.   Yes.

 2        Mr. Samples:  Why don't we take a five minute break?

 3   (Off the record at 2:33 p.m.)

 4   (On the record at 2:52 p.m.)

 5   Examination resuming by Mr. Samples:

 6   Q.   All right, Ms. Taylor, we're back on the record.

 7        You filed a charge with EEOC, which you've alluded to

 8        earlier; is that right?

 9   A.   Yes.

10   Q.   When did you file your charge?

11   A.   It was in August of 2014.

12   Q.   I'm just going to show you a few documents related to

13        your charge; I'm not going to spend very much time on

14        them, but I'd like for you to identify them for me.

15        Mr. Samples:  Let's mark this.

16            (Defendant's Exhibit Number Eight is marked.)

17   Examination resuming by Mr. Samples:

18   Q.   Ms. Taylor, you've been handed what's been marked as

19        Exhibit Number Eight.  Is this the intake questionnaire

20        that you completed when you filed your EEOC charge?

21   A.   Yes.

22   Q.   And this is Bates numbered Taylor 225 through 228.  If

23        you look over on page 228, the last page, is that your

24        signature?

25   A.   Yes.
```



1  Q.  And what's the date beside your signature?

2  A.  4 August '14.

3  Q.  So you completed the intake questionnaire in August

4      2014, correct?

5  A.  Yes.

6  Q.  So you filed your EEOC charge before you learned that

7      your position was being eliminated; is that right?

8  A.  Yes.

9  Q.  Now, in -- let's actually take a look at your charge.

10         (Defendant's Exhibit Number Nine is marked.)

11 Examination resuming by Mr. Samples:

12 Q.  You've been handed what's been marked as Exhibit Number

13     Nine.  Is this a copy of the charge that you filed with

14     EEOC?

15     Mr. Murphy:  Well, can you tell her which page?

16 Examination resuming by Mr. Samples:

17 Q.  Yes, if you look over on the -- I think we may have

18     some extra pages in here, but --

19 A.  Yes, the third page.

20 Q.  -- the third page is an actual copy of your charge?

21 A.  Yes.

22 Q.  And is that your signature on the third page?

23 A.  Yes.

24 Q.  In your charge, you've checked the box for retaliation;

25     is that right?



TARA TAYLOR                                                    April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                      160

1    A.    Yes.

2    Q.    Who retaliated against you?

3    A.    Ron Riley.

4    Q.    Did anybody else retaliate against you?

5          Mr. Murphy:  I'm going to object to the form.

6    A.    I'm not really sure how to answer that question.

7          Mr. Murphy:  You have to speak up so she can hear you.

8    A.    Can you ask that question in a different way?

9    Q.    Yeah, you said that Ron Riley retaliated against you,

10         and my question was did anybody else retaliate against

11         you?

12         Mr. Murphy:  Object to the form.

13   A.    Not directly.

14   Q.    Did anybody indirectly retaliate against you?

15   A.    I'll say no.

16   Q.    Have we discussed already today in your deposition the

17         reasons that you were -- the reasons you believe you

18         were retaliated against?

19   A.    I haven't stated the reasons I feel like I was

20         retaliated against.

21   Q.    Maybe I didn't ask the question correctly then.  Have

22         we stated -- have we covered today the ways in which

23         you think Ron Riley retaliated against you?

24   A.    Yes, the ways that I could recall.

25   Q.    As you sit here now, can you recall any other ways that



```
 1        Ron Riley retaliated against you?
 2   A.   Not that I can recall.
 3   Q.   When you filed your EEOC charge, were you represented
 4        by an attorney at that time?
 5   A.   No.
 6   Q.   You submitted a time line to the EEOC; do you recall
 7        doing that?
 8   A.   Yes.
 9             (Defendant's Exhibit Number Ten is marked.)
10   Examination resuming by Mr. Samples:
11   Q.   Ms. Taylor, you've been handed what's been marked as
12        Exhibit Number Ten.  What is this document?  And just
13        for the record, this is Taylor 11 through Taylor 22 --
14        or 23.
15   A.   It's a time line of things that occurred while I was in
16        Afghanistan during the investigations.
17   Q.   Did you prepare this time line?
18   A.   Yes.
19   Q.   Did anyone help you prepare it?
20   A.   No.
21   Q.   When did you prepare this time line?
22   A.   Over time as things occurred.
23   Q.   So is this a running document that you would update
24        over time as things happened?
25   A.   Yes.
```



1    Q.    When did you start preparing this document?

2    A.    I'm not exactly sure.

3    Q.    Was it before you filed your EEOC charge or after?

4    A.    It was before that.

5    Q.    Why did you start documenting things in this manner?

6    A.    Because I wanted to make certain that I had a record of

7          what was happening.

8    Q.    Why did you want to have a record?

9    A.    Because I can't remember everything.

10   Q.    Did you think you would need to use it at some point?

11   A.    Yes.

12   Q.    Why did you think you would need it?

13   A.    Because once the decision was made to file the internal

14         investigation and then I started making certain I kept

15         a record of everything that was happening.

16   Q.    Once you filed the hotline complaint, is that what

17         you're talking about?

18   A.    I'm not sure if it was -- I mean, there was information

19         that I sent Mr. Smith, so it had to be somewhere in

20         that time frame.

21   Q.    When did you submit this to the EEOC?

22   A.    In August.

23   Q.    When you filed your charge?

24   A.    Yes.

25   Q.    Is that your signature on the last page?



1   A.   Yes.

2   Q.   And it's dated August 4, 2014, right?

3   A.   Yes.

4   Q.   And that's the same day you signed the EEOC intake

5        questionnaire, right?

6   A.   Yes.

7   Q.   With this time line, you refer to some attachments; did

8        you have some exhibits that went with this?

9   A.   Yes.

10  Q.   I believe I have those.

11       Mr. Samples:  Let's mark this.

12          (Defendant's Exhibit Number Eleven is marked.)

13  Examination resuming by Mr. Samples:

14  Q.   Ms. Taylor, you've been handed what's been marked as

15       Exhibit Number Eleven; do you recognize these

16       documents?

17  A.   Yes.

18  Q.   What are we looking at here?

19  A.   Looking at exhibits that were -- attachments that were

20       referenced in the chronology of events that I wrote.

21  Q.   And there's a fax cover page on the front of this; it

22       looks like it was faxed from Bagram Airfield

23       Afghanistan, right?

24  A.   Yes.

25  Q.   Did you fax it?



1   A.   Yes.

2   Q.   And the fax cover page is dated August 4, 2014, right?

3   A.   Yes.

4   Q.   And it looks like you faxed it to the EEOC office in

5        Greenville?

6   A.   Yes.

7   Q.   Did you compile the chronology and the attachments for

8        the purpose of submitting it to the EEOC or did you

9        compile it for some other purpose?

10  A.   I compiled it to match what was in my -- in the write-

11       up.

12  Q.   Did you submit it to anybody before you submitted it to

13       the EEOC?  More specifically, did you give this

14       information to Fluor?

15  A.   Some of this information was given to Fluor.  I don't

16       know -- I can't tell you exactly which documents, but I

17       -- but some of it was given to Fluor.

18  Q.   But you didn't give it to Fluor in this format, in the

19       form of a chronology with the attachments, did you?

20  A.   I actually can't recall -- I can't recall if I did.

21  Q.   I guess what I'm trying to get at is why you would

22       prepare this very detailed chronology with these

23       attachments if not to give it to the EEOC or somebody

24       else?  I mean, was -- did you prepare it in this manner

25       and in this format to give to the EEOC?



1   A.    I gave this to the EEOC.

2   Q.    Right.  And why did you create it if not to give it to

3         the EEOC?

4   A.    To keep a record of everything that was happening.

5   Q.    Right, and when you were keeping that record, did that

6         record include the attachments or is that something you

7         added for the EEOC?

8         Mr. Murphy:  I think I've figured --

9         Mr. Samples:  Okay.

10        Mr. Murphy:  You can keep going if you want, or I can

11        -- I think I understand the confusion.  Do you want me

12        to tell you?

13        Mr. Samples:  Sure.  Let's go off the record.

14  (Off the record at 3:04 p.m.)

15  (On the record at 3:05 p.m.)

16  Examination resuming by Mr. Samples:

17  Q.    All right, Ms. Taylor, we're back on the record.

18        The question I'm trying to get at is with the time line

19        and these attachments, this compilation, why did you

20        prepare this particular compilation in this way; was it

21        to submit to the EEOC or did you do it for some other

22        purpose?

23        Mr. Murphy:  He's just referring to Exhibit Number

24        Eleven.

25  A.    To go to the EEOC.



1    Q.    Looking at Exhibit Number Eleven, it looks like there's

2          some emails in here that were Kelvin Johnson emails

3          that you're not copied on; did Kelvin Johnson provide

4          you with those emails?

5    A.    Yes.

6    Q.    Did you ask him to or did he just give those to you?

7    A.    Both.

8    Q.    Take a look at attachment number 5; it's Taylor 194 and

9          195.   These are -- it looks like this was an email sent

10         from Kelvin Johnson to you, Paul and Nikoletta on April

11         2, 2014; is that right?

12   A.    Yes.

13   Q.    In this email, he attaches the responsibilities of each

14         individual on the team; do you see that over on page

15         195?

16   A.    Yes.

17   Q.    It looks like there are a couple of these responsibil-

18         ities that were unique to you, including serving as

19         contracts advisor to Fluor senior management and trade

20         departments; were you the only person on the team that

21         had that responsibility?

22   A.    When I was there.

23   Q.    Okay, when you were there, you were -- okay, but if you

24         weren't there, somebody would do that for you?

25   A.    Yes.



1    Q.    Who would do that for you?

2    A.    It could either be Niki or Paul.

3    Q.    You also have track/record completed projects and

4          process close-out actions, and you're the only person

5          who had that responsibility, according to this summary;

6          was that true?

7    A.    Ask that question again, please.

8    Q.    According to this, you were responsible for tracking

9          and recording completed projects and processing close-

10         out actions.  You were the only person on this chart

11         that has that responsibility; was that true in

12         practice?  Was that your -- were you the only one who

13         had that responsibility?

14   A.    If I was there.

15   Q.    Is that the same as the close-out duties that we were

16         referring to earlier or is that something different?

17   A.    That's something different.

18   Q.    Who would do the tracking and recording if you weren't

19         there?

20   A.    Most likely Niki.

21   Q.    After you filed your -- or submitted your initial time

22         line, you later on submitted a supplemental time line

23         to your -- update to your chronology; do you remember

24         doing that?

25   A.    Yes.



TARA TAYLOR                                          April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS              168

1  Q.   Why did you do that?

2  A.   I updated it as things happened.

3          (Defendant's Exhibit Number Twelve is marked.)

4  Examination resuming by Mr. Samples:

5  Q.   This is Exhibit Number Twelve.  This is Taylor 162 and

6       163; is this an update that you provided to the EEOC?

7  A.   Yes.

8  Q.   And it looks like it's dated September 2, 2014?

9  A.   Yes.

10 Q.   And this was the same day you found out your position

11      was being eliminated; is that right?

12 A.   Yes.

13 Q.   So you were just updating the EEOC to let them know

14      your position was being eliminated?

15 A.   Yes.

16 Q.   Ms. Taylor, have you reviewed the complaint that began

17      this lawsuit?

18 A.   I skimmed through it, yes.

19 Q.   In your own words, tell me what claims are you

20      asserting against Fluor?

21      Mr. Murphy:  Object to the form.

22 A.   The -- I mean, I don't really know any legal jargon.

23      The main claim that I had was that I felt as though I

24      had been retaliated against.

25 Q.   And that retaliation was by Ron Riley?



```
 1   A.   Yes.

 2        Mr. Murphy:  Object to the form.

 3   Examination resuming by Mr. Samples:

 4   Q.   And that was -- and we've previously discussed the

 5        reasons why -- the ways in which you think he

 6        retaliated against you?

 7   A.   What I could recall, yes.

 8        Mr. Samples:  Let's mark this.

 9        (Defendant's Exhibit Number Thirteen is marked.)

10   Examination resuming by Mr. Samples:

11   Q.   Ms. Taylor, you've been handed what has been marked as

12        Exhibit Number Thirteen.  Do you recognize this as

13        being a copy of the complaint that you reviewed that

14        initiated this lawsuit?

15   A.   Yes.

16   Q.   Why did you file a lawsuit against Fluor?

17   A.   Because nothing was -- one, nothing was done to stop

18        what was happening over there.  Once I got through the

19        EEOC process and we went through conciliation with the

20        EEOC, that did not turn out favorably.  I did not feel

21        like that turned out favorably, so I made the decision

22        to obtain an attorney.

23   Q.   And what are you hoping to gain by bringing this

24        lawsuit?

25   A.   That this, what happened to me, will not happen to any
```



TARA TAYLOR                                              April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                  170

1      other employee in the company.
2   Q.  Are you seeking to get any monetary relief by bringing
3      this case?
4      Mr. Murphy:  Object to the form.
5   A.  Yes.
6   Q.  What are your damages in this case?
7   A.  I would like to be --
8      Mr. Murphy:  Object to the form.  You can answer.
9   A.  I would like to be made whole as if I were working in
10     Afghanistan, still working in Afghanistan, which I
11     would have been.
12  Q.  Okay, so you're seeking -- what do you mean by be made
13     whole?
14  A.  Whatever monies would have been paid to me from the
15     time that I left until whenever; I would like to have
16     that money.
17  Q.  Now, you continued to work for Fluor for this entire
18     time period, right?
19  A.  Yes.
20  Q.  And your base salary has always been the same or
21     greater than what it was in Afghanistan, right?
22  A.  My base salary, yes.
23  Q.  And your benefits have been basically the same, except
24     you've got a different health insurance provider; is
25     that right?



1  A.   Yes.

2  Q.   But your -- I guess the crux of your damages is the

3       uplift?

4       Mr. Murphy:  Object to the form.

5  Examination resuming by Mr. Samples:

6  Q.   Is that right?

7       Mr. Murphy:  Same objection.

8  A.   The -- it's the uplift, it's the having to pay for a

9       second place to live that I -- an expense I wouldn't

10      have had, and food, utilities, those expenses I

11      wouldn't have had had I remained there.

12 Q.   The uplift consisted of a hazard pay and a hardship

13      allowance, as we've talked about, right?

14 A.   Yes.

15 Q.   You haven't been in a war zone since September of 2014,

16      have you?

17 A.   No.

18 Q.   And you haven't had the hardship of having to live in a

19      foreign country since September 2014, have you?

20 A.   No.

21 Q.   I want to look at a couple of specific things in your

22      complaint.  We talked about your retaliation claim,

23      which is on page 6.  Over on page 7, you've got a claim

24      for breach of contract; do you see that?

25 A.   Yes.



1  Q.  Did you have a written employment contract with Fluor?

2      Mr. Murphy:  Object to the form.

3  A.  I -- to me that would be their policies.

4  Q.  Well, my question was, did you have a written

5      employment agreement with Fluor that outlined the terms

6      and conditions of your employment?

7      Mr. Murphy:  Object to the form.

8  A.  When we -- when I first started with the company in

9      2009, they had employment provisions that you had to

10     sign; I don't know if that's considered a contract or

11     not.

12 Q.  What were those -- what do you mean by employment

13     provisions?

14 A.  They -- that's where they told you how much your --

15     what your -- what your pay would be, as far as the --

16     your uplift, what your base pay was, what your uplift

17     was.

18 Q.  Are you talking about the offer letter that you

19     received?

20 A.  I don't know.  I guess you could call that an offer

21     letter.

22 Q.  Did that offer letter promise you a job for a certain

23     period of time?

24 A.  No.

25 Q.  Has it always been your understanding that you could be



TARA TAYLOR                                            April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS                  173

1           released from the project at any time?  I mean, you're

2           not guaranteed employment for a definite period, are

3           you?

4    A.    No, you're not guaranteed employment for a definite

5           period.

6    Q.    Okay, but -- so tell me what's the basis for your

7           contract -- what contract did you have with Fluor?

8           Mr. Murphy:  Object to the form.

9    A.    What I just told you.

10   Q.    And tell me again.  I'm sorry.

11   A.    The only thing I can recall signing were the employment

12          provisions and I looked at their policies and

13          procedures as -- they told me that this is how things

14          operate in the company.

15   Q.    And those policies and procedures weren't actually

16          handed to you, you had to go online and find them?

17   A.    I was trained to them.

18   Q.    But they weren't actually handed to you, were they?

19   A.    I don't recall getting any documents, no.

20   Q.    In the complaint, you -- there's some specific

21          allegations about HR -- policy HR 705; is it your

22          contention that that policy creates a contract?

23          Mr. Murphy:  Object to the form.

24   A.    The company clearly states in the policy what their

25          position is and what they will and will not tolerate as



1    far as what their position is, so to me that's --

2    that's a contract that you -- that you have with me.

3  Q.   Let's take a look at 705.

4       (Defendant's Exhibit Number Fourteen is marked.)

5  Examination resuming by Mr. Samples:

6  Q.   Ms. Taylor, you've been handed what's been marked as

7       Exhibit Number Fourteen.  This is Bates numbered Taylor

8       229 through 236.  This is the policy that you have

9       produced to us.  Is this a copy of policy HR 705?

10 A.   Yes.

11 Q.   How did you get this policy?

12 A.   I went on to the Fluor site, the FGG site, and got it.

13 Q.   It looks like there's an extra page that has been

14      stapled on here, so I'm just going to take off -- just

15      take off page 236.  So this should only go from 229 to

16      235.

17      I'm sorry, you were saying how you got the policy; how

18      was that?

19 A.   From the Fluor portal; it would have been from probably

20      their FGG portal.

21 Q.   When did you access this policy?

22 A.   I'm sure it was -- was when I was in Afghanistan; I

23      don't know exactly when.

24 Q.   Was it in the context of you filing hotline complaints?

25 A.   It was in the context of me sending information to the



TARA TAYLOR                                              April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS              175

```
 1        EEOC.
 2   Q.   Now, this policy, it's not directed specifically to
 3        you, is it?
 4   A.   Yes; I'm an employee of the company.
 5   Q.   Where do you see that it's directed to all Fluor
 6        employees?
 7   A.   It's -- I was trained to this; it's a policy of the
 8        company and I --
 9   Q.   You never signed this policy, did you?
10   A.   No, but I was trained to this policy and expected to
11        abide by it.
12   Q.   Where in this policy does it promise you that you will
13        always have a job if you participate in an
14        investigation?
15        Mr. Murphy:  Object to the form.
16   A.   Nowhere, to my knowledge.
17   Q.   Other than this policy and the offer letter that you
18        referred to, are there any other documents that you
19        contend create a contract between you and Fluor?
20        Mr. Murphy:  Object to the form.
21   A.   I would think that every HR policy is a contract that I
22        have with the company, adhering to every HR policy.
23   Q.   Did Fluor breach any other policies, from your
24        perspective?
25        Mr. Murphy:  Object to the form.
```



 1  A.   Not to my knowledge.

 2  Q.   How did Fluor breach this policy?

 3       Mr. Murphy:  Object to the form.

 4  A.   The company said that if I reported an action or if I

 5       reported something, whether it be discrimination,

 6       harassment, or what have you, that I would not be

 7       retaliated against.

 8  Q.   And you contend in this case that you were retaliated

 9       against?

10  A.   Yes.

11  Q.   And so is that how you think the policy was breached?

12       Mr. Murphy:  Object to the form.

13  A.   Yes.

14  Q.   Are there any other HR policies that you're aware of

15       that Fluor has, you know, to use your term, breached in

16       this case?

17  A.   I don't know.

18  Q.   Any that you're aware of as you sit here today?

19  A.   Not that I can recall.

20  Q.   You've also got a claim in the complaint for breach of

21       contract accompanied by fraudulent act.  What did Fluor

22       do that you contend is fraudulent?

23       Mr. Murphy:  Object to the form.

24  A.   I really don't understand the legal term fraudulent

25       act.  I don't know what --



1   Q.   Well, the complaint says as evidenced by Fluor's

2        dishonesty in fact and unfair dealing, such as

3        misrepresenting the reason for the termination of

4        plaintiff's assignment.  Is that what you contend was

5        fraudulent?

6   A.   Yes.

7   Q.   Anything else that you're aware of that was fraudulent

8        or dishonest or that misrepresented things?

9        Mr. Murphy:  Object to the form.

10  A.   Not that I can recall.

11  Q.   You've also got a claim here for promissory estoppel,

12       and that's another legal term.  I guess my question is,

13       did anyone at Fluor promise you that you would have a

14       job indefinitely on the LOGCAP project?

15  A.   No.

16  Q.   You knew all along that one day the project would come

17       to an end, right?

18  A.   Yes.

19  Q.   With the end of the project would be an end to your job

20       on that project, right?

21  A.   Yes.

22  Q.   And that's sort of the nature of working for a company

23       like Fluor that does a lot of project based work,

24       right?

25  A.   If you're working on a project.



1   Q.   Did anyone promise you that you would have a job -- let

2        me rephrase that.  When you filed your hotline

3        complaint, did anyone tell you that now that you've

4        filed a hotline complaint your job is protected

5        indefinitely?

6   A.   No.

7   Q.   I guess, obviously, if that were the case then

8        everybody would be filing hotline complaints, right?

9   A.   I don't know.

10  Q.   Are you seeking your attorney's fees in this case?

11       Mr. Murphy:  Object to the form.

12  A.   It's not something I've spoken to about my -- with my

13       attorney.

14  Q.   Have you paid your attorney any fees to date?

15  A.   No.

16       (Defendant's Exhibit Number Fifteen is marked.)

17  Examination resuming by Mr. Samples:

18  Q.   Ms. Taylor, I'm handing you what's been marked as

19       Exhibit Number Fifteen.  These are the W-2s from your

20       employment with Fluor, all the way up to your current

21       W-2, which we produced this week.  First of all, are

22       these your W-2s?

23  A.   Yes.

24  Q.   And do these accurately reflect how much you were paid

25       by Fluor in each of these years?



1    A.    Yes.

2    Q.    Earlier in this case, we submitted questions to you

3          that we call interrogatories; do you remember getting

4          those questions and responding to them?

5    A.    Yes.

6    Q.    I want you -- we're going to take a look at those in

7          just a moment.

8          Mr. Samples:  Let's mark this.

9             (Defendant's Exhibit Number Sixteen is marked.)

10   Examination resuming by Mr. Samples:

11   Q.    Ms. Taylor, you've been handed what's been marked as

12         Exhibit Number Sixteen.  Do you recognize these as your

13         responses to defendant's interrogatories and

14         defendant's request for production?

15   A.    Yes.

16   Q.    I want you to just take a few minutes and read through

17         the interrogatories and after you finish, I'm going to

18         ask you two questions; I'm going to ask you whether

19         they're complete and whether they're accurate, so we

20         can go off the record while you do that.

21   A.    Okay.

22   (Off the record at 3:29 p.m.)

23   (On the record at 3:39 p.m.)

24   Examination resuming by Mr. Samples:

25   Q.    Ms. Taylor, we're back on the record.  Have you had an



1      opportunity now to read through the interrogatory

2      responses?

3   A.  Yes.

4   Q.  First of all, are the responses complete?

5      Mr. Murphy:  Object to the form.

6   A.  To the best of my knowledge.

7   Q.  Are they accurate, to the best of your knowledge?

8   A.  I saw a couple of things.

9   Q.  Okay.

10  A.  In number 6 -- I'm sorry, on page 2.

11  Q.  Okay.  So the 6th witness on page 2?

12  A.  Dexter Hooks.  In the second sentence where it says Mr.

13     Hicks --

14  Q.  It's just a typo there?  Should be Hooks?

15  A.  Hooks.

16  Q.  Okay.

17  A.  And on page 3, number 8, I do not recall saying that

18     Paul told me that he spoke with -- that it was -- he

19     was with -- it was Ron and, what's the other

20     gentleman's name, Ron and Mark Cofer, instead of

21     Badillo; that's what I can recall in that conversation.

22     I just don't --

23  Q.  Okay, so the second sentence it says "Paul Gentry

24     informed plaintiff that Mr. Riley had conversations

25     with Badillo", but that -- you think that should be



1        Mark Cofer?

2    A.  Well, that's what I recall him saying to me.

3    Q.  It was with Mark Cofer?

4    A.  Mark Cofer, right, and --

5    Q.  Okay.

6    A.  Okay.

7    Q.  Any other changes or things that you saw that are not

8        accurate?

9    A.  Not to my knowledge.

10   Q.  I've got just a few follow-ups to these

11       interrogatories.  Number 4, we asked if you've treated

12       with a medical provider for any injuries that you seek

13       in this case; you indicated that you had not; is that

14       still the case?

15   A.  That's correct.

16   Q.  You're not seeking any damages for emotional distress

17       or anything like that?

18       Mr. Murphy:  Object to the form.

19   A.  Am I not seeking -- ask that again.

20   Q.  Are you seeking any damages for emotional distress?

21       Mr. Murphy:  Object to the form.

22   A.  Yes.

23   Q.  What are you seeking for emotional distress?

24       Mr. Murphy:  Object to the form.

25   A.  I'd have to discuss that with my attorney.  I have no



```
 1        number.

 2   Q.   Have you treated with a psychiatrist or a psychologist

 3        or a counselor in any way connected with your claims in

 4        this case?

 5   A.   No.

 6   Q.   Was it stressful to work in Afghanistan?

 7   A.   It could be.

 8   Q.   Did you ever hear gunfire?

 9   A.   Yes.

10   Q.   How often?

11   A.   Not often gunfire.

12   Q.   Did you ever hear bombs?

13   A.   Yes.

14   Q.   How often?

15   A.   Not often in Bagram.

16   Q.   But you did -- heard it more often in other bases?

17   A.   Yes.

18   Q.   Which bases did you hear bombs more often?

19   A.   Shank and Salerno.

20   Q.   How often would you hear bombs when you were working on

21        those bases?

22   A.   Shank, almost daily; Salerno, maybe three times a week.

23   Q.   How often did you hear bombs in Bagram?

24   A.   Maybe once a month.

25   Q.   Did you hear fighter jets taking off?
```



1    A.    I don't know if they were fighter jets, I heard planes

2          taking off.

3    Q.    Was that a common sound to hear at Bagram?

4    A.    Yes.

5          Mr. Murphy:  At an Air Force base?

6    Examination resuming by Mr. Samples:

7    Q.    I assume you heard that on a daily basis?

8    A.    Yes.

9    Q.    Were you ever concerned for your safety when you were

10         working on any of these bases?

11   A.    No.

12   Q.    What were your living quarters like?

13   A.    I've lived in a tent, I've lived in a wooden structure

14         called a B hut, and I've lived in a container.

15   Q.    Is a container like a shipping -- like a tractor

16         trailer type --

17   A.    Like a shipping container, yes.

18   Q.    What were you living in when you left Bagram?

19   A.    A container.

20   Q.    Would you say you sleep better at night now in your

21         home in Jacksonville than you did at Bagram?

22   A.    No.

23   Q.    Why not?

24   A.    Do I sleep better here -- I mean in Jacksonville?

25   Q.    Yes.



```
 1   A.   I slept well in Bagram.

 2   Q.   Did you have to wear ear plugs or have white noise or

 3        anything like that?

 4   A.   I did have white noise.

 5   Q.   Do you still have that in Jacksonville?

 6   A.   No.

 7   Q.   Why not?

 8   A.   Because I'm not living wall to wall with someone that I

 9        can hear snoring.

10   Q.   You haven't had employment with any other companies

11        since -- other than Fluor, since 2014?

12   A.   That's correct.

13   Q.   And you haven't performed work as an independent

14        contractor for another company, or for anybody, since

15        2014?

16   A.   No.

17   Q.   Other than income from your investments, the only

18        source of your income has been from Fluor since 2014;

19        is that right?

20   A.   Yes.

21   Q.   You currently have a Fluor email account; is that

22        right?

23   A.   Yes.

24   Q.   Is your email address the same as it was on the LOGCAP

25        project?
```



TARA TAYLOR                                              April 26, 2018
TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS              185

```
 1  A.   Yes.
 2  Q.   Do you have access to your emails from LOGCAP?
 3  A.   Not all.
 4  Q.   What do you not have access to?
 5  A.   There are some -- some emails are archived; I mean, it
 6       doesn't go all the way -- my archived email doesn't go
 7       all the way back to when I was in Afghanistan.
 8  Q.   It doesn't go all the way --
 9  A.   To --
10  Q.   -- to the beginning --
11  A.   To the beginning --
12  Q.   -- of your time --
13  A.   -- of my time --
14  Q.   -- in Afghanistan?
15  A.   -- in --
16  Q.   Do you have emails from 2014 still saved?
17  A.   I'm sure that I still have emails from 2014.
18  Q.   And you have the ability now to review those and search
19       those?
20  A.   Yes.
21  Q.   Have you made any efforts to review those for
22       responsive documents in this case?
23  A.   I don't think I understand the question.
24  Q.   Have you done anything to search through your emails to
25       see if there might be some emails relevant to your
```



```
 1         claims in this case?
 2  A.   No; I printed most of the -- I already -- I mean --
 3  Q.   You already had it printed?
 4  A.   Right.
 5  Q.   So you haven't gone back to look to see if there's
 6         anything else that might be relevant?
 7  A.   Yes, I have.
 8  Q.   What did you do or how did you search for things that
 9         might be relevant?
10  A.   I would just go and put in a name and then the emails
11         would come up from a certain individual or individuals
12         that I received emails from.
13  Q.   So you would use a keyword search to try to find
14         relevant emails?
15  A.   Yes.
16  Q.   What names or what keywords did you search?
17  A.   I searched Ron Riley's name, I searched Niki's name,
18         Kelvin Johnson's name.
19  Q.   Any other keywords that you can recall using?
20  A.   No, I can't recall using any keywords.
21  Q.   Just those three names?
22  A.   Yes.
23  Q.   Do you recall searching any other names?
24  A.   I can't recall searching any other names.
25  Q.   When you did those name searches, did you find any
```



1          emails that were relevant?

2    A.    No, not other than emails that I already had printed.

3    Q.    Have you deleted any emails that are relevant to this

4          lawsuit?

5    A.    No, sir.

6    Q.    I'm sure your attorney has told you this already, but

7          I'm going to tell you again, because this is a unique

8          case from most of the cases that we deal with because

9          you still work for the company and you still have

10         access to your emails, now that you've filed a lawsuit

11         against the company, you're obligated to preserve those

12         emails and to keep them.

13   A.    Yes.

14   Q.    Do you understand that?

15   A.    Yes.

16         Mr. Samples:  All right, let's take a five minute

17         break.

18   (Off the record at 3:50 p.m.)

19   (On the record at 3:59 p.m.)

20   Examination resuming by Mr. Samples:

21   Q.    All right, Ms. Taylor, we are back on the record and we

22         are in the home stretch.  I've just got a few loose

23         ends that I want to follow back up on and make sure we

24         cover before we wrap up here.

25         Going back to the issue with the television in the



1      office and Ron Riley informing you that you needed to

2      have it off; that television had not always been in the

3      Prime Contracts office, right?

4  A.  No.

5  Q.  Prime Contracts had recently moved into a different

6      office, correct?

7  A.  Yes.

8  Q.  And that new office had a television already there; is

9      that right?

10 A.  Yes.

11 Q.  Do you recall if Ron Riley was on R and R when the

12     office move occurred?

13 A.  I don't recall.  I don't -- no, I don't remember that.

14     I don't know if he was on R and R.

15 Q.  How long had you been in that new office when Mr. Riley

16     told you to keep the TV off?

17 A.  I don't know.  I don't remember the date we moved into

18     that office.

19 Q.  Was it less than a month?

20 A.  I don't know.

21 Q.  It wasn't very long, was it?

22 A.  I don't know.

23 Q.  So you were a Prime Contract supervisor at the time you

24     were RIF'd, correct?

25 A.  Yes.



　
```
 1   Q.   And most of the Prime Contract specialists that you

 2        worked with were tier two employees; is that right?

 3   A.   Yes.

 4   Q.   As tier twos, they were paid significantly less than

 5        you were, right?

 6   A.   What's significantly?

 7   Q.   Well, you tell me.  Do you know how much less they made

 8        than you did?

 9   A.   Their rate was a set rate, which I don't remember what

10        that is.

11   Q.   When you started out on the project as a tier two, I

12        think your base pay was around $54,000; is that right?

13   A.   Uh-huh.  Yes.

14   Q.   And as a tier one, your base pay went up to $80,000 and

15        then $85,000 when you were promoted to supervisor,

16        right?

17   A.   Something to that effect, yes.

18   Q.   So the difference between 54 and 85 is pretty

19        significant, right?

20   A.   There is a difference between 54 and 80.

21   Q.   Was Nikoletta Klimak a tier two?

22   A.   Yes.

23   Q.   Was Paul Begnaud a tier two?

24   A.   Yes.

25   Q.   Do you know how much either of them made each year?
```



```
 1   A.   No.
 2   Q.   Do you know if your position was filled after you left?
 3   A.   Yes.
 4   Q.   Do you know it was?
 5   A.   Yes.
 6   Q.   Who do you think filled your position?
 7   A.   Alan Krapa.
 8   Q.   Why do you think that?
 9   A.   Because he was told to come to Bagram and do a turn
10        over with me.
11   Q.   While you were still there?
12   A.   Yes.
13   Q.   When was that?
14   A.   It was in September; I don't remember exactly when in
15        September; September 2014.
16   Q.   He was told to come and do a turn over with you; what
17        does that mean?
18   A.   It meant that he needed to come to Bagram so that I can
19        give him -- go over the list of responsibilities that I
20        had.
21   Q.   And did anybody tell you he would be coming in to work
22        at Bagram?
23   A.   Yes.
24   Q.   Who told you that?
25   A.   Dexter Hooks.
```



1    Q.   Lynn Krapa was a Prime Contracts specialist, right?

2    A.   Yes.

3    Q.   He wasn't a supervisor, was he?

4    A.   No.

5    Q.   You don't know how long -- well, let me ask you this;

6         when you left Bagram, was he still there?

7    A.   Yes.

8    Q.   When he was at Bagram, he was supporting other bases,

9         wasn't he?

10   A.   Yes.

11   Q.   At the time you were there, he wasn't supporting

12        Bagram, was he?

13   A.   No.

14   Q.   Do you know how long he stayed at Bagram after you

15        left?

16   A.   Until last year.

17   Q.   How do you know that?

18   A.   Because I know he was promoted into an HR manager

19        position in Dubai.

20   Q.   Have you been in touch with him?

21   A.   No.

22   Q.   How do you know that?

23   A.   Because I'm in contact with people in Afghanistan.

24   Q.   Who told you about that, about Lynn Krapa?

25   A.   Kimberly Johnson.



1  Q.  Lynn Krapa had previously worked in Prime Contracts at

2      other bases, is that right, before he came to Bagram?

3  A.  Yes.

4  Q.  He wasn't a new hire, was he?

5  A.  No.

6  Q.  When he came to Bagram, you didn't actually provide any

7      training to him, did you?

8  A.  When he initially came to Bagram, no.

9  Q.  What about in September when he came?

10 A.  I didn't give him any training, no.

11     Mr. Samples:  Ms. Taylor, those are all the questions I

12     have.  I appreciate your time today and your patience.

13     Your attorney may have some questions for you or he may

14     not.  I'll turn it over to him.

15     Mr. Murphy:  I just have a couple.

16 Examination by Mr. Murphy:

17 Q.  You were asked earlier who specifically retaliated

18     against you; let me call your attention -- if you'd go

19     back to Exhibit Thirteen, which is the complaint, go to

20     page 4, paragraph 24.  We see Wickham in here, and

21     we've already clarified to the court that's Mr.

22     Whitcomb.  We've alleged in paragraph 24, plaintiff was

23     informed that Steve Whitcomb also was involved in the

24     decision to terminate plaintiff's assignment.  Whitcomb

25     was an individual about whom complaints had been made



1       and about whom plaintiff had provided adverse

2       information.  Who informed you that Mr. Whitcomb was

3       involved in the decision to terminate your assignment?

4       Mr. Samples:  Object to the form.

5   A.  Pete Irvin.

6   Q.  Do you have personal knowledge as to who within Fluor

7       made the decision to terminate your assignment?

8   A.  No.

9   Q.  You were also asked about applying for jobs in

10      Afghanistan and an issue came up about whether you had

11      been trying to get work in Afghanistan; other than the

12      specific applications that you submitted that you

13      testified to earlier, did you let Fluor know that you

14      wanted any open positions in Afghanistan that came

15      available?

16  A.  No.

17      Mr. Murphy:  I don't have anything further.

18      Mr. Samples:  Just a couple of follow-ups.

19  Examination by Mr. Samples:

20  Q.  Did Steve Whitcomb engage in any retaliatory acts

21      against you?

22      Mr. Murphy:  Object to the form.

23  A.  He was involved with the termination, or the RIF, which

24      I consider a retaliatory act.

25  Q.  Anything else?



1    A.    Not that I can recall.

2          Mr. Samples:  That's all the questions I have.

3          Mr. Murphy:  Nothing further.

4          Court reporter:  Mr. Murphy, would you like your client

5          to Read and Sign?

6          Mr. Murphy:  Yes, please.

7          Court reporter:  And you said you want a copy, but you

8          want an e-tran with a PDF of the Exhibits?

9          Mr. Murphy:  Yes.  And we'll use that for the Read and

10         Sign; you don't have to send another one.

11   (There being no further questions, this deposition concluded

12   at 4:11 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25



1                    Certificate of Reporter

2

3       I, Karen E. Holley, a Notary Public in and for the

4  state of South Carolina, do hereby certify that the

5  foregoing 194 pages represents a true and accurate

6  transcript of the deposition of Tara Taylor, which was taken

7  by me on the 26th day of April, 2018.

8       That the witness was first duly sworn to tell the

9  truth, the whole truth and nothing but the truth of her own

10 knowledge concerning this matter.

11      That I am not related to nor the employee of any of the

12 parties hereto, nor related to or employed by any attorney

13 or counsel employed by the parties hereto, nor interested in

14 the outcome of this action.

15

16  _____

17                    Karen E. Holley, CVR-M

18                    Notary Public for S.C.

19                    Commission expires: 4/11/2027

20

21

22

23

24

25



```
 1   Reference No.: 2137489

 2

 3   Case:  TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS

 4

          DECLARATION UNDER PENALTY OF PERJURY

 5

          I declare under penalty of perjury that

 6   I have read the entire transcript of my Depo-
     sition taken in the captioned matter or the

 7   same has been read to me, and the same is
     true and accurate, save and except for

 8   changes and/or corrections, if any, as indi-
     cated by me on the DEPOSITION ERRATA SHEET

 9   hereof, with the understanding that I offer
     these changes as if still under oath.

10

11       _____

12          Tara Taylor

13

14          NOTARIZATION OF CHANGES

15              (If Required)

16

17   Subscribed and sworn to on the _____ day of

18

19   _____, 20_____ before me,

20

21   (Notary Sign)_____

22

23   (Print Name)                    Notary Public,

24

25   in and for the State of _____
```



1    Reference No.: 2137489

     Case:  TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   Tara Taylor



1    Reference No.: 2137489

     Case:  TARA TAYLOR versus FLUOR FEDERAL GLOBAL PROJECTS

2

3    Page No._____Line No._____Change to:_____

4    _____

5    Reason for change:_____

6    Page No._____Line No._____Change to:_____

7    _____

8    Reason for change:_____

9    Page No._____Line No._____Change to:_____

10   _____

11   Reason for change:_____

12   Page No._____Line No._____Change to:_____

13   _____

14   Reason for change:_____

15   Page No._____Line No._____Change to:_____

16   _____

17   Reason for change:_____

18   Page No._____Line No._____Change to:_____

19   _____

20   Reason for change:_____

21   Page No._____Line No._____Change to:_____

22   _____

23   Reason for change:_____

24

     SIGNATURE:_____DATE:_____

25   Tara Taylor



# FLUOR.

Salerno, Afghanistan
APO AE 09314

## RESIGNATION LETTER

NAME _Tara D Taylor_

SAP# _10288600_

JOB TITLE _Prime Contracts Specialist_

DEPT _Prime Contracts_

EFFECTIVE DATE _21 March 11_

I am Resigning from Fluor Inc because

_I've accepted a Tier I position with fluor in Greenville, SC._

EE SIGNATURE _Tara D Taylor_   10 Mar 11

Fluor Confidential
No Release Except to Client

DEFENDANT'S
EXHIBIT NO. _1_
FOR IDENTIFICATION
_Taylor_
DATE: _4/24/19_ RPTR: _KH_

PENGAD 800-631-6989

DEF 000091



February 24, 2014

Tara D Taylor
ID: 10288600
Prin Spec, Prime Contract Mgmt

Dear Tara:

The Company recently completed its annual salary review. The results of the review have been approved by your management team. We are pleased to inform you that based on the approved results you will receive a salary increase of 4844 USD, which will result in a new annual salary of 85574 USD. Your new salary will be effective February 22, 2014, and paid to you as soon as administratively possible.

In addition to your salary increase, you are also being promoted to Supervisor, Prime Contract Mgmt, with a salary grade of 19.

Thank you for your continued dedication, commitment and contributions that make Fluor the company of choice for clients. I look forward to working with you throughout 2014.

Please contact me if you would like to discuss further.

Sincerely,

Joseph C Poniatowski

DEFENDANT'S
EXHIBIT NO. ___2___
FOR IDENTIFICATION
DATE: 4/26/18  Taylor  RPTR: KH
PENGAD 800-631-6989

*Nothing in this letter supersedes an existing employment contract or changes the at will nature of your employment.*

Taylor 000270

# 2012 W-2 and EARNINGS SUMMARY

Social Security Number: 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

PAGE 01 OF 01

TARA D TAYLOR

© 2011 ADP, INC

Safe, accurate, FAST! Use ~e-file~ Visit the IRS Web Site at www.irs.gov/efile

**W-2** Wage and Tax Statement **2012**

Employee Reference Copy

OMB No. 1545-0008

Copy C for employee's records.  Employer use only

| | | | | |
|---|---|---|---|---|
| Dept. | Corp. | Employer use only | | |
| Wll02 | | | 1980 | |

1 Control number  K000031887 W59

Employer's name, address, and ZIP code
FLUOR GOVERNMENT GROUP INTL INC
1200 JADWIN AVENUE, B4-54
RICHLAND, WA  99352

e Employee's name, address, and ZIP code
TARA D TAYLOR

| | |
|---|---|
| b Employer's FED ID number 20-0476974 | a Employee's SSA number |
| c Wages, tips, other comp. 213660.94 | 2 Federal income tax withheld 27325.90 |
| 3 Social security wages 110100.00 | 4 Social security tax withheld 4624.20 |
| 5 Medicare wages and tips 225389.58 | 6 Medicare tax withheld 3268.15 |
| 7 Social security tips | 8 Allocated tips |
| | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 D 11720.64 12b DD 3714.36 12c 12d |
| 14 Other | 13 Stat emp Ret plan 3rd party sick pay |

| 5 State | Employer's state ID no. | 16 State wages, tips, etc. |
|---|---|---|
| GA | 22159128J | 213660.94 |
| 7 State income tax | 18 Local wages, tips, etc. | |
| 12491.58 | | |
| 8 Local income tax | 20 Locality name | |

DEFENDANT'S
EXHIBIT NO. 5
FOR IDENTIFICATION
Taylor
DATE: 4/24/18  RPTR: KH
PENGAD 800-631-6989

CONFIDENTIAL

Taylor 000362

# 2013 W-2 and EARNINGS SUMMARY

**Employee Reference Copy**

Safe, accurate, FAST! Use *e-file* Visit the IRS Web Site at www.irs.gov/efile

**W-2** Wage and Tax Statement **2013**
OMB No. 1545-0008

Copy C for employee's records.

| Control number 0000000187 W20 | Dept. | Corp. WI02 | Employer use only 121 |
|---|---|---|---|

b Employer's name, address, and ZIP code
FLUOR GOVERNMENT GROUP INTL INC
100 FLUOR DANIEL DR.
GREENVILLE, SC 29607

c Employee's name, address, and ZIP code
TARA D TAYLOR

| | |
|---|---|
| b Employer's FED ID number 20-0476974 | a Employee's SSA number |
| 1 Wages, tips, other comp. 222680.24 | 2 Federal income tax withheld 14634.75 |
| 3 Social security wages 113700.00 | 4 Social security tax withheld 7049.40 |
| 5 Medicare wages and tips 235708.76 | 6 Medicare tax withheld 3739.16 |
| 7 Social security tips | 8 Allocated tips |
| 9 | 10 Dependent care benefits |
| 11 Nonqualified plans | 12a See instructions for box 12 D | 13028.52 |
| 13 Stat emp/Ret. plan/3rd party sick pay X | 12b DD | 1928.16 |
| 14 Other | 12c | |
| | 12d | |

| 15 State | Employer's state ID no. | 16 State wages, tips, etc. | 18 Local wages, tips, etc. |
|---|---|---|---|
| GA | 235(912-8)J | 222680.24 | |
| 17 State income tax 13032.85 | | | |
| 19 Local income tax | 20 Locality name | | |

Social Security Number: 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

TARA D TAYLOR

PAGE 01 OF 01

© 2011 ADP, INC.

CONFIDENTIAL

Taylor 000363

## 2014 W-2 and EARNINGS SUMMARY

accurate,
Use — Visit the IRS Web Site at www.irs.gov/efile
Employee Reference Copy
W-2 Wage and Tax Statement 2014
for employee's records. OMB No. 1545-0008

| Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 000000 W99 | | WH99 | 26350 |

Employer's name, address, and ZIP code
FLUOR FEDERAL SERVICES INC
00 FLUOR DANIEL DR.
GREENVILLE, SC  29607

Employee's name, address, and ZIP code
TARA D TAYLOR

| Employer's FED ID number 91-1735446 | a Employee's SSA number |
|---|---|
| Wages, tips, other comp. 12180.40 | 2 Federal income tax withheld 1492.46 |
| Social security wages 13168.00 | 4 Social security tax withheld 816.42 |
| Medicare wages and tips 13168.00 | 6 Medicare tax withheld 190.94 |
| Social security tips | 8 Allocated tips |
| | 10 Dependent care benefits |
| Nonqualified plans | 12a See instructions for box 12 D I  987.60 |
| Other | 12b |
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |
| State Employer's state ID no. SC  25401717   5 | 16 State wages, tips, etc. 12180.40 |
| State income tax 806.48 | 18 Local wages, tips, etc. |
| Local income tax | 20 Locality name |

TARA D TAYLOR                 Social Security Number:  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

© 2014 ADP, LLC

PAGE 01 OF 01

## 2014 W-2 and EARNINGS SUMMARY

accurate,
Use — Visit the IRS Web Site at www.irs.gov/efile
Employee Reference Copy
W-2 Wage and Tax Statement 2014
for employee's records. OMB No. 1545-0008

| Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 01887 W99 | | WI02 | 92 |

Employer's name, address, and ZIP code
FLUOR GOVERNMENT GROUP INTL INC
0 FLUOR DANIEL DR.
GREENVILLE, SC  29607

Employee's name, address, and ZIP code
TARA D TAYLOR

| Employer's FED ID number 20-0476974 | a Employee's SSA number |
|---|---|
| Wages, tips, other comp. 207979.64 | 2 Federal income tax withheld 15755.82 |
| Social security wages 117000.00 | 4 Social security tax withheld 7254.00 |
| Medicare wages and tips 218456.54 | 6 Medicare tax withheld 3333.72 |
| Social security tips | 8 Allocated tips |
| | 10 Dependent care benefits |
| Nonqualified plans | 12a See instructions for box 12 D I 10476.90 |
| Other | 12b DD  3551.00 |
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |
| State Employer's state ID no. A  2214912-8J | 16 State wages, tips, etc. 191595.97 |
| State income tax 11230.81 | 18 Local wages, tips, etc. |

TARA D TAYLOR                 Social Security Number:  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

<u>CONFIDENTIAL</u>

Taylor 000364

Taylor 000365

## Copy B—To Be Filed With Employee's FEDERAL Tax Return.

41-0852411
OMB No. 1545-0008

| | | |
|---|---|---|
| a Employee's soc. sec. no. 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 | 1 Wages, tips, other comp. 75523.25 | 2 Federal income tax withheld 10253.73 |
| | 3 Social security wages 77787.24 | 4 Social security tax withheld 4822.79 |
| b Employer ID number (EIN) 26-1292089 | 5 Medicare wages and tips 77787.24 | 6 Medicare tax withheld 1127.76 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number
254

e Employee's name, address, and ZIP code — Suff.
Tara D Taylor
8534 Lake Meadow Dr
UNION CITY GA 30291

| | | |
|---|---|---|
| 7 Social security tips 0.00 | 8 Allocated tips 0.00 | 9 |
| 10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code See inst. for box 12 D 1963.96 |
| 13 Statutory employee | 14 Other Un. Dues 0.00 0.00 0.00 | 12b Code |
| Retirement plan X | | 12c Code |
| Third-party sick pay | | 12d Code |
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement 2015 — Dept. of the Treasury - IRS
This information is being furnished to the Internal Revenue Service and is available

## Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.

41-0852411
OMB No. 1545-0008

| | | |
|---|---|---|
| a Employee's soc. sec. no. 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 | 1 Wages, tips, other comp. 75523.25 | 2 Federal income tax withheld 10253.73 |
| | 3 Social security wages 77787.24 | 4 Social security tax withheld 4822.79 |
| b Employer ID number (EIN) 26-1292089 | 5 Medicare wages and tips 77787.24 | 6 Medicare tax withheld 1127.76 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number
254

e Employee's name, address, and ZIP code
Tara D Taylor
8534 Lake Meadow Dr
UNION CITY GA 30291

| | | |
|---|---|---|
| 7 Social security tips 0.00 | 8 Allocated tips 0.00 | 9 |
| 10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code D 1963.96 |
| 13 Statutory employee | 14 Other Un. Dues 0.00 0.00 0.00 | 12b Code |
| Retirement plan X | | 12c Code |
| Third-party sick pay | | 12d Code |
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement 2015 — Dept. of the Treasury - IRS

## Copy C—For EMPLOYEE'S RECORDS (See Notice to Employee on the back of Copy B.)

41-0852411
OMB No. 1545-0008

| | | |
|---|---|---|
| a Employee's soc. sec. no. [redacted] | 1 Wages, tips, other comp. 75523.25 | 2 Federal income tax withheld 10253.73 |
| | 3 Social security wages 77787.24 | 4 Social security tax withheld 4822.79 |
| b Employer ID number (EIN) 26-1292089 | 5 Medicare wages and tips 77787.24 | 6 Medicare tax withheld 1127.76 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number
254

e Employee's name, address, and ZIP code — Suff.
Tara D Taylor
[redacted]

| | | |
|---|---|---|
| 7 Social security tips 0.00 | 8 Allocated tips 0.00 | 9 |
| 10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code See inst. for box 12 D 1963.96 |
| 13 Statutory employee | 14 Other Un. Dues 0.00 0.00 0.00 | 12b Code |
| Retirement plan X | | 12c Code |
| Third-party sick pay | | 12d Code |
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement 2015 — Dept. of the Treasury - IRS

## Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.

41-0852411
OMB No. 1545-0008

| | | |
|---|---|---|
| a Employee's soc. sec. no. 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 | 1 Wages, tips, other comp. 75523.25 | 2 Federal income tax withheld 10253.73 |
| | 3 Social security wages 77787.24 | 4 Social security tax withheld 4822.79 |
| b Employer ID number (EIN) 26-1292089 | 5 Medicare wages and tips 77787.24 | 6 Medicare tax withheld 1127.76 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number
254

e Employee's name, address, and ZIP code
Tara D Taylor
[redacted]

| | | |
|---|---|---|
| 7 Social security tips 0.00 | 8 Allocated tips 0.00 | 9 |
| 10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code D 1963.96 |
| 13 Statutory employee | 14 Other Un. Dues 0.00 0.00 0.00 | 12b Code |
| Retirement plan X | | 12c Code |
| Third-party sick pay | | 12d Code |
| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement 2015 — Dept. of the Treasury - IRS

**Copy B—To Be Filed With Employee's FEDERAL Tax Return.**

41-0852411 OMB No. 1545-0008

| | |
|---|---|
| a Employee's soc. sec. no. | 1 Wages, tips, other comp. 91426.48 | 2 Federal income tax withheld 11280.01 |
| b Employer ID number (EIN) 6-1292089 | 3 Social security wages 94276.64 | 4 Social security tax withheld 5845.09 |
| | 5 Medicare wages and tips 94276.64 | 6 Medicare tax withheld 1366.86 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number 226
e Employee's name, address, and ZIP code
Tara D  Taylor

7 Social security tips 0.00 | 8 Allocated tips 0.00
10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code 2850.16
13 Statutory employee | 14 Other
Retirement plan | Un. Dues 0.00 0.00 0.00 | 12b Code
Third-party sick pay X | 12c Code | 12d Code

15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax
18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name

Form W-2 Wage and Tax Statement  2016   Dept. of the Treasury -- IRS
This information is being furnished to the Internal Revenue Service.   www.irs.gov/efile

---

**Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.**

41-0852411 OMB No. 1545-0008

| | |
|---|---|
| a Employee's soc. sec. no. 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 | 1 Wages, tips, other comp. 91426.48 | 2 Federal income tax withheld 11280.01 |
| b Employer ID number (EIN) 26-1292089 | 3 Social security wages 94276.64 | 4 Social security tax withheld 5845.09 |
| | 5 Medicare wages and tips 94276.64 | 6 Medicare tax withheld 1366.86 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number 226
e Employee's name, address, and ZIP code
Tara D  Taylor

7 Social security tips 0.00 | 8 Allocated tips 0.00
10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code 2850.16
13 Statutory employee | 14 Other
Retirement plan | Un. Dues 0.00 0.00 0.00 | 12b Code
Third-party sick pay X | 12c Code | 12d Code

15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax
18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name

Form W-2 Wage and Tax Statement  2016   Dept. of the Treasury -- IRS

---

**Copy C—For EMPLOYEE'S RECORDS (See Notice to Employee on the back of Copy B.)**

41-0852411 OMB No. 1545-0008

| | |
|---|---|
| a Employee's soc. sec. no. | 1 Wages, tips, other comp. 91426.48 | 2 Federal income tax withheld 11280.01 |
| b Employer ID number (EIN) 6-1292089 | 3 Social security wages 94276.64 | 4 Social security tax withheld 5845.09 |
| | 5 Medicare wages and tips 94276.64 | 6 Medicare tax withheld 1366.86 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number 226
e Employee's name, address, and ZIP code
Tara D  Taylor

7 Social security tips 0.00 | 8 Allocated tips 0.00
10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code See inst. for box 12 2850.16
13 Statutory employee | 14 Other
Retirement plan | Un. Dues 0.00 0.00 0.00 | 12b Code
Third-party sick pay X | 12c Code | 12d Code

15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax
18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name

Form W-2 Wage and Tax Statement  2016   Dept. of the Treasury -- IRS
This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

---

**Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.**

41-0852411 OMB No. 1545-0008

| | |
|---|---|
| a Employee's soc. sec. no. | 1 Wages, tips, other comp. 91426.48 | 2 Federal income tax withheld 11280.01 |
| b Employer ID number (EIN) 26-1292089 | 3 Social security wages 94276.64 | 4 Social security tax withheld 5845.09 |
| | 5 Medicare wages and tips 94276.64 | 6 Medicare tax withheld 1366.86 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number 226
e Employee's name, address, and ZIP code
Tara D  Taylor

7 Social security tips 0.00 | 8 Allocated tips 0.00
10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code 2850.16
13 Statutory employee | 14 Other
Retirement plan | Un. Dues 0.00 0.00 0.00 | 12b Code
Third-party sick pay X | 12c Code | 12d Code

15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax
18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name

Form W-2 Wage and Tax Statement  2016   Dept. of the Treasury -- IRS
L4UP

5205

Taylor 000368

CONFIDENTIAL

## Copy B—To Be Filed With Employee's FEDERAL Tax Return.

41-0852411
OMB No. 1545-0008

| a Employee's soc. sec. no. | 1 Wages, tips, other comp. 95143.23 | 2 Federal income tax withheld 12092.75 |
|---|---|---|
| **b Employer ID number (EIN)** 26-1292089 | 3 Social security wages 98113.15 | 4 Social security tax withheld 6083.09 |
| | 5 Medicare wages and tips 98113.15 | 6 Medicare tax withheld 1422.71 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number
1899

e Employee's name, address, and ZIP code                                    Suff.
Tara D Taylor

| 7 Social security tips 0.00 | 8 Allocated tips 0.00 | 9 Verification code |
|---|---|---|
| 10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code See inst. for box 12 D   2969.92 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | Un. Dues 0.00 Unit Way 0.00 | 12c Code |
| Third-party sick pay | 0.00 | 12d Code |

| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement **2017**    Dept. of the Treasury -- IRS
This information is being furnished to the Internal Revenue Service.    www.irs.gov/efile

---

## Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.

41-0852411
OMB No. 1545-0008

| a Employee's soc. sec. no. | 1 Wages, tips, other comp. 95143.23 | 2 Federal income tax withheld 12092.75 |
|---|---|---|
| **b Employer ID number (EIN)** 26-1292089 | 3 Social security wages 98113.15 | 4 Social security tax withheld 6083.09 |
| | 5 Medicare wages and tips 98113.15 | 6 Medicare tax withheld 1422.71 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number
1899

e Employee's name, address, and ZIP code                                    Suff.
Tara D Taylor

| 7 Social security tips 0.00 | 8 Allocated tips 0.00 | 9 Verification code |
|---|---|---|
| 10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code D   2969.92 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | Un. Dues 0.00 Unit Way 0.00 | 12c Code |
| Third-party sick pay | 0.00 | 12d Code |

| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement **2017**    Dept. of the Treasury -- IRS

---

## Copy C—For EMPLOYEE'S RECORDS (See Notice to Employee on the back of Copy B.)

41-0852411
OMB No. 1545-0008

| a Employee's soc. sec. no. | 1 Wages, tips, other comp. 95143.23 | 2 Federal income tax withheld 12092.75 |
|---|---|---|
| **b Employer ID number (EIN)** 26-1292089 | 3 Social security wages 98113.15 | 4 Social security tax withheld 6083.09 |
| | 5 Medicare wages and tips 98113.15 | 6 Medicare tax withheld 1422.71 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number
1899

e Employee's name, address, and ZIP code                                    Suff.
Tara D Taylor

| 7 Social security tips 0.00 | 8 Allocated tips 0.00 | 9 Verification code |
|---|---|---|
| 10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code See inst. for box 12 D   2969.92 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | Un. Dues 0.00 Unit Way 0.00 | 12c Code |
| Third-party sick pay | 0.00 | 12d Code |

| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement **2017**    Dept. of the Treasury -- IRS
This information is being furnished to the IRS. If you are required to file a tax return, a negligence penalty or other sanction may be imposed on you if this income is taxable and you fail to report it.

---

## Copy 2—To Be Filed With Employee's State, City, or Local Income Tax Return.

41-0852411
OMB No. 1545-0008

| a Employee's soc. sec. no. | 1 Wages, tips, other comp. 95143.23 | 2 Federal income tax withheld 12092.75 |
|---|---|---|
| **b Employer ID number (EIN)** 26-1292089 | 3 Social security wages 98113.15 | 4 Social security tax withheld 6083.09 |
| | 5 Medicare wages and tips 98113.15 | 6 Medicare tax withheld 1422.71 |

c Employer's name, address, and ZIP code
Fluor Federal Solutions
Mail Stop C203D
100 Fluor Daniel Drive
GREENVILLE SC 29607 USA

d Control number
1899

e Employee's name, address, and ZIP code                                    Suff.
Tara D Taylor

| 7 Social security tips 0.00 | 8 Allocated tips 0.00 | 9 Verification code |
|---|---|---|
| 10 Dependent care benefits 0.00 | 11 Nonqualified plans 0.00 | 12a Code D   2969.92 |
| 13 Statutory employee | 14 Other | 12b Code |
| Retirement plan  X | Un. Dues 0.00 Unit Way 0.00 | 12c Code |
| Third-party sick pay | 0.00 | 12d Code |

| 15 State Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax |
|---|---|---|
| 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |

Form W-2 Wage and Tax Statement **2017**    Dept. of the Treasury -- IRS
L4UP                                                                                         5205