**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | |
|---|---|
| **Tara Taylor,** ) | |
| ) | **Case No.: 6:17-cv-01875-BHH-KFM** |
| **Plaintiff,** ) | |
| **v.** ) | |
| ) | **Plaintiff's Opposition to Defendants'** |
| **Fluor Corporation and Fluor Gov't** ) | **Motion for Summary Judgment** |
| **Group International, Inc.,** ) | |
| ) | |
| **Defendants.** ) | |

## I.    Introduction

After learning of Tara Taylor's protected activity, an irate Ron Riley was candid as to his retaliatory reasons for terminating her assignment.  Both of Taylor's managers maintain that Riley retaliated against her.   One human resource ("HR") manager confirmed that racial problems were repeated, and he advised that an employee had to go outside the company to get any help.  Another HR manager, who also is a lawyer, served as the "investigator" of Taylor's complaints and secretly directed Riley to engage in some of the retaliation.  Yet a third, who headed strength management, told Riley to construct a pretextual reason for Taylor's separation and described it as "fucked up from an HR standpoint."   Of course, none of these facts appear anywhere in Fluor's Memorandum.   Instead, Fluor relies on immaterial issues and sharply-disputed testimony to create the illusion that there is nothing here.  This case is nothing close to a candidate for summary judgment.

## II.  Facts

**A.    Background Fluor & LOGCAP**

Tara Taylor (black) was employed by Fluor as a government contract specialist ("GCS") under the Logistics Civil Augmentation Program ("LOGCAP"), a government contract to provide civilian support to the military effort in countries such as Afghanistan. (Taylor 39:13–20).[1]  Taylor was assigned to the Bagram Airforce Base ("BAF"), which is a forward operating base ("FOB")[2] and the headquarters for senior leadership for Afghanistan.  (Klimak 17:18 – 18:10).  Taylor reported to government contracts manager ("GCM"), Kelvin Johnson.  (Johnson 117:21 – 118:9).  Johnson supervised the GCSs in Bagram, and he reported directly to Ron Riley (white).  (Johnson 19:20-25; *id.* 21:18-23; *id.* 24:24 – 25:21; Riley 11:20 – 13:4).  Riley reported to the country manager, Steve Whitcomb (white).  (Riley 33:23 – 34:2; Whitcomb 9:9-19).[3]

---

[1]    Taylor originally joined Fluor as an operations specialist.  (Taylor 35:2-7; *id.* 36:3 – 11; *id.* 39:8-12).  She transferred to prime contracts in 2010.  (*Id.* 55:4:16).  Fluor promoted Taylor and transferred her to Greenville in March 2011.  (*Id.* 56: 2 – 58:15).  Taylor returned to Afghanistan as a GCS in October of 2011.  (Taylor 58:16 – 59:25).

[2]    30(b)(6) 167:9-10.

[3]    Whitcomb held the title of the "country manager."  His direct subordinates, such as Tom Roy and Mark Cofer also had country-wide responsibility and were also referred to colloquially as "country managers" and were all white.  (30(b)(6) 17:13-22; Taylor Decl. ¶ 2 (Exh. 15)).

B.    **Taylor's duties and performance**

Taylor was known as the "subject matter expert" in executing on the letters of technical direction ("LOTD")[4] from the military's administrative contracting officer ("ACO"),[5] and she dealt directly with ACOs on occasion. (Johnson 27:16 – 28:19; *see* Riley 22:10-24; Klimak 27:23 – 28:8). Taylor also would backfill (substitute) for Johnson, and she served as GCM at least four times per year. (Johnson 28:21-25; *id.* 87:14 – 88:3; Taylor 65:24 – 66:4). Fluor viewed Taylor as the "best GCS" (Johnson 91:15; *see infra* nn. 6-7), who had the "institutional knowledge" and "knew all of the players better than anyone there" (Johnson 30:20 - 32:4; *see* Johnson Exh. 1; Johnson 34:15 – 35:11).[6] Riley historically gushed over Taylor's performance, contributions, and attitude.[7]

---

[4]    Letters of Technical Direction ("LOTD's") are written instructions from the government to perform a certain task under Fluor's contract with the government. (Riley 20:18 – 21:8). They were issued daily. (Riley 21:12-23).

[5]    30(b)(6) 91:8-9. This is the governmental "customer" contact for Fluor. (Johnson 18:24-19:14).

[6]    Ian Dolan was the project manager over LOGCAP, and was, at times, Whitcomb's boss. (Riley 64:22-25; 30(b)(6) 38:17-25). Dolan opined that Taylor "excelled in every mission," was one of our most experienced Operations Managers," that her "performance during this 2014 rating period has been nothing short of superb," and that [h]er commitment to excellence is singularly noteworthy and reflects on her dedication to Fluor, her team and the customer that she serves." (Exh.16). Taylor's last manager (Dexter Hooks) also viewed her performance during the year in question as "superb," stated that she was a "key player," and that teamwork contributed greatly to her being spoken highly of amongst her peers within the Prime Contracts community as well as those within the LOGCAP program." (Exh. 17). Others concurred, including Riley. (See Lamb 86:2-7; Riley 17:22-24; *id.* 64:18 – 65:18; *see also* Whitcomb 19:4-13; Johnson 175:12 – 176:1; *id.* 176:3-5.

[7]    Riley's view of Taylor's performance had been consistent through the years. (Exh. 18 (2012 review): "Tara is exceptional herself, I see her career as limitless. Any manager should feel lucky to have her as an employee."); *id.* at DEF 241; *id.* DEF 237

3

## C.    Taylor promoted in early 2014 to keep her to the end

In February 2014, Riley promoted Taylor to "prime contracts supervisor" (although she supervised nobody and continued to be listed as a GCS).  (Exh. [promotion to supervisor]); Taylor 61:16-18).  Riley noted that Taylor had been doing "an outstanding job" and "has often filled in for the GCM [Johnson] and has never missed a beat."  (Exh. 22).

Riley promoted Taylor so that she would remain on the project to the end.  (Exh. 23 at DEF 2407)] ("Ron stated that he moved Tara to a closeout position, which is a very important position.  It will likely be the last position to remain on the project.");  30(b)(6) 65:20 – 66:6; Riley 101:9-16; *id.* 102:18 – 103:22; *see* Taylor 61:16–25).  Project controls head, Preston Howard, explained that, even when Fluor earlier anticipated that the military might cease activity in Afghanistan, Fluor anticipated that work would remain in Bagram.  (Howard 10:13-24; *id.* 42:14-22); Exh. 24).  Taylor now reported directly to Riley, who moved her up to the "second floor," which is the location of Whitcomb and the country managers.  (Taylor 64:3-9; 30(b)(6) 27:20 – 28:1; Johnson 29:7-25; *id.* 73:24 – 75:2).  Taylor took on "closeout" duties, which is work done to prepare closing out the FOBs.  (Taylor 64:23 – 65:6).

---

("I can honestly say that Tara outperforms every employee in our field department – managers and supervisors alike"); *id.* DEF 238 ("She is the first person at work every morning and she is often observed working late hours.  Her work ethic is unmatched."); Exh. 19 (January 2013 email from Riley, describing Taylor as having "performed beyond expectations" and as having to "take a significant increase in [he]r workload"); Exh. 20 (2013 review by Riley with all top marks); *id.* DEF 243 (noting that Taylor was the only GCS to handle more than one FOB at a time, and that she completes "the most difficult of tasks as if they were routine"); *id.* at 244 ("There has never been an instance where she was unable to produce quality work in a timely manner which usually exceeds the client's expectations.")  Riley testified that the only position Taylor was not qualified to perform was his own.  (Riley 34:22 – 35:15).

Riley continually reaffirmed his intention to keep Taylor employed until the end of the project. Before Riley learned of Taylor's protected activity, he created an Organizational Realignment Plan to project the makeup of the department during the reduction. (Riley 38:15-17; *id.* 39:10-13). Riley's Plan shows Taylor remaining as a GCS, reporting directly to Riley, on the July 2014 chart (Exh. 25 at DEF 2617), the Oct 2014 chart (*id.* DEF. 2618), the Jan 2015 chart (*id.* DEF at 2619), the April 2015 chart (*id.* at DEF 2620), and the July 2015 chart (*id.* at DEF. 2621), which was the last projected date at the time. (*See also* Exh. 26; 30(b)(6) 68:4-18).[8] In early June, Riley had an email exchange with Taylor in which Taylor expressed her desire to stay on the project; Riley responded, "We'll be glad to have you." (Exh. 27; Taylor 129:25 – 131:10).

## D.    Staffing levels in Afghanistan and Bagram

Throughout much of Afghanistan, Fluor was closing FOBs in 2014 and reducing staffing. In Bagram, however, Fluor was staffing up during the same period. (Johnson 46:1 – 47:5; *id.* 47:6-9; *id.* 157:13 – 159:12; *id.* 167:20 – 168:8). Another GCS, Paul Begnaud, came to Bagram in Jan or Feb 2014, (30(b)(6) 91:10-12); Johnson 47:6-9), and was brought back again later in 2014, (30(b)(6) 91:21- 92:4-23). Rather than reduce ("RIF") favored employees when their FOBs closed, management would transfer them to Bagram, a process Fluor's own GCM referred to as "padding the books." (Johnson 46:24 – 47:5).

---

[8]    This chart was created the day before Taylor was interviewed by investigators (discussed below). (30(b)(6) 69:5-18).

**E.     Johnson submits two complaints of discrimination and retaliation**

Beginning in early 2014, Johnson made complaints about racism and retaliation that set into motion a series of events culminating in Taylor's separation.

**1.     The Tom Roy complaint**

Johnson complained about racist comments from country manager for operations, Tom Roy (white). (Exh. 28; Johnson 54:13 - 55:4; 30(b)(6) 21:15-16). These include Roy's reference to a primarily black department as a "ghetto" in the presence of country managers (Mark Cofer[9] and Riley). (Johnson 56:4 – 57:9; id. 61:8-10). The final straw for Johnson was Roy's comment about the way Johnson was wearing his hat, referencing saggy jeans, and Roy gesturing in a manner that mocked black people. (Johnson 57:10-17; Taylor 80:7-16). Johnson also reported that Roy would refer to Afghani food service workers as wanting to "blow us up," and he used the word "fuck" whenever he referenced them. (Exh. 30 at DEF 2400).

Roy had a hard-earned reputation for engaging in racist behavior, which upper management simply ignored. Human resources manager, Emanuel "Pete" Irvin, noted that it "seems like [Roy] had a habit of demonstrating this behavior," and that management knew it. (Irvin 9:24 – 10:4; id. 23:22-23; id. 27:7-9). "[M]ost of the people in Tom Roy's circle just considered this as that's just Tom Roy being Tom Roy. And so I guess it was accepted in that circle or known in that circle." (Irvin 27:10-13). Fluor's own investigation unearthed numerous instances of racist conduct by Roy.[10]

---

[9]     Whitcomb 16:11 – 17:12; Exh. 29).

[10]     Cofer recounted another incident to Wells. (Exh. 31; 30(b)(6) 13:19-14:7). Another employee, Kimberly Johnson, added yet another racist incident involving Roy. (Exh. 32; 30(b)(6) 14:12-21). In other words, Fluor's investigators were presented with

Whitcomb discouraged Johnson from pursing his discrimination complaint. Whitcomb told Johnson that he "had a bright future at Fluor and led me to believe that this wasn't going to be helpful with my rapport with leadership" (*id.* 68:14-17; id. 19-21; *id.* 69:24 – 70:2). Whitcomb "wanted it to be handled, like, low level . . . . You know, he didn't think it warranted being escalated." (Johnson 69:11-16; *see also id.* 65:7-13). Another manager, Paul Gentry, advised Johnson that "[t]he bosses aren't going to be happy with you, man. You . . . stirring up a pot," and that "senior management . . . wasn't too happy that the investigation was going on." (Johnson 170:7-14). Gentry confirmed that Cofer (a country manager) told him that Johnson should not have reported Roy. (Gentry 26:23 – 27:11). Cofer's sentiment got back to employees, such as Taylor. (Exh. 30 at DEF 2394; Taylor 28:2-8; *id.* 89:13-18; 30(b)(6) 34:17-23).

When Johnson complained to Irvin (HR) about Roy, Irvin told Johnson that it was not the first time, that Irvin wished he could do more, but that Whitcomb would be making the decisions. (Johnson 64:15 – 65:2; *id.* 171:21 – 173:25; Irvin 15:20-25). Gentry explained that Roy had other issues at a prior assignment, that nothing came of them, and that Roy would probably only "get a smack on the wrist this time." (Johnson 171:8-17).

As predicted, nothing resulted from the Roy complaint. Johnson did not even get an apology. (Johnson 65:3-5).[11] Whitcomb refused to give a recommended strongly

---

at least three different sources of different racist conduct by Roy. (30(b)(6) 14:22 – 16:8). Fluor employees from Roy's former assignment had warned Johnson that Roy is a racist. (Johnson 58:17-20).

[11]    The purported investigation was handled by manager for employee relations, Steve Shenk (Irvin 42:13-14), who issued an "investigation report" a mere three days

worded written reprimand (Exh. 33 at DEF 2559; Whitcomb 30:7-21; 30(b)(6) 20:4-7). Instead, repeated and corroborated instances of racist conduct resulted in a claimed, but undocumented verbal "counseling" and a promotion for Roy the following month. (Exhs. 34-35; 30(b)(6) 18:20 – 19:2; *id.* 20:21-25). Whitcomb chose a purported verbal counseling and a promotion for Roy because: (1) Whitcomb did not want to blemish Roy's record, which was devoid of any of Roy's known racist conduct, and (2) while Whitcomb didn't find fault with Roy's conduct, Whitcomb faulted Johnson for wearing a hat that had a tag. (Exh. 30 ¶¶ 1, 5).

### 2.    Johnson complaint about Whitcomb and Riley

During the investigation of the Roy complaint, Johnson complained of resulting retaliation and discrimination, which was docketed as a separate complaint. (Exh. 36). Johnson complained, for example, that management held him to a different standard than his white counterparts, and that he and other black employees felt micromanaged. (*Id.* at DEF 2715; Exh. 37 ¶ 23). Johnson also complained that country managers, including Riley, ceased communicating with him, which interfered with the prime contract department's ability to function. (Johnson 72:13-17; 73:11-23; *id.* 74:3-10; *id.* 94:4-16; *id.* 84:10 – 85:6; *id.* 86:5-6; *id.* 86: 18 - 87:2; *id.* 125:24 – 126:6; *id.* 85:17-21; *id.* 103:21 – 104:5; *id.* 108:13-18; *id.* 111:19 – 113:4; *id.* 124:14-125:12; Exh. 38). Fluor assigned Rob Wells to review Johnson's second complaint. (30(b)(6) 38:9-13).

---

after the complaint. (Exhs. 28, 33; 30(b)(6) 11:9-12:15; Irvin 20:4-7; *see id.* 17:21 – 18:2)). Shenk interviewed Taylor as a witness in Johnson's complaint of Roy's racism. (Exh. 33). Shenk reported to someone who reported to Whitcomb. (Irvin 15:3-21).

### a.    Wells tipped off Whitcomb, and Fluor again admits that complaints against top brass are futile

Wells arrived in Afghanistan on May 28, 2014.  (Exh. 39 at DEF 313).  When Wells arrived, he told Whitcomb he was the target of the investigation.  (Whitcomb 24:20 – 25:11).  Wells told Johnson that Wells was communicating with Whitcomb throughout the process and letting Whitcomb know about the allegations as they arose. (Johnson 95:10 – 97:25; *id.* 168:19-22).  James Badillo was an HR manager, who was head of strength management. (Badillo 9:18 – 10:25; *id.* 13:16-20). Badillo also confided to Johnson that all complaints against Whitcomb were brought to Whitcomb's attention. (Johnson 163:12-15).  Badillo "ma[d]e it clear to me that they were going to take care of their own," and that "they were never going to punish their own." (Johnson 163:16-22; *id. 1*64:1). Two managers told Johnson that, if Johnson wanted something to be done, he would have to go outside the company and file an EEOC complaint because others who had filed internal complaints got nowhere.  (Johnson 132:22 – 135:8; *id.* 163:23 – 164:2))

In addition to tipping off Whitcomb, Wells was giving him strategic advice to defend against Johnson's claims.  For example, although Wells was to be an objective fact finder, he was instead using his investigation to advise Whitcomb to be aware that Johnson might be trying to "bait" him.    (Exh. 30 at DEF 2410; 30(b)(6) 45:21 – 24). Wells advised Riley as well.  Wells told Riley that Johnson filed a complaint against Whitcomb.  (Riley 121:1-16).  After Wells arrived and went to the second floor, Riley came down and stared at Taylor and another GCS, Nikoletta Klimak.  (Exh. 39 at DEF 313 (May 28 entry)).    Riley knew what the witnesses were saying during the

investigation.[12]  (Johnson 190:3 -191:13; *id.* 193:10 – 195:3).  Johnson confronted Wells about using the investigation information to coach Riley; Wells never denied doing so, but just characterized his coachings as "hav[ing] managers do their job."  (Exh. 30 at DEF 2410).

  **b. Taylor's protected activity**

  Wells Interviewed Taylor and Klimak on May 29, 2014.  (Exh. 36 at DEF 2721-24; Exh. 30 at DEF 2394-97; 30(b)(6) 26:4-16; Taylor 86:9-16).  Taylor corroborated the retaliatory treatment Johnson and the department received after Johnson complained and Taylor was interviewed the first time.  (Taylor 84:3 – 85:25).  Taylor also reported disparate treatment of black employees, including Riley calling a minority male a "bitch" (Exh. 30 at DEF 2394) and personnel moves based on favoritism that negatively impacted black employees (30(b)(6) 33:15-21).

  As to Fluor's reaction to Johnson's first complaint, Taylor also complained about the resulting lack of respect from country management (30(b)(6) 27:15 – 28:1) and management's retaliation against Johnson.  (Taylor 87:12-22; *id.* 90:7-10).  Taylor also reported that Cofer said that rules don't apply to second floor and that Cofer also ceased communication with the department.  (Exh. 30 at DEF 2394; 30(b)(6) 28:2-8; id. 34:17-23; Taylor 89:13-18).  She also reported that Cofer told Gentry that Johnson was wrong to have reported Roy.  (30(b)(6) 34:17-23).

---

[12] Wells never told Johnson that he coached Riley.   (30(b)(6) 47:4-10).  Only Wells and Riley would have known that.  (Exh. 30 at DEF 2410).

### c.    Fluor gives short shrift to complaint and, as promised, nothing happens

Wells's purported investigation was so cursory that he did not even interview Whitcomb.  (Whitcomb 25:24 – 26:2).  Wells also did not investigate the troublesome aspects of the information provided.  For example, he did not question Cofer about Taylor's report of Cofer boasting about the second floor not being held accountable.  (30(b)(6) 28:2 – 29:6; *id.* 30:9-13).   Nor did he investigate Cofer's statement that Johnson was wrong to have reported Roy.   (30(b)(6) 34:17 – 35:2)).[13]   Wells rationalized that, in making this chilling statement, Cofer probably was just expressing an "opinion."    (30(b)(6) 36:20 – 37:7).   Although employees were hearing these "opinions" of high-level country managers, Wells simply concluded that, "[i]t didn't seem relevant" to a retaliation investigation, and that it was "not worth investigating."  (30(b)(6) 37:13 – 38:4).[14]

Predictably, Fluor again took no action (Whitcomb 24 – 27:1) and did not even discuss whether action should be taken with regard to Whitcomb (30(b)(6) 38:17 – 43:5; *id.* 44:3-6; *id.* 44:18-20).  Wells merely claims he told Whitcomb to be sensitive to yelling

---

[13]    Nor did anyone investigate the allegation about Riley calling a minority male a "bitch."  (30(b)(6) 32:25 – 33:11).

[14]    Whitcomb confirmed that Wells had no authority to take any action against him.  (Whitcomb 27:16-24).   Whitcomb reported to Rick Reuter.  (Whitcomb 15:24 – 16:5).  Reuter and Whitcomb spoke several times per week, but Reuter never even mentioned the issue.  (Whitcomb 27:10-15).  There was not even any follow up about Whitcomb's profanity and yelling (30(b)(6) 49:18 – 50:19).

or other behavior that might be inappropriate. (30(b)(6) 43:13-15; Exh. 30 at DEF 2411). Whitcomb never indicated he would take any action. (30(b)(6) 49:4-11).

Wells had an huge incentive to discredit the allegations from Johnson, Taylor, and others. Before Wells concluded his investigation, Fluor advised him that his investigation, including the leaks and bias, was the subject of other complaints. (Exh. 40; Exh. 41 at DEF 2386 (June 10 entry)).

## F.     Taylor and Klimak submit complaints of retaliation

On June 2nd, 2014 Taylor submitted her own hotline complaint. (Taylor 104:25 – 105:3; Exh. 41). Her coworker, Nikoletta Klimak, submitted one on the same day. (Klimak 49:17 – 50:14; Exhs. 42-44). Taylor also complained to Irvin and had approximately three discussions with him. (Taylor 49:13 – 52:1). Willard Smith was the only person from Fluor that investigated Taylor's complaint. (30(b)(6) 119:20 – 120:1).

Taylor complained about the significant difference in Riley's behavior after Taylor spoke to Wells (Taylor 98:8-15; 104:13-14; Johnson 120:12 – 122:10), Wells's handling of the Roy Complaint (Exh. 30 at DEF 2395),[15] the retaliation Taylor observed against Johnson and the department (Taylor 101:6 - 102:4; Exh. 45), as well as her prescient concern that Riley would now be targeting herself and Klimak (Exh. 41 at DEF 2381); Exh. 45 at Taylor 367, 370-71; Exhs. 46-51; Taylor 105:5-22; *id.* 108:19 – 109:20).

Taylor reiterated the common concern that Whitcomb was not holding his direct reports accountable and that nothing comes of any complaints filed by employees.

---

[15]     Taylor discussed the fact that Wells had coached Riley during the prior investigation. (Exh 34 at DEF 318).

(Exh. 51; Exh. 45; Taylor 111:11 – 115:15; see Whitcomb 22:21 – 23:2).[16]  Irvin not only recalls that "a number of people" shared this concern (Irvin 67:14 – 68:2; *id.* 78:4-16), but he is one of them (*id.* 68:3-5).  Irvin explained that there was nothing management could do internally because everyone reported to Whitcomb.  (Irvin 68:12-25; *see also id.* 64:17-25; Lamb 19:4 – 20:21; *see* Whitcomb 16:8-10).  Of course, nobody would risk the wrath of conveying such prevalent concerns.  Whitcomb claims he was never even informed of them.  (Whitcomb 40:13-17).  Badillo and the investigators obviously took their jobs of shielding Whitcomb very seriously.  (*See supra* § II(E)(2)(a)).

**G.    "The war was on"[17] against the "ungrateful bitches"**

**1.    Riley was fully aware about Taylor's participation in the complaints**

Riley knew full well who complained about him.  Riley falsely testified that he wasn't aware of any hotline calls until he talked to Smith in August.  (Riley 73:9-25).[18]  However, Smith set up an interview with Riley in early July in which Fluor claims the details were discussed.  (Exh. 41 at DEF 2386; 30(b)(6) 215:17-24; Exhs. 52-53).[19]  Shortly after Hooks arrived in Bagram (i.e. early July), Riley and Smith told him that Taylor and Klimak had filed hotline complaints.  (Hooks 62:5-7; *id.* 63:6-9; *id.* 49:8-18).  Gentry confirms that the complaints were common knowledge.  (Gentry Dep 26:2-7).

---

[16]    Irvin is unaware of Fluor issuing any discipline to executives on the second floor. (Irvin 42:23 – 43:1).

[17]    Gentry 26:1.

[18]    Despite Smith's claim that he doesn't advise individuals who made a complaint, Riley acknowledges that he knew that he was interviewed regarding a complaint from Taylor.  (Riley 74:19 – 76:2).

[19]    Smith created notes in 2014 after his interview and then modified them after he testified for Fluor earlier in this case.  (30(b)(6) 214:21 – 215:16; *id.* 217:20 – 221:20; *id.* 224:10-22; *id.* 225:22 – 227:4; *id.* 229:9-17).

Riley was "upset" that Taylor and Klimak "put a hotline complaint against him." (Hooks 62:5-7). Riley had a loud reaction, which Irvin described it as an "outburst" (Irvin 50:12-21; *id.* 78:1) during which Riley was "making a comment about he can't f[ucking] do his job or run his operation or something like that" (*id.* 50:25 – 51:2; *id.* 51:21 – 52:3).

### 2. The retaliation is swift and severe

### a. Taylor and Klimak become the "ungrateful bitches"

As Gentry explained, once word got out of Taylor's complaints, "the war was on." (Gentry 26:1). Riley attributed a post-R&R drug screen in early July to the complaints and referred to Taylor and Klimak as the "ungrateful bitches." (Taylor 117:8-25; Gentry 24:19 – 25:11; *see id.* 37:17-25).[20] Taylor was told that this was said to Gentry and in front of Mark Cofer. (Taylor 118:1-6; *see also* Klimak 82:6-16). Taylor reported the "ungrateful bitches" comment to Smith twice in early July. (Exhs. 46, 49). Hooks recalls Riley calling Taylor an ungrateful bitch more than once: "[I]f it's one thing I remember from 2014, that's it." (Hooks 63:10-16; *id.* 64:11-13; *id.* 64:24 – 65:2).[21] Hooks believes

---

[20]    Fluor makes the passing argument, that Riley's statement is "hearsay." (DE 54-1 at p. 26). To the extent it needs to be said, Taylor is not offering the statement to prove the truth of the matter asserted (i.e. that she is an "ungrateful bitch"). Fed. R. Evid. 801. The statement simply is not hearsay. *E.g. EEOC v. Watergate at Landmark Condo.*, 24 F.3d 635, 638 (4th Cir. 1994) (citing Fed. R. Evid. 801(d)(2)(D)); *Cline v. Roadway Express, Inc.*, 689 F.2d 481, 488 (4th Cir. 1982) (same). Nor is the direct testimony of what Riley said hearsay. Further, the fact that managers repeated what Riley said is offered for numerous other non-hearsay purposes as proof of notice to Fluor, the effect it had on Taylor, the insincerity of the investigation, and Taylor's reasons for reporting it.

[21]    It is possible that the occurrences on which Hooks heard Riley call Taylor and Klimak "ungrateful bitches" are in addition to the occurrence about which Taylor was told by management during her employment. (*See* Hooks 66:1-4; *id.* 76:5-11). That wouldn't breathe merit into the pending Motion one bit.

the comment was made in the presence of other managers.   (Hooks 64:6-10; *see* Gentry 33:10-13).

### b.     Shunning

Taylor also reported that Riley "stopped speaking to me altogether" upon his return from R&R in early July.  (Taylor 115:24-25; *id.*116:4-9; *see also* Hooks 60:16-19; *see id.* 62:22-23; *id.* at 63:4-5).  Riley admits he stopped working with Taylor after she complained:

> Q.     So after you learned of the complaint made by Tara Taylor, you stopped working directly with her?
>
> A.     To the best of my ability.

(Riley 81:1-4); *see id.* 81:5-8 (same as to Klimak)).   Riley could not recall a single conversation with Taylor after he banished her to the first floor.  (Riley 115:20 – 116:13); *see also* Johnson 22:22 - 23:4).

What Taylor never knew prior to discovery was that Fluor directed this silent treatment.  Smith instructed Riley to not deal directly with Taylor, but to operate through the GCM.  (Riley 79:20 – 80:80:25).

### c.     Demotion and plans to terminate

Given Smith's directive to not deal with Taylor, Riley demoted Taylor, moved her away from management, and stripped her of the very duties she was given to ensure her continued employment.   (Taylor 116:1-3; *id.* 119:12-20; *id.* 120:20-22).   Riley previously had Taylor reporting directly to him at the top of the organizational chart, but he moved her to the very bottom after she complained.  (*Compare* Exh. 26, which was created the day before Taylor was interviewed, *with* Exhibit 54, dated after Riley learned of Taylor's complaints; 30(b)(6) 69:19 – 70:13).

Riley was not satisfied with moving Taylor to the bottom of the organization.  In July he told Preston Howard for the first time that he planned to terminate Taylor and Klimak.  (Howard 13:10-18; id. 14:1-5; *id.* 15:15-20).  Taylor heard a rumor to this effect from management, but she dismissed it because she did not believe Riley was "stupid" enough to try it or that Fluor would allow such a thing.  (Taylor Decl. ¶ 10 (Exh. 15)).  As discussed below, Taylor was wrong.

### d.    Refusal to promote

Johnson resigned after management discouraged him from reporting discrimination. (Johnson 127:7-10; *id.* 129:25 – 131:12; *id.* 154:23-25; *id.* 179:11-25)).  This left an opening for a new GCM – the job Taylor frequently performed "without missing a beat" according to Riley.  (*See supra* § II(B) & n. 7, § II(C)).  Riley never posted or advertised the position. (Riley 93:20-22).  Instead, after another employee apparently rejected an offer, Riley tapped Dexter Hooks, who was at the Phoenix FOB that was on the verge of closing.  (Hooks 8:9 – 9:3).  Hooks knew that he was transferred because of a rift between Riley and Taylor.  (Hooks 10:10-21).  Hooks never sought the position, and he told Riley that he did not want to come to Bagram.  (Riley 93:9-19; Exh. 55).

### e.    Riley imposes rules on just Taylor and Klimak.

To send another strong message to the "ungrateful bitches," Riley imposed new rules that Taylor and Klimak could not use electronic devices or have a television on. (Taylor 122:4-13; Riley 110:6-12; Exh. 56).  Nothing had changed operationally in five years, and this was never an issue until the investigation.  (Taylor 123:6-124:8).

16

The cumulative effect of shunning and essentially eliminating contact with the outside world is particularly punitive given the unique circumstances of Bagram. The time difference between Bagram and the East Coast is 9 ½ hours. (Taylor Decl. ¶ 3 (Exh. 15). Plaintiff worked seven days a week, typically for at least twelve hours per day. (Taylor 70:13 – 71:23). These factors severely limited her contact with family and the outside world. CNN and the Internet were the main sources Taylor and Klimak knowing what was going on anywhere in the world off their base located in a remote, but active, war zone. With others in the building refusing to speak to them and their access to the outside world cut off, Taylor and Klimak were effectively isolated. (*Id.* ¶ 5).

Riley's new rules applied only to those who complained. Hooks was free to have personal electronic devices in the office. (Taylor 124:9 – 125:14; Hooks 60:20 – 61:5). Riley used personal electronic devices during working hours. (Johnson 147:14-17; *id.* 148:3-6; *id.* 187:19 – 188:25)). Johnson earlier questioned why Riley imposed this policy only after the complaints. (*Id.* 148:3 – 150:11). Management told Riley that, if he instituted the rule for Bagram, he needed to do so for all FOBs. (Irvin 69:21-25). Yet, Fluor knew that Riley did not do so. (Irvin 70:1-2; Hooks 61:15-17; Exh. 56; *see* Taylor 126:6-24).

## H.     Smith phones in the investigation.

Smith never visited Afghanistan to investigate issues raised by Taylor and Klimak. Instead, he communicated solely by phone and email from the confines of his office in Dallas, Texas. (30(b)(6) 120:6-11; Taylor 108:13-18). Smith's "investigation" was so cursory that Riley did not even know who was investigating the matter, and he

17

claims nobody told him the specifics of the complaints from either Taylor or Klimak. (Riley 82:24 – 83:1; *id.* 93:2–8).  Riley's remarkable statement is, in fact, buttressed by the fact that Smith did not document that he asked questions about Taylor or her serious allegations.  (30(b)(6) 230:13 – 231:1; *id.* 231:14-23; *see also id.* 233:14-234:20).

Smith never investigated the most serious allegations.  He never asked, for example, why Taylor was demoted and moved from the top of organizational chart to the very bottom.  (*See supra* § II(G)(2)(c); 30(b)(6) 70:14-19).  Smith claims he just assumed there were legitimate reasons, and he didn't see a need to get into details.  (30(b)(6) 130:10-11).  Smith also never asked why closeout duties that Riley told Wells were so critical were suddenly removed from Plaintiff after she complained.    (30(b)(6) 131:11-14).

Smith also saw nothing significant in the "ungrateful bitches" rant(s) by Riley.  Smith spoke several times to Riley in July after learning about Riley's infamous tantrum(s) (*supra* § II(G)(2)(a)), but he did not raise the issue with Riley.  (30(b)(6) 238:19-239:3).

Fluor's new GCM, Hooks, told Smith the situation in Bagram was a "powder keg." (Exh. 57 at DEF 326).   As to Riley's retaliation, Hooks told Smith that there were things that did not happen before but that were now taking place and that everything Taylor and Klimak did was being questioned. Hooks stressed it was abnormal, unnecessary, and "due to the Hotline calls."  (*Id.*)  Like Johnson before him, Hooks stated that the personal electronics issue "was not an issue until the Hotline complaints were filed." (*Id.*)  Hooks also corroborated that Riley was not speaking to Taylor and Klimak.  (*Id.*

DEF 327).   Smith further documented Hooks's view that "it has been a 180 degree turnaround based on the hotline complaints from the three people. It is a hostile work environment for the women and for Dexter it is uncomfortable."  (*Id.*)

Smith dutifully kept this information under wraps.  (*See supra* § II(E)(2)(a)). Fluor did nothing to improve the situation in Bagram. (Hooks 67:3-7).    In fact, Hooks experienced similar adverse treatment after he spoke to the investigators.    (Hooks 67:10-22).

Hooks was not the only source of corroboration that Fluor ignored.  Gentry also reported to Smith that Badillo reported that Riley wanted to RIF Taylor and perhaps Klimak because he was "sick of them and their bullshit."  (Exh. 58 at DEF 339; 30(b)(6) 136:1 – 12)   Gentry testified that the "bitches" comment was discussed within management.  (30(b)(6) 136:25 – 137:8).  These revelations never made it past Smith either.

**I.     Riley moves to separate the "ungrateful bitches," and management describes the move as "fucked up."**

After Riley learned of the complaints, he actually taunted Klimak about demobilizing (i.e. separating) her.  (Exh. 59 at DEF 348).  What Fluor kept secret until discovery in this case was that Riley quickly sought to demobilize the "ungrateful bitches" while Smith's investigation was pending.   In early August, Riley requested separation paperwork (SRFs) for Taylor and Klimak.   (30(b)(6) 59:23 – 25); Exhs. 60-62; 30(b)(6) 78:22-25; *id.* 79:1-5). Riley was the sole decision-maker, and he admits that neither his bosses nor project controls instructed him to reduce headcount in his department or to eliminate any particular positions.  (Riley 31:16-21; *id.* 34:7-15)).

19

In a flash, Plaintiff went from "exceptional" to "ungrateful bitch," and to being the *only* Bagram prime contracts employee involuntarily demobilized. (Riley 85:1–7; Klimak 35:8-15; *see supra* Section II(B) & nn. 6-7). Riley freely admits: (1) that the *only* person for whom he submitted an SRF form in Bagram is Taylor -- the same person he put in a closeout position to be the last person on the project; and (2) that he never requested SRF paperwork for any employee assigned to Bagram other than Taylor and Klimak, whom he knew had filed hotline complaints against him. (Riley 104:7-12; *id.* 91:25 – 92:4; *id.* 92:18 – 93:1).

Management openly discussed the fact that Riley wanted to get rid of Taylor and Klimak, as well as its coaching of Riley to construct a pretextual reason. While Riley claims he never discussed his reasons for demobilizing Taylor and Klimak (Riley 89:1-12), Badillo gave Gentry a contrary account:

> [Badillo] ma[d]e a statement, if you will, that Ron was wanting to RIF Tara and Nikki, and he told him what he needed to do for the process. . . . And I guess Mr. Riley had made the complaint to him that his justification, basically, was he's just sick of them and sick of their BS and wanted to get rid of them, and he told him, said, well, that's not going to work. You actually have to come up with a business justification, and I think Mr. Badillo had said, basically, just because he was frustrated, that [Riley] wasn't going through the necessary steps to sit down and write the justifications and put together the organizational charts and everything that had to be turned in when you were doing these reductions.

(Gentry 32:4-33:1 (emphasis added); *id.* 33:2-5; *see also id.* 33:25 - 34:10). Gentry reported this information to Smith, who, of course, did nothing with it. (Exh. 58 at DEF

338-39). [22]  None of this was a secret at Fluor.  Gentry told the investigators about all of this.  (Exh. 58 at DEF 339; 30(b)(6) 136:1-8).

Badillo told Hooks that Taylor's separation "was fucked up from an HR standpoint."  (Hooks 26:15 – 27:4).  Gentry agreed: "I'm sure there were quite a few people that did say that." (Gentry 35:7).

Riley skipped the process of getting HR approval altogether just as he failed to follow the process with strength management.[23]  Badillo was responsible for ensuring that reductions were done according to policy.  (Badillo 17:13-20).  The process requires that the government, project controls, and the manager at issue (i.e. Riley) are to meet and document what positions would be eliminated.  (Badillo 23:13-26:4). Badillo states that there was always an LOTD when positions were eliminated. (Badillo 57:10-19; *id.* 25:9 – 26:4). Badillo would then sit down with manager, document reason why individual would be let go, and they would then create before and after organization charts (Badillo 26:5 – 28:5).  This process applied to organizational modifications as well.  (Badillo 57:20 – 59:4).

None of this occurred regarding Taylor's separation.  Fluor has produced no such LOTD.  Badillo has no recollection of ever meeting with Riley about the decision. (Badillo 52:19 – 54:15).  Riley never created an organization chart that did not project

---

[22]    Badillo "had a reputation for siding with management all the time when it came to reduction or staffing issues," (Irvin 71:25 – 72:2), and for "ke[e]p[]ing the second floor happy because he addressed their needs" (*id.* 81:9-11; *id.* 81:25 – 82:2).

[23]    A RIF is decided by the manager, but must be approved by HR.   (30(b)(6) 58:13-16)    Strength management (i.e. Badillo) must review the request.  (30(b)(6) 59:6-22). While Fluor claims that HR reviewed the decision, Fluor could not identify any such discussions.   (30(b)(6) 60:1-4).   Irvin claims to have no recollection of being told any reason.  (Irvin 54:16-19; *id.* 67:4-6; *see* 30(b)(6) 61:2-5)

Taylor's continued employment.  (Riley 40:2-5; *see supra* § II(C)).  Badillo was unaware of any documentation other than emails where Riley requests SRFs and returns one digitally signed for Taylor.  (Badillo 52:14-18; Howard 43:19-23).  Riley acknowledged that there are no others.  (Riley 31:2-5).

Rather than ensuring that Fluor was following the law and company policies, the responsible managers adopted an "every man for himself" mentality.  Badillo told Johnson that he knew how Fluor was operating, that he had his own plan to take legal action if he was demobilized unfairly, and that he was keeping notes about the shaky things they had been doing.  (Johnson 162:11 – 163:11).

**J.    Smith learns of plans to demobilize Taylor and shuts down the investigation.**

On August 14 2014, Smith received a Notice of Taylor's EEOC Charge (Exh. 63; Exh. 41 at DEF 2385).  The next day (August 15), Smith also learned of Riley's effort to demobilize Taylor.  (Exh. 64).  That same day, Smith moved to close out the investigations.  (Exh. 65).  Smith never told Taylor or Klimak about the demobilizations (SRF) forms requested by Riley.  (30(b)(6) 138:22 – 139:2); Klimak 81:13-22; Taylor Decl. ¶ 8 (Exh. 15)).

Armed with the knowledge that Riley was seeking to eliminate the two remaining employees who had complained, Smith didn't bother to seriously investigate.  Instead, he set up a call with Riley "for a few minutes" so he could ask "one or two follow up questions."  (Exh. 66).  The only thing Smith claims he did to investigate the reasons for Taylor's separation was to read the SRF and to speak to Riley.  (30(b)(6) 261:7 – 262:2).

## K.    Taylor removed involuntarily from the project

On September 2nd 2014, Riley executed the form to demobilize Taylor.  (Exh. 68).[24]  Irvin contacted Hooks to bring Taylor over to the office. (Hooks 21:18 – 22:18). Irvin told Taylor that he came from Whitcomb's office and was told by Riley to RIF Taylor that evening.  (Taylor 128:14-21).    Irvin relayed that Whitcomb was involved in the decision.  (Taylor 193:2-5).  Hooks, who had no forewarning, was "shocked" and "extremely upset" about the meeting and that he was required to sign the papers, which he described to Gentry as "do[ing Riley's] dirty work."  (Hooks 22:21 – 24:8; *id.* 28:8-10; id. 28:22 – 29:6; *see also id.* 70:25 – 71:2; 71:11-13; Gentry 35:22- 36:2).

Riley confirms that it was his intent to separate Klimak as well.  (Riley 90:5-10; 91:14-16)).  He testified that the only reason Klimak was not involuntarily separated is that she later resigned.  (Riley 91:17-19).  Mission accomplished.

## L.    Fluor knows Riley's newfound reasons for separating Taylor are false.

Riley was candid to Badillo as to his retaliatory reasons for demobilizing the "ungrateful bitches."  (*Supra* § II(I)). Badillo's response was to tell Riley to come up with another reason.  (*Id.*)  Fluor knows that its purported reasons are a pretext.

Irvin knew that Taylor made a complaint, and he discussed his concern that Taylor was being retaliated against with employee relations head, Steve Shenk, but he claims that there was no action they could take.  (Irvin Dep. 46:3-21; *id.* 64:14-25).

---

[24]    Unlike the situations involving others who had not complained (e.g. Begnaud, Krapa, Hooks, Kimberly Johnson), Riley made no effort to find either Taylor another position.  (Exh. 67 at DEF 2631).

Hooks told Johnson that Hooks felt that Riley was "getting back at" Taylor.  (Johnson 177:24 – 178:4).[25]

Fluor always knew that reliance on the FOB closures and personnel reductions was contrary to the facts.  Fluor knew that Taylor was put in her position specifically to manage the reduction and to be the last person on the project. (*See supra* § II(C), II(E); *see also* Exh. 30 at DEF 2407]; Riley 102:18 – 103:22).   Consistent with Riley's own pre-complaint views, Johnson noted that Taylor would be the last person that should be laid off and that it made no sense for the company to be saving jobs of GCSs on smaller FOBs that were being eliminated.  (Johnson 155:23 - 157:7); *see also* Klimak 52:3-21; *id.* 53:4-8).   While personnel were reduced at other FOBs, Bagram was staffing up. (*See supra* § II(D)).[26]   Further, nobody ever told Riley to reduce headcount in prime contracts.  (Riley 22:25 – 23:10; *id.* 24:8-16; *id.* 34:7-15; *id.* 89:1-12; 30(b)(6) 61:17 - 62:22; *see also* Whitcomb 38:17 – 39:7.[27]   Fluor never discussed reductions in prime contracts/BAF in either the meetings with the government or in Fluor's internal meetings (Howard 37:3-7; *id.* 38:24 – 39:14; Irvin 74:19-25; *id.* 85:2-11; *id.* 82:3-22; *id.* 86:20 –

---

[25]     Johnson agrees that the company had no business letting Taylor go, and that none of the GCMs would want to come to Bagram if Taylor is not there.  (Johnson 176:20 – 177:24).

[26]     Before Taylor's RIF, the office consisted of Hooks, Taylor, and Klimak (3).  After the RIF, the office consisted of Hooks, Krapa, Klimak (3) and then Hooks, Krapa, Siani (July – Dec. 15 or Jan. 16), and Antevska (4).   (Krapa 20:6 – 23:9)).

[27]     Riley claims that project controls told him he needed to get to a certain number in terms of dollars, but that there is no documentation of this instruction.  (Riley 32:8-20). Nor are there any documents showing that Bagram was over budget during Taylor's tenure.  (Riley 25:16-19).

87:9).   Johnson saw the strength number reports and there never was a report that discussed eliminating the position of either Taylor or Klimak.  (Johnson 165:4 – 165:5).

Nor is there any truth to the contention that Riley was motivated by a completely-unsubstantiated anticipation that Plaintiff's job duties would go away.  In his rage, Riley requested the paperwork to eliminate Klimak as well.  Klimak was doing work that nobody contends was going away.  (Klimak 15:1-25; *id.* 28:23 – 29:4).

Plaintiff's position was never eliminated.  During discovery, Riley claimed for the first time that Greenville took over closeout duties. (Riley 118:15 – 119:6).  Nobody substantiated this claim, and it contradicts what Riley said at the time and what actually happened.  In 2014, Riley told Preston Howard that he was moving another Tier 1 GCS, Allan Krapa, to Bagram to perform the closeout work (i.e. the work Plaintiff was performing).  (Howard 17:1 -18:1).  And he did.  Before Taylor was even gone, Riley brought Krapa from a closing FOB to replace Taylor in Bagram.  (Riley 46:9 – 48:20; Krapa 19:14-16).).[28]   Krapa was expecting to be demobilized, which was the plan. (Krapa 35:2–13; Johnson 166:6–13).  Instead, Riley instructed Krapa on September 3, 2014 to do a turnover (i.e. transition) meeting with Taylor.   (Exh. 69; Krapa 29:25 – 30:23; Taylor 190:2-25). After Taylor's departure, Krapa worked in Bagram during the remaining time that he was a GCS.  (Riley 62:8-18).[29]   Krapa, Begnaud, Weber, and Kimberly Johnson did closeout work in Afghanistan throughout 2015 and were doing so as of the time Krapa left in 2016.  (Krapa 25:11 – 29: 24; *id.* 36:24 - 37:7-9).

---

[28]    Krapa had not served previously in Bagram as a GCS.  (Krapa 19:10-13).

[29]    Riley admits that there was nothing Krapa was doing that either Taylor or Klimak could not do.  (Riley 49:14-20).

25

Fluor also knew all along that Riley's lack of work justification was false.  Hooks told the investigators in August 2014 that there was enough work in Bagram to support the number of employees, (57 at DEF 326), and he testified to this as well, (Hooks 60:12-15; *id.* 73:14-18).  Hooks's review of Taylor at the end of 2014 also shows she was busy.  (Hooks 32:16 – 25; id. 35:1-4; Exh. 17; Hooks 38:4 – 19; *id.* 40:3-13).

**M.    Smith misleads upper management, but they don't care.**

Smith created an investigation report that ignored key allegations, such as Riley referring to the complaining employees as "ungrateful bitches" and the revelation that Riley was seeking to separate them.  (Exh. 41 at DEF 2384-85).  Smith also created notes of the various allegations in July and marked them "unsubstantiated" before even purporting to investigate them.  (Exh. 70; 30(b)(6) 245:9 – 246:18; *id.* 267:6-7).  Smith again failed to include key allegations and marked others "unsubstantiated" when, in fact, multiple witnesses corroborated the claims and only Riley denied them.  (*Id.* 246:18 – 250:12).  Smith bobbed, weaved, and strived mightily to avoid answering questions as to what supported his various "unsubstantiated" notations and whether he even investigated the claims.  (*Id.* 250:11 – 262:2; *id.* 264:21 – 266:5; *id.* 268:20 – 278:17).

Smith, Wells, and Badillo protected Whitcomb well.  Director of Human Resources, Steve Lamb, to whom Rob Wells reported, testified that he never received any complaints about Whitcomb.  (Lamb 15:13-16; *id.* 17:21-22; *id.* 24:22-24).  Human resources did nothing about Taylor's allegations.[30]  Notwithstanding corroboration from

---

[30]    Nobody told Lamb about the Klimak complaint.  (Lamb 63: 17-19).  Lamb was aware of Johnson's complaint about Whitcomb. (Lamb 24:25 – 25:8; *id.* 29:14 – 37:8; *id.* 48:18 – 49:7).  Lamb, however, does not know what was said, and he did nothing to find out.  (Lamb 38:2 – 25).  Wells told Lamb told that Roy received a verbal reprimand with

managers, Lamb states that he read that everything Taylor alleged was unsubstantiated. (Lamb 66:5 – 67:3). But Lamb does not even know what Taylor was claiming to be retaliation. (Lamb 80:6-8; *id.* 80:18-20). Lamb stated he had one phone call with Smith about it. (Lamb 70:17-21). Smith only told him that the investigation was complete and that the allegations were unsubstantiated (which he documented before even pretending to investigate them). (Lamb 72:20 – 73:7). Nobody told Lamb that Smith knew Riley had submitted paperwork to demobilize Taylor or about the information Hooks provided. (Lamb 77:7 – 79:3; *id.* 79:20-22). Lamb knew that Riley separated Taylor after she complained about Riley, but he did nothing to find out whether Riley retaliated, and, in fact, he has no idea whether or not Riley retaliated. (Lamb 82:18 – 84:23).

Predictably, nothing happened to either Riley or Whitcomb. Nobody spoke to Whitcomb about the allegations or discussed taking any action against Riley. (30(b)(6) 122:6-6; *id.* 127:19 – 129:13; *see also id.* 30(b)(6) 129:14-21). Nobody from Fluor met with Riley to discuss any findings as a result of the complaints. (Riley 81:14-25; see *id.* 95:7-8; see also Klimak 83:16-19). Nor did Riley ever bother to ask about the complaints. (Riley 81:21-25). Likewise, this was the second complaint against Whitcomb, Fluor knew that Whitcomb discouraged reports of discrimination, and Fluor

---

strong coaching. (Lamb 37:13-24). Lamb did not speak to anyone else about it. (Lamb 39:1-8). Lamb did nothing to determine that there was, in fact, coaching. (Lamb 39 14-16; *see id.* 40:3-6). Lamb did not discuss the issue with Whitcomb. (Lamb 39:17-20; *id.* 58:23-25). Lamb did not review the investigation file. (Lamb 60:20 – 61:8). Wells told Lamb the allegations were unsubstantiated, but he didn't tell Lamb why, and Lamb didn't ask. (Lamb 61:9-25). Lamb did not inquire as to what witnesses were interviewed, and Lamb cannot recall if he was even told who was interviewed. (Lamb 62:1-11).

knew that the only action Whitcomb took against Roy was to promote him the following month.  Yet, Lamb never even counseled Whitcomb.  (Lamb 80:22 – 81:4).

**N.    Smith lies unsuccessfully to the EEOC**

Smith replied to the EEOC on behalf of Fluor and made numerous material misrepresentations.   Smith told the EEOC in October 2014 that the FOB's in Afghanistan would close within a year (Exh. 71 at DEF 08) and that "the LOGCAP project is currently undergoing the process of shutting down its operations" (*id*. DEF 09). Howard confirmed that Fluor never believed that operations would cease, Fluor never gave instructions to cease operations, and that, since early to mid-2014, Fluor never made plans to close operations.   (Howard 46:21 – 48:3; *see also id*. 40:21 – 42:13; *id*. 31:18 – 32:13; *id*. 44:20 – 45:14).   Smith told the EEOC that the workforce in prime contracts had declined (Exh. 71 at DEF 08), but he failed to note that Taylor's department was growing in 2014 and never declined.  (Howard 36:25 – 37:2; *id*. 45:23 – 46:8).   Smith also claimed that "The Prime Contracts department in Afghanistan was asked by senior management of the project to reduce headcount in accordance with the needs of the client." (Exh. 71 at DEF 09).   That simply is not true.  (Riley 34:7-15).  The EEOC saw through Smith's misrepresentations and issued a rare for-cause determination.  (Exh. 72).

## III.  Argument

**A.     Count I:  Retaliation under Section 1981[31] and Title VII**

**1.     Defendant's Motion is only a partial motion as to Count I.**

The pleadings in this case have always included adverse employment actions in addition to termination of employment.  (DE 1 ¶ 35).  Plaintiff amended the Complaint "to ensure that the Complaint encompasses Plaintiff's claim that she was not placed into the manager position in retaliation for her protected activity."  (DE 36; see DE 39 ¶¶ 19, 36).  Defendant has not filed any Motion relative to these claims.  Accordingly, these should be set for trial.[32]

**2.     Termination of Assignment:  Traditional proof analysis**

Fluor briefs only the *McDonnell Douglas* analysis, which the Court need not reach.  Taylor has created issues of fact based on traditional proof principles.  *Desert Palace v. Costa*, 539 U.S. 90 (2003); *Diamond v. Colonial Life Accident Insurance Co., Inc.*, 416 F.3d 310, 317 (4th Cir. 2005); *Rowland v. American General Finance, Inc.*, 340 F.3d 187, 193 (4th Cir. 2003). At the summary judgment stage, Plaintiff need only provide evidence (either circumstantial or direct) that retaliation was a motivating factor.

---

[31]     In a footnote, Fluor claims, without explaining, that "Plaintiff failed to engage in any activity protected by Section 1981 – namely, she is not complaining about retaliation on the basis of race."  (DE 54-1 at 27 n. 5).  If, Fluor's point is that Taylor has not engaged in participation or opposition activity related to race, that isn't even a close question here.  (See supra §§ II(E)(1) n. 11, II(E)(2)(b), II(F) (detailing race-based opposition and participation-based protected activity)).

[32]     Taylor cannot be expected to anticipate and respond to any issue not properly raised in a timely Motion, and she would object to any new issues raised for the first time in a reply.  *United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006); *Chesher v. 3M Co.*, 234 F. Supp. 3d 693, 715 (D.S.C. 2017).

*Desert Palace,* 539 U.S. at 101; *Diamond*, 416 F.3d at 317 (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 285 (4th Cir. 2004); *Kubicko v. Ogden Logistics Services*, 181 F.3d 544, 553 n.8 (4th Cir. 1999) (mixed motive applicable to retaliation); e.g. *Jones v. Arteva Specialties*, 7:02-cv-03662-HFF-BHH (D. S.C. 2003) (Exh. 73).   The burden of proof then shifts to Defendant.   *Hill*, 354 F.3d at 284; *Rowland*, 340 F.3d at 193.  This generally necessitates a trial.  *Frobose v. Am. Sav. & Loan Ass'n of Danville*, 152 F.3d 602, 615 n.12 (7th Cir. 1998) (citing *Venters v. City of Delphi*, 123 F.3d 956, 973 (7th Cir.1997)); *e.g. Rowland*, 340 F.3d at 193.

### 3.    Termination of Assignment:  McDonnell Douglas analysis

#### a.    Prima facie:  Causation

Fluor's prima facie case argument is limited to whether Taylor can show that the termination of her assignment relates to her protected activity.  (DE 54-1 at 19).  *Ray*, Slip Op. at 13 (Exh. 74) (providing elements) (citing *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015)); *Jenkins v. Gaylord Entm't Co.*, 840 F. Supp. 2d 873, 880 (D. Md. 2012) (noting that the elements for retaliation are the same under both Title VII and Section 1981) (citations omitted).   **"**[T]the burden for establishing causation at the prima facie stage is 'less onerous.'"  *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015) (quoting *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989); *Tinsley v. First Union Nat. Bank*, 155 F.3d 435, 443 (4th Cir.1998) ("very little evidence of a causal connection is required to establish a prima facie case").  Temporal proximity certainly exists here, which is itself enough for the prima facie showing. *Clark County*

30

*School Dist. v. Breeden*, 532 U.S. 268, 273 (2001).[33] Riley's harsh treatment post-complaint also suffices. *Bryant v. Aiken Regional Med. Ctrs., Inc.*, 333 F.3d 536, 544 (4th Cir. 2003); *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (courts may look at intervening actions preceding ultimate employment action to discern retaliatory intent) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir.2000)).

**b.    Pretext**

Fluor proffers three reasons for "the elimination of Plaintiff's position" (DE 54-1 at p. 23): (1) budget cuts (*id.*); that Taylor was the most junior manager (*id.* at 23-24); and (3) reduction in force (*id.* at 24).  While Taylor need not disprove every reason given, *Burns v. AAF-McQuay, Inc.*, 96 F.3d 728, 733 (4th Cir. 1996), she can.

**1.    Taylor's position was not eliminated**

Before addressing Fluor's stated reasons, the primary evidence that Fluor's reasons for "the elimination of Plaintiff's position" is that Fluor never eliminated her position.  (*See supra* § II(L)).  That should end the inquiry.

**2.    Budget cuts**

Fluor has attempted, but failed, to establish that any budget cuts affected decisions here.  (See DE 54-1 at p. 24.  Fluor provided no documentation whatsoever of this purported budget pressure in prime contracts, or of any need to reduce the budget there.  (30(b)(6) 196:2-3; *id.* lines 19-25; *id.* 197:4; Riley 32:8-20; *id.* 25:16-19).  Fluor's witness (Howard) would not say that prime contracts was over budget during

---

[33]    *See Strothers v. City of Laurel*, 895 F.3d 317, 336-37 (4th Cir. 2018); e.g. *Lauer v. Schewel Furniture Co., Inc.*, 84 F. App'x 323, 329 (4th Cir. 2004) (three months); *Shields v. Fed. Exp. Corp.*, 120 F. App'x 956, 963 (4th Cir. 2005) (calling three to four months a "relatively short gap").

Taylor's employment.  (Howard 18:23 – 19:3).  He claimed, however, that the graph and spreadsheet relied on by Fluor showed a projected future budget deficit. (Howard 20:2-5; 30(b)(6) 188:15-18; *id.* 204:8-13).  That fell apart when Howard acknowledged that the document did not contain projections at all, but rather actual data for later time periods.  (30(b)(6) 207:5 – 208:18; Howard 14:21 – 15:4).  The argument unraveled further when Howard agreed that the graph numbers themselves are faulty because they include individuals who were never employed at the same time.  (Howard 22:22 – 26:6).  Again, the document is not reflective of the time at issue, and it was updated in 2017 to include people who were not employed (e.g. Taylor).  (*Id.* 27:7-20).  The document Fluor uses is simply irrelevant.

Worse, Howard testified that there are records and notes of all the meetings in during which Fluor purportedly discussed staffing and budgets with the government. (Howard 32:14 – 35:25).  Fluor has not produced any such documents.

Fluor's budget argument also makes no sense because the budget had already been set for the year beginning July 1, 2014.  There was no change in the budget. (Howard 30:3 – 31:3).

In any event, Fluor's own managers confirm that there was no plan to eliminate Taylor's position discussed in the meetings.  (*Supra* § II(L)).  All Howard actually said is that Riley first raised the prospect in late July of terminating both Plaintiff and Klimak, which is fully consistent with the timeline of the retaliation here.  (Howard 13:10-18; *id.* 14:1-5; 15:15-20)

### 3.     Downsizing

As with the mythical position elimination, Fluor also didn't downsize prime contracts.  (*Supra* §§ II(D), II(L), II(M)).  Even if it had, Fluor is incorrect that downsizing itself is a legitimate reason.  (DE 54-1 at p. (De 54-1 at p. 24).  In a reduction in force scenario, the only issue is why the plaintiff was chosen. *Mitchell v. Data General Corp.*, 12 F.3d 1310, 1315 (4th Cir. 1993); *see, e.g., Rowe v. Marley Co.*, 233 F.3d 825, 831 (4th Cir. 2000); *Culler v. Thrifty Car Rental*, No. 3:05-1758-MBS, 2007 U.S. Dist. LEXIS 24609, at ** 10-11 (D.S.C. Mar. 30, 2007). "[A]n employer may not try to shield a discriminatory or retaliatory termination by hiding it in a layoff." *Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 69 (1st Cir. 2002).

Fluor's reliance on the downsizing also is self-defeating because, as noted above, she had been put in the position specifically to manage that process to the end (*supra* § II(C)) and the notions that her work went away and that her position was eliminated are simply false (*supra* § II(L)).

Fluor's comparison of Taylor to managers in arguing that she was the least senior manager (DE 54-1 at p. 14) is wrong and self-defeating.  First, Taylor was never a manager (which is one of her claims that Fluor fails to address).  In fact, nobody has ever referred to her in the context of other managers before Fluor filed a summary judgment motion.   As noted above, Taylor was moved to the bottom of the organizational chart.  (*Supra* § II(G)(2)(c)).  Fluor argues in the same paragraph that Taylor was the most expensive of the non-manager employees (PCSs), which is why she was let go.  (DE 54-1 at p. 14).  Well which is it?  Is she the least senior manager or the most expensive non-manager?  To that point, Fluor has not shown that Plaintiff, if a

manager, was more expensive than the other managers (e.g. Hooks), which she surely was not.  If cost was the factor, Taylor would have remained employed as even Riley viewed her as qualified to be manager.

### 4.    Fluor's reasons contradict Riley's stated reason and Fluor admittedly instructed him to create the pretextual reason now relied on.

Perhaps the best evidence that Riley's reasons are a pretext is because, after he stated his real reason, Fluor's HR manager (Badillo) instructed him to create a pretext. (Supra § II(I)).

### 5.    Deviation from policy

Fluor's failure to follow HR and strength management policies (supra § II(I)) also evidences pretext.  *Herold v. Hajoca Corp.*, 864 F.2d 317, 320 (4th Cir. 1988); Stiles v. General Electric Co., No. 92-1886, 1993 U.S. App. LEXIS 2870, **11-12 (4th Cir. Feb. 12, 1993).

### 6.    Shifting Reasons

Fluor's stated reasons after it was sued are different than what Riley used at the time and different from those Smith used before the EEOC.  "Contradictions between an employer's proffered explanation and the contemporaneous statements of the employer are convincing evidence of pretext."  *EEOC v. Town & Country Toyota, Inc.*, 7 Fed. App'x. 226, 233 (4th Cir. 2001) (unpublished).  As Judge Norton recently remarked in an ADEA case where, like here, the summary judgment reasons were different than those in the EEOC statement of position: "[D]efendants' inability to keep their story straight provides evidence of pretext."  *McFadden v. Stahl Crane Sys.*, No. 2:13-cv-03039-DCN,

2017 U.S. Dist. LEXIS 48618, at *26 (D.S.C. Mar. 31, 2017) (citing *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 647 (4th Cir. 2002)).[34]

**B.      Count II:      Breach of Contract**

Fluor begins with the false premise that Taylor's contractual claims "are basically repackaged versions of her retaliation claim."  (DE 54-1 at p. 28). While there is overlap, the policy relied on (discussed below) is in no way limited to claims of unlawful discrimination.   See Exh. 75 § II (policy "is intended to cover concerns regarding compliance and ethical business practices and conduct, including but not limited to  . . . other employment issues").

**1.      Whether Fluor intended to enter into a contract**

While it is discouraging that Fluor is attempting to disavow the strong promises it has made, its arguments nonetheless have no legal merit.  (DE 54-1 at p 29).  It doesn't matter what Fluor intended.   Employer policies create unilateral contracts.   *Small v. Springs Industries*, 292 S.C. 481, 357 S.E.2d 452, 454 (1987); *Fleming v. Borden, Inc.*, 450 S.E.2d 589, 594 (S.C. 1994).  Fluor can be bound to its promises even though it, like every other employer, claims it did not intend such a result.      *Miller v. Schmid Labs., Inc.*, 307 S.C. 140, 142, 414 S.E.2d 126, 127 (1992).

Fluor then quotes Taylor's testimony about handbooks, which are not at issue and whether she was "given" a copy of Policy 705 while in Afghanistan.  (DE 54-1 at p. 29).   Fluor conveniently chops off the subsequent questions in which Taylor affirms she had access to the policy and accessed it during the period of retaliation.  (Taylor Dep.

---

[34]      See also *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 298 (4th Cir. 2010); *Holland v. Washington Homes, Inc.*, 487 F.3d 208, 217 n.7 (4th Cir. 2007) *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 852-53 (4th Cir. 2001).

47:20 – 48:3).  Fluor incorrectly states that Taylor testified she first obtained a copy after she was informed her assignment ended.  (DE 54-1 at p. 29).  Taylor didn't say that, and she never said she first contacted the EEOC after being informed of her separation. Taylor contacted the EEOC well before she was told of her separation and, in fact, before the Riley submitted the SRF.  (Taylor Decl. ¶ 7; Exh. 76). In fact, Fluor had notice of the Charge weeks before it informed Taylor of her separation.   (Exh. 41 at DEF 2385).

Fluor also ignores the fact that Taylor's claim is based also on the training she received that retaliation was not tolerated.  (DE 39 ¶ 29; Taylor Dep. 48:7- 49:6); Taylor Decl. ¶¶ 11-12 (Exh. 15)).  Finally, Defendant's *Moss* argument (DE 54-1 at pp. 29-30) completely misses the mark as Taylor is not suing on a policy or handbook about which she was unaware and to which she did not have access.

### 2.    HR705 mandatory language

Without any disclaimer, HR Policy 705 provides: "Fluor expects employees to report any suspected noncompliance with the law the Fluor Code of Business Conduct and Ethics (HR-700), or related Fluor policies or procedures, including HR-701. Fluor will take appropriate action to investigate, and where appropriate, remediate. . . ."  (Exh. 75 § I).  In the strongest of terms, the policy states: "Fluor prohibits retaliation of any kind against any individual who reports suspected misconduct in good faith. Reports that are made ill good faith do not require proof of misconduct - only that there is a reasonable basis for making the claim."  *Id.* III(C).

Mandatory language includes such terms as "will." *See Conner v. City of Forest Acres*, 348 S.C. 454, 560 S.E.2d 606, 611 & n.4  (2002); *McCutcheon v. Wal-Mart*

36

*Stores, Inc.*, Civil Action No. 5:04-2467-RBH, 5:04-2468-RBH, 2006 U.S. Dist. LEXIS 17435, at *17 (D.S.C. Mar. 28, 2006) ("The Court agrees with the Magistrate Judge that mandatory words such as 'will' used in a handbook could be found by a trier of fact to be a promise, thus supporting a finding that a contract existed or wrongful discharge occurred.").  The existence of mandatory language in the promise requires that this case be submitted to the jury.  *Burns v. Universal Health Services*, 361 S.C. 221, 234-35, 603 S.E.2d 605, 612 (Ct. App. 2004) (citing *Horton v. Darby Elec. Co.*, 360 S.C. 58, 599 S.E.2d 456 (2004) and *Fleming v. Borden, Inc.*, 316 S.C. 452, 450 S.E.2d 589 (1994)).  Every case differs as to the policy and circumstances at issue, which is why Fluor's argument that there is a blanket rule that nonretaliation policies are not binding as a matter of law (DE 54-1 at pp. 31-34) is simply wrong.  The existence of mandatory language creates a jury issue under the binding authority of the South Carolina Supreme Court.

Further, this case is not limited to written policies.  Fluor's oral assurances that employees will not be retaliated against themselves create genuine issues of material fact.[35]  The jury is to consider it all.  *Small v. Springs Industries*, 292 S.C. 481, 483, 357 S.E.2d 452, 454 (1987) ("Small I") ("It was for the jury to decide whether the [written policies] and the oral assurances constituted an employment contract.")

---

[35]    *Williams v. Reidman*, 339 S.C. 251, 261-62, 529 S.E.2d 28, 33 (Ct. App. 2000); *Jones v. General Elec. Co.*, 331 S.C. 351, 368-69, 503 S.E.2d 173, 182-83 (Ct. App. 1998); *King v. PYA/Monarch, Inc.*, 317 S.C. 385, 391 & n. 2, 453 S.E.2d 885, 889 & n.2 (1995); *Baril v. Aiken Regional Med. Ctr.*, 352 S.C. 271, 282, 573 S.E.2d 830, 836 (S.C. Ct. App. 2002); *Leahy v. Starflo*, 314 S.C. 546, 549-550, 431 S.E.2d 567, 569 (S.C. 1993).

### 3.    Plaintiff's understanding

Fluor again misses the point by citing testimony for the proposition that Plaintiff was not guaranteed employment for a definite term.  (DE 54-1 at p. 34).  That has never been the claim.  Likewise, Fluor's question "where in this policy does it promise you that you will always have a job if you participate in an investigation (*Id.* (citing Taylor Dep. 175:12-16)) is a straw man.  Nobody claims that, if you complain, you can never be fired.  The claim is that you won't be fired for complaining.  While a layperson's testimony as to what is a "contract" is immaterial,[36] Fluor ignores Taylor's testimony that she considered HR 705 to be a contract.  (Taylor Dep. 173: 24 – 174:2; *id.* 175:21-22).

Fluor fails to understand that contract claims often are not based on a promise of employment for a definite term.  *E.g.* Jones v. GE, 331 S.C. 351, 369, 503 S.E.2d 173, 183 (Ct. App. 1998) (grievance policy)*; Hessenthaler v. Tri-County Sister Help, Inc.*, 365 S.C. 101, 616 S.E.2d 694, 698 (2005) ("Mandatory, progressive discipline procedures may constitute enforceable promises.") (citations omitted); *Burns*, 361 S.C. at 238-39, 603 S.E.2d at 614-15; *see, e.g., Parker v. Nat'l Honorary Beta Club*, 423 S.C. 590, 593, 815 S.E.2d 769, 771 (Ct. App. 2018) (employee terminated in breach of promise to not fire her for speaking to board of directors).  Fluor's straw-man arguments about contracts for a term simply cannot warrant judgment as a matter of law because that is not what this case is about.

---

[36]    *Guadagno v. Wallack Ader Levithan Associates*, 950 F. Supp. 1258, 1261 (SDNY 1997); *Evans v. Tubbe*, 657 F.2d 661, 665 (5th Cir. 1981); *Strohl Sys. Grp., Inc. v. Fallon*, No. CIV A 05-CV-0822, 2006 WL 2828997, at *6 (E.D. Pa. Sept. 29, 2006); *Gonzalez-Wiley v. Tessa Complete Health Care, Inc.*, No. CV 00-1320-AS, 2002 WL 985564, at *7 (D. Or. Mar. 21, 2002); Nebraska Builders Products Co. v. Indus. Erectors, Inc., 239 Neb. 744, 761, 478 N.W.2d 257, 269 (1992).

### 4.    Breach

Fluor incorporates its arguments that it did not discriminate.  (DE 54-1 at p. 35).

For the reasons set forth above, whether Fluor breached the contract under South

Carolina law is a jury issue.  *McCall v. Myrtle Beach Hosp.*, No. 96-1201, 1997 U.S.

App. LEXIS 23745, at *17 (4th Cir. Sep. 10, 1997) (citing *Shelton v. Oscar Mayer Foods

Corp.*, 319 S.C. 81, 91, 459 S.E.2d 851, 857 (Ct. App. 1995)).

## C.    Count III:    Breach of Contract Accompanied By Fraudulent Act

Evidence of a pretextual reason for the termination of employment is all that is

needed to support a punitive damage claim.  *Parker v. Nat'l Honorary Beta Club*, 423

S.C. 590, 596, 815 S.E.2d 769, 772 (Ct. App. 2018) (finding *Conner v. City of Forest

Acres*, 348 S.C. 454, 466, 560 S.E.2d 606, 612 (2002) to be "dispositive" on this point).

While evidence of pretext abounds (*supra* §§ II(I), II(L), (II(N)), there is so much more

here, including the rigged investigation, the efforts to shut it down when serious

evidence of retaliation appeared, and Smith's failure to disclose evidence of violations to

upper management (s*upra* § II(M)).

## D.    Fluor Corp. as proper defendant.

Fluor Corp's claim that it has no employees contradicts the testimony of Smith,

who says he is employed by it (30(b)(6) 119:4-5; *id.*, lines 22-23), and Lamb's testimony

that Wells also now works for it and that Lamb reports to an employee of Fluor Corp.

(Lamb 45:9 – 46:8; *id.* 87:6-9).  Lamb is an officer of Fluor Corp. "embedded" at the

subsidiary that employed Taylor.  (Lamb 17:5-6; *see also* 15:17 – 16:21).  The policies

at issue are corporate policies, and the hotline is operated by Fluor Corp.  (*Id.* 49:19 –

51:13).    Fluor entity employees transfer between companies and the various

39

companies are commonly managed even at the lower levels.  (Taylor Decl. ¶ 16 (Exh. 15)).   Fluor is intimately involved in the actions at issue here and is subject to the relief that could be awarded.  Fluor Corp. is a proper party both in its own right and as an integrated employer.  *Hukill v. Auto Care, Inc.*, 192 F.3d 437, 442 (4th Cir. 1999).

## E.    Damages Issues

Defendant moves for judgment on certain aspects of Taylor's claims in the event there is a trial.  Damage issues should be addressed in the context of the evidence at trial to avoid the risk of a second trial even if Taylor wins at trial.  *E.g. Gallina v. Mintz*, 123 F. App'x 558, 564 (4th Cir. 2005).  Fluor's arguments nonetheless lack merit for many reasons.

### 1.    Punitive damages

#### a.    Title VII and Section 1981

Punitive damages are available where a defendant acts "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1); *E.E.O.C. v. Federal Express Corp.*, 513 F.3d 360, 372 n. 9 (4th Cir. 2008).[37]   Taylor need only show that Fluor knew of the risk of injury or illegality and was deliberately indifferent.  *Kolstad v. American Dental Assn.*, 527 U.S. 526, 536 (1999).

Fluor's only argument as to Count I is that Taylor cannot show that Fluor acted with malice or reckless indifference.  (DE 54-1 at p. 39).  Fluor does not focus on the

---

[37]    Where discrimination claims are based on both Title VII and Section 1981, there is no double recovery.  *Lowery v. Circuit City Stores, Inc.*, 206 F.3d 431, 441 (4th Cir. 2000).

conduct at issue, but it simply re-states its arguments on liability.  First, it rehashes its incorrect position that Taylor's position was just one of thousands affected by the draw down and she was a "natural section" for reduction given her title of supervisor.  (*Id.*) Taylor's position was not eliminated, the drawdown did not affect prime contracts in Bagram, Taylor's position was created specifically to have her remain to the end and manage the drawdown, the shifting of those responsibilities to Greenville is fiction, and Riley was blunt about his reason at the time.  (*Supra* §§ II(D), II(I), II(L)).

Second, Fluor argues that strength management reviewed and approved of her separation.  (DE 54-1 at 39).  The head of strength management is the one who said Taylor's separation was "fucked up from an HR standpoint," and he confirmed that Riley did not engage in a compliant review.  (*Supra* §§ II(I)).

Third, Fluor argues that Smith's investigation precludes punitive damages because he had Riley hold off until Smith concluded his investigation. (DE 54-1 at p. 39).  Fluor misses the point.  After directing some of the retaliation (*supra* § II(G)(2)(B)), Smith learned about the most serious form of retaliation (termination of assignment) and, on the same day, moved to immediately close out the investigation.  (*Supra* § II(J)). Smith never investigated the fact that the two remaining employees who complained were slated for termination.  (*Id.*).  After being told by Taylor's own manager that Riley was retaliating, Smith covered it up.  (*Id.*; *see also supra* § II(M)).

Finally, the fact that another division of Fluor sought to employ Taylor after her separation (DE 54-1 at p. 39) says nothing about the conduct of Riley, Whitcomb, Wells, Smith, Badillo, and the others who retaliated, shirked all responsibility, and then covered it up.

### b.    Breach of Contract Accompanied by Fraudulent Act

Fluor incorporates by reference its same arguments for the proposition that punitive damages are not available under Count III. (DE 54-1 at pp. 41-42).  And, for the same reasons, they should fail.  Fluor next argues that punitive damages are not available for mere breach of contract (*Id.* at 42).  This is not a mere breach of contract case.  (*Supra* § III(C)).  The showing of a fraudulent act (i.e. pretextual reason) is all that is required under South Carolina law to recover punitive damages.  *Hotel & Motel Holdings, LLC v. BJC Enters.*, LLC, 414 S.C. 635, 654, 780 S.E.2d 263, 273 (Ct. App. 2015).

### 2.    Salary uplifts

Discrimination remedies involve make whole relief, which includes all compensation and fringe benefits.  *Albemarle Paper Co. v. Moody*, 442 U.S. 405, 421 (1975); 42,U.S.C. § 2000e-5(g)(1)("Section 706(g)(1)").  "The remedy . . . consists of restoring victims, through backpay awards and injunctive relief, to the wage and employment positions they would have occupied absent the unlawful discrimination." *United States v. Burke*, 504 U.S. 229, 239 (1992).

Without any supporting authority, Fluor argues that a key component of the Taylor's W-2 compensation should be excluded from damages.   (DE 54-1 at pp. 42-43).  The parties agree that Taylor received a salary uplift as part of her W-2 wages[38] to compensate for the undesirability and inconvenience of being stationed in a war zone. (Taylor Dep. 170:6 – 171:14).  A salary uplift is analogous to a shift differential, which

---

[38]    *See* 26 U.S. Code § 3401 (defining wages to include "all remuneration . . . for services performed by an employee for his employer").

also is additional compensation for the undesirability of an assignment.  *Corning Glass Works v. Brennan*, 417 U.S. 188, 197 n.13 (1974); *Herman v. City of St. Petersburg*, 131 F. Supp. 2d 1329, 1333 (M.D. Fla. 2001).  Courts have always awarded such compensation as part of make whole relief, "so long as the plaintiff can prove that (s)he would have earned those items absent discrimination." II Barbara T. Lindemann, Paul Grossman & C. Geoffrey Weirich, Employment Discrimination Law § 41-10 (Exh. 77); s*ee, e.g.*, *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1562 (11th Cir. 1986); *Floyd v. Mellon Bank*, N.A., Civil Action No. 87-7656, 1991 U.S. Dist. LEXIS 2599, at *7 (E.D. Pa. Mar. 5, 1991); see also *United States v. Ga. Power Co.*, 474 F.2d 906, 922 (5th Cir. 1973) (per diem payments).

## F.    Failure to Mitigate

Mitigation is an affirmative defense for which Fluor bears the substantive burden of proof.  *Edwards v. Sch. Bd.*, 658 F.2d 951, 956 (4th Cir. 1981); *Wagner v. Dillard Dep't Stores, Inc.*, 17 F. App'x 141, 153 (4th Cir. 2001) (citing *Miller v. AT&T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001)).  There are several reasons why Fluor cannot prove its defense as a matter of law.

First, Fluor's statement that Taylor did not seek work before March 2016 is not accurate.  Taylor networked to seek comparable work, and she provided Fluor with emails showing some of her efforts prior to March 2016.  (Taylor Decl. ¶ 14 (Exh. 15)).

Taylor was never unemployed.  Fluor itself points out that Taylor progressed internally, had a higher base salary, and served at the management level (i.e. a higher level) after leaving Afghanistan.  (DE 54-1 at p. 16).  While she never recovered financially or achieved total earnings that equaled her Afghanistan earnings, the

43

employment she obtained meets the standard for being substantially equivalent. *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1527 (11th Cir. 1991) ("Substantially equivalent employment" is employment that affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions, and status to those available to employees holding the position from which the Title VII claimant has been discriminatorily terminated).    Taylor was under no duty to quit Fluor to lower Fluor's exposure to liability.

It also is disingenuous for Fluor to now claim that Taylor should have been more aggressive in quitting Fluor.[39]   Taylor's manager, Henri Fuentes, testified that, "it was very key I keep her here through the end of the contract."  (Fuentes 8:3-4).  Now Fluor is saying she should have left the company at this critical time?

An email withheld by Fluor in discovery shows that Fluor knew Fuentes would not release Taylor.  (Exh. 78).  Fuentes confirmed that he would not have released Taylor.  (*Id.* 5:17-6:10; *id.* 7:1 – 8:11; *id.* 10:18 – 11:18; *id.* 13:18-21).   Fluor cannot meet its burden of proof when it wouldn't have permitted Taylor to accept another job (that it never offered her).

Because Fluor cannot show that Taylor was unreasonable in seeking work (as she had work), its Motion fails also because offers no evidence of other positions for which Taylor failed to apply.[40]   Fluor did not advertise many of its openings.   It simply

---

[39]    Fluor mis-states Taylor's testimony as to why she applied for jobs.  (DE 54-1 at p. 44).  Taylor specifically denied she sought jobs to create an appearance for litigation. (Taylor Dep. 150:5-10).

[40]    *United States EEOC v. CTI Glob. Sols., Inc.*, 815 F. Supp.2d 897, 918 (D. Md. 2011); *Marquez v. Glendale Union High Sch. Dist.*, No. CV-16-03351-PHX-JAT, 2018 U.S. Dist. LEXIS 173343, at *75 (D. Ariz. Oct. 9, 2018)

placed people into the jobs it wanted to them to fill (*e.g.* Krapa and Begnaud), whether they wanted to work there or not (*e.g.* Hooks).  (Taylor Decl. ¶ 13 (Exh. 15)).  Fluor's failure to offer Taylor any work in Afghanistan when her performance was "superb" and she was reputedly the "best," (supra § II(B)) as it did for others (*supra* n. 24; see Taylor Decl. ¶ 15 (Exh. 15)) speaks far more to Fluor's retaliatory intentions than it does to any failure on Taylor's part to apply for jobs never advertised.  Fluor admits it has no reason to doubt that Taylor wanted to return to Afghanistan.  (30(b)(6) 115:10-15).

Even after Taylor left Afghanistan and after she became an HR manager, Fluor's superiors continue to rave about her performance.  (Dolan review, supra n. 6; Fuentes Dep. 10:16-18; *id.* 8:3).  The jury could easily find that, absent protected activity including the filing of this suit, Fluor would at least have been as aggressive in finding Taylor a position as it was for those who didn't even want to work in Bagram.  But when Taylor applied, management began emailing each other regarding her efforts, including giving Smith a heads up, which led to Taylor's candidacy going nowhere.  (Exh. 79; Taylor Decl. ¶ 15 (Exh. 15)).

## IV.  Conclusion

For the foregoing reasons, Fluor's Motion should be denied.

Respectfully submitted this 24 day of January 2019.

s/ Brian P. Murphy
Brian P. Murphy, Bar No. 6405
Attorney for Plaintiff

Stephenson & Murphy, LLC
207 Whitsett Street
Greenville, SC 29601
Phone: (864) 370-9400
Fax:   (864) 240-9292