IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

CASE NO.  6:17-cv-01875-MGL-KFM

Tara Taylor,

      Plaintiff,

vs.

Fluor Corporation, and Fluor
Government Group International, Inc.,

      Defendants.

_____

DEPOSITION OF FLUOR GOVERNMENT GROUP INTERNATIONAL
GIVEN BY ROBERT WELLS AND WILLARD M. SMITH, III

_____

DATE TAKEN:            April 27, 2018

TIME BEGAN:            9:10 a.m.

TIME ENDED:            4:46 p.m.

LOCATION:              Stephenson & Murphy, LLC
                       207 Whitsett Street
                       Greenville, South Carolina  29601

REPORTED BY:           Traci L. Barr, RPR
                       Registered Professional Reporter
_____

EXPEDITE COURT REPORTING, LLC
Traci L. Barr & Associates
Post Office Box 25882
Greenville, South Carolina  29616
(864) 509-0914
ExpediteReporting@gmail.com

1    APPEARANCES:

2

3    BRIAN P. MURPHY, ESQUIRE
     Stephenson & Murphy, LLC
4    207 Whitsett Street
     Greenville, South Carolina  29601
5    Brian@stephensonmurphy.com
     (864) 370-9400
6
         .........On behalf of the Plaintiff
7

8    T. CHASE SAMPLES, ESQUIRE
     Jackson Lewis, LLP
9    15 South Main Street
     Suite 700
10   Greenville, SC  29601
     ChaseSamples@jacksonlewis.com
11   (864) 232-7000

12       .........On behalf of the Defendants

13
     ALSO ATTENDING:  Tara Taylor, Roshella James Smalls
14

15

16

17

18

19

20

21

22

23

24

25

Page 11

1   A.    The interviews were summarized into an employee

2         -- into a memo.  Additionally, employee

3         statements about the event were included in the

4         hotline case.

5              (Exhibit Number 3 marked for

6         identification.)

7                        EXAMINATION RESUMED

8   BY MR. MURPHY:

9   Q.    **We've handed you a memo Bates numbered 2556**

10        **through 2560.  We've marked it as Deposition**

11        **Exhibit Number 3.  Is this the memo to which you**

12        **were referring?**

13  A.    Yes.

14  Q.    **And who created this memo?**

15  A.    Steve Shenk and Pete Irvin.

16  Q.    **And who is Pete Irvin?**

17  A.    He was the HR manager for Bagram at the time.

18  Q.    **Was he over Mr. Shenk?**

19  A.    No.

20  Q.    **And this memo was created on what date?**

21  A.    It's dated 23 April, 2014.

22  Q.    **So that's four days after -- strike that.**

23        **That is three days after the report was received?**

24  A.    No.

25  Q.    **Okay.  Let's back up, and if you would, look at**

Page 12

1          **Exhibit Number 1.**

2     A.   The report was received on April 19th, so four

3          days.  Is that what you said?

4     Q.   **Sir, I'm looking at Exhibit Number 1, defendants'**

5          **document 33, and I see under a heading, general**

6          **case information, and I see a case number,**

7          **correct?**

8     A.   Uh-huh.

9     Q.   **What's the received/reported date?**

10    A.   April 20th.

11    Q.   **Okay.**

12    A.   Okay.  So four days after the --

13    Q.   **Okay.  I'm sorry, but April 23rd is three days**

14         **after you received the complaint, correct?**

15    A.   Yes.

16    Q.   **And was Mr. Shenk stationed in Afghanistan?**

17    A.   Yes.

18    Q.   **Do you know where in Afghanistan he was --**

19    A.   Bagram.

20    Q.   **You mentioned before that employees were**

21         **interviewed.  Turning your attention to**

22         **Deposition Exhibit Number 3, on the first page,**

23         **are these the employees that were interviewed,**

24         **the employees listed under employees interviewed?**

25    A.   Yes.

Page 13

1    Q.    Who is witness number 1, anonymous?

2    A.    I don't know.

3    Q.    Is there any documentation as to who the

4          anonymous witness is?

5    A.    Not that I'm aware of.

6    Q.    If you look at page 3 of this report, the final

7          sentence of that paragraph -- it spills over on

8          the top of the page -- says the witness number 1

9          declined to provide a written statement as he

10         wished to remain anonymous.  Do you see that?

11   A.    I do.

12   Q.    Is it your understanding that the anonymous

13         witness was male?

14   A.    Based on his pronoun.

15               (Exhibit Number 4 marked for

16         identification.)

17                    EXAMINATION RESUMED

18   BY MR. MURPHY:

19   Q.    Can you identify the document that's been marked

20         as Deposition Exhibit Number 4?

21   A.    It appears to be a statement from Mark Cofer.

22   Q.    And this is one of the witness statements to

23         which you referred earlier?

24   A.    Yes.

25   Q.    And in his statement, Mr. Cofer discusses the

Page 14

1       encounter about which Mr. Johnson is complaining,

2       correct?

3    A.   Correct.

4    Q.   Mr. Cofer also brings up another situation in

5       which Mr. Johnson had made remarks about another

6       African-American?

7    A.   Correct.

8            (Exhibit Number 5 marked for

9       identification.)

10                      EXAMINATION RESUMED

11   BY MR. MURPHY:

12   Q.   What is Exhibit Number 5?

13   A.   It appears to be a statement by Kimberly Johnson.

14   Q.   And Ms. Johnson is not listed as one of the

15       witnesses interviewed in Exhibit Number 3, is

16       she?

17   A.   She is not.

18   Q.   And Ms. Johnson is recounting yet another

19       incident is which Mr. Roy made comments about an

20       African-American, isn't she?

21   A.   Yes.

22   Q.   So in this investigation, we have testimony from

23       different people as to three separate instances

24       in which Mr. Roy made stereotypical gestures and

25       comments about African-Americans?

1    MR. SAMPLES:  Object to the form.

2    THE DEPONENT:  I don't know who anonymous witness

3         number 1 is.

4                    EXAMINATION RESUMED

5    BY MR. MURPHY:

6    Q.   **I didn't ask you who anonymous witness number 1**

7         **is just a minute ago.  Ms. Johnson is referring**

8         **to a different incident than the Dubai incident**

9         **or the incident Mr. Johnson was referring to,**

10        **wasn't she?**

11   A.   You asked if it was three individuals making

12        statements.  I said I don't know because I don't

13        know who anonymous number 1 is.

14   Q.   **You have Mr. Johnson making statements, correct?**

15   A.   Correct.

16   Q.   **You have Mr. Cofer making statements and**

17        **providing evidence of a different incident,**

18        **correct?**

19   A.   Correct.

20   Q.   **And then you have Ms. Johnson providing evidence**

21        **of yet another incident, correct?**

22   A.   I have three statements -- three incidents.  I

23        don't know if one of the -- Ms. Johnson or Mr.

24        Cofer could be anonymous number 1.  I have no

25        idea to know that.

Page 16

1    Q.    We don't need to know if they're anonymous number

2          1 or not.

3          My question simply is, with what we have with Ms.

4          Johnson's and Mr. Cofer's statements are three

5          different incidences of stereotypical gestures

6          and comments about African-Americans by Mr. Roy?

7    MR. SAMPLES:  Object to the form.

8    THE DEPONENT:  Yes.

9                      EXAMINATION RESUMED

10   BY MR. MURPHY:

11   Q.    Now, turning to the issue of the anonymous

12         witness, the date of the interview of the

13         anonymous witness matches the date of Ms.

14         Johnson's statement, correct?

15   A.    Yes.

16   Q.    And the location of the FOB Shank dining hall

17         facility mentioned in anonymous witness number

18         1's statement is the same facility mentioned in

19         Ms. Johnson's statement, correct?

20   A.    Correct.

21   Q.    And the information the anonymous witness is

22         giving is about statements regarding an

23         African-American male's dress, including his hat,

24         correct?

25   A.    Correct.

Page 17

1    Q.   And both statements include the quote, what's up,

2         bro?

3    A.   Correct.

4    Q.   Was Tom Roy the country manager at the time?

5    A.   At the time of what?

6    Q.   At the time of this complaint.

7    A.   Can you ask that again?

8    Q.   Sure.  Was Tom Roy the country manager at the

9         time of the complaint that we've marked as

10        Exhibit Number 1?  In other words, in late April,

11        April 20 to 23rd time frame --

12   A.   Tom Roy was never the country manager.

13   Q.   Let me go to page 4 of this report that we've

14        marked as Exhibit Number 3.  The reason I asked

15        you that question, if you go to the second

16        sentence of the recommendation that begins on the

17        third line down, when considering Tom Roy's

18        position as the country manager with supervision

19        over the AO and site managers, it goes on --

20   A.   Tom Roy was a -- he had country management

21        responsibility, but there was one country

22        manager, Steve Whitcomb.

23   Q.   And this recommendation documents that there had

24        been a prior dignity and respect issue involving

25        Mr. Roy, doesn't it?

Page 18

1   A.   Yes.

2   **Q.   And employee relations recommended a**

3        **strongly-worded written reprimand be given to Mr.**

4        **Roy, didn't they?**

5   A.   They did.

6   **Q.   And that didn't happen, did it?**

7   MR. SAMPLES:  I'm going to object here because I think

8        this is outside the scope of the notice to the

9        extent it refers to Tom Roy's complaints.

10  MR. MURPHY:  That's incorrect.  Topic 4A is the

11       complaint of this, and subtopic 7 is what action,

12       if any, was taken as a result of the complaint.

13  MR. SAMPLES:  As long as you're not going into the

14       details of Tom Roy's prior complaints, which you

15       have just referenced.

16  MR. MURPHY:  I didn't ask about the details of Tom

17       Roy's prior complaint.

18                    EXAMINATION RESUMED

19  BY MR. MURPHY:

20  **Q.   My question, was Mr. Roy given a strongly-worded**

21       **written reprimand?**

22  A.   He was given a strongly-worded verbal coaching by

23       HR.

24  **Q.   By whom?**

25  A.   By the country manager, Steve Whitcomb.  And

1        there was additional issues.  His promotion was

2        withheld.

3    Q.   Are you done answering?

4    A.   Yes.

5    Q.   I didn't mean to cut you off.  Sometimes it

6        happens, and if I do that, you can tell me you

7        have more to say in the answer, and then we'll

8        stop and let you finish any answer.

9    A.   I apologize.

10   Q.   No, no, no.  That happens all the time.  We just

11       don't want to cut you off.  It reads like I cut

12       you off when it comes out on the transcript, and

13       it's not my intent.

14   A.   Okay.

15   Q.   Is there any documentation of this

16       strongly-worded oral statement from the country

17       manager, Mr. Whitcomb?

18   A.   There is documentation that it took place.

19   Q.   What documentation is that?

20   A.   Mr. Whitcomb provided an e-mail stating that it

21       had taken place.

22   Q.   An e-mail to whom?

23   A.   I believe it was Mike Doyle or Steve Shenk.

24   Q.   Doyle?

25   A.   I believe it was Mike Doyle, but it could have

Page 20

1          been Steve Shenk.

2     Q.   **Who is Mike Doyle?**

3     A.   At the time, he was the HR country manager.

4     Q.   **Who made the decision not to issue the**

5          **strongly-worded written reprimand recommended by**

6          **employee relations?**

7     A.   Steve Whitcomb.

8     Q.   **When did Mr. Whitcomb make that decision?**

9     A.   I'm unsure.

10    Q.   **This e-mail from Mr. Whitcomb, what does it say?**

11    A.   I believe it's a -- it states that the verbal

12         coaching took place and gave a date.

13    Q.   **Is there any documentation in EthicsPoint of this**

14         **e-mail?**

15    A.   I believe so.

16    Q.   **Is there any documentation that Mr. Roy was**

17         **denied a promotion as a result of the Kelvin**

18         **Johnson complaint?**

19    A.   I'm sure there is.  I'm not aware of it at the

20         moment.

21    Q.   **What is Fluor's basis for saying that Tom Roy was**

22         **denied a promotion?**

23    A.   It was withheld for several months.

24    Q.   **So Mr. Roy received the promotion?**

25    A.   Yes.

Page 21

1   Q.   Promotion to what?

2   A.   I'm unsure of the job title that he was promoted

3        to.

4   Q.   Looking at Exhibit Number 3, if you would turn to

5        page 4.  Do you see the list of documents that

6        are listed there as attachments?

7   A.   Yes.

8   Q.   Where are those documents maintained?

9   A.   They're in EthicsPoint.

10  Q.   Are they still in EthicsPoint?

11  A.   Yes.

12  Q.   Why was Mr. Whitcomb the individual to make the

13       decision as to what action would be taken against

14       Tom Roy with respect to Mr. Johnson's complaint?

15  A.   Mr. Whitcomb was Mr. Roy's manager, as well as

16       being the country manager.

17  Q.   And at the time Mr. Whitcomb made the decision as

18       to what action would be appropriate to take

19       against Tom Roy with regard to Kelvin Johnson's

20       complaint, Mr. Whitcomb himself was the subject

21       of a complaint by Mr. Johnson?

22  A.   Correct.  However, he was not aware of it.

23  Q.   How do you know he wasn't aware of it?

24  A.   Because I informed him of it when I traveled to

25       Afghanistan to investigate it.

Page 26

```
 1          to refer to, just let me know.  If I have it,

 2          we'll pull it up and print it, or if I have it

 3          ready, we'll be happy to let you refer to it.

 4          Did you interview Tara Taylor on May 29 with

 5          respect to the complaint by Mr. Johnson regarding

 6          Steve Whitcomb?

 7     A.   I did.

 8     Q.   If you go to Exhibit Number 2, go to page 2721,

 9          if you look at the bottom, is this an entry you

10          did, I interviewed Tara Taylor?

11     A.   Yes.

12     Q.   Okay.  And is the date on that incorrect?

13     A.   Yes.

14     Q.   Okay.  You interviewed her the same day as you

15          interviewed Nikki, right?

16     A.   Correct.  It should be 5/29/2014, not 4/29/2014.

17     Q.   And this is the second time that Ms. Taylor was

18          interviewed with regard to Mr. Johnson's

19          complaints, correct?

20     A.   It was the first time I interviewed her.

21     Q.   It was the second time she had been interviewed?

22     A.   Yes.

23     Q.   Who interviewed her the first time?

24     A.   It was probably Steve Shenk.  Correction.  I

25          believe that she wrote just a written statement,
```

Page 27

1      as opposed to being interviewed.

2  Q.  **Going back to Exhibit Number 3, isn't Ms. Taylor**

3      **listed as one of the people interviewed?**

4  A.  She is.

5  Q.  **Do you have any reason to believe she was not**

6      **interviewed with respect to the first complaint?**

7  A.  Several of the people provided written statements

8      of their events.

9  Q.  **Is there any statement from Tara Taylor listed as**

10     **one of the attachments?**

11 A.  I don't recall.

12 Q.  **Well, look at page 4 of Exhibit Number 3.**

13 A.  No.  Then she might have been interviewed,

14     actually.

15 Q.  **Let me go through some of the statements Tara**

16     **made that are documented here.  It would be on**

17     **page 2721 of Exhibit Number 2.  Beginning the**

18     **fourth line down, there is a statement, Tara**

19     **stated there is no dignity and respect on the**

20     **second floor.  What does that mean to you, second**

21     **floor?**

22 A.  There is a management building.  It's a

23     hard-sided building, which was unusual for

24     Bagram, and the country management usually sat on

25     the second floor of that, and it's just referred

1          to as second floor.

2     Q.   **You documented that she stated they boast about**

3          **not being worried about complaints against them,**

4          **and at worst, HR might tell them to play nice.**

5          **She said that Mark Cofer told her that the rules**

6          **and policies don't apply to us on the second**

7          **floor, end quote.  Do you see that statement?**

8     A.   I do.

9     Q.   **Did you ever investigate it?**

10    A.   I asked Mike Doyle about it, and he had looked

11         into it previously.

12    Q.   **Was Mr. Doyle on the second floor?**

13    A.   No.

14    Q.   **Where was it documented that you asked Mr. Doyle**

15         **about it and he had looked into it previously?**

16    A.   I believe it's in EthicsPoint.

17    Q.   **Okay.  Well, let's look at Exhibit Number 6.**

18         **These are your notes regarding your interviews,**

19         **correct?**

20    A.   Correct.

21    Q.   **And on page 2398, you documented your interview**

22         **with Mr. Doyle, correct?**

23    A.   Correct.

24    Q.   **Did you, anywhere here, document that you asked**

25         **Mr. Doyle about Ms. Taylor's allegations**

1       **regarding people on the second floor believing**

2       **that the rules don't apply to them?**

3   A.   I had a limited time in Afghanistan.  My priority

4        was to investigate the Kelvin Johnson complaint.

5        When I returned to Greenville, I was able to look

6        into other complaints that were brought up.

7   Q.   **Well, let me rephrase the question.**

8        **A few moments ago you testified that when you**

9        **asked Mr. Doyle about Ms. Taylor's complaints,**

10       **that he told you he had looked into it**

11       **previously.**

12  A.   That was an e-mail exchange that happened later.

13  Q.   **That's not -- -- my question is, that's not**

14       **documented in your notes on page 2398, is it?**

15  A.   Because that happened after 5/30/2014, which my

16       interview notes talk about.

17  Q.   **Is that exchange with Mr. Doyle identified**

18       **anywhere in Exhibit Number 2?**

19  A.   Yes.

20  Q.   **Where is it?**

21  A.   Loomis and Cofer.pdf.

22  Q.   **And what page are you referring to?  Give me the**

23       **Bates number, please.**

24  A.   002717.

25  Q.   **And is that document still in EthicsPoint?**

Page 30

1    A.    It is.

2    Q.    What is Loomis and Cofer.pdf?

3    A.    It's an e-mail.

4    Q.    And who is Mark Cofer?  What position did he have

5          at the time of all of this in May of 2014?

6    A.    He had a country management position, but I'm not

7          sure exactly what his duties were and what his

8          title was.

9    Q.    Did you ever ask Mr. Cofer about Ms. Taylor's

10         statement that Mr. Cofer said, quote, the rules

11         and policies don't apply to those of us on the

12         second floor, end quote?

13   A.    No.

14   Q.    Going back to that same page, 2721, Ms. Taylor

15         starts to discuss Rachelle Weber.  Do you see

16         that?

17   A.    I do.

18   Q.    And the other thing I wanted to let you know is

19         if I start asking you about something and you

20         want to pause to read something, go ahead and

21         tell me that.  Okay?

22   A.    Okay.

23   Q.    I kind of jump into questions, but that doesn't

24         mean you need to jump in on answering.  Okay?

25   A.    Gotcha.

1    Q.    Okay.  Ms. Taylor makes a statement that Ms.

2          Weber and Mr. Riley live together.  Do you see

3          that?

4    A.    Yes.

5    Q.    Is that true?

6    A.    Not that I'm aware of.

7    Q.    Was anything done to investigate that?

8    A.    There is nothing illegal about people living --

9          or against policy about people living together

10         prior to their employment.

11   Q.    That wasn't my question.  I asked, did anybody

12         investigate to see if that was true?

13   A.    No.

14   Q.    She states, Rachelle -- according to you, Ms.

15         Taylor stated, Rachelle has been moved from site

16         to site because people don't want to work with

17         her and her dignity and respect allegations.

18         Do you see that?

19   A.    I do.

20   Q.    Was that investigated?

21   A.    I looked -- I investigated all the dignity and

22         respect allegations that Tara provided about

23         Rachelle.

24   Q.    What was your understanding as to why Ms. Taylor

25         was talking to you about Rachelle Weber?

1    A.   I wasn't sure.

2    Q.   **Did you ask her?**

3    A.   I don't believe so.  Often, when you're doing an

4         interview, the interviewee goes off on a tangent.

5         Sometimes it relates to what you're

6         investigating, sometimes it doesn't.

7    Q.   **Did you ask Ms. Taylor how her statements about**

8         **Rachelle Weber related to anything you had asked**

9         **her?**

10   A.   No.

11   Q.   **The next document that Ms. Taylor told you that**

12        **there was an incident which the CM -- that's a**

13        **reference to Mr. Whitcomb, correct?**

14   A.   Correct.

15   Q.   **-- told Mike Doyle to, quote, shut the fuck up,**

16        **end quote.**

17        **Do you see that?**

18   A.   I do.

19   Q.   **Was that investigated?**

20   A.   I believe I asked Mike Doyle about his

21        interactions with the country manager.  I don't

22        think I specifically said did he say, shut the

23        fuck up, but we had spoke about the country

24        manager and his behavior.

25   Q.   **In the next paragraph you document that Ms.**

Page 33

1          Taylor spoke to you about John Cahill, an

2          individual she identified as African-American who

3          received the worst treatment from Mr. Riley and

4          was called a bitch by Mr. Riley.  Do you see

5          that?

6    A.    I do.

7    Q.    Was that investigated?

8    A.    John Cahill was no longer on the project.

9    Q.    That wasn't my question.  My question was, was

10         this incident relayed by Ms. Taylor investigated?

11   A.    Not that I remember.

12   Q.    Do you see the paragraph beginning, Tara stated

13         that Ron is not a good leader?

14   A.    Yes.

15   Q.    And the second sentence says, he shows favoritism

16         to Rachelle and Paul and made moves to

17         accommodate them, which adversely affects others,

18         but mostly the African-Americans in the group.

19         Is that something Ms. Taylor told you in your

20         meeting?

21   A.    Yes.

22   Q.    Ms. Taylor goes on to -- according to your

23         account, she goes on to discuss some moves in

24         that paragraph.  It begins, quote, she stated

25         that she was moved to closeout, which opened a

Page 34

1          BOE position for Paul.  Dexter Hooks, paren,

2          African-American, closed paren, was moved to

3          another AO to make room for Rachelle.  Todd

4          Bagnus' e-mail was ignored, which signaled to him

5          that he should find another job, which made room

6          for Paul.  Do you see those statements?

7     A.   I do.

8     Q.   Was any of that investigated?

9     A.   Yes.

10    Q.   When was it investigated?

11    A.   At the -- during my time in Afghanistan and

12         after.

13    Q.   Were there any other notes of your interviews

14         other than the ones that we've marked as Exhibit

15         Number 6?

16    A.   No.

17    Q.   The bottom of that page, there is a statement

18         referring to Ms. Taylor.  It says, she believes

19         the second floor wants to make Kelvin quit.  She

20         stated that Mark Cofer said to Paul Gentry that

21         Kelvin, quote, was wrong, end quote, to have

22         reported Tom Roy.  Do you see that statement?

23    A.   I do.

24    Q.   Was that investigated?

25    A.   No.  Let me correct that.  Mark Cofer's

1          statements saying that he was wrong was not

2          investigated.

3     Q.   **Was any part of what I just read investigated?**

4     A.   The alleged -- Kelvin's treatment following his

5          complaints was investigated.

6     Q.   **Mark Cofer, you said, was in a country management**

7          **position, correct?**

8     A.   Yes.

9     Q.   **So here you have an employee telling you that her**

10         **understanding is that a country manager told Paul**

11         **Gentry that another employee was wrong to have**

12         **reported his manager, correct?**

13    A.   An employee didn't report his manager.

14    Q.   **Okay.  Let me be specific.  Well, let me ask,**

15         **what position was Paul Gentry in at the time?**

16    A.   I believe he had a Bagram-specific position, but

17         I'm not certain of that.  It was a higher level

18         management position.  And neither Paul Gentry nor

19         Mark Cofer had any supervision or guidance with

20         how Tom Roy, Kelvin Johnson were treated or the

21         discipline provided to Tom Roy.  This was their

22         -- this is secondhand information of someone's

23         personal opinion.

24    Q.   **What question were you answering?**

25    A.   I was clarifying my previous answer.

Page 36

1   Q.   But there is nothing in here stated that's an

2        opinion, is there?  Ms. Taylor told you that Mark

3        Cofer, a person in a country management position,

4        said to Paul Gentry, a person in a high

5        management level position, that Kelvin Johnson

6        was wrong to have reported Tom Roy.  She made

7        that statement to you?

8   MR. SAMPLES:  Object to the form.

9   THE DEPONENT:  That's the definition of an opinion;

10       somebody felt something.

11                    EXAMINATION RESUMED

12  BY MR. MURPHY:

13  Q.   The statement was that Mr. Cofer gave an opinion

14       to Paul Gentry that Kelvin was wrong to have

15       reported Tom Roy?

16  A.   That was his opinion, secondhand.

17  Q.   Sir, I'm not asking that question.  We can do

18       this all day long if you want.

19  A.   I've got all day.

20  Q.   Why did you not investigate whether Mark Cofer

21       said to Paul Gentry that Kelvin was wrong to have

22       reported Tom Roy?

23  A.   None of those individuals were in the -- had

24       oversight or supervision of those involved in the

25       incident.  They weren't involved in what

Page 37

1          discipline was provided, and it appears that it

2          was Mark Cofer's opinion of what is right and

3          wrong.

4     Q.   **And both of these individuals, Mark Cofer and**

5          **Paul Gentry, are in higher-ranking positions than**

6          **Tara Taylor, correct?**

7     A.   I believe so.

8     Q.   **Was Tom Roy in a higher position than Kelvin**

9          **Johnson?**

10    A.   I'm not certain on grade level.

11    Q.   **To whom did Kelvin Johnson report?**

12    A.   Ron Riley.

13    Q.   **So the fact that an employee reported to you that**

14         **a person in a country management level position**

15         **is expressing the opinion that it's wrong for**

16         **Kelvin Johnson to have reported Tom Roy did not**

17         **concern you at all?**

18    MR. SAMPLES:  Object to the form.

19    THE DEPONENT:  It didn't seem relevant to this

20         investigation.

21                        EXAMINATION RESUMED

22    BY MR. MURPHY:

23    Q.   **Did it concern you at all?**

24    A.   I didn't feel it was worth investigating.  Let me

25         rephrase that.  I didn't feel it was relevant

Page 38

1       enough to investigate in relation to this

2       complaint.

3   Q.  Did you investigate it at all?

4   A.  No.

5   MR. MURPHY:  Let's take a break.

6           (Recess taken.)

7                   EXAMINATION RESUMED

8   BY MR. MURPHY:

9   Q.  With regard to Mr. Johnson's complaints against

10      Mr. Whitcomb, did anybody else for Fluor

11      participate as an investigator other than

12      yourself?

13  A.  No.

14  Q.  What is Sametime?

15  A.  Sametime is a program on Fluor computers that

16      allows instant chat between two individuals.

17  Q.  To whom did Mr. Whitcomb report in June of 2014?

18  A.  Who was his supervisor?

19  Q.  That's fine.

20  A.  Is that your question?

21  Q.  Yes, sir.  Who was his direct boss, is, I guess,

22      another way people say it?

23  A.  It would have been either Ian Dolan or Rick

24      Rueter, R-U-E-T-E-R.

25  Q.  And the first name was Ian Dolan?

Page 39

1   A.   Correct.

2   Q.   D-O-L-A-N?

3   A.   D-O-L-A-N.

4   Q.   Could you spell Mr. Rueter's last name again,

5        please?

6   A.   R-U-E-T-E-R.  I believe it's the same as the news

7        organization.

8   Q.   That's R-E-U.

9   A.   Maybe it isn't, then.  It's one of those two.

10       Roshella might be able to tell us how --

11  Q.   You just do the best you can.  No one holds you

12       to spellings.

13  A.   That's good.

14  Q.   Did you or anybody else have any discussions with

15       or communications with Mr. Dolan regarding Mr.

16       Johnson's complaints about Mr. Whitcomb?

17  A.   Not that I'm aware of.

18  Q.   Did you or anybody else have any discussions with

19       Mr. Rueter about Mr. Johnson's complaints

20       regarding Mr. Whitcomb?

21  A.   Not that I'm aware of.

22  Q.   Who made the decision as to what action, if any,

23       would be taken with regard to Mr. Whitcomb?

24  A.   In regards to?

25  Q.   In regards to Mr. Johnson's dignity and respect

Page 40

1          complaints.

2    A.    I made the recommendation that I go to

3          Afghanistan to investigate.

4    Q.    **Let me repeat my question.  Who made the decision**

5          **as to what action, if any, to take against Mr.**

6          **Whitcomb as a result of the dignity and respect**

7          **complaint filed by Kelvin Johnson?**

8    A.    There was no action taken.

9    Q.    **Who made the decision that no action would be**

10         **taken?**

11   A.    My investigation didn't make the recommendation

12         that action be taken against Mr. Whitcomb.

13   Q.    **Who decided not to make a recommendation to take**

14         **action?**

15   A.    I made the recommendation.

16   Q.    **To whom did you make the recommendation?**

17   A.    In my report.

18   Q.    **Who did you give the report to?**

19   A.    I believe it was provided to Legal, as well as

20         Steve Lamb, who is the head of FGG HR, and

21         probably April Porter.

22   Q.    **Well, who made the decision that no action would**

23         **be taken against Mr. Whitcomb?**

24   A.    I made the recommendation that no action be taken

25         against Mr. Whitcomb.  I believe that they

1       followed that recommendation.

2    Q.  **Is it documented anywhere as to who made the**

3        **decision or what the decision was?**

4    A.  I believe that the recommendations are included

5        in the report.  I don't believe it's documented

6        -- I'm unaware of any documentation that says

7        that -- that either chooses to follow or not

8        follow my recommendation.

9    Q.  **Did you have the authority to discipline Mr.**

10       **Whitcomb?**

11   A.  No.

12   Q.  **Who has the authority to discipline Mr. Whitcomb?**

13   A.  His supervisor.

14   Q.  **Mr. Doyle or Mr. Rueter?**

15   A.  Uh-huh.

16   Q.  **And to the best of your knowledge, neither one of**

17       **them was even informed of the allegations, were**

18       **they?**

19   A.  The conversations between Mr. Rueter and Mr.

20       Dolan would have taken place between Mr. Lamb and

21       those two.

22   Q.  **Were there any such conversations?**

23   A.  I believe there were.

24   Q.  **What leads you to believe that?**

25   A.  That's typical practice.

Page 42

1    Q.   Did Mr. Rueter or Mr. Dolan have discussions with

2         Mr. Lamb about what action, if any, to take

3         against Steve Whitcomb as a result of the dignity

4         and respect complaint filed by Kelvin Johnson?

5    MR. SAMPLES:  Object to the form.

6    THE DEPONENT:  I believe those conversations happened.

7                      EXAMINATION RESUMED

8    BY MR. MURPHY:

9    Q.   Well, in our Notice of Deposition, in topic 4B6,

10        we ask about what discussions occurred within

11        Fluor's management, so I'm asking you what

12        discussions occurred?

13   A.   Because there was -- we didn't substantiate Mr.

14        Whitcomb was -- violated the dignity and respect

15        of Kelvin Johnson --

16   Q.   Let me go back --

17   MR. SAMPLES:  Let him finish answering the question.

18   THE DEPONENT:  Because there was no recommendation

19        because it was unsubstantiated, there wouldn't

20        have been a conversation for what kind of action

21        to take.

22                      EXAMINATION RESUMED

23   BY MR. MURPHY:

24   Q.   What communications occurred within management

25        regarding your recommendation that no action be

Page 43

1          taken against Mr. Whitcomb?

2     A.   I am unaware of any communications that occurred.

3          However, I believe that discussions occurred

4          between Mr. Lamb and either Ian and/or Mr.

5          Rueter.

6     Q.   What was said during those communications?

7     A.   I would be speculating, but I would imagine that

8          it was found to be unsubstantiated, was the crux

9          of the conversation.

10    Q.   Did anybody tell you that was the crux of the

11         conversation?

12    A.   No.

13    Q.   Did anybody give you any instruction as to what

14         action, if any, to be taken as a result of your

15         investigation?

16    A.   No.

17    Q.   Did anybody coach Mr. Whitcomb with regard to the

18         allegations raised by Mr. Johnson?

19    A.   I informed Mr. Whitcomb that he needs to be

20         sensitive to yelling or any other behavior that

21         would be inappropriate.

22    Q.   Do you consider that to be coaching?

23    A.   Yes.

24    Q.   Did anybody else coach Mr. Whitcomb?

25    A.   Not that I'm aware of.

Page 44

1    Q.    Is Mr. Lamb still employed by Fluor?

2    A.    Yes.

3    Q.    Is there any documentation that either Mr. Dolan

4          or Mr. Rueter were ever informed of the

5          allegations against Mr. Whitcomb?

6    A.    Not that I'm aware of.

7    Q.    So the allegations against Mr. Whitcomb were

8          handled differently than the allegations against

9          Mr. Roy, correct?

10   MR. SAMPLES:  Object to the form.

11   THE DEPONENT:  They were both investigated.

12                         EXAMINATION RESUMED

13   BY MR. MURPHY:

14   Q.    But in Mr. Roy's situation, you testified Mr.

15         Whitcomb made the decision because he was Mr.

16         Roy's superior?

17   A.    Correct.

18   Q.    And in Mr. Whitcomb's situation, you didn't even

19         inform his superiors of the allegations?

20   A.    I don't know if they were informed or not.

21   Q.    Going to Exhibit Number 6, if you look at the

22         last two pages -- it begins at the very bottom of

23         the page 2410 -- there is an entry, I met with

24         Steve Whitcomb on 6/1/2014 at 1830 to provide an

25         out brief.  Do you see that?

Page 45

1   A.   Can you repeat the page?

2   Q.   **Sure.  It's the last few pages.  The second to**

3        **last page has the header referring to, I met with**

4        **Steve Whitcomb on 6/1.  Do you see that?**

5   A.   I do.

6   Q.   **Do you see the notes there on page 2411?**

7   A.   I do.

8   Q.   **Are the statements that you documented on page**

9        **2411 the coaching that you provided to Mr.**

10       **Whitcomb?**

11  A.   I'm sorry, can you repeat the question?

12  Q.   **Earlier, you stated that you coached Mr.**

13       **Whitcomb?**

14  A.   Uh-huh.

15  Q.   **Does page 2411 accurately recite the coaching**

16       **that you gave to Mr. Whitcomb?**

17  A.   It does.

18  Q.   **Is there any other documentation of the coaching**

19       **that you gave to Mr. Whitcomb?**

20  A.   No.

21  Q.   **And part of the coaching was telling him to be**

22       **aware that Kelvin may be baiting him.  Do you see**

23       **that?**

24  A.   I do.

25  Q.   **Is that the role of the investigator to advise**

1      management as to -- to be aware that someone may

2      be baiting them?

3   A.   In context, I believe Mr. Whitcomb showed me an

4      e-mail earlier that day, or that he had received

5      from Kelvin earlier that day, where it appeared

6      that Kelvin was trying to get him to react.  I

7      was advising him not to retaliate.  That's

8      something I do with everyone, and I wanted -- I

9      felt that that was good information to provide

10      him.

11   Q.   On Exhibit Number 2, pages 2730 to 2731, on page

12      2731, Mr. Johnson talks to you about you coaching

13      Mr. Riley.  Do you see that?

14   A.   I do.

15   Q.   Did you ever ask Mr. Johnson how he learned about

16      that?

17   A.   I think it was obvious from his comments how he

18      learned about that.

19   Q.   What do you mean by that?

20   A.   Apparently, Kelvin had told Mr. Whitcomb that he

21      would not fill in for Mr. Riley during Mr.

22      Riley's upcoming R and R.  Mr. Riley said that he

23      would be working during his R and R and not ask

24      Kelvin to fill in for him, as was the usual

25      practice.  I asked Ron, coached Ron -- however

Page 47

1       you want to say it -- I would ask Kelvin directly
2       if he would fill in for you during your R and R,
3       as is the normal practice.
4   Q.  **You didn't tell Kelvin Johnson that you coached**
5       **Mr. Riley, did you?**
6   A.  I said I disagree with the term coach.  I asked
7       him to ask you your intentions.
8   Q.  **That wasn't my question.  You never told Mr.**
9       **Johnson that you coached Mr. Riley, did you?**
10  A.  No.
11  Q.  **Did you ever ask Mr. Johnson where he got his**
12      **information from?**
13  A.  No.
14  Q.  **Did you tell all the individuals in the**
15      **investigation that the investigation was to be**
16      **kept confidential?**
17  MR. SAMPLES:  Object to the form.
18  THE DEPONENT:  I state I keep the investigation as
19      confidential as possible.  I never state absolute
20      confidentiality.  It's impossible to do during an
21      investigation.
22                  EXAMINATION RESUMED
23  BY MR. MURPHY:
24  Q.  **Did you ever look into how Mr. Johnson was**
25      **informed about your discussion with Mr. Riley?**

 1   A.   I think it's obvious from the Sametime that Mr.

 2        Riley asked Kelvin if he would fill in for him

 3        for the next R and R.

 4   Q.   **Nothing in the Sametime says that, does it?**

 5   A.   I believe the context of the entire investigation

 6        does.

 7   Q.   **Mr. Johnson doesn't say that, does he?**

 8   A.   It was clear with the context of the

 9        investigation at that time.  Even though it

10        doesn't say it here in the Sametime conversation,

11        it was clear at the time.

12   Q.   **In your discussion with Mr. Whitcomb on June 1,**

13        **what e-mail were you referring to?**

14   A.   I believe that Mr. Whitcomb showed me an e-mail

15        on his computer that Kelvin had sent to him

16        earlier that day.

17   Q.   **Was that e-mail made a part of the investigation?**

18   A.   No.

19   Q.   **Do you still have access to that e-mail today?**

20   A.   It should be part of the litigation.

21   Q.   **What did the e-mail say?**

22   A.   I don't remember the specifics of it.  It was

23        more of a -- I remember it being snarky.

24   Q.   **Let's go back to your recommendations on page**

25        **2411.  Your final comment is, the CM -- and**

 1           that's, again, a reference to Mr. Whitcomb,

 2           correct?

 3    A.     Correct.

 4    Q.     Mr. Whitcomb acknowledged my recommendations, but

 5           we did not go into specifics or ask questions

 6           about them.  Do you see that statement?

 7    A.     Correct.

 8    Q.     Mr. Whitcomb never actually told you he would

 9           take any action or change his behavior in any way

10           as a result of your recommendations, did he?

11    A.     I don't remember him saying that.

12    Q.     With respect to your first recommendations, all

13           his direct reports are Caucasian and you

14           recommend he add diversity to that group, did he

15           do anything to add diversity to the group?

16    A.     I'm unsure of how his direct reports changed over

17           time.

18    Q.     Did you do any follow-up to determine whether or

19           not Mr. Whitcomb had ceased using profanity and

20           ceased yelling?

21    A.     I don't recall subsequent incidents of that.

22    Q.     That wasn't my question.  My question was, did

23           you or anybody else do any follow-up to determine

24           whether Mr. Whitcomb stopped yelling at people or

25           stopped using profanity?

Page 50

1    A.    The hotline is monitored.  I don't recall seeing

2          any additional allegations of that.

3    Q.    **That wasn't my question.  My question was, did**

4          **you or anybody from Fluor ever follow up to**

5          **determine whether or not Mr. Whitcomb had stopped**

6          **yelling or stopped using profanity?**

7    MR. SAMPLES:  Objection.  Asked and answered.

8          Go ahead.

9    THE DEPONENT:  I would say that monitoring is following

10         up.

11                      EXAMINATION RESUMED

12   BY MR. MURPHY:

13   Q.    **Did anybody do anything to determine whether Mr.**

14         **Whitcomb stopped yelling or using profanity,**

15         **other than monitoring the hotline?**

16   A.    I'm unaware of additional actions that were taken

17         besides me coaching him on it.

18   Q.    **And the coaching is what's there on page 2411,**

19         **correct?**

20   A.    Correct.

21   Q.    **Did you ever contact any of the witnesses and ask**

22         **how things are going?**

23   A.    I don't recall contacting any witnesses and

24         specifically asking how things are going.  I had

25         normal calls with Mike Doyle, and he didn't bring

1        up anything.  It was a weekly call.

2    Q.    **Well, you say you monitored the hotline.  There**

3          **were, in fact, subsequent hotline complaints**

4          **involving issues with Mr. Whitcomb, weren't**

5          **there?**

6    A.    There were two that were investigated.  The first

7          --

8    MR. SAMPLES:  Sorry to interrupt.

9    MR. MURPHY:  I'm not going to go into specifics of

10         them.

11   MR. SAMPLES:  Hold off, Rob.

12                    EXAMINATION RESUMED
     BY MR. MURPHY:
13   Q.    **Go ahead and tell me what they are.**

14   A.    The first had his name in it, but included no

15         allegations against him.

16   Q.    **And who filed that one?**

17   A.    Jeffrey Nix.  Jeremy Nix.  Jeffrey Nix.  Mr. Nix,

18         N-I-X.

19   Q.    **And what was the second one?**

20   A.    The second one was filed by Tuskahoma Thompson,

21         and at that point Mr. Thompson had been

22         terminated, ineligible for rehire due to some

23         serious incidents, and he said that, at one

24         point, Mr. Whitcomb --

25   MR. SAMPLES:  I'm going to stop you again because the

1         complaints allowed to be inquired into by the

2         Court are just those involving discrimination and

3         retaliation.

4         Brian, why don't you ask if any of them involved

5         discrimination or retaliation.  Otherwise,

6         they're not relevant.

7    MR. MURPHY:  Well, I don't know.  I'm just asking who

8         filed it.

9    MR. SAMPLES:  But if they didn't involve discrimination

10        or retaliation, they're not relevant.

11   MR. MURPHY:  Well, I don't know.

12   MR. SAMPLES:  Ask him the question.

13   MR. MURPHY:  You're making an argument.

14   MR. SAMPLES:  He told you he filed it.  Why don't you

15        ask another question whether it involved

16        discrimination or retaliation.

17                    EXAMINATION RESUMED

18   BY MR. MURPHY:

19   Q.   **What was Mr. Nix's complaint about?**

20   A.   He believed that he had been promised a promotion

21        --

22   MR. SAMPLES:  I'm going to object again.

23        Do you want to go off the record and talk about

24        it?

25   MR. MURPHY:  No.  I think he's allowed to say what it's

Page 53

1       about.

2   MR. SAMPLES:  He's only -- according to the Court's

3       order, he's only -- your inquiry is limited to

4       complaints that involve discrimination involving

5       Steve Whitcomb --

6   MR. MURPHY:  The witness said that.

7   MR. SAMPLES:  Ask him whether it involved

8       discrimination or retaliation.  Otherwise, it's

9       not relevant.

10  MR. MURPHY:  I don't know that I have to accept his

11      characterization about whether it stated a claim

12      of discrimination or retaliation.  I'm just

13      asking him what was his complaint.

14  MR. SAMPLES:  But if it didn't involve discrimination

15      or retaliation --

16  MR. MURPHY:  Then we don't go further.  I'm not bond by

17      his characterization of retaliation or

18      discrimination.

19  MR. SAMPLES:  We're bound by Judge McDonald's order.

20  MR. MURPHY:  But I don't know what the answer is yet.

21      You have to let him answer the question.

22  MR. SAMPLES:  I will just instruct the witness to

23      answer whether it involved discrimination and

24      retaliation and to avoid going into the details.

25  MR. MURPHY:  But I don't have to accept that

Page 54

1        characterization.

2                        EXAMINATION RESUMED

3    BY MR. MURPHY:

4    **Q.    What did he complain about?  Just tell us what he**

5           **complained about.**

6    A.    It did not deal with discrimination or

7           retaliation.

8    **Q.    What was Jeremy Nix's position?**

9    MR. SAMPLES:  Again, how is this relevant?

10   MR. MURPHY:  I get to find that out.  I get to ask

11          questions in a deposition.

12   MR. SAMPLES:  But we're limited to --

13   MR. MURPHY:  I'm asking, what was Jeremy Nix's

14          position.

15   MR. SAMPLES:  It's only relevant if the complaint by

16          Jeremy Nix is related.

17   MR. MURPHY:  This crosses the line.  I can ask

18          questions in a deposition.

19   MR. SAMPLES:  You can -- with a 30(b)(6), you're

20          limited to the topics.

21   MR. MURPHY:  After you've given this instruction, he's

22          given an answer which mirrored your instruction.

23          Nobody said I could not ask what Jeremy Nix's

24          position was.

25   MR. SAMPLES:  Judge McDonald said you could only ask

Page 55

1        about prior complaints involving Steve Whitcomb

2        and discrimination and retaliation.

3    MR. MURPHY:  We don't have to accept your

4        characterization.  I'm at least getting an answer

5        to this question, or you can instruct him not to

6        answer.  One or the other.

7                    EXAMINATION RESUMED

8    BY MR. MURPHY:

9    **Q.   What was Jeremy Nix's position?**

10   MR. SAMPLES:  Object to the form of the question.

11       You can answer the question.

12   THE DEPONENT:  I can?

13   MR. SAMPLES:  Yes, yes.

14   THE DEPONENT:  Jeremy Nix's position, I believe, was

15       audit response, and I don't know if it was

16       supervisor or manager or specialist.

17                   EXAMINATION RESUMED

18   BY MR. MURPHY:

19   **Q.   Was he in Bagram?**

20   A.   I believe so.

21   **Q.   Did he report to Mr. Whitcomb?**

22   A.   No.

23   MR. SAMPLES:  Object.

24                   EXAMINATION RESUMED

25   BY MR. MURPHY:

1   Q.   **What does the term organizational modification**

2         **mean?**

3   A.   It's the term used -- it's a term used when --

4         it's a term that can be used when a position is

5         eliminated in Afghanistan.

6   Q.   **What's a reduction in force?**

7   A.   It's a term that can be used in the position

8         elimination in Afghanistan.

9   Q.   **In the 2014 time frame, what was the procedure**

10       **for determining whether there would be an**

11       **organizational modification?**

12  A.   Procedure was the manager completes a form called

13       an SRF, which is sent to HR for review, and then

14       the person is given a notice that their position

15       has been eliminated.

16  Q.   **Okay.  I want to back it up a little bit.**

17       **My question was intending to get, who decides if**

18       **there is going to be an organizational**

19       **modification?**

20  A.   Typically, it's a manager.

21  Q.   **And how is that documented?**

22  A.   With an SRF form.

23  Q.   **An SRF form is a document that indicates that a**

24       **person is going to be RIF'd, correct?**

25  A.   Correct.

1   Q.   **But who decides whether a reduction in force is**

2        **necessary in the first place?**

3   A.   So the form talks about reduction in force and

4        organizational modifications.  Are you meaning

5        just the reduction in force in that or the

6        broader position elimination?

7   Q.   **I'm talking about the broader.  Who decides**

8        **whether we're going to reduce head count in**

9        **Afghanistan?  Start with that.**

10  A.   Well, it can be if a base closes or a PWS item is

11       cancelled.

12  Q.   **What is PWIS?**

13  A.   PWS.

14  Q.   **What is that?**

15  A.   I'm not sure what it stands for, but basically,

16       it's a piece of work, such as one item could be

17       food service, something specific.

18  Q.   **Those are good examples.  So if one of those**

19       **events happen, someone decides to close a base or**

20       **eliminate a piece of work, then what happens at**

21       **that point?**

22  A.   Then a list is created of the personnel affected.

23       It's determined if any cross leveling can occur,

24       and then the SRF form is created, and the

25       personnel, the effected personnel, are given a

1          memorandum of record which states what their last

2          date on the project will be.

3     Q.   Isn't it true that before any reduction is

4          conducted, there is a meeting between Fluor and

5          its government customer to discuss the proposal

6          and the reduction of the head count and how it

7          would be carried out?

8     A.   I don't believe so.

9     Q.   Does the military customer need to approve a

10         reduction in force or organizational modification

11         before it occurs?

12    A.   Not that I'm aware of.

13    Q.   Under Fluor's policies in effect in 2014, could

14         Ron Riley just decide on his own to conduct a

15         reduction in force?

16    A.   It has to be reviewed by HR.

17    Q.   Is there any other requirement for conducting a

18         reduction in force other than Mr. Riley deciding

19         to do one and HR reviewing it?

20    A.   Well, with an organizational modification, it

21         would be the manager, and then it's reviewed by

22         HR.  As I said earlier, a reduction in force, as

23         pertains to that particular document canceling

24         PWS items or closing a base, there is more

25         involved in that.

Page 59

1    Q.    And I get that.  If Ron Riley, on his own -- I'm

2          not suggesting Ron Riley, on his own, is going to

3          close a base.

4    A.    Right.

5    Q.    I understand that's done high-level stuff.  I'm

6          not trying to get to that.  I'm just asking, can

7          Ron Riley himself, in 2014, decide to reduce the

8          head count in his department and conduct a layoff

9          with HR review?

10   A.    Yes.

11   Q.    And who, within HR, would need to review that?

12   A.    I believe strength management reviews that.

13   Q.    That would be Mr. Badillo?

14   A.    He was one person in strength management at the

15         time.  I don't know if he was the only person at

16         the time.

17   Q.    Did Mr. Badillo have the authority to veto a

18         decision by Mr. Riley to reduce the head count in

19         his department?

20   A.    No.  However, HR did make sure that any

21         eliminated position was not backfilled with a new

22         requisition.

23   Q.    Who made the decision to eliminate plaintiff's

24         position?  That would be Ms. Taylor.

25   A.    Ron Riley initiated the SRF.

1   Q.   Who else was involved?

2   A.   HR reviewed it.

3   Q.   Who in HR?

4   A.   I'm unsure of who in HR.  It would have been

5        someone on the strength management team.

6   Q.   When did Mr. Riley decide to eliminate Ms.

7        Taylor's position?

8   A.   I believe the SRF was generated, I believe, on 11

9        August, 2014, but you probably have the form that

10       states that.

11  Q.   I do, and I won't hold you to a date that's on a

12       form.

13       Did Mr. Riley make the decision to eliminate her

14       position on the date that he created the SRF?

15  A.   I don't know.

16  Q.   What discussions did Mr. Riley have with HR about

17       the elimination of Ms. Taylor's position?

18  A.   Besides providing the SRF, I'm unsure of any

19       conversations he had with HR at that time.

20  Q.   Did Mr. Riley discuss it with Mr. Whitcomb?

21  A.   I don't know.

22  Q.   Who, within HR, was involved in the discussions

23       with respect to the elimination of Tara Taylor's

24       position?

25  A.   Strength management would have received the SRF,

1          and Pete Irvin provided Ms. Taylor her notice.

2     Q.   **Was Mr. Irvin involved at all in the decision to**

3          **eliminate Ms. Taylor's position or the HR review**

4          **of that decision?**

5     A.   Not that I'm aware of.

6     Q.   **Had anybody at Fluor instructed Mr. Riley that he**

7          **needed to eliminate any positions in his**

8          **department?**

9     A.   There was a great deal of pressure from the

10         client about eliminating positions.  In fact, the

11         project had come down from around 25,000 to

12         around 10,000 employees and subcontractors at

13         that point.  Prime Contracts was in meetings

14         every other week to discuss reductions in

15         personnel.  So there was a great deal of pressure

16         to remove positions.

17    Q.   **Did anybody at Fluor instruct Mr. Riley to**

18         **eliminate any positions in his department in**

19         **2014?  Let me ask --**

20    A.   No, no --

21    Q.   **No.  Let me narrow it down, because 2014 is a**

22         **really awful long time period, some of which**

23         **wasn't at issue here, so I don't want you to get**

24         **trapped in something too broad.**

25         **Did anybody at Fluor give Mr. Riley any**

Page 62

1  instruction to eliminate any positions in his
2  department after May 29, 2014?

3  A.  I'm not sure of the dates.  I believe Mr. Harbor
4  spoke to all the functions about reducing their
5  head count.

6  Q.  Who is Mr. Harbor?

7  A.  At the time, he was the deputy country manager.

8  Q.  Is there any documentation of Mr. Harbor told the
9  different functions?

10  A.  Not that I have seen.

11  Q.  Did anybody from Fluor instruct Mr. Riley that he
12  needed to reduce the head count in his department
13  in 2014?

14  A.  I believe, sometime in 2014, Mr. Harbor had those
15  discussions with him.

16  Q.  So Mr. Harbor told Mr. Riley to reduce the head
17  count in the Prime Contracts department?

18  A.  He had those discussions with all the functions,
19  and I believe he had them with Mr. Riley as well.

20  Q.  When was the discussion between Mr. Harbor and
21  Mr. Riley?

22  A.  I don't know.

23  Q.  Did anybody from the military ever tell Mr. Riley
24  that he should reduce the head count of the
25  department in 2014?

Page 68

1   A.    Yes.

2   Q.    It's dated May 1, 2014?

3   A.    It is.

4   Q.    If you go to page 2617, who is projected to be

5         the country GCS on the July 1, 2014 chart?

6   A.    Tara Taylor.

7   Q.    Going to the next page, who is projected to be

8         the country GCS on October 1, 2014?

9   A.    Tara Taylor.

10  Q.    Going to the next page, who is projected to be

11        the country GCS in January 2015?

12  A.    Tara Taylor.

13  Q.    Going to the next page, who is projected to be

14        the country GCS in April 2015?

15  A.    Tara Taylor.

16  Q.    Going to the next page, who is projected to be

17        the country GCS in July of 2015?

18  A.    Tara Taylor.

19  Q.    Do you know who created this Organizational

20        Realignment Plan?

21  A.    I do not.

22  Q.    Did you ever discuss it with Mr. Riley?

23  A.    I don't believe I did.

24  Q.    That document was created -- or is dated May 1,

25        2014.

Page 69

1              (Exhibit Number 8 marked for

2         identification.)

3                   EXAMINATION RESUMED

4    BY MR. MURPHY:

5    Q.   Can you tell me, what is the document we've

6         marked Exhibit Number 8?

7    A.   It's a Fluor Government Group Prime Contracts

8         management organizational chart.

9    Q.   And it's dated what?

10   A.   May 28th, 2014.

11   Q.   So that's three weeks after the date of Exhibit

12        Number 7, correct?

13   A.   Correct.

14   Q.   It's also the day before you interviewed Ms.

15        Taylor?

16   A.   Correct.

17   Q.   And who is the country GCS?

18   A.   Tara.

19              (Exhibit Number 9 marked for

20        identification.)

21                  EXAMINATION RESUMED

22   BY MR. MURPHY:

23   Q.   Can you identify for us what is Exhibit Number 9?

24   A.   It's Fluor Government Group Prime Contracts

25        management organizational chart.

Page 70

1  Q.  Okay.  And that was dated July 14, 2014, correct?

2  A.  It was.

3  Q.  And in Exhibit Number 8, Ms. Taylor is listed as

4      country GCS, with a direct line to Ron Riley.  Do

5      you see that?

6  A.  Yes.

7  Q.  Where is she on 9?

8  A.  She falls under Dexter Hooks.

9  Q.  And this was after she participated in the

10     interviews and after she filed her own hotline

11     complaint?

12 A.  One of many people that participated in the

13     investigation.

14 Q.  Did you ever discuss with Mr. Riley why her

15     position is represented to have been changed in

16     the organization charts?

17 A.  I did not.

18 Q.  Do you know if anybody did?

19 A.  I believe Willard might have.

20 Q.  In May of 28, Tara Taylor reported to Ron Riley?

21 A.  May of?

22 Q.  I think I screwed up the question.

23     In May of 2014, Ms. Taylor reported to Ron Riley?

24 A.  Yes.

25 Q.  And in July of 2014, she's reporting to somebody

Page 78

1   Q.   Was the SRF dated the same day as the SRF for Ms.

2        Taylor?

3   A.   I don't believe so.

4   Q.   What was the date of Ms. Klimak's SRF?

5   A.   The form that they have on record was dated

6        October 11th, I believe.  However, it was never

7        presented to her.

8             (Exhibit Numbers 11, 12, and 13 marked for

9        identification.)

10                     EXAMINATION RESUMED

11  BY MR. MURPHY:

12  Q.   Do you see the e-mail that is attached from Mr.

13       Badillo to Mr. Smith dated October 18 that's been

14       marked as Exhibit Number 11?

15  A.   Yes.

16  Q.   It says, as discussed and requested, attached are

17       the SRFs and first initial stage for the

18       elimination of positions/employees, Mrs. Taylor,

19       Tara, and Ms. Klimak, Nikoletta.  Did you see

20       that?

21  A.   Yes.

22  Q.   Exhibit Number 12 is what?

23  A.   An SRF with Nikoletta's name.

24  Q.   Was that the attachment to Mr. Badillo's e-mail?

25  A.   I believe it was.

1   **Q.   And what is Exhibit 13?**

2   A.   It is an SRF for Ms. Taylor.

3   **Q.   And is that the other attachment that's**

4   **identified in Exhibit 11?**

5   A.   I believe it is.

6   **Q.   Did Mr. Riley make a recommendation to eliminate**

7   **Nikoletta Klimak's position in August 2014?**

8   A.   An SRF -- there is an SRF form here, but it is --

9   it has Ron Riley's name typed in, but it doesn't

10   have an electronic signature.

11   **Q.   That wasn't my question.  My question was, did**

12   **Mr. Riley make a recommendation to eliminate Ms.**

13   **Klimak's position in August of 2014?**

14   A.   I don't know if he made the recommendation.  I

15   can state that there was an SRF filed with Ron

16   Riley's name on it with the elimination of her

17   position.

18   **Q.   When was a decision made to -- was a decision**

19   **made to eliminate Ms. Klimak's position?**

20   A.   I'm sorry, can you say that again?

21   **Q.   Was there a decision made in 2014 to eliminate**

22   **Ms. Klimak's position?**

23   A.   Ms. Klimak's position was never eliminated.

24   **Q.   Does it exist today?**

25   A.   Yes.  There is a Prime Contracts specialist in

1    However, I don't know if his initial assignment

2    in Bagram was a result of that.

3  Q.  **When you say initial assignment, what are the**

4      **dates of his initial assignment?**

5  A.  He mobilized in -- he was hired January 2014, and

6      I believe it was February when he mobilized to

7      Afghanistan.

8  Q.  **For the record, what is an ACO?**

9  A.  Assigned contracting officer.

10 Q.  **When did Mr. Begnaud come to Bagram?**

11 A.  He mobilized from Greenville in either late

12     January or early February 2014.

13 Q.  **And at that time, did he report to the Bagram Air**

14     **Force Base?**

15 A.  To the Bagram Prime Contracts, yes.

16 Q.  **Okay.  For what period of time was he assigned to**

17     **the Bagram Air Force Base Prime Contracts group?**

18 A.  Very soon thereafter, he was traveling to other

19     FOBs far more than he was ever in Bagram, so he

20     was dealing with the issues out there.

21 Q.  **And was he then brought back to Bagram at some**

22     **point in 2014?**

23 A.  Yes.

24 Q.  **And when was that?**

25 A.  I believe it was near the end of the year.  He

Page 108

1     Does Fluor disagree with any of the factual

2     assertions made by Dr. Alford in paragraphs 1

3     through 10?

4  A.  Number 5, the 55 percent uplift, I believe,

5      started in February 2017, not December 31st,

6      2016.

7  Q.  Okay.  And I can come back to those things, but

8      if you want to go through and tell me if there is

9      anything else, we'll come back to that.

10 A.  On Number 6, it states that during R and R, she

11     would have been compensated at her base rate for

12     only 40 hours per week with no salary uplift.

13     However, employees are given 288 hours of

14     vacation to use during their vacations, and they

15     can't go over 40 hours, so you're not --

16     basically, you're not guaranteed a 40-hour

17     workweek while you're on vacation.  You use your

18     vacation balance as you have it.  Is that clear

19     enough or --

20 Q.  We'll come back to these things.

21 A.  Oh, okay.

22 Q.  I want you to list for me -- the pending question

23     is, are there any statements, which you disagree,

24     and then we'll come back and revisit those, and

25     I'll let you explain.

Page 119

1    MR. SAMPLES:  Yes.

2    MR. MURPHY:  Let's take a break.

3              (Recess taken.)

4              (The following testimony provided by Mr.

5         Smith.)

6                   EXAMINATION RESUMED

7    BY MR. MURPHY:

8    Q.   **What was done to investigate Ms. Taylor's hotline**

9         **complaint?**

10   A.   The allegations were reviewed and a decision was

11        made who to investigate.  An interview was

12        conducted and findings were reached.

13   Q.   **Who made the decision as to who would conduct the**

14        **investigation?**

15   A.   Steve Lamb.

16   Q.   **Excuse me?**

17   A.   Steve Lamb.

18   Q.   **And who is Steve Lamb?**

19   A.   He is the HR lead for FGG.

20   Q.   **And who did the investigation?**

21   A.   I conducted the investigation.

22   Q.   **And by whom are you employed?**

23   A.   With Fluor Corporation.

24   Q.   **Did anybody else participate as an investigator**

25        **with regard to Tara Taylor's complaint?**

Page 120

1   A.   No.

2   Q.   **Did you ever meet face to face with any of the**

3        **individuals involved in the Tara Taylor**

4        **complaint?**

5   A.   I did not.

6   Q.   **Did you ever go to Afghanistan with respect to**

7        **the Tara Taylor complaint?**

8   A.   I did not.

9   Q.   **And were all of your conversations by telephone?**

10  A.   Conversations, yes, were by telephone.  There

11       were some e-mail exchanges as well.

12  Q.   **Who made the decision as to what action, if any,**

13       **should be taken as a result of Tara Taylor's**

14       **complaint?**

15  A.   I'm sorry, what do you mean by what action?

16  Q.   **Well, was any action taken as a result of Tara**

17       **Taylor's complaint?**

18  A.   Yes.

19  Q.   **What action was taken?**

20  A.   Guidance was provided to Mr. Riley.

21  Q.   **And did somebody recommend that action be taken**

22       **against Mr. Riley?**

23  A.   That came from me.

24  Q.   **And what did you recommend?**

25  A.   My guidance to Mr. Riley, which was implemented,

Page 129

1   Q.   Do you have -- well, it's one of the topics we

2       listed.  Did anybody from Fluor speak to Mr.

3       Witcomb about the allegations against Mr. Riley

4       that were raised by Tara Taylor?

5   A.   What I would say is it would not surprise me.  My

6       job was to report back to Mr. Lamb, but I have no

7       knowledge of that, to answer your question.

8   Q.   Fluor doesn't have any knowledge of anybody

9       discussing the allegations with Mr. Witcomb?

10   A.   I do not have any knowledge of that.

11   Q.   Do you understand you're speaking for the

12       corporation?

13   A.   Yes.

14   Q.   And Mr. Witcomb would be the only individual with

15       authority to discipline Mr. Riley?

16   A.   He would certainly be one of the people to do

17       that, for sure.  It may be that HR decides to

18       discipline them as well.  If that is the case,

19       then that is a discussion that would be had.

20   Q.   But no discussion like that was ever had, was it?

21   A.   I can't say that it was.

22   Q.   And there is no documentation that you ever

23       investigated the fact that closeout duties were

24       removed from Tara Taylor, is there?

25   A.   My investigation was to see why -- she had

Page 130

```
 1          brought up the issue that she was moved

 2          downstairs.  Mr. Riley said that, and I confirmed

 3          with -- Dexter said it was an operational or

 4          managerial move, but --

 5   Q.     Go ahead.

 6   A.     No.  Go ahead.

 7   Q.     You complete.  If you're done, let me know.  If

 8          you have more to say, it wasn't my intent to

 9          interrupt you.

10   A.     I didn't go into detail about why duties were

11          removed from her.  It was a managerial move.

12   Q.     Did you ever ask Mr. Riley why he took closeout

13          duties away from Tara Taylor?

14   A.     My understanding was there weren't a lot of

15          duties to be had.  There seemed to be a

16          misunderstanding between Ms. Taylor and Mr. Riley

17          on what was expected of her when she went

18          upstairs and then when she went back downstairs.

19   Q.     What is your basis for saying that?

20   A.     There was an e-mail exchange between the two of

21          them.  Ms. Taylor was attempting to portray her

22          side of the story, whereas Mr. Riley was doing

23          the same, and that's my understanding on there

24          was a differing opinion of what was required of

25          each or what she was going to do.
```

1    Q.    Is that e-mail exchange referenced in your
2          investigation here, Exhibit 15?
3    A.    I don't recall the title of it, of that e-mail,
4          but I have seen it.  I think it was quite
5          possibly the Response Relocation of
6          Office.2pdf.pdf, but I'm not sure.  I would need
7          to look and see the document.  It's on Bates
8          2383, is what I'm referencing.
9    Q.    Let's go back to my question.
10   A.    Okay.
11   Q.    Did you ever ask Mr. Riley why he took closeout
12         duties away from Ms. Taylor?
13   A.    I asked -- no.  I asked him why the move was
14         made.
15   Q.    Why the move from second floor to first floor?
16   A.    Yes.
17   Q.    Had Mr. Riley completed an SRF form for Kimberly
18         Johnson?
19   A.    I think there was a form for her.
20   Q.    And did they find Ms. Johnson another job?
21   A.    I don't recall if they did or did not.
22   Q.    Did they fill Ms. Johnson's position after an SRF
23         was completed?
24   A.    I do not know that.
25   Q.    Did you have access to the prior investigation

1    Q.   And why did you interview Paul Gentry?

2    A.   His name came up in connection to this case.

3    Q.   And he told you that Mr. Badillo said Ron wanted

4         to fire or RIF Tara and maybe Nikki?

5    A.   Yes.

6    Q.   Was sick of them and their bullshit, or something

7         to that effect?

8    A.   Yes.

9    Q.   And that Mr. Badillo told him there was no

10        justification for it, didn't he?

11   A.   That's what Mr. Gentry said.  Mr. Badillo said he

12        didn't say that.

13   Q.   Did your investigation lead you to any reason to

14        believe why Mr. Gentry would say that if it

15        didn't occur?

16   A.   I am not sure why he would say that.  I don't --

17        I don't want to speculate.  What I can say is it

18        was denied by Mr. Badillo.  I do know that Mr.

19        Gentry mentioned that he wasn't a big supporter

20        of Ron, and he thought that Mr. Witcomb should

21        terminate him.  If he was in Mr. Witcomb's place,

22        he would terminate him, so I'm not sure if --

23        what's driving his opinion on that.  He said Ron

24        was a weak manager.

25   Q.   He also told you that it was relayed to him that

Page 137

1       **Mr. Riley said he was sick of those bitches, and**

2       **I want to get rid of them, right?**

3   A.  Mr. Gentry did say that was relayed by Mr.

4       Badillo.

5   **Q.  And that's the comments that Tara Taylor told you**

6       **she had been hearing, correct?**

7   A.  And that's why I went to Mr. Badillo and raised

8       the issue.

9   **Q.  Well, did Mr. Badillo say who was party to the**

10      **conversations between him and Mr. Riley?**

11  A.  No, he did not.

12  **Q.  As far as you know, it was just Mr. Badillo and**

13      **Mr. Riley?**

14  A.  That's correct.

15  **Q.  And Mr. Badillo was aware, then, that in the**

16      **investigation there was an allegation that he**

17      **said to another member of management what Mr.**

18      **Riley purportedly said?**

19  A.  Mr. Badillo was aware that I was investigating.

20      Mr. Badillo came to understand, through the

21      course of the interview, that that statement was

22      made, and I was asking him about it, which he

23      denied.

24  **Q.  And Mr. Badillo is the individual who reviewed**

25      **Mr. Riley's decision to RIF both Ms. Taylor and**

Page 138

1          **Ms. Klimak?**

2    A.    My understanding, it may have been him.  It was

3          somebody in SMT, Strength Management's team.

4    Q.    **You saw the e-mails from Mr. Badillo --**

5    A.    Like I said, it's him or somebody in Strength

6          Management.

7    Q.    **You knew, as of mid August, that there was**

8          **purportedly a conversation between -- where Mr.**

9          **Riley told Mr. Badillo he wanted to get rid of**

10         **those bitches, you know there was documents**

11         **recommending that he get rid of them, and you**

12         **know that Mr. Badillo reviewed that?**

13   A.    In my estimation, speaking to Mr. Badillo, I did

14         not see where he had animosity towards those two

15         ladies.  In fact, he wanted to stay out of all of

16         this.

17   Q.    **Is there any documentation of anybody else from**

18         **HR reviewing the recommendation to terminate the**

19         **assignments of Tara Taylor and Nikki Klimak other**

20         **than Mr. Badillo?**

21   A.    I cannot say that there is or is not.

22   Q.    **Did you ever advise Ms. Taylor that while you**

23         **were investigating her matter, you found out that**

24         **Mr. Riley was, in fact, planning to get rid of**

25         **her?**

Page 139

1    A.    I don't recall that I told her that she was on a

2          RIF list.

3    **Q.    So you know there was an allegation from Ms.**

4          **Taylor that she was being told that Ron Riley**

5          **wanted to get rid of her.  You corroborated, in**

6          **fact, he was trying to get rid of her, and you**

7          **couldn't substantiate any allegations?**

8    MR. SAMPLES:  Object to the form.

9    THE DEPONENT:  My understanding is that the SRFs were

10         not acted upon.  They weren't signed.  All I can

11         tell you, sir, is that I heard the statements, I

12         heard the denial, and I heard Mr. Riley's

13         explanation as to why Ms. Taylor was being let go

14         from the project, and that was because they

15         needed a manager and specialist at the project.

16         She was a supervisor and wasn't qualified to be a

17         manager.

18                        EXAMINATION RESUMED

19   BY MR. MURPHY:

20   **Q.    There isn't any documentation of Mr. Riley**

21         **explaining to you why he chose Ms. Taylor, is**

22         **there?**

23   A.    He told me that, sir, and he did -- I do have

24         documentation.  I just have to get that to you.

25   **Q.    What is the documentation?**

Page 143

1          participated in complaints?

2     A.   He told me that she didn't have the experience to

3          be a manager, and a manager and a specialist were

4          needed in Bagram to cover the duties.

5     Q.   And again, that would be in some notes you have?

6     A.   Yes.

7     Q.   But you can't tell me what notes?

8     A.   Not at this time, sir.

9     Q.   In August of 2014, the manager of the department

10         was Dexter Hooks, correct?

11    A.   That's my understanding.

12    Q.   And you interviewed Dexter Hooks?

13    A.   I did.

14    Q.   And Dexter Hooks told you he thought that Tara

15         Taylor was being retaliated against?

16    A.   No, he did not.  He said that the TV issue -- he

17         hadn't heard anything about the TV issue, being

18         turned off.  He told me that the move downstairs,

19         he thought that was an operational and managerial

20         decision.  He had no issues with that.  He told

21         me there has been increase in management activity

22         from Mr. Riley towards the group.  He's more

23         hands on, but at no time did he tell me there was

24         retaliation going on.  He also told me he wanted

25         no part of this whatsoever.

Page 144

1    Q.   Well, you can understand why that is, can't you?

2    MR. SAMPLES:  Object to the form.

3                    EXAMINATION RESUMED

4    BY MR. MURPHY:

5    Q.   I mean, did you ever take that comment that Mr.

6         Hooks was a little bit afraid of retaliation?

7    A.   No.  I took it as he's a good person that was

8         giving good and not-so-great things about the

9         department.  I thought he was even handed in his

10        statement to me.

11   Q.   So you found Mr. Hooks credible?

12   A.   I -- yes.  He wasn't clearly -- he didn't think

13        there was retaliation there, but at the same

14        time, he thought there were some differences.

15             (Exhibit Number 16 marked for

16        identification.)

17                    EXAMINATION RESUMED

18   BY MR. MURPHY:

19   Q.   Can you identify what's been marked as Deposition

20        Exhibit 16?

21   A.   Yes, I can.  It's Dexter Hooks' interview

22        conducted by me on August 19th, 2014.

23   Q.   And you created these notes?

24   A.   That is correct.

25   Q.   Let's go to the second page.  Under discussion

Page 145

1         concerning Ms. Taylor and Ms. Klimak, do you see

2         under moving downstairs?

3    A.   I do.

4    Q.   Okay.  In the second to last sentence, it says,

5         the move was viewed by Tara as retaliation, and

6         Dexter believes it was as well.  Do you see that?

7    A.   I do.

8    Q.   So Dexter did tell you he viewed the move of Ms.

9         Taylor as being retaliation, didn't he?

10   A.   No.  He said the manager has a right to move

11        people, and he had no problems with moving her

12        downstairs.  After that, once he got there, then

13        he thought that it was fine to move her back.

14   Q.   Did you accurately recount your conversation with

15        Mr. Hooks here?

16   A.   I did.

17   Q.   And Dexter told you he believed the move was

18        retaliation?

19   A.   He told me that she should have went upstairs --

20        I'm sorry, she -- she could have gone upstairs if

21        -- once he got there, but initially, when he

22        wasn't there and she was moved downstairs, he

23        didn't have any issues with that.

24   Q.   Let's go to the next page.  Do you see the

25        heading, Dexter summed up his observations as

1            follows?

2    A.      I do.

3    Q.      In the first bullet point, you recount that Mr.

4            Hooks said the problem is it's been a 180-degree

5            turnaround based on the hotline complaints from

6            three people.  It is a hostile work environment

7            for the women, and for Dexter, it is

8            uncomfortable.  Do you see that?

9    A.      I do.

10   Q.      Does that accurately reflect what Mr. Hooks told

11           you?

12   A.      The women believed it was a hostile work

13           environment, yes, and that he wasn't comfortable.

14           He did not want to speak to me about this at all.

15   Q.      He told you it was a 180-degree turnaround based

16           on the hotline complaints?

17   A.      Because there was increased management.  He did

18           not say it's improper.  He did not say it was

19           inappropriate.  He did not say it was

20           retaliatory.

21   Q.      He told you that Mr. Riley stopped communicating

22           with the women verbally?

23   A.      He was e-mailing them back and forth, and they

24           were e-mailing him.  There wasn't greetings and

25           things of that nature, but he was communicating

Page 147

1          with them.

2   Q.    **Going back to the previous page, Mr. Hooks, the**

3          **department manager, told you the situation was a,**

4          **quote, powder keg.  Do you see that?**

5   A.    I do.

6   Q.    **He says there are things that did not happen**

7          **before but are now taking place.  Do you see**

8          **that?**

9   A.    I do.

10  Q.    **And he told you that, for example, they're not**

11         **approving R and Rs quickly, and he did not see**

12         **the need for that.  Do you see that?**

13  A.    Yes, but he's not in a position to know

14         everything that Mr. Riley knows about what's

15         happening and who needs to take time off.

16  Q.    **You never questioned Mr. Riley about the R and**

17         **Rs, did you?**

18  A.    It wasn't his managerial prerogative.  I didn't

19         see it was retaliatory if he took a few days.  At

20         the same time, he hadn't approved his own R and

21         R.  It may have taken longer for Ms. Taylor to

22         get her R and Rs approved, but his wasn't

23         approved the next day either.

24  Q.    **That wasn't my question.  Answer my question.**

25  MR. SAMPLES:  Brian, I think he's answered your

Page 148

1          question.

2     MR. MURPHY:  No, he hasn't.

3                    EXAMINATION RESUMED

4     BY MR. MURPHY:

5     Q.   **You never asked Mr. Riley about the R and R**

6          **approvals, did you?**

7     A.   I spoke to him.  He said that he hadn't approved

8          his -- or his wasn't approved, and theirs weren't

9          approved either.

10    Q.   **Did you document that?**

11    A.   I believe it's in my notes.

12    Q.   **The next bullet point, you say, Mr. Hooks was**

13         **questioned if Ron Riley was improving his**

14         **management style.  Mr. Hooks believes these**

15         **actions are due to the hotline calls and does not**

16         **think Mr. Riley is trying to become a better man.**

17         **Do you see that?**

18    A.   I do.

19    Q.   **Does that accurately reflect what Mr. Hooks told**

20         **you?**

21    A.   Yes.  He did say these actions came after the

22         hotline calls came in.  He did say that Mr. Riley

23         was not trying to become a better manager.

24    Q.   **He didn't say the actions came after the hotline**

25         **calls.  He said the actions are due to the**

Page 149

1        **hotline calls.**

2   A.   Excuse me.

3   **Q.   That's what the --**

4   A.   I misspoke.

5   **Q.   That's what the manager onsite told --**

6   A.   Okay.  I understand.  I heard you.  I misspoke.

7   **Q.   And Dexter told you that the TV was not an issue**

8        **until the hotline complaints were filed, didn't**

9        **he?**

10  A.   That's what I wrote, yes.

11  **Q.   And that's what he told you?**

12  A.   That's right.  But the reason for that, in

13       speaking to Ron Riley, is that there is more

14       customers there onsite, more three-star generals,

15       and we needed to have a professional environment.

16  **Q.   Did you document Mr. Riley told you that?**

17  A.   Yes.

18  **Q.   Where is that documentation?**

19  A.   In my notes.

20  **Q.   And on August 19 -- if you look at the final**

21       **entry there on page 326 -- Mr. Hooks told you**

22       **that there is enough work to keep the current**

23       **staffing levels in Bagram.  Do you see that?**

24  A.   I do.

25  **Q.   Did you tell Mr. Hooks that Mr. Riley had**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

CASE NO.  6:17-cv-01875-MGL-KFM

Tara Taylor,

      Plaintiff,

vs.

Fluor Corporation, and Fluor
Government Group International, Inc.,

      Defendants.

_____

DEPOSITION OF FLUOR GOVERNMENT GROUP INTERNATIONAL
GIVEN BY PRESTON TAYLOR HOWARD, JR.
VOLUME II
_____

DATE TAKEN:              May 10, 2018

TIME BEGAN:              8:56 a.m.

TIME ENDED:              11:11 a.m.

LOCATION:                Stephenson & Murphy, LLC
                         207 Whitsett Street
                         Greenville, South Carolina  29601

REPORTED BY:             Traci L. Barr, RPR
                         Registered Professional Reporter

_____

EXPEDITE COURT REPORTING, LLC
Traci L. Barr & Associates
Post Office Box 25882
Greenville, South Carolina  29616
(864) 509-0914
ExpediteReporting@gmail.com

```
 1    APPEARANCES:

 2

 3    BRIAN P. MURPHY, ESQUIRE
      Stephenson & Murphy, LLC
 4    207 Whitsett Street
      Greenville, South Carolina  29601
 5    Brian@stephensonmurphy.com
      (864) 370-9400
 6
         .........On behalf of the Plaintiff
 7

 8    T. CHASE SAMPLES, ESQUIRE
      Jackson Lewis, LLP
 9    15 South Main Street
      Suite 700
10    Greenville, SC  29601
      ChaseSamples@jacksonlewis.com
11    (864) 232-7000

12       .........On behalf of the Defendants

13
      ALSO ATTENDING:  (None.)
14

15

16

17

18

19

20

21

22

23

24

25
```

 1    A.    Two have.

 2    Q.    **What two bases have reopened?**

 3    A.    FOB Lightning and Shank, which is renamed to FOB

 4          Dhalke.

 5    Q.    **Can you spell that for us?**

 6    A.    D-H-A-L-K-E.

 7    Q.    **And FOB Lightning?**

 8    A.    Yes.

 9    Q.    **What does FOB stand for?**

10    A.    Forward operating base.

11    Q.    **Where is FOB Lightning?**

12    A.    It's in Central Afghanistan just west of Kabul.

13    Q.    **In October 2014, was Fluor in the process of**

14          **shutting down the Bagram Air Force Base?**

15    A.    No.

16    Q.    **In October 2014, was Fluor in the process of**

17          **shutting down any LOGCAP 4 operations for which**

18          **Tara Taylor had any responsibility?**

19    A.    I would say yes, because we were drawing down

20          overall in Theater.

21    Q.    **How did the drawing down overall in the Theater**

22          **result in the elimination of Tara Taylor's**

23          **position?**

24    A.    That was in the period of performance called

25          Option Year 4.  In the Request for Proposal from

 1          is why the recommendation was made and --

 2     MR. MURPHY:  Right.  I'm trying to get to the timing of

 3          it.

 4     MR. SAMPLES:  That was covered by another topic.  That

 5          was covered by 22-B, when the decision was made.

 6                    EXAMINATION RESUMED

 7     BY MR. MURPHY:

 8     Q.   **Why did Mr. Riley recommend that Tara Taylor's**

 9          **position be eliminated?**

10     A.   To stay within budget for his department.

11     Q.   **How did you inform yourself of that information?**

12     A.   I was the Project Controls manager that

13          participated in the budget review meetings with

14          each department manager.

15     Q.   **Is there any documentation of Mr. Riley's reasons**

16          **for why he was recommending Tara Taylor's**

17          **position be eliminated?**

18     A.   The department budget graphs.

19     Q.   **Are you saying graphs?**

20     A.   Graphs or worksheets.  The department budget

21          tool.

22     Q.   **Do you know whether or not that was produced in**

23          **this case?**

24     A.   Do we know when it was produced?

25     Q.   **Do you know whether it was?**

1    A.    Yes.

2    Q.    **Is there any documentation of Mr. Riley orally**

3          **giving names and dates at these budget meetings?**

4    A.    No, I don't -- no.

5    Q.    **When was the Pivots tab data created?**

6    A.    Monthly.  It was a working file throughout the

7          period of performance.

8    Q.    **Okay.  Let me be a little more specific.  With**

9          **regard to Document 2739, the data that's in the**

10         **Pivots tab, when was that created?**

11   A.    It was initially created July of '14.

12   Q.    **And is what we have as 2739 data from July of**

13         **2014, or is it data that started in July of 2014**

14         **and was modified after?**

15   A.    Yes, it was data that started in July, and

16         depending on the actual scenario that happened

17         monthly, it was modified throughout the period of

18         performance.

19   Q.    **Do we have any documentation as to what person or**

20         **persons Ron Riley may have recommended for --**

21         **strike that.**

22         **Do we have any documentation as to what positions**

23         **Ron Riley may have recommended for elimination in**

24         **July of 2014?**

25   A.    No.

1    Q.   Do we have any documentation as to any positions

2         Ron Riley may have recommended for termination in

3         August of 2014?

4    A.   No.

5    Q.   Do we have any documentation as to what positions

6         Ron Riley may have recommended for elimination in

7         August of 2014?

8    MR. SAMPLES:  Object to the form.

9    THE DEPONENT:  Do I answer?

10   MR. SAMPLES:  Go ahead.

11   THE DEPONENT:  No.

12                   EXAMINATION RESUMED

13   BY MR. MURPHY:

14   Q.   Do we have any documentation as to what positions

15        Ron Riley would have recommended for elimination

16        in September of 2014?

17   A.   Yes.

18   Q.   What is that?

19   A.   The SRF form.

20   Q.   Anything else?

21   A.   No.

22   Q.   Under the first table here, which looks like it

23        takes Lines 3 to 11, under which line would the

24        salary associated with Tara Taylor's position

25        appear?

1       what time?

2   A.   1 July of '14 to 30 June of '15.

3   Q.   **When was the budget created for Option Year 4?**

4   A.   It would have been early July time frame.  Yeah,

5        early July time frame.

6   Q.   **Who created the budget?**

7   A.   Project Controls.

8   Q.   **Is there any document we have here that shows**

9        **that Mr. Riley's department was operating above**

10       **budget?**

11  A.   Yes.

12  Q.   **What document?**

13  A.   It's the 2372 document.

14  Q.   **Does 2372 give us the budget for Project**

15       **Controls?**

16  MR. SAMPLES:  Object to the form.

17  THE DEPONENT:  Project Controls?

18                  EXAMINATION RESUMED

19  BY MR. MURPHY:

20  Q.   **I'm sorry.**

21  A.   Prime Contracts, yes.

22  Q.   **Where is that budget number for Prime Contracts?**

23  A.   It is in the upper right 1.08 million.

24  Q.   **Okay.  And again, I think we've covered this**

25       **before in another context, but the budget is**

1     correct?

2  A.  The actuals?

3  Q.  Yes.

4  A.  Correct.

5  Q.  Where is the forecast showing that Ms. Taylor's

6      position needed to be eliminated because of the

7      budget?

8      That data didn't exist in July 2014, did it?

9  A.  The forecast data?

10 Q.  Is there forecast data from July 2014?

11 A.  It would be budget at that point, and then we

12     would forecast based on the department's

13     personnel plan.

14 Q.  Document 2372 is not forecast data, is it?

15 A.  The forecast portion of this would be the no

16     reduction.

17 Q.  That wasn't a forecast.  That was actual numbers

18     created in 2015.

19 A.  It's actuals, plus forecast.

20 Q.  Where is the forecast data?

21 A.  I'm not sure --

22 Q.  There is no --

23 A.  -- I understand your question.

24 Q.  All the data on this chart is actual data that

25     was updated as of June of 2015?

1    A.    Not the forecast.  The no reduction is the

2          forecast with no reductions in that department.

3          So at the time when this first was created, there

4          would be a budget based on the Option Year 4

5          proposal, and then you would see the forecast,

6          which would be a forecast at the time, in the no

7          reduction column.

8    **Q.    That's my question.  Where is that document, at**

9          **the time in July of 2014, that says here's the**

10         **forecast?**

11   A.    It would have been the first iteration of this

12         file.

13   **Q.    And where would we get that?**

14   A.    I would have to see -- I would have to look in

15         the archive to see if we saved these by month.

16   **Q.    Because the data could be different than what's**

17         **on 2372?**

18   A.    It could be.

19   MR. MURPHY:  No further questions.

20   MR. SAMPLES:  I don't have anything further.

21              (Deposition concluded at 11:11 a.m.)

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

CASE NO.  6:17-cv-01875-MGL-KFM

Tara Taylor,

     Plaintiff,

vs.

Fluor Corporation, and Fluor
Government Group International, Inc.,

     Defendants.

_____
                    VIDEO LINK DEPOSITION OF
FLUOR GOVERNMENT GROUP INTERNATIONAL
GIVEN BY WILLARD SMITH
VOLUME II
_____


DATE TAKEN:        November 20, 2018

TIME BEGAN:        9:30 a.m.

TIME ENDED:        12:16 p.m.

LOCATION:          Jackson Lewis, PC
                   15 South Main Street, Suite 700
                   Greenville, South Carolina  29601


REPORTED BY:       Traci L. Barr, RPR
                   Registered Professional Reporter


_____


EXPEDITE COURT REPORTING, LLC
Traci L. Barr & Associates
Post Office Box 25882
Greenville, South Carolina  29616
(864) 509-0914
ExpediteReporting@gmail.com

```
 1   APPEARANCES:

 2

 3   BRIAN P. MURPHY, ESQUIRE
     Stephenson & Murphy, LLC
 4   207 Whitsett Street
     Greenville, South Carolina  29601
 5   Brian@stephensonmurphy.com
     (864) 370-9400
 6
        .........On behalf of the Plaintiff
 7

 8   T. CHASE SAMPLES, ESQUIRE
     Jackson Lewis, LLP
 9   15 South Main Street
     Suite 700
10   Greenville, SC  29601
     ChaseSamples@jacksonlewis.com
11   (864) 232-7000

12      .........On behalf of the Defendants

13
     ALSO ATTENDING:  Roshella James Smalls (via telephone)
14

15

16

17

18

19

20

21

22

23

24

25
```

1            (It is hereby stipulated and agreed by

2            and among counsel for the  respective

3            parties that this deposition is being taken

4            in accordance with the Federal Rules of

5            Civil Procedure; and that the deponents

6            do not waive reading and signing of this

7            deposition.)

8                     - - -

9            WILLARD SMITH, after having been duly

10           sworn, was examined and testified as

11           follows:

12                    - - -

13                  EXAMINATION

14   BY MR. MURPHY:

15   Q.    **So the record is clear, would you state your name**

16         **again, please?**

17   A.    Willard Smith.

18   Q.    **Okay.  And you're the same Willard Smith who**

19         **testified on April 27th on behalf of Fluor?**

20   A.    That's correct.

21   Q.    **Mr. Smith, if you would turn your attention to**

22         **the documents that were previously sent to you**

23         **that are Bates numbered 3401 through 3404.**

24           MR.  MURPHY:  And we'll mark these as

25         Exhibit 23.

1              (Exhibit Number 23 marked for

2         identification.)

3    THE DEPONENT:   3401 through 3404?

4                   EXAMINATION RESUMED

5    BY MR. MURPHY:

6    Q.    **Right.  Do you have those?**

7    A.    I do.

8    Q.    **Can you identify the documents that have been**

9          **marked Defendants' 3401 through 3404?**

10   A.    Yes, I can.

11   Q.    **What are they?**

12   A.    They would be my interview notes of Ron Riley

13         dated July 8, 2014.

14   Q.    **And when did you create these notes?**

15   A.    Shortly -- during the course of the interview

16         with Mr. Riley.

17   Q.    **And what was the purpose of the interview with**

18         **Mr. Riley?**

19   A.    To ascertain his view on the allegations that

20         were received -- or, rather, contained in a

21         hotline complaint.

22   Q.    **Which hotline complaint?**

23   A.    There was a hotline complaint from Nikoletta

24         Klimak and Tara Taylor.

25   Q.    **Did you create these notes on your computer?**

1    A.   Yes.

2    Q.   **And you were in your office at the time?**

3    A.   Yes.

4    Q.   **And where is your office located?**

5    A.   In Irving, Texas.

6    Q.   **Were these notes put into the Ethics Point**

7         **database?**

8    A.   No.

9    Q.   **Why not?**

10   A.   In light of the numerous attachments I had, it

11        was an inadvertent mistake that they were left

12        out.

13   Q.   **Were these notes created from any other document?**

14   A.   No.

15   Q.   **I call your attention to the next set of**

16        **documents, which is Bates stamped 3405 to 3410.**

17   MR. MURPHY:  We'll mark these as Exhibit 24.

18             (Exhibit Number 24 marked for

19        identification.)

20                  EXAMINATION RESUMED

21   BY MR. MURPHY:

22   Q.   **Before I get to that, with regard to your**

23        **interview with Mr. Riley on July 8, 2014, are**

24        **there any notes other than the notes -- strike**

25        **that.**

1      **With regard to your interview of Mr. Riley in**

2      **July of 2014, did you create any notes in July of**

3      **2014 other than the notes that we've marked as**

4      **Exhibit 23?**

5   A.  I had a document where I put down initial

6       questions that I wanted to consider asking Mr.

7       Riley.  I asked some of those questions, and

8       some, I did not.  That document was just renamed

9       something different than what was the original

10      document with the questions on it, but it was the

11      final repository of my interview of Mr. Riley.

12      So in short, the draft -- the draft and the final

13      are the same.  I just changed the name and

14      cleaned it up a bit.

15  Q.  **I'm not asking you that.**

16      **I'm asking you, in July of 2014, did you create**

17      **any other notes of your interview other than what**

18      **was marked as Exhibit 23?**

19  A.  Not that I can recall.

20  Q.  **All right.  Can you identify what we've marked as**

21      **Exhibit 24?**

22  A.  Could you tell me the Bates number?  I don't have

23      it marked.

24  Q.  **Sure.  Defendants' 3405 through 3410.  Can you**

25      **identify that document for me?**

1    A.    The questions that were on that document when it

2          was originally created was created prior to the

3          interview with Mr. Riley.

4    **Q.    So your testimony is that both the content of**

5          **both 3401 through 3404 and 3405 through 3410, the**

6          **contents of those documents were created all in**

7          **July of 2014?  Is that your testimony?**

8    MR. SAMPLES:  Object to the form.

9    THE DEPONENT:  No.

10                       EXAMINATION RESUMED

11   BY MR. MURPHY:

12   **Q.    All right.  Let's back this up.  I'm going to try**

13         **it one more time, Mr. Smith.**

14         **Document 3401 through 3404 --**

15   MR. SAMPLES:  I think he's hung up over created versus

16         last modified.  You're asking him when he created

17         it.

18   MR. MURPHY:  He's saying they're two different

19         documents.

20   MR. SAMPLES:  Right.  I didn't mean to interrupt.  Go

21         ahead.

22                       EXAMINATION RESUMED

23   BY MR. MURPHY:

24   **Q.    All right.  Mr. Smith, the document 3405 through**

25         **3410, is there any content of that document that**

1       you did not create in July of 2014?

2    A.  There was some formatting changes in lieu of some

3        questions that were added later, so to answer

4        your question, yes, sir.

5    Q.  And those changes were made to the documents

6        we've marked 3405 through 3410?

7    A.  Yes.

8    Q.  When were those changes made?

9    A.  At some point after the interview with Mr. Riley.

10       I don't have an exact date, sir.

11   Q.  Was it in July of 2014?

12   A.  I believe it was after.

13   Q.  How far after July of 2014?

14   A.  I believe, going back, when I found the draft --

15       the notes of interview, rather, it was this year,

16       I believe.

17   Q.  2018?

18   A.  Yeah, I believe -- it was after -- it was after

19       the interview, sometime after the interview, as

20       best I can recall.

21   Q.  When you say, the interview, you're referring to

22       the interview that you had with Mr. Riley in July

23       of 2014?

24   A.  That's correct.

25   Q.  Well, is there any content --

1    A.    These are interview -- a draft of interview notes

2          of Ron Riley dated July 8th, 2014.

3    Q.    **Again, we're having some trouble hearing you.**

4    A.    My apologies.  These are interview notes from Ron

5          Riley dated July 8th, 2014.

6    Q.    **Did you create these notes?**

7    A.    Yes.

8    Q.    **When?**

9    A.    At the time of my interview with Mr. Riley.

10   Q.    **And was your interview with Mr. Riley on July 8,**

11         **2014?**

12   A.    Yes, sir.

13   Q.    **Was that an interview by phone?**

14   A.    It was.

15   Q.    **Did anybody else participate in the interview**

16         **other than yourself and Mr. Riley?**

17   A.    No.

18   Q.    **And the purpose of your discussion with Mr. Riley**

19         **on July 8, 2014 was to discuss Tara Taylor's**

20         **hotline complaint?**

21   A.    Yes.  And Nikoletta Klimak as well.  She had a

22         hotline complaint as well too.

23   Q.    **Did you take the notes that are marked as Exhibit**

24         **24, 3405 through 3410, did you take those notes**

25         **during the phone call you had with Mr. Riley?**

1    A.   Yes.

2    Q.   **After your phone call with Mr. Riley, did you**

3         **modify the document marked Exhibit 24?**

4    A.   No.

5    Q.   **So there is only one version of Exhibit 24,**

6         **document 3405 through 3410, and that is the**

7         **document we've marked as Exhibit 24, which was**

8         **created on July 8, 2014; is that correct?**

9    A.   Yes.

10   Q.   **With respect to your interview with Mr. Riley,**

11        **did you create any other notes in July of 2014**

12        **other than Exhibit 24, which are documents 3405**

13        **through 3410?**

14   A.   No.

15   Q.   **Did you make any recordings of your interview**

16        **with Mr. Riley?**

17   A.   What do you mean, electronic recordings?

18   Q.   **Any kind of recording.**

19   A.   Just the document you see in front of you.

20   Q.   **Exhibit 24?**

21   A.   Yes.

22   Q.   **All right.  Let's turn to Exhibit 23, which is**

23        **documents Bates stamped 3401 through 3404.**

24        **Do you have that document with you?**

25   A.   Yes.

1   Q.   Can you identify the document 3401 through 3404

2        for us?

3   A.   These would be the final version of my interview

4        notes.  This is Ron Riley dated July 8, 2014.

5   Q.   But you did not create Exhibit 23 on July 8,

6        2014, did you?

7   A.   No.

8   Q.   When did you create it?

9   A.   I believe it was in May of this year.

10  Q.   May of 2018?

11  A.   I would have to double-check, but it was much

12       later.

13  Q.   What would you have to check to make sure of

14       that?

15  A.   I just -- I don't recall, sir.  I think it was in

16       2018 after the deposition that I had in

17       connection with this case.

18  MR. SAMPLES:  Willard, we're having a hard time hearing

19       you.

20            (Discussion held off the record.)

21                  EXAMINATION RESUMED

22  BY MR. MURPHY:

23  Q.   Just to recap, you created Exhibit 23, which is

24       3401 through 3404, after your deposition in this

25       case; is that correct?

1   A.   Yes.

2   Q.   **The first time you testified, which would have**

3        **been April 27?**

4   A.   Yes.

5   Q.   **Why did you create Exhibit 23, which is 3401**

6        **through 3404?**

7   A.   In reviewing the Attachment 24, I noticed that

8        there were some punctual and grammatic (phonetic)

9        errors, such as not capitalizing words or

10       misspelling names.  I also noticed there was

11       questions that were not asked, so in order to be

12       a little bit more professional, I made those

13       changes.

14  Q.   **What do you mean by questions not asked?**

15  A.   That they -- they were questions that weren't

16       asked of Mr. Riley.

17  Q.   **Why did you document questions that were not**

18       **asked?**

19  A.   When I -- when -- the draft for the document that

20       we used in Mr. Riley's interview back in July 8,

21       2014 contained questions.  It doesn't necessarily

22       mean that I'll use all of those questions.  So

23       when I looked at Attachment 23, those questions,

24       I just had -- I just did not remove them at the

25       time after I did the interview.

1    Q.   Did you refer to any other notes when you made

2         the changes to the document that ended up

3         becoming Exhibit 23?

4    A.   What do you mean, refer to?

5    Q.   Well, did you have anything that you looked at,

6         in May of 2018, that told you what was accurate

7         or inaccurate about the notes you created in July

8         of 2018?

9    A.   No, I don't recall that I did that.

10   Q.   How did you know, in May of 2018, which is almost

11        four years after the interview, which specific

12        questions you asked or did not ask?

13   A.   There weren't -- there weren't responses to them

14        on the document, by and large, that I can recall.

15   Q.   When you say, the document --

16   A.   I apologize.  Attachment 23.

17   Q.   What do you mean?  Exhibit 24, the first set?

18   A.   That's correct.

19   Q.   So if you didn't see a response to a question on

20        Exhibit 24, which is your first set of notes, you

21        deleted it in the document that you created in

22        May of 2018, which is Exhibit 23?

23   A.   I'm going to repeat what I heard you said just to

24        be sure.

25   Q.   That's fine.

1  A.    I -- okay.  Questions that were not asked on the

2        draft document that, which is Attachment 24, were

3        removed on Attachment 3.  Was that your question,

4        sir?

5  Q.    **Yes.**

6  A.    Yes.  If there was no response to the question,

7        it was removed.  If there was no response on the

8        document, it was removed.

9  Q.    **Okay.  So if a question appears on Exhibit 24,**

10       **but it does not appear on Exhibit 23, then your**

11       **testimony is that question was not asked of Mr.**

12       **Riley?**

13 A.    That's correct, unless it appears in another part

14       of that same document.  Sometimes, in interviews,

15       people jump around, so my questions may have been

16       much later on the document than what actually

17       occurred in the conversation with Mr. Riley.

18 MR. SAMPLES:  Willard, I'm still having a little

19       trouble hearing you.  I want you to keep using

20       the louder voice that you had, but just do it

21       through the phone.

22 THE DEPONENT:  Okay.

23 MR. SAMPLES:  Yeah, that's much better.

24 THE DEPONENT:  All right.

25                    EXAMINATION RESUMED

1    BY MR. MURPHY:

2    Q.    Let's go, then, to page 3403, which is part of

3          Exhibit 23.

4    A.    Okay.  Wait.  Hold on.  Okay.

5    Q.    Is this the only documentation we have of what

6          you and Mr. Riley said to each other with respect

7          to Tara Taylor's Ethics Point complaint or

8          hotline complaint?

9    A.    No.

10   Q.    What other documentation do we have?

11   A.    There were later interviews with Mr. Riley in

12         e-mail follow-ups.

13   Q.    With respect to your July 8, 2014 meeting, do we

14         have any documentation of what was said between

15         yourself and Mr. Riley about Ms. Taylor's hotline

16         complaint other than what appears on Document

17         3403, which is part of Exhibit 23?

18   A.    No.

19   Q.    And, in fact, you don't document any questions

20         that you asked Mr. Riley about Ms. Taylor, do

21         you?

22   A.    We spoke -- I spoke to Mr. Riley about Ms.

23         Taylor.

24   Q.    We don't have any documentation of the questions

25         you asked him, do we?

1  A.  No.

2  **Q.  Why not?**

3  A.  That's not always my writing style.  As I

4      mentioned before, sometimes, when you're speaking

5      to an interviewee, there is a free flow of

6      information that's coming from them, which may

7      not --

8  **Q.  Well --**

9  A.  I'm sorry.  Go ahead.

10  **Q.  No.  You finish your answer.**

11  A.  Sometimes, there is not a question there because

12      the information is coming in, and I want to

13      document what's being said.

14  **Q.  But as we saw from Exhibit 24, or Documents 3405**

15      **through 3410, prior to the interview, you wrote**

16      **down questions you wanted to ask Mr. Riley,**

17      **correct?**

18  A.  Yes.

19  **Q.  Did you write down any questions you wanted to**

20      **ask Mr. Riley about Ms. Taylor's hotline**

21      **complaint?**

22  A.  No.  I thought I was getting the information I

23      needed.

24  **Q.  Do we have any documentation of what Mr. Riley**

25      **said to you during the July 8, 2014 phone**

1      interview you had with him other than the

2      statements that appear on page 3403 of Exhibit

3      23?

4   A.  No, I don't believe there is anything else that I

5      can recall.

6   Q.  **Do you recall anything Mr. Riley said to you in**

7      **your July 8, 2014 phone interview with him other**

8      **than the words that appear on the document**

9      **Defendants' 3403, which is part of Exhibit 23?**

10  A.  No, I don't recall anything.

11  Q.  **And nowhere in your July 8 notes of your**

12     **discussion with Mr. Riley does he ever discuss**

13     **eliminating Tara Taylor's position, does he?**

14  A.  Let me review my notes.  No, I don't believe so.

15  Q.  **Let's go to the third bullet point or the circle**

16     **under the heading, Back in January and February,**

17     **he wanted to focus on task order closeout.**

18     **Do you see that?**

19  A.  Yes, I do.

20  Q.  **It's the bullet point that begins with, When Mr.**

21     **Johnson departed.  Do you see that?**

22  A.  Yes, I do.

23  Q.  **Four lines down, there is a statement beginning**

24     **at the end of the line that says, Essential to be**

25     **moved to the lower floor.**

1          Do you see that?

2     A.   I do.

3     Q.   Is that a reference to Ms. Taylor?

4     A.   Yes.

5     Q.   The next statement is, GCM and GCS are tied

6          together and tries to get them to work together.

7          Do you see that?

8     A.   I do.

9     Q.   Who is the GCM to whom Mr. Riley was referring?

10    A.   He was talking, in general, about GCMs and GCSs,

11         not necessarily there in Bagram, to explain why

12         it's necessary to have unit cohesion and those

13         individuals working together.

14    Q.   Let's go back to Exhibit 24 if we could for a

15         moment.

16    A.   Sure.  Give me one second to switch.

17         I have Attachment 24 in front of me.

18    Q.   Okay.  And you can go to page 3408, please.

19    A.   3408.  I have that.

20    Q.   Okay.  Just a moment, please.

21         On page 3408, do you see that, in the original

22         document you created in July of 2014, that you

23         did document questions you wanted to ask Mr.

24         Riley about Tara Taylor?

25    A.   I see some questions, yes, about that.

1   Q.   Are these the only questions you ever wrote down

2        that you wanted to ask Mr. Riley in your July 8

3        phone interview with him?

4   MR. SAMPLES:  Object to the form.

5                      EXAMINATION RESUMED

6   BY MR. MURPHY:

7   Q.   Let me back up.

8        Is there any other document in which you put down

9        questions you wanted to ask Mr. Riley about Tara

10       Taylor?

11  A.   These are all the questions that I have in front

12       of me that I can say, at one point, I wanted to

13       ask him about.

14  Q.   Well, my question is, is there anything else --

15  A.   No.  I'm sorry.  I didn't mean to interrupt.

16  Q.   No, you didn't interrupt me.

17       All I'm trying to get at, are there any other

18       questions written down anywhere that you planned

19       on asking Mr. Riley on July 8, 2014?

20  A.   These were the -- no.

21  Q.   Do you have the document Bates stamped 3445?

22  A.   3545, I do.

23            (Exhibit Number 25 marked for

24       identification.)

25                      EXAMINATION RESUMED

 1    A.    I believe it was in a later interview that I had

 2          with him.  It was -- the date was, I think,

 3          August 19th, sir.

 4    Q.    **Why did you not --**

 5    A.    To answer your question, August 19th of 2014.

 6          That would be --

 7    Q.    **Why --**

 8    A.    I apologize.  Go ahead.

 9    Q.    **Are you done with your answer?**

10    A.    Yes.  I didn't mean to talk over you.

11    Q.    **It was a little choppy, so I'm not sure either**

12          **one of us knew when the other was finished.**

13          **Have you been able to fully answer the last**

14          **question?**

15    A.    Yes.  So let me restate it or just reiterate it.

16          I have an interview of Ron Riley dated August 19,

17          2014, where I asked him about him allegedly

18          calling those two women bitches.

19    Q.    **Why did you not ask Mr. Riley about the**

20          **ungrateful bitches comment on July 8?**

21    A.    I had a fairly large file with a lot of

22          allegations, again, juggling two cases.  I got to

23          it as quick as I could, and I did -- as you

24          noted, I did ask him about it.

25    Q.    **Why did you not ask Mr. Riley about the**

1        **ungrateful bitches comment on July 30th, 2014?**

2    A.   I think, again, I got to it as quick as I could,

3         juggling the material that I had.

4    **Q.   Let's -- do you have the Document 3546 through**

5         **3547?**

6    A.   Bear with me one moment.

7         I have Document 3546 and 3547 in front of me.

8    MR. MURPHY:  We're going to mark that as Exhibit 26.

9         (Exhibit Number 26 marked for

10        identification.)

11                    EXAMINATION RESUMED

12   BY MR. MURPHY:

13   **Q.   Looking at page 3547, it appears to be part of an**

14        **e-mail from -- well, the top of it gives me and a**

15        **to and a bcc -- or cc, but it doesn't say who**

16        **it's from, but it says, Thank you, Willard Smith,**

17        **on there.  Do you see that?**

18   A.   I do.

19   **Q.   What is Document 3547?**

20   A.   That was my notice from me just informing them

21        that the case -- I need to close the case.  Let

22        me say that.  Ron Riley was out of the office.

23   **Q.   Did you have a discussion with Mr. Riley about**

24        **closing the case?**

25   A.   I did.

1   A.   I can't recall that he did.

2   **Q.   All right.  Let's go to the document marked 3554**

3        **through 3556.**

4   A.   3554, 3556.

5   **Q.   Do you have that in front of you?**

6   A.   I do.

7   MR. MURPHY:  Document 3554 through 3556 will be marked

8        as Exhibit 27.

9            (Exhibit Number 27 marked for

10       identification.)

11                    EXAMINATION RESUMED

12  BY MR. MURPHY:

13  **Q.   Can you identify the document that's been marked**

14       **3554 through 3556?**

15  A.   Yes.

16  **Q.   What is it?**

17  A.   It is a working draft of my thoughts of where the

18       case stood at a particular point in time.  At no

19       time was it intended to be my final thoughts of

20       the outcome or the allegations.  That information

21       is contained in the hotline case.

22  **Q.   What's the name of this document?**

23  A.   Tara -- the name on the document says, Tara

24       Taylor Allegations.

25  **Q.   And is that the file name of the document?**

1    A.   I'd have to go back and see, sir.  I'm not sure.

2    Q.   **Was this document kept in the Ethics Point**

3         **database?**

4    A.   I do not believe it was.

5    Q.   **When did you create this document?**

6    A.   I believe it was in July of 2014.

7    Q.   **When was it last revised?**

8    A.   I believe in August 2014, before the closure of

9         the case.

10   Q.   **What was the purpose of creating this document?**

11   A.   There was a lot of information to manage, and I

12        thought it wise to put pen to paper, so to say,

13        and write it down and see where I stood at a

14        particular point in time.  It was a way of

15        organizing information in my mind.

16   Q.   **So your testimony is that the last time this**

17        **document was revised was August of 2014?**

18   A.   I believe so.

19   Q.   **And anywhere in this document, do you discuss the**

20        **allegations that Mr. Riley referred to Ms. Taylor**

21        **and Ms. Klimak as the ungrateful bitches?**

22   A.   I don't see that I did.

23   Q.   **Let's go to number 2 on page 3554.**

24   A.   Yes.

25   Q.   **Do you see where it says, Mr. Riley ostracized,**

1      isolated, and ignored Mr. Johnson?

2   A.   Yes.

3   Q.   **And you wrote down, Unsubstantiated; is that**

4        **correct?**

5   A.   Yes.

6   Q.   **But you had Mr. Johnson, Ms. Klimak, and Ms.**

7        **Taylor all telling you that that allegation was**

8        **true, didn't you?**

9   A.   That's what they were alleging.

10  Q.   **And did anybody deny that other than Mr. Riley?**

11  A.   I cannot recall off the top of my head.  Let me

12       think.  Are you still there?

13  Q.   **We're here.**

14  A.   Okay.  I can't recall.  All I can tell you is

15       that I looked at the facts, took the interviews,

16       and I didn't see where retaliation was present.

17       A simple allegation doesn't mean it's a fact.

18  Q.   **You had three people telling you it happened and**

19       **Mr. Riley saying it didn't.  Is that all you had**

20       **when you concluded that the allegation was**

21       **unsubstantiated?**

22  A.   I looked at what was alleged by Ms. Taylor and

23       Ms. Klimak, and I reviewed Mr. Wells'

24       investigation, and I couldn't find -- and after

25       talking to everybody, this is what I found.  I

1       couldn't find it was retaliation.

2  Q.   My question is, you had Ms. Klimak, Ms. Taylor,

3       and Mr. Johnson saying this is true, and you had

4       Mr. Johnson denying it.  Is that all you had when

5       you determined that the allegation was

6       unsubstantiated?

7  MR. SAMPLES:  Object to the form.

8  THE DEPONENT:  Well, no.  I talked to Dexter Hooks, and

9       he said in certain situations, such as Ms.

10      Taylor's move downstairs, he thought it was a

11      legitimate business reason.  He didn't think it

12      was retaliation, is my recollection.

13                  EXAMINATION RESUMED

14  BY MR. MURPHY:

15  Q.   Well, allegation number 2 doesn't have anything

16      to do with Ms. Taylor being moved downstairs,

17      does it?

18  A.   No, but I thought you were talking about the

19      three of them and whether they were retaliated

20      against, so that's why I responded that way.

21      My apologies if I misunderstood your intent.

22  Q.   With regard to allegation number 2, you had Ms.

23      Klimak, Ms. Taylor, and Mr. Johnson saying one

24      thing, and you had Mr. Riley saying something

25      different.  Is there anything else on which you

1    **based your determination that the allegation was**

2    **unsubstantiated other than statements from those**

3    **four people?**

4    A.   And reviewing Rob Wells' investigation, that's

5         what I based it on.

6    **Q.   Anything else?**

7    A.   And my own personal investigation as well.

8    **Q.   Your own personal investigation was done over the**

9    **phone, correct?**

10   A.   Yes, sir.  That's correct.

11   **Q.   You didn't observe anything with regard to any of**

12   **these allegations, did you?**

13   A.   I spoke to the people, but no, I did not observe

14        anything.  I was not there.

15   **Q.   So the only thing you relied on was Mr. Riley's**

16   **denial and whatever Rob Wells' investigation**

17   **showed?**

18   A.   In my experience as an investigator, sir, I

19        looked at the information in Rob Wells'

20        investigation, as well as my own investigation,

21        and I reached that decision.

22   **Q.   I'm not asking you that question.**

23   **I'm asking you, in stating that allegation number**

24   **2 is unsubstantiated, did you rely on anything**

25   **other than statements from Mr. Riley and what you**

1      **read from the Rob Wells investigation?**

2      MR. SAMPLES:  Object to the form.

3      THE DEPONENT:  Nothing beyond what I have already said,

4          sir.  This matter was -- as it relates to

5          retaliation against Mr. Johnson, Mr. Wells had

6          done a thorough and complete investigation.  I

7          reviewed it, and I didn't see anything that would

8          cause me to change his outcome.

9                      EXAMINATION RESUMED

10     BY MR. MURPHY:

11     Q.  **But the only thing you relied on in determining**

12         **Mr. Wells did a thorough investigation was Mr.**

13         **Wells' investigation notes?**

14     A.  Well, and I also did interviews with Ms. Taylor

15         and Ms. Klimak as well, sir.  They brought up

16         issues that Mr. Wells' investigation was

17         compromised and things of that nature.

18         So again, I relied on Mr. Wells' investigation

19         and my own investigation as well.

20     Q.  **What did you base your determination that**

21         **allegation number 3 was unsubstantiated?  What**

22         **was that based on?**

23     A.  Give me one moment to read that allegation, sir,

24         please.

25     Q.  **Of course.**

1    A.    In speaking to Mr. Wells and reading his

2          interview notes, I didn't see where he

3          compromised the investigation by providing any

4          information that should not have been disclosed

5          to management, HR, or anyone else.

6    **Q.   So since Mr. Wells did not document that he**

7          **compromised the investigation, you determined**

8          **that he did not do so?**

9    MR. SAMPLES:  Object to the form.

10                        EXAMINATION RESUMED

11   BY MR. MURPHY:

12   **Q.   Is that correct?**

13   A.    No.  No, sir.  I reviewed his investigation and

14         reached my own conclusion.

15   **Q.   Did you interview the people out there to find**

16         **out whether the investigation had been**

17         **compromised?**

18   A.    I spoke to Mr. Wells, and I read his interview

19         notes, and I spoke to some of the same people

20         that he spoke to.  I didn't see where it was

21         compromised, sir.

22   **Q.   What employees, actually in Afghanistan, did you**

23         **ask whether or not the investigation had been**

24         **compromised?**

25   A.    I read his interview notes, and I read what Mr.

1       Johnson said.  I'm -- and that's all I can tell

2       you, sir.

3    Q.  **Did you ask anybody that actually worked in**

4       **Afghanistan any questions to determine whether or**

5       **not Mr. Wells' investigation had been**

6       **compromised?**

7    A.  All I can say, sir, is I asked some questions.  I

8       asked questions of the people that were in my

9       case, some of them were in his case, and Mr.

10      Wells told me what he said.  I read what he

11      wrote, and that's all I can say about that.  I

12      don't have -- I cannot recall where one specific

13      person also said that it was a compromised

14      investigation.

15   Q.  **Okay.  I didn't ask you what you read, and I**

16      **didn't ask you what Mr. Wells said.**

17      **I'm asking you, did you ask anybody who worked in**

18      **Afghanistan any questions to determine whether or**

19      **not Mr. Wells' investigation was compromised?**

20   MR. SAMPLES:  Object to the form.

21   THE DEPONENT:  It's unclear to me who should have been

22      asked, sir.

23                    EXAMINATION RESUMED

24   BY MR. MURPHY:

25   Q.  **I'm not asking you who should have been asked.**

1          I'm asking you a very simple fact question, Mr.

2          Smith.  Did you, Mr. Smith, ask any employee who

3          actually worked at Bagram in Afghanistan any

4          questions to determine whether or not the

5          investigation into Mr. Johnson's complaints was

6          compromised?

7     MR. SAMPLES:  Object to the form.

8     THE DEPONENT:  I can't recall anybody off the top of my

9          mind, sir, but I haven't seen anything -- let me

10         just leave it -- to answer your question, I

11         cannot recall off the top of my mind, but, again,

12         I don't think this was relevant to Tara Taylor's

13         complaint.

14                    EXAMINATION RESUMED

15    BY MR. MURPHY:

16    Q.   Let's go to allegation number 6 on page 3555, and

17         read that allegation in your conclusion for a

18         moment if you would for a moment, please.

19    A.   Sure.  Mr. Riley has been playing --

20    Q.   You don't need to read it out loud.  I'm just

21         asking you to read it before I ask questions.

22    A.   Oh, okay.  Okay, I have read it, sir.

23    Q.   Okay.  Who did you ask about this allegation

24         about Mr. Riley being on his phone and on the

25         Internet during business hours?

1   A.   I believe I asked Ms. Klimak.  I believe I asked

2        Mr. Riley as well.

3   **Q.   And Ms. Klimak and Mr. Riley told you different**

4   **     things?**

5   A.   My understanding, in talking to both of them, was

6        that they did play -- I think Mr. Riley said they

7        swapped hard drives or some kind of computer

8        device, and they did play after hours.

9   **Q.   Ms. Klimak's allegation was not that Mr. Riley**

10  **     was playing games after hours, was it?**

11  A.   She did -- she mentioned to me that he was

12       playing games.

13  **Q.   But during business hours?**

14  A.   It may have been, sir.  I don't recall off the

15       top of my head.

16  **Q.   Read the first line of allegation number 6.**

17  A.   Uh-huh.

18  **Q.   Who told you that Mr. Riley was playing on his**

19  **     phone and the Internet during business hours?**

20  A.   That came from one of the cases.  I think it was

21       Ms. Klimak.

22  **Q.   Okay.  So Ms. Klimak told you one thing, and Mr.**

23  **     Riley told you something different; is that**

24  **     correct?**

25  A.   That's my understanding.

1    Q.    And you chose to believe Mr. Riley?

2    A.    Yes.

3    Q.    Did you ask any other employees about whether the

4          allegation was true before you decided to believe

5          Mr. Riley over Ms. Klimak?

6    A.    To me, sir, whether they played the game or not

7          wasn't critical to the issue of retaliation that

8          was raised.  I listened to them both, and I made

9          a judgment call.

10   Q.    And that was --

11   A.    The Internet and playing games did happen.

12   Q.    That wasn't my question, Mr. Smith.

13         My question was, did you ask any other employees

14         about allegation number 6 before you made the

15         decision to believe Mr. Riley over Ms. Klimak?

16   A.    I don't recall that I did, sir, but as I said,

17         off the top of my head, I don't recall.  There

18         may be something in my notes.  I just don't

19         recall it off the top of my head.

20   Q.    Allegation number 7, take a moment to review

21         that, please.

22   A.    Yes, I read it, sir.

23   Q.    Okay.  Who made the allegation Mr. Riley has

24         become stricter and singled out Ms. Klimak?

25   A.    I believe it is Ms. Klimak.

1    Q.    Anybody else make that allegation?

2    A.    I don't recall off the top of my head, but,

3          again, I do want to reiterate, sir, this is not

4          the final findings for either one of these cases.

5          It's just an interim document to organize

6          information.

7    Q.    **But it's the only version of this document we**

8          **have, correct?**

9    A.    It's not the final version of the finding, sir.

10         To answer your question, yes, that's the only

11         version of this document, but I reached the final

12         findings in the respective hotline cases.

13   Q.    **Let's go to the second line of the response**

14         **there.  You state, He has also let those in**

15         **theater know the same.  Do you see that?**

16   A.    Yes.

17   Q.    **And he is a reference to Mr. Riley?**

18   A.    Yes.

19   Q.    **Who, in the theater, did Mr. Riley inform about**

20         **enforcing work-related rules regarding personal**

21         **electronics?**

22   A.    I believe I spoke to -- I don't want to throw out

23         a name without there being documentation, but I

24         also want to say, sir, this wasn't meant to be

25         the end-all and be-all for each of these

1    questions.  It's just initial thoughts, and the

2    investigation was not completed at this point, so

3    --

4  Q.  **Again, sir, focus on my question, please.**

5      **Who did Mr. Riley let know in theater anything**

6      **about enforcing work rules regarding personal**

7      **electronics?**

8  A.  My understanding is that he made it known to

9      possibly Ms. Riley (phonetic), since they're in

10     the office that had the client and the government

11     there, it needed to be a professional

12     environment, so that's why the TV wasn't supposed

13     to be on and things of that nature.

14 Q.  **Is the reference to the theatre limited solely to**

15     **Bagram?**

16 A.  No, sir.

17 Q.  **Okay.  Well, who, outside of Bagram, did Mr.**

18     **Riley speak to about enforcing work rules related**

19     **to personal electronics?**

20 A.  I can't -- I do not know who he spoke to.

21 Q.  **Did anyone other than Mr. Riley tell you that?**

22 A.  I can't recall that anybody else did or did not.

23 Q.  **Let's go to number 8.**

24 A.  Okay.  I'm ready.

25 Q.  **Okay.  This allegation is that Mr. Riley would**

1          **retaliate in the future.  Do you see that?**

2     A.   I do.

3     Q.   **And that's an allegation coming from Ms. Taylor?**

4     A.   Yes.

5     Q.   **And in August of 2014, you said that was**

6          **unsubstantiated, correct?**

7     A.   Yes.  She -- I think she -- there was no loss in

8          job or title -- in pay or job title.

9     Q.   **As of the time you wrote this, did you know that**

10         **Ron Riley had requested paperwork to demobilize**

11         **Tara Taylor?**

12    A.   I don't recall that I did.

13    Q.   **Would you agree that demobilizing Tara Taylor was**

14         **a loss of a job?**

15    A.   It is a loss of a job.

16    Q.   **But in August of 2014, you learned that Mr. Riley**

17         **had requested paperwork to demobilize Tara**

18         **Taylor, correct?**

19    A.   It was towards the end of the hotline case.  I

20         don't recall the exact date, sir.  I did learn

21         that.

22    Q.   **And after learning that, you never went back and**

23         **changed your finding from unsubstantiated to**

24         **substantiated, did you?**

25    A.   Well, I never changed this document, sir, because

1      it was never intended to be the final repository

2      of my findings.

3  Q.  **Did you ever make a finding that Mr. Riley**

4      **retaliated against Tara Taylor?**

5  A.  I don't believe he did, sir.

6  Q.  **My question was, did you ever make a finding that**

7      **he retaliated?**

8  A.  Ms. Taylor and Ms. Klimak each had specific

9      issues or allegations, and I responded to those,

10     and I would say it was unsubstantiated, and there

11     was no merit to the allegation, but no, I don't

12     believe that he did retaliate, and if that's

13     unclear, then that's an error on my part at the

14     office, but I do not believe he retaliated

15     against them.

16 Q.  **Even after you learned that he had requested**

17     **paperwork to demobilize her without talking to**

18     **you about it?**

19 A.  He had a legitimate business reason for the

20     actions that he articulated to me for the reason

21     why Ms. Taylor was being separated.

22 Q.  **Mr. Smith, the truth is you never investigated**

23     **Ron Riley's reasons for seeking to demobilize**

24     **Tara Taylor --**

25 MR. SAMPLES:  Object to the form.

1                    EXAMINATION RESUMED

2    BY MR. MURPHY:

3    Q.    -- did you?

4    A.    I did, sir.

5    Q.    **What did you do to investigate that other than**

6          **talk to Ron Riley?**

7    A.    I spoke to Ms. Taylor.  I looked at the reasons

8          why she was being let go.  I kept in mind that

9          the project, in particular, Prime Contracts, was

10         downsizing.  There was not a need for a

11         supervisor.  Mr. Riley articulated that there

12         would be a limited number of managers, general

13         contract managers.  She did not -- she, being Ms.

14         Taylor, did not have the requisite experience or

15         background in his opinion, based on what he had

16         seen.  Based on that, her remaining duties, such

17         as they were, would be partitioned between the

18         manager and the existing specialist, and she was

19         separated from the project.  Notably, she found

20         another job with Fluor Federal Solutions, I

21         believe, and is employed.

22   Q.    **I didn't ask you about that.**

23   A.    Well, I was just trying to respond.  That's all.

24   Q.    **Okay.  You never spoke to Tara Taylor about her**

25         **demobilization, did you?**

1   A.    We spoke about the role she was in.

2   **Q.    No, sir.  I'm asking you, you said Ron Riley**

3   **sought to demobilize Tara Taylor, and you**

4   **investigated his reasons for doing that.**

5   **Is that your testimony?**

6   A.    Yes.  I did speak to him about it.

7   **Q.    Okay.  Did you do anything to investigate Ron**

8   **Riley's reasons for demobilizing Tara Taylor**

9   **other than speak to Ron Riley?**

10  MR. SAMPLES:  Object to the form.

11  THE DEPONENT:  Well, I looked at the SRF that came in.

12                    EXAMINATION RESUMED

13  BY MR. MURPHY:

14  **Q.    Anything else?**

15  A.    And, again, in speaking to -- with the project

16        coming down and the loss of jobs, I looked into

17        that, and that's the reason I got for the need to

18        make the decision to separate her.

19  **Q.    No, Mr. Smith, I'm not asking you whether you**

20  **looked into it.  I'm asking you what you did to**

21  **look into it.  Did you do anything to investigate**

22  **Ron Riley's reasons for separating Tara Taylor**

23  **other than speak to Mr. Riley and look at an SRF**

24  **form?**

25  MR. SAMPLES:  Object to the form.

1    THE DEPONENT:  I'm not trying to be combative, sir.

2        That's all I can say on that.

3                      EXAMINATION RESUMED

4    BY MR. MURPHY:

5    **Q.    Okay.  So the only thing you recall doing to**

6    **      investigate Ron Riley's reasons for separating**

7    **      Tara Taylor was to speak to Mr. Riley and to look**

8    **      at the SRF form; is that correct?**

9    MR. SAMPLES:  Object to the form.

10   THE DEPONENT:  As best I can right now, my

11        recollection, that's what I have, sir.

12                      EXAMINATION RESUMED

13   BY MR. MURPHY:

14   **Q.    You made a statement that Prime Contracts was**

15   **      downsizing.**

16   **      Can you identify for me any employee that was**

17   **      demobilized from Prime Contracts in 2014 prior to**

18   **      Tara Taylor?**

19   A.    I can't recall if anybody was or was not.  It was

20        a small department.  To answer your question, I

21        can't, sir, identify anybody.

22   **Q.    And isn't it true that, in Bagram, the number of**

23   **      staff in Prime Contracts grew in 2014?**

24   A.    I would have no knowledge of that, sir.

25   **Q.    Let's go to allegation number 9 on page 3555 of**

1      the Tara Taylor allegations document.

2   A.  Okay.

3   Q.  **And you document that Ms. Taylor was complaining**

4       **about Mr. Whitcomb's failure to hold direct**

5       **reports accountable, correct?**

6   A.  Yes.  That's one of the things that was in my

7       mind.

8   Q.  **And you found that to be unsubstantiated?**

9   A.  I found -- sir, this is an incomplete document.

10      It doesn't have all of my thoughts on there at

11      the time.

12  Q.  **Let me ask --**

13  A.  I would --

14  Q.  **Did you ever find that allegation to be**

15      **substantiated?**

16  A.  I didn't find where Mr. Whitcomb did anything

17      wrong.

18  Q.  **You wrote down, the reporter.  That's a reference**

19      **to Ms. Taylor?**

20  A.  It could have been, sir.  Like I said, it's a

21      working document.  Not all the information is in

22      there.  I just can't say with any certainty.

23  Q.  **Did you ever document asking Ms. Taylor who she**

24      **believes was treated differently and on what**

25      **basis?**

1   A.   Her primary concern was against Mr. Riley, and

2        that's what I -- because he allegedly retaliated

3        against her, and that's what my focus was on.

4   **Q.   I would like you to focus right now on my**

5        **question because my question wasn't that.**

6        **My question is, did you document --**

7   A.   I.

8   **Q.   -- ever asking Ms. Taylor who she believes was**

9        **treated differently and on what basis?**

10  MR. SAMPLES:  Willard, y'all are starting to talk over

11       each other.  Let Brian finish his question --

12  THE DEPONENT:  That's not my intent.

13  MR. SAMPLES:  Let Brian finish his question, and you

14       can answer.  Take your time.  I think the record

15       is getting muddled.  You're also not giving me

16       time to object.

17  THE DEPONENT:  Okay.

18                  EXAMINATION RESUMED

19  BY MR. MURPHY:

20  **Q.   I'll start it over.**

21       **Mr. Smith, did you document asking Ms. Taylor who**

22       **she believes was treated differently and on what**

23       **basis?**

24  A.   I think there was an incident -- I believe there

25       was an incident where an employee -- his name

```
 1        escapes me right now -- said something or an
 2        article of clothing that was offensive, and there
 3        was an issue as to whether he received the
 4        appropriate corrective action.  I think his name
 5        was -- I don't want to say.  His name escapes me,
 6        sir, but there was one incident where somebody
 7        said something to Calvin Johnson that he found
 8        was offensive, and there was an allegation that
 9        maybe he didn't receive the appropriate
10        corrective action, when, in fact, he did receive
11        it.  I just don't recall the name.
```

12 **Q. Do you recall anything else that you might have**
13 **done to document asking Ms. Taylor who she**
14 **believes was treated differently and on what**
15 **basis?**

16 A.  I don't recall anything at this particular
17      moment.

18 **Q. Let's go to number 10.  Review that, please.**

19 A.  Okay.  I'm ready.

20 **Q. You make the statement, in the response, you**
21 **state, Unsubstantiated.  The statement was not**
22 **corroborated by Mr. Gentry.**

23 **Do you see that?**

24 A.  Yes.

25 **Q. Do you have any documentation of asking Mr.**

1          Gentry about this issue?

2     A.   Give me one moment, please, while I review one of

3          the attachments that I received.

4          I don't have anything in front of me, sir, about

5          that.

6     Q.   Let's go to allegation number 11, which is on

7          pages 3555 through 3556.

8     A.   Okay.  I'm there.  I'm reading it.  Okay.

9     Q.   Do you see you marked that unsubstantiated?

10    A.   Yes.

11    Q.   Do you have any documentation that you even

12         investigated this issue?

13    A.   I do.

14    Q.   Where is that?

15    A.   My August 19th notes of Ron Riley.

16    Q.   Anywhere else?

17    A.   Nothing that I see right now, sir.

18    Q.   Okay.  So would that indicate to you that the

19         document that we have marked as Exhibit 35 --

20         well, that's stamped 3554 through 3556, that

21         we've marked as Exhibit 27, was created on or

22         after August 19, 2014?

23    A.   I -- my apologies.  I was shuffling through

24         papers.  Could you say that one more time?

25    Q.   The fact that you documented investigating the

1       issue in paragraph number 11 on August 19, 2014,

2       does that indicate to you that this document that

3       we've marked as Exhibit 27, which is 3554 through

4       3556, was created on or after August 19?

5   MR. SAMPLES:  Object to the form.

6   THE DEPONENT:  I believe this document was created in

7       July of 2014.  It was created before then.

8                    EXAMINATION RESUMED

9   BY MR. MURPHY:

10  Q.  But it was modified on or after August 19,

11      correct?

12  A.  I can't -- I can't say.

13  Q.  And what notes of your August 19 investigation

14      show that you addressed the issue in paragraph

15      11?

16  A.  It's on the second page, first paragraph and two

17      sentences.

18  Q.  What's the Bates stamp?

19  A.  There is no Bates stamp for this.  This interview

20      that I see, I didn't write anything down.

21  Q.  And this is your interview with Mr. Riley?

22  A.  Yes, sir, on August 19th of 2014.

23  Q.  Any other documentation of investigating the

24      issue in paragraph 11 other than in your August

25      19 interview notes with Mr. Riley?

1    A.    I do not recall any.

2    Q.    **Did you base your determination that the**

3          **allegation in paragraph 11 was unsubstantiated**

4          **other than from your conversation with Mr. Riley?**

5    A.    Sir, I didn't make any determination in this

6          document.  Like I said, it was more my thoughts

7          about different things that were brought up.

8    Q.    **When you wrote down that the allegation in**

9          **paragraph 11 was unsubstantiated, were you**

10         **relying on anything other than a statement from**

11         **Mr. Riley himself?**

12   A.    I could not say off the top of my head.  Again,

13         it's an incomplete thought.  I don't have

14         anything in this document to be considered a

15         complete and final analysis of whether it did or

16         not occur in my mind in terms of a final

17         conclusion.  All conclusions for these cases were

18         captured in the Ethics Point for the relevant

19         allegations.

20   Q.    **Did Mr. Riley receive a dignity-and-respect**

21         **complaint from Robert Page?**

22   A.    I believe there was.

23   Q.    **Did you read it?**

24   A.    I'm familiar with it.  I'm trying to recall did I

25         read -- if I read it or not.  I just can't say,

1     sir.  This is four or five years ago.

2  Q.  **What was Mr. Page's complaint?**

3  A.  It was an issue about, I think, work and whose

4      responsibility it was, if I recall correctly,

5      but, again, this is off recollection and having

6      not reviewed it.

7  Q.  **When you wrote, Unsubstantiated, on document**

8      **3556, were you relying on anything other than**

9      **what Mr. Riley told you on August 19?**

10 A.  I can't say, sir.  As I mentioned, it's an

11     incomplete document, nor was it intended to have

12     everything on there or serve the basis for my

13     findings.

14 Q.  **Let's go to paragraph 13.**

15 A.  Okay.  Okay.  I'm ready, sir.

16 Q.  **Did you actually investigate that allegation?**

17 A.  I did inquire about it, but it wasn't to Ms.

18     Taylor's and Klimak's allegation.

19 Q.  **To whom did you make an inquiry?**

20 A.  To Mr. Riley.

21 Q.  **Anyone else?**

22 A.  Possibly to Dexter Hooks, but I would need to go

23     back and look at my notes.

24 Q.  **Sitting here today, can you tell us anything that**

25      **you relied on when you typed down,**

1        **Unsubstantiated, other than a statement from Mr.**

2        **Riley?**

3    A.   I can't tell you much about this, sir, this

4        particular one, as I sit right here today.  As I

5        mentioned, possibly Dexter Hooks I asked about

6        this.  I did ask Mr. Riley, but, again, it's an

7        incomplete statement.  There is nothing there to

8        go on -- go off of this.

9    Q.   **What do you mean by that?**

10   A.   It means it was never intended to be a final

11       repository of my findings.  Again, all the things

12       that I thought were relevant that Ms. Taylor

13       raised, I put those in the Ethics Point case.

14       Ms. Weber had absolutely nothing to do with the

15       retaliation aspect again, retaliation allegation

16       that Ms. Taylor has raised.

17   Q.   **But you didn't write down, Did not investigate.**

18       **You wrote down, Unsubstantiated, right?**

19   A.   It was a placeholder, sir.  If you see, there is

20       a subarticle.  It's just something to have there.

21       Again, I spoke to definitely Mr. Riley,

22       potentially Mr. Hooks, and I hadn't gone any

23       further.  It wasn't relevant to Ms. Taylor's

24       allegations.

25   Q.   **But you don't write down, Not relevant.  You**

1           wrote down, Unsubstantiated, correct?

2     A.    I didn't think I needed to, sir.  This was just

3           my internal thoughts in organizing the

4           information.  This was solely for my benefit to

5           organize information.

6     Q.    Let's go to number 14.

7     A.    Okay.

8     Q.    Now, this one, you gave a good bit of commentary

9           on, didn't you?

10    A.    Yes.  I can't say if it's full or not.

11    Q.    Well, let's go to the -- you wrote down, once

12          again, Unsubstantiated, again, correct?

13    A.    Uh-huh.

14    Q.    You have to say yes or no for the record, please.

15    A.    Oh, I -- yes, yes.

16    Q.    You state, The employees that were interviewed

17          did not indicate that they were unprotected and

18          did not have anyone they could speak with about

19          their concerns.

20          Do you see that statement?

21    A.    I do.

22    Q.    What employee was interviewed by you that was

23          ever asked that question?

24    A.    So I would say that I -- this was just -- I would

25          say that I -- as I recall, I don't think -- I

1        don't recall that Tara and Nikoletta said that

2        Mr. Whitcomb wasn't protecting them.  I don't

3        recall that any of the employees I interviewed

4        mentioned that he was a problem and they had

5        nowhere to turn to if there are complaints

6        against him.

7   Q.   I'm going to ask it another way since you won't

8        answer that question.

9        Did you ask any employee whether they felt

10       unprotected and did not have anyone they could

11       speak to about their concerns?

12  MR. SAMPLES:  Object to the form.

13                    EXAMINATION RESUMED

14  BY MR. MURPHY:

15  Q.   Did you ask anybody that question?

16  A.   I don't recall if I asked if there was nowhere

17       they could turn to.  We have a very robust system

18       to report complaints, whether through the

19       open-door policy or the ethics hotline.  In fact,

20       employees will make complaints as they see fit,

21       but off the top of my head, I can't think of

22       anybody that said that Mr. -- or that I asked

23       about Mr. Whitcomb and what's mentioned in item

24       14.  Again, what's contained in the hotline case

25       are the relevant points of Ms. Tara's allegations

1      of retaliation, which had nothing to do with Mr.

2      Whitcomb.

3   Q.  **Well, that's not true.  Tara Taylor complained**

4      **about Mr. Whitcomb and whether he held direct**

5      **reports accountable, didn't she?**

6   A.  There was a complaint about -- that was about the

7      one employee.  I don't recall if she said that or

8      not, but certainly, Mr. Whitcomb has held

9      employees accountable.

10  Q.  **Yeah, and you know that wasn't my question.**

11     **My question was, didn't Ms. Taylor complain about**

12     **Mr. Whitcomb failing to hold direct reports**

13     **accountable as part of her Ethics Point**

14     **complaint?**

15  A.  She may have.

16  Q.  **Look at your number 9 on page 3555.  We just**

17     **talked about it.  You documented that her**

18     **complaint was Mr. Whitcomb's failure to hold his**

19     **direct reports accountable for their actions.**

20     **Do you see that?**

21  A.  Again, I don't have -- again, these are not full

22     notes, sir.  What was relevant to Ms. Taylor, I

23     addressed in ethics hotline case.  What I have in

24     terms of my investigatory notes, sir, are

25     contained in the case, sir.

 1   Q.   I'm going to try to break this down for you, Mr.

 2        Smith, and I would appreciate responses to my

 3        actual questions.

 4   A.   I'm trying to respond, sir.

 5   Q.   You understood that Ms. Taylor was complaining

 6        about Mr. Whitcomb's failure to hold direct

 7        reports accountable, correct?

 8   A.   She may have raised that issue.  I just don't

 9        recall, sir.

10   Q.   You say she may have raised that issue, but you

11        document it in number 9 on page 3555.

12        Is there any doubt in your mind that Ms. Taylor

13        complained about Mr. Whitcomb's failure to hold

14        his direct reports accountable?

15   A.   She may have.  She may have mentioned it in

16        passing, sir.  I'm just trying to recall as best

17        I can through the notes.  I'm not saying she

18        didn't.  I'm just trying to recall and give an

19        honest answer.

20   Q.   Would you agree with me that you never

21        investigated that issue?

22   A.   I did look into the issue as it relates to the

23        employee that I mentioned that I could not name

24        that supposedly said something that was

25        inappropriate towards Mr. Johnson, and I saw that

1      Mr. Whitcomb -- that employee suffered some

2      corrective action as a result.  I believe it was

3      a loss of pay.

4  Q.  **So you don't recall if an allegation is made, but**

5      **you recall investigating the allegation.  Is that**

6      **your testimony?**

7  A.  I can recall reading Mr. Wells' investigation,

8      and that was an issue that was brought up.  I'm

9      -- I have no -- I just can't recall for sure, and

10     I'm trying to think of the notes.  If it's in

11     here -- like I said, I don't have all the

12     information because this document wasn't intended

13     to have all the information.

14  Q.  **Did you ask any employee at Fluor whether they**

15      **felt that they did not have any protection and**

16      **that they didn't have anywhere to turn with their**

17      **issues?**

18  A.  I have it there that I did.  I just don't recall

19      who did it.  That's --

20  Q.  **Well, Ms. Taylor -- go ahead.  Are you done with**

21      **your answer?**

22  A.  No, sir, I wasn't.  I was just wanting to make

23      sure that you had your opportunity.

24  Q.  **No, finish your answer.**

25  A.  Okay.  It's there.  I just don't recall off the

1          top of my -- who I spoke to about that or what

2          was said.

3     Q.   **Well, you agree that Ms. Taylor complained that**

4          **she didn't have any protection and she didn't**

5          **have anybody to turn to, correct?**

6     A.   I think she turned to the hotline complaint, but

7          I --

8     Q.   **I didn't ask you where she turned.  We're going**

9          **to take a five-minute break.**

10              (Recess taken.)

11    MR. SAMPLES:  Read back the last question.

12              (The question was read back by the reporter

13         as follows:

14    Q.   **Well, you agree that Ms. Taylor complained that**

15         **she didn't have any protection and she didn't**

16         **have anybody to turn to, correct?)**

17                   EXAMINATION RESUMED

18    BY MR. MURPHY:

19    Q.   **Your answer, sir?**

20    A.   It was a little muffled.  Could she repeat it one

21         more time?

22              (The question was read back by the reporter

23         as follows:

24    Q.   **Well, you agree that Ms. Taylor complained that**

25         **she didn't have any protection and she didn't**

1          have anybody to turn to, correct?)

2     THE DEPONENT:  Yes, that's correct.

3                    EXAMINATION RESUMED

4     BY MR. MURPHY:

5     Q.   Would you agree that Ms. Klimak had the same

6          complaint?

7     A.   Let me look at my -- her case --

8     Q.   Sure.

9     A.   -- please.

10         I don't have anything in front of me, but I know

11         she was concerned about what happened to Kelvin.

12         I just don't have any notes there.  It would not

13         surprise me if she didn't raise the issue of Mr.

14         Whitcomb and what was just said by the court

15         reporter.

16    Q.   And Mr. Hooks, who was then manager of the

17         department, told you that, in fact, Ms. Taylor

18         and Ms. Klimak were being retaliated against?

19    A.   I believe he felt that was true.

20    Q.   So you have Ms. Taylor saying she didn't feel she

21         had protection, Ms. Klimak made a similar

22         complaint, and their manager told you that they

23         were being retaliated against.

24         Why did you write down, Unsubstantiated, as to

25         allegation 14?

1    MR. SAMPLES:  Object to the form.

2    THE DEPONENT:  As I said, this is just a matter of

3        organizing my thoughts.  The investigation wasn't

4        completed at the time.  I don't -- in speaking

5        with Mr. Riley and looking at the facts as they

6        were presented, I couldn't find that it was

7        retaliation.  He articulated a legitimate

8        business reason for his actions.  His reasoning

9        and rationale is not always, as best I can tell,

10        explained to his team, but what he was able to

11        articulate to me did not demonstrate retaliation.

12                    EXAMINATION RESUMED

13    BY MR. MURPHY:

14    **Q.   Did you ever speak to Mr. Johnson about whether**

15        **employees felt they had protection if they**

16        **complained?**

17    A.   I did not.  I don't recall speaking to him.

18    MR. MURPHY:  I don't have anything further.

19    MR. SAMPLES:  Let's take a few minutes, and then,

20        Willard, I think we're almost done.

21            (Recess taken.)

22                        EXAMINATION

23    BY MR. SAMPLES:

24    **Q.   Mr. Smith, I just have a few questions, going**

25        **back to the first exhibits we looked at today,**