IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Tara Taylor, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. |
| ) | 6:17-cv-01875- |
| Fluor Corporation and Fluor ) | DCC-KFM |
| Gov't Group International, ) | |
| Inc., ) | |
| ) | |
| Defendants. ) | |

　　　The deposition of JAMES BADILLO, called for examination pursuant to the Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Layli Phillips, Certified Shorthand Reporter of the State of Illinois, at 150 North Michigan Avenue, Suite 2500, Chicago, Illinois, on September 10, 2018, at 11:08 a.m.

Reported by:　Layli Phillips, CSR, RPR, CRR
License No.:　084.003900

 1    APPEARANCES:

 2    For the Plaintiff:
            STEPHENSON & MURPHY LLC
 3          MR. BRIAN P. MURPHY
            207 Whitsett Street
 4          Greenville, South Carolina 29601
            (864) 370-9400
 5          brian@stephensonmurphy.com

 6    For the Defendants:
            JACKSON LEWIS P.C.
 7          MR. T. CHASE SAMPLES
            15 South Main Street, Suite 700
 8          Greenville, South Carolina 29601
            (864) 232-7000
 9          chase.samples@jacksonlewis.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    A.   No.
2    **Q.   In order to use a subpoena, sometimes we**
3  **have to show that you're beyond the reach of the**
4  **court.  It depends on the situation.  But we're**
5  **just establishing on the record --**
6    A.   Yeah.
7    **Q.   -- you aren't in town where we're going**
8  **to be trying the case.  Okay?**
9    A.   No, I'm not.
10   **Q.   Okay.  All right.**
11   A.   No.
12   **Q.   Are you currently employed, sir?**
13   A.   Yes.
14   **Q.   With whom are you employed?**
15   A.   LaGrou.
16   **Q.   Can you spell it for me?**
17   A.   L-a-G-r-o-u Distribution Center.
18   **Q.   When were you last employed by Fluor?**
19   A.   I want to say December of 2015.  I was
20  overseas for a long time.  December of 2015 is
21  when I got the reduction in force.
22   **Q.   And what position did you hold at that**
23  **time?**
24   A.   At that time, I was a logistics manager,
25  senior logistics manager if I'm not mistaken.

1        Q.    Okay.  And where were you located?

2        A.    I was in Bagram, Afghanistan.

3        Q.    **How long had you been the senior**

4    **logistics manager?**

5        A.    A year I want to say, yeah, a year.

6        Q.    **Okay.  So approximately end of 2014**

7    **until 2015?**

8        A.    '15, yes.

9        Q.    **Prior to becoming senior logistics**

10   **manager, what position did you hold with Fluor?**

11       A.    I was an HR manager.

12       Q.    **And what was your title when you were an**

13   **HR manager?**

14       A.    That was my title.

15       Q.    **That was your title?**

16       A.    Yeah.  I was an HR manager from -- I

17   don't recall when I got promoted.  But I went -- I

18   came in as an HR generalist in '09 because I

19    started in September -- no, August of '09 I want

20   to say.  And then I got promoted in December

21   of '09 to HR supervisor.  And I don't recall when

22   I got promoted to manager honestly.

23       Q.    **Okay.  Were all these HR positions in**

24   **Bagram?**

25       A.    Yes, sir, yeah.

1    questions, but you still have to answer, so I'm
2    just doing it to make a record, so --
3        A.   Oh, okay.
4             I really don't recall, to be honest with
5    you.  I don't.  There was, you know -- I mean, let
6     me see.  I'm trying to think of a scenario.  I'm
7    trying to think of one.  God, it's so long ago.
8    Let me think.
9             I really don't recall.  If I had -- do
10   you have paperwork or --
11       **Q.   Well, I can come back to that.**
12       A.   Okay.
13       **Q.   Was it your job to make sure that the**
14    **reductions in force were done in accordance with**
15   **Fluor policy?**
16       A.   Yes, yes, yes, and according to how we
17    put it on the reduction in force policy that was
18   written up that we had meetings about.  It was
19   myself and Tony Lorusso.  I don't know if he's
20   still with Fluor.
21       **Q.   Is Mr. Lorusso in strength management?**
22       A.   No, sir.
23       **Q.   What was his job?**
24       A.   Tony was communications, publications.
25   He was a -- he was a -- I really don't know his

1    not an official copy of a policy; is that fair?
2        A.    Yes, sir.
3              MR. MURPHY:  Okay.  Okay.  Well, let's
4    go off the record a second.
5                    (Whereupon, discussion was held
6                      off the record.)
7    BY MR. MURPHY:
8        **Q.    Since we don't have apparently the**
9    policy that you recall, Mr. Badillo, I'm going to
10   ask you to do the best from memory and explain to
11   me --
12       A.    Okay.
13       **Q.    -- what the policy was, walk me through**
14   the beginning, please, that existed in 2014 for
15    when there was a proposal to eliminate someone's
16   position in Bagram.
17       A.    Okay.  Like I said, Mr. Riley and
18   Preston and Scott Roesler, they would attend these
19   government meetings, and they would look at -- you
20   know, the government looks at every scenario.
21    Government looks at -- at -- everything's money.
22   They look at labor.  They look at equipment.  They
23   look at leases.  And Fluor has to provide these
24   updates to these meetings.
25              And they have to look at every scenario.

1  They have to look at -- and labor is probably one
2  of the biggest scenarios.  And that is determined
3  by hiring managers which is considered management.
4       **Q.    Mm-hmm.**
5       A.    Management then makes the determination
6  that, you know, these positions are to be -- X
7  positions are to be eliminated in accordance to
8  restructuring their department to be more
9  efficient, to be more efficient.
10            Also it could be sometimes positions are
11  eliminated due to base closures.  That's another
12  thing.  Base closures play a huge part in
13  reduction in force.  When there are base closures,
14  at that time, there was -- when we first started,
15  there was 72 bases if I recall correctly.  And we
16  were downsizing, starting to downsize in 2013, I
17  want to say, around that time, and we had base
18  closures.
19            So and there was DFAC closings, and mind
20  you, these bases, there's a lot that goes into
21  these bases.  There's material.  There's DFACs.
22  There's porta potties.  All this comes into play.
23            When you eliminate that and a government
24  eliminates a base, those positions go away.  Those
25  positions go away.  When those positions go away,

1  naturally the person goes away with the closure of
2  a base.
3           And that's where we took the reduction
4  in force and the reduction in force came into
5  play.
6       Q.   Okay.  So Mr. Riley, Mr. Howard, and
7  Roesler would meet with the government?
8       A.   Correct.
9       Q.   **Were those meetings documented?**
10      A.   Yes.  They are documented with an LOTD.
11      Q.   **And tell us what does LOTD stand for?**
12      A.   A letter of technical direction, I
13 think, if I recall.
14      Q.   **So if --**
15      A.   Letter of technical direction is an
16 LOTD.
17      Q.   **If they discussed eliminating a**
18 **position, that should be documented on a letter of**
19 **technical direction?**
20      A.   Correct.  An LOTD is given saying that
21 you have X amount of time to get from -- and they
22 issue an LOTD sometimes 6 months in advance,
23 90 days in advance, or 60 days in advance.
24           That letter of technical direction is an
25 official document that says, this base is going to

1  close X date.

2          However, sometimes there's changes to
3  those LOTDs and which is considered a mod.  A mod
4  is modification to the LOTD.

5      **Q.   After the LOTD is issued, what happens**
6  **next?**
7      A.   Then the next step of the process is
8  where I get involved, SMT.  SMT will sit down with
9  whatever department is affiliated with the
10 reduction in force and the restructuring of it or
11 reorganization of it you would say.

12     **Q.   Mm-hmm.**
13     A.   And they would have to submit a
14 justification as to why the position is going
15 away.

16     **Q.   And is that submission in writing?**
17     A.   Sometimes it's in writing.  Sometimes
18 it's verbal.  But everything is referenced to a
19 document.

20     **Q.   The LOTD?**
21     A.   The LOTD, correct, or the mod if there
22 was a modification because the government issues a
23  lot of mods.  Like they will say, we're going to
24 close base X January 1st, and then that base X
25 just keeps extending.  They will extend it because

1  the government makes a lot of changes.
2      **Q.    Sure.  Okay.**
3            So you sit down, and they provide the
4  LOTD or the mod, and you have a discussion with
5  them about the justification for --
6      A.    Correct.
7      **Q.    -- for removing that position.**
8            What happens next?
9      A.    Then we show the original organizational
10 structure and what positions the hiring manager
11 plans to eliminate.  And that's where the
12 justification applies.
13     **Q.    I'm sorry.  What was the last --**
14     A.    The justification will come into play.
15     **Q.    Would apply.**
16     A.    Right, would apply.
17     **Q.    So then you have org charts which are in**
18 **writing?**
19     A.    Right.  And then we show the
20 restructuring org chart, and then project controls
21 can eliminate those specific positions through
22 what human resources/SMT did with the hiring
23 managers and with, let's say, for example, all the
24 way up to Mark Cofer.
25     **Q.    Let me back up before we get to project**

1  controls.  You've got the before and after --

2      A.    Correct.

3      **Q.    -- org charts that you review with the**

4  **department?**

5      A.    Correct.

6      **Q.    And then does strength management sign**

7  **off on something saying approved or yes, let's go**

8  **ahead?**

9      A.    Yeah.  We won't sign off on it.  We

10 would just say, this is the new org structure that

11 was approved through human resources.

12     **Q.    Okay.**

13     A.    And then we would have the valid

14 justifications, and then we would assist the

15 hiring managers in issuing the reduction in force

16 notification letterhead.  It's another part.  It's

17 a letter that we issue to the employee.

18     **Q.    The DSRF?**

19     A.    I would have to see it.  I --

20     **Q.    Okay.**

21     A.    Yeah.  I would have to see it so that --

22 and that's the next step.

23     **Q.    Okay.  Did you ever see an LOTD that**

24 **documented the elimination of Tara Taylor's**

25 **position?**

1      there was no such meeting?

2              MR. SAMPLES:  Object to the form.

3         A.   No, because he has to come to HR to meet

4      with us before he can do the SRF.  They just don't

5      have copies of that, managers.  We've got to --

6       that's why the initial Exhibit 3 shows me giving

7      it to him and then him replying to me.

8         **Q.   What you sent him was blank SRF forms --**

9         A.   Correct.

10        **Q.   -- and he sent you back what we -- what**

11     we have documented there, one digitally signed one

12     for Tara Taylor.

13        A.   Correct.

14        **Q.   Are you aware of any other documentation**

15     with regard to the elimination of Tara Taylor's

16     position other than Exhibit 3 that you're holding

17     in your hand?

18        A.   This is all I'm aware of is this one.

19        **Q.   All right.  Back to my question.  Do you**

20     have specific recollection of sitting in a meeting

21      with Mr. Riley and discussing the elimination of

22     Tara Taylor's position?

23        A.   I guess, because he needs help to fill

24     out the form.

25        **Q.   Okay.  Well, you emailed him the form.**

1     A.     Yeah, I emailed him the form, correct.

2     **Q.     Did you email him the form and then meet**

3  **with him?**

4     A.     A majority of the time, managers do,

5  yeah.  They need help filling out the form.

6     **Q.     All right.  Let me rephrase the**

7  question.

8            I'm speaking specifically with regard to

9  Tara Taylor's position.  You emailed him the forms

10 it appears on August 5th, 2016 (sic), as reflected

11 in Exhibit 3.

12    A.     Mm-hmm.

13    **Q.     Do you have recollection of meeting with**

14 Mr. Riley in person on August 5th, 2016 -- I'm

15 sorry, August 5th, 2014?  Let me back up and

16 restate the question.

17           Exhibit 3 reflects that you sent two

18 blank forms, SRF forms, to Mr. Riley on

19 August 5th, 2014.  Do you have recollection of

20 then sitting down with Mr. Riley on August 5th,

21 2014, to discuss them?

22    A.     No, sir.

23    **Q.     Did you meet with Mr. Riley on August 6,**

24 2014?

25    A.     I don't recall.

1    Q.    August 7th?

2    A.    I -- I have no recall.

3    Q.    August 8th?

4    A.    I don't recall.

5    Q.    August 9th?

6    A.    I don't recall.

7    Q.    August 10th?

8    A.    I don't recall.

9    Q.    August 11th?

10   A.    I don't recall.

11   Q.    **Do you have recollection of sitting down

12   and meeting with Mr. Riley to discuss the

13   elimination of Tara Taylor's position prior to

14   August 5th, 2014?**

15   A.    I don't recall.

16   Q.    **Let's go back to Exhibit 4 a minute if

17   we could, your email to Willard.**

18   A.    Mm-hmm.

19   Q.    **Towards the end of the first paragraph

20   there, three lines up, you reference HR Policy

21   139.**

22   A.    Mm-hmm.

23   Q.    **I know we're four years after the fact.

24   Do you have any recollection of what Policy 139

25   is?**

1   Ms. Klimak's position would not have been

2   eliminated; is that correct?

3        A.    Yes, sir.

4        **Q.    And you don't have any specific**

5   recollection of ever seeing a digitally signed

6   copy of Exhibit 5, do you?

7        A.    No, sir.

8        **Q.    You talked about an LOTD.**

9        A.    Mm-hmm.

10       **Q.    Did you always have an LOTD when a**

11  position was being eliminated?

12       A.    Yes.

13       **Q.    Okay.  Even if it wasn't a base closure,**

14   even if it was just a single position, you would

15  still have an LOTD?

16       A.    An LOTD will come with a base closure.

17  However, if the government chooses to eliminate

18  specifics on a base that wasn't closing, yes,

19  there would be an LOTD.

20       **Q.    Are you familiar with the term**

21  organizational modification?

22       A.    Yes.

23       **Q.    What does that mean to you?**

24       A.    Organizational modification is to reduce

25  a department to be more efficient, to be more

1  efficient to meet the labor staffing budgetary
2  constraints for that year or that quarter.
3      **Q.   Okay.  And if someone was going to do an**
4  **organizational modification, they would complete**
5  **one of these SRF forms; is that right?**
6      A.   No, sir.  The first thing they would do
7  is we would give them a current copy of their
8  organizational structure.
9      **Q.   Okay.**
10     A.   And they would say specifically what
11 positions they -- they were eliminating and why.
12     **Q.   And when you say "they," who is they?**
13     A.   Hiring managers, for example, the Ron
14 Rileys, the Mark Cofers, the country staff, the
15 country staff.
16     **Q.   Okay.  So as far as deciding which**
17 **positions to eliminate, that wasn't in your**
18 **department, was it?**
19     A.   No, sir, no, sir.
20     **Q.   And your department or your position,**
21 **you didn't have the authority to reject an SRF,**
22 **did you?**
23     A.   No, no, no.  Well, if the paperwork
24 wasn't filled out properly, yes.
25     **Q.   Okay.  But other than making sure**

 1   everything was documented, that was the extent of
 2   your authorization?
 3        A.    Right, that was the extent of my
 4   authorization.
 5        **Q.    Okay.  Did project controls play a role**
 6   in approving the execution of an SRF?
 7        A.    No, sir, no, sir.  That was after I
 8   left, after I was part of the reduction in force.
 9        **Q.    Okay.  So after strength management is**
10             **involved, then project controls becomes**
11   **involved?**
12        A.    After I was part of the reduction in
13              force that I was in November of 2014,
14   that process
15    changed.
16        **Q.    Oh, okay.  I see what you're saying.**
17        A.    That process changed internally in
18   theater.
19        **Q.    How do you know that if it changed after**
20   you left?
21        A.    Because then I was on the outside
22   through logistics, and I was doing it, and then it
23   was through project controls --
24        **Q.    Okay.**
25        A.    -- not through strength management