## Brian Murphy

| | |
|---|---|
| **From:** | Samples, T. Chase (Greenville) <Chase.Samples@jacksonlewis.com> |
| **Sent:** | Thursday, August 02, 2018 1:36 PM |
| **To:** | Brian Murphy |
| **Subject:** | Taylor - draft damages expert report |
| **Attachments:** | Taylor v Fluor 6-17-cv-01875-MGL MEDIATION.PDF |

Brian:

For purposes of mediation, attached for you review is a draft report from our expert analyzing damages. It's still a bit rough, but I think there's enough here so that you can get the gist of his analysis. In brief, he's challenging Dr. Alford's assumption that Ms. Taylor would have remained on the LOGCAP project through the present. Looking at the rate at which personnel were being laid off from the project, we think it's necessary to discount the value of Ms. Taylor's claims based on the reality that there was no guarantee that she would remain on the project.

This analysis basically assumes that all of the wage-based damages are recoverable and then discounts those based on the likelihood of continued employment. Fluor does not concede that all of the W2 damages are recoverable, and we've also done some analysis of the damages when the uplift for hazard pay and hardship pay is taken out of the equation. We can discuss those further tomorrow.

**T. Chase Samples**

Attorney at Law

**Jackson Lewis P.C.**

15 South Main Street
Suite 700

Greenville, SC 29601

Direct: (864) 672-8034 | Main: (864) 232-7000

Chase.Samples@jacksonlewis.com | www.jacksonlewis.com

*Jackson Lewis P.C. is included in the AmLaw 100 law firm ranking and is a proud member of the CEO Action for Diversity and Inclusion initiative*

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the individual(s) or entity named on the e-mail. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

**EXPERT REPORT**

of
**JAMES F. JOYNER III**

Dated 31 July 2018

in the matter of

**TARA TAYLOR**

- Plaintiff -

and

**FLUOR CORPORATION**
and **FLUOR GOVERNMENT GROUP INTERNATIONAL, INC.**

- Defendants -

**CASE NO. 6:17-cv-01875-DCC-KFM**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

# CONTENTS

1.      THE ASSIGNMENT..................................................................................................1
    1.1.    Subject legal action...............................................................................................1
    1.2.    Engagement date and terms. ..................................................................................1
    1.3.    Topics of expert testimony. ...................................................................................1
    1.4.    Education and professional credentials. .................................................................1
    1.5.    Professional experience. ........................................................................................1
    1.6.    Independence and conflicts of interest. ..................................................................1
    1.7.    Sources.................................................................................................................1
    1.8.    Compliance with Fed. R. Evid. 702 and Fed R. Civ. P. 26(a)(2). .............................1
    1.9.    Revisions..............................................................................................................2

2.      SELECTED DEFINITIONS .....................................................................................2
    2.1.    The "Subject Legal Action"...................................................................................2
    2.2.    Presiding Judge ....................................................................................................2
    2.3.    Magistrate Judge ..................................................................................................2
    2.4.    "Plaintiff"............................................................................................................2
    2.5.    "Attorney for Plaintiff" .........................................................................................2
    2.6.    "Defendants".........................................................................................................2
    2.7.    "Attorney for Defendants" .....................................................................................2
    2.8.    "DoD"...................................................................................................................2

3.      INTRODUCTION AND BACKGROUND...................................................................2
    3.1.    Defendant's contract in Afghanistan. .....................................................................2
    3.2.    Shortages and premature departure. .......................................................................4
    3.3.    Troop levels. ........................................................................................................4

4.      PLAINTIFF'S EMPLOYMENT BY DEFENDANT .....................................................7
    4.1.    Tara Taylor's employment with Defendant Fluor....................................................7
    4.2.    Income Taxation of Meals and Lodging in Afghanistan ..........................................8
    4.3.    Foreign Earned Income Exclusion (from Taxable Income) for Expatriate Status in Afghanistan ...........9

5.      DAMAGES CALCULATIONS ..................................................................................11
    5.1.    General Assumption. .............................................................................................11
    5.2.    Probability-weighted calculation of putative damages.............................................11
    5.3.    Putative damages related to earnings differences.....................................................11
    5.4.    Conclusion of putative damages. ...........................................................................11

APPENDIX A - EXPERT QUALIFICATIONS OF JAMES FORREST JOYNER III ................13

APPENDIX B – SELECTED DATA REVIEWED FOR THIS REPORT ...................................14

EXHIBIT 1 – DEMOBILIZATION TRENDS ........................................................................15

EXHIBIT 2 – PROBABILITY-WEIGHTED EARNINGS DIFFERENCE .................................16

THIS PAGE INTENTIONALLY BLANK

1.  **THE ASSIGNMENT**

1.1.  Subject legal action.

My report is written for TARA TAYLOR, Plaintiff v. FLUOR CORPORATION and FLUOR GOV'T GROUP INTERNATIONAL, INC., Defendants, CASE NO. 6:17-cv-01875-DCC-KFM.

1.2.  Engagement date and terms.

I was engaged by the Defendant on 09 February 2018 to testify for the Defendants. My fee is based on my time at the hourly rate of $295, and other professional time at the hourly of $195.

1.3.  Topics of expert testimony.

Damages calculations, based on my professional training as a certified public accountant (SC, NC, GA), and a certified valuation and risk analyst; testimony pertaining to accounting, taxation, and payroll practices of business operations; and, other matters about which I may be asked to testify during this engagement.

1.4.  Education and professional credentials.

1.4.1.  An outline of my education and professional licenses and credentials is attached to this report.

1.5.  Professional experience.

1.5.1.  My professional experience includes accounting and attestation services, professional tax planning and compliance, fiduciary services to ESOPs, ERISA compliance, valuation of business entities and business assets, and litigation support (. I have been engaged in approximately 75 ESOP transactions (i.e., serving as an independent trustee to buy or sell employer stock), and I have served seven ESOP-owned companies as an ongoing trustee.

1.5.2.  I have published no professional articles or books in the past 10 years.

1.5.3.  Litigation for which I provided expert testimony is attached hereto.

1.6.  Independence and conflicts of interest.

1.6.1.  I am independent[1] of the parties to this litigation and I have no conflicts of interest with any litigant in this litigation.

1.7.  Sources

1.7.1.  Selected data on which I relied is listed at APPENDIX B – Selected Data Reviewed For This Report.

1.8.  Compliance with Fed. R. Evid. 702 and Fed R. Civ. P. 26(a)(2).

---

[1] Independence is defined for my purposes by the American Institute of Certified Public Accountants. Strictly speaking, independence is required only in attestation engagements, and I am not performing attestation services for this litigation. See, for example, https://pcaobus.org//Standards/Ei//Pages/ET101.aspx, accessed 02 April 2018.

1.8.1. My qualifications, my professional work, and this report are intended to satisfy Fed. R. Evid. 702 and Fed R. Civ. P. 26(a)(2).

1.9. Revisions.

1.9.1. I respectfully reserve the right to revise my report for additional information.

## 2. SELECTED DEFINITIONS

2.1. The "Subject Legal Action"

is Civil Action No. 6:17-cv-01875-DCC-KFM in South Carina District Court, Greenville Division.

2.2. Presiding Judge

is Judge Donald C. Coggins, Jr.[2]

2.3. Magistrate Judge

is Judge Kevin F. McDonald.

2.4. "Plaintiff"

is Tara Taylor.

2.5. "Attorney for Plaintiff"

is Brian P. Murphy of STEPHENSON & MURPHY, LLC, 207 Whitsett St., Greenville, SC, 29601.

2.6. "Defendants"

2.6.1. "Defendant FLUOR" is FLOUR CORPORATION.

2.6.2. "Defendant FGG" is FLUOR GOVERNMENTAL GROUP, INC.

2.7. "Attorney for Defendants"

2.7.1. is T. Chase Samples of JACKSON LEWIS, P.C., 15 South Main Street, Suite 700, Greenville, SC, 29601.

2.8. "DoD"

2.8.1. is the U.S. Department of Defense.

## 3. INTRODUCTION AND BACKGROUND

3.1. Defendant's contract in Afghanistan.

---

[2] Originally assigned to Judge Mary Geiger Lewis.

In June 2007, Defendant (along with DynCorp International) won a competitive bid for contracts under the DoD program known as LOGCAP IV.[3] The contracts were for a base year with options for each of the 9 succeeding years.



Flour's announcement about winning a LOGCAP IV contract is no longer available from the Defendant's web page, but an archived report preserved Fluor's announcement:[4]

"July 9/09: Fluor Intercontinental in Greenville, SC, receives a $1.5 billion task order cost plus award fee contract for LOGCAP IV services in Afghanistan. Fluor's release (http://investor.fluor.com/phoenix.zhtml?c=124955&p=newsarticle&id=1305703) values the contract at up to $7 billion. In return, they will provide construction services, power, water, housing, base operations, sustainment services and logistics support to 74 U.S. operating bases in Afghanistan's Northern region, over a period of up to 5 years: a base year, plus four 1-year options. Fluor adds that this latest task order is the 4th it has received under the LOGCAP IV contract, following task orders to expand and operate 4 forward operating

---

[3] Contract #W52P1J-07-0008.

[4] https://www.defenseindustrydaily.com/Billions-of-Dollars-Awarded-Under-LOGCAP-4-to-Supply-US-Troops-in-Afghanistan-05595/, accessed 25 July 2018.

bases in northern Afghanistan, to provide measurement and testing services in Kuwait, and to build and operate 8 additional forward operating bases in Afghanistan.

Work on this task order is to be performed in Greenville, SC (5%), and Afghanistan (95%) with an estimated completion date of July 1/10. Three bids were solicited with 3 bids received by the Army's Rock Island Contracting Center in Rock Island, IL (W52P1J-07-D-0008)."



| Company/ Contract Number/Task Order | Service | Country | Notes |
|---|---|---|---|
| **Fluor** | | | |
| **W52P1J-07-D-0008** | | | |
| Task Order 0001 | Program Management Office (PMO) | | Firm Fixed Price Service Contract Base Year + 9 Option Years Currently in Base Year |
| Task Order 0002 | RC-East - Base Life Support (BLS) (Urgent) | Afghanistan | Cost Plus Award Free, Service and Facilities Contract Task Order expired, closeout |
| Task Order 0003 | Test, Measurement, Diagnostic Equipment (TMDE) | Iraq/Afghanistan | Cost-Plus-Fixed-Fee Service and Facilities Contract Base Year + 4 Option Years Currently in Base Year |
| Task Order 0004 | RC-South bridge - Base Life Support (BLS) (Urgent) | Afghanistan | Cost Plus Award Fee Service Contract Task Order expired, closeout |
| Task Order 0005 | Afghanistan North - Base Life Support (BLS) | Afghanistan | Cost Plus Award Fee Service Contract Base Year + 4 Option Years Currently in Base Year |

UNCLASSIFIED

3.2.  Shortages and premature departure.

3.2.1.  Private contractors like Fluor offer financial incentives to motivate qualified candidates for employment and assignment under DoD contracts, which support American troops in battle.

3.2.2.  Significant academic research has been published to address the phenomenon of expatriate's premature departure from assignments, including stressful military assignments.

3.3.  Troop levels.

3.3.1.  The activities of private contractors, like Fluor, are related to (American) troop levels in Afghanistan.

3.3.2. The private contractors for LOGCAP IV, as with their predecessors, experienced changing demands in the number expatriated employees of private contractors. Flour's 2017 annual report included this comment:

"...the continued reduction in project execution activities associated with the LOGCAP IV program in Afghanistan."[5]



Department of Defense Contractors in Afghanistan and Iraq: Background and Analysis

Figure 4. Number of Contractor Personnel in Afghanistan vs. Troop Levels

Source: CENTCOM Quarterly Census Reports; *Troop Levels in the Afghan and Iraq Wars, FY2001-FY2012: Cost and Other Potential Issues*, by Amy Belasco; Joint Staff, Joint Chiefs of Staff, "Boots on the Ground" monthly reports to Congress.

Staffing levels under LOGCAP IV has been in severe decline, which indicates the declining probability of the Plaintiff's continued employment in this theater.

---

[5] Fluor's 2017 Annual Report, page 42.



M&A vs Total Personnel
Feb 2012 - Jun 2015

| | Feb-12 | Jun-12 | Sep-12 | Dec-12 | Mar-13 | Jun-13 | Sep-13 | Dec-13 | Mar-14 | Jun-14 | Sep-14 | Dec-14 | Mar-15 | Jun-15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FOB | 67 | 64 | 61 | 50 | 44 | 29 | 27 | 23 | 21 | 18 | 14 | 11 | 10 | 9 |
| TF ACO | 0 | 0 | 0 | 9 | 8 | 8 | 8 | 6 | 6 | 6 | 4 | 4 | 3 | 3 |
| Prime Contracts | 17 | 16 | 14 | 15 | 15 | 14 | 13 | 12 | 12 | 8 | 7 | 7 | 7 | 6 |
| M&A | 3,805 | 3,354 | 3,091 | 3,213 | 2,630 | 2,290 | 2,002 | 1,837 | 1,420 | 1,344 | 1,140 | 1,043 | 981 | 894 |
| M&A % | 15% | 13% | 13% | 13% | 12% | 13% | 12% | 12% | 11% | 11% | 12% | 12% | 12% | 12% |
| Adl M&A | 1,677 | 1,420 | 1,354 | 1,324 | 997 | 606 | 383 | 704 | 616 | 563 | 481 | 443 | 388 | 360 |
| Adj M&A % | 7% | 6% | 6% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% | 5% |
| Total Personnel | 25,757 | 25,308 | 24,106 | 24,137 | 21,488 | 17,943 | 15,762 | 14,761 | 13,110 | 11,902 | 10,001 | 8,801 | 7,958 | 7,553 |
| Jun-13 | | | | | | 0% | -14% | -22% | -32% | -38% | -47% | -51% | -57% | -60% |
| M&A % Decrease | | | | | | | | | | | | | | |
| PC % Decrease | | | | | | 0% | -7% | -14% | -14% | -43% | -50% | -50% | -50% | -57% |
| Jun-14 | | | | | | | | | | | | | | |
| M&A % Decrease | | | | | | | | | | 0% | -15% | -21% | -31% | -36% |
| PC % Decrease | | | | | | | | | | 0% | -13% | -13% | -13% | -25% |

DEF 002371

## 4. PLAINTIFF'S EMPLOYMENT BY DEFENDANT

### 4.1. Tara Taylor's employment with Defendant Fluor.

Plaintiff Taylor was most recently hired by Fluor Government Group International, Inc. (one of the Defendants) on April 4, 2011, as a Prime Contracts Management Principle Specialist in the Greenville home office and was deployed to Afghanistan in October of the same year.[6] She was promoted to a Prime Contracts Supervisor in February of 2014. She remained in that position until she demobilized from the project on September 24, 2014. She continued to be employed by Fluor Government Group in Greenville from October 2014 until February 2015 when she accepted a HR Manager position in Jacksonville, Florida with Fluor Federal Solutions – a position that she currently holds.

Selected payroll information about Plaintiff's earnings is presented below.

### Table 1- Selected Payroll Information

Taylor v. Fluor et al

| Pay Period ⟹ | 30-Nov-13 | 30-Nov-13 | 20-Sep-14 | 20-Sep-14 | Projected 29-Nov-14 |
|---|---|---|---|---|---|
| Pay | Rate | $ | Rate | $ | $ |
| Weeks | | 52 | | 42 | 52 |
| **Gross** | | | | | |
| Regular | 38.82 | 67,282.88 | 41.15 | 63,591.20 | 78,731.96 |
| OT Straight | 38.82 | 64,679.80 | 41.15 | 65,353.87 | 80,914.32 |
| Travel Time | | 6,790.40 | | 3,292.00 | 4,075.81 |
| Hardship | | 28,028.84 | | 23,292.00 | 28,837.71 |
| FSI | | 8,023.64 | | 6,664.80 | 8,251.66 |
| Out of Country | | 621.12 | | 329.20 | 407.58 |
| Period Leave | | 12,162.32 | | 2,633.60 | 3,260.65 |
| Hazard Allowance | | 23,553.76 | | 22,255.20 | 27,554.06 |
| Lump Sum Expat Allowance | | 8,000.00 | | 4,750.00 | 4,750.00 |
| Home/Family Visit | | 13,024.00 | | 6,512.00 | 8,062.48 |
| AP-Meals-Supl Tax | | 286.00 | | 143.00 | 177.05 |
| AP-Hom/Family Visit | | 3,256.00 | | 3,256.00 | 3,256.00 |
| **Total** | | **235,708.76** | | **202,072.87** | **248,279.27** |
| Federal Withholding | | 14,634.75 | | 11,761.03 | 14,561.28 |
| FICA-OASDI | | 7,049.40 | | 7,254.00 | 8,981.14 |
| FICA-HI | | 3,739.16 | | 2,948.71 | 3,650.78 |
| Georgia Withholding | | 13,032.85 | | 13,032.85 | 16,135.91 |
| 401k Deferral | | 13,028.52 | | 13,028.52 | 16,130.55 |
| **Total** | | **51,484.68** | | **48,025.11** | **59,459.66** |
| **Net Payroll Disbursements** | $ | **184,224.08** | | **154,047.76** | **188,819.61** |

---

[6] Travel records for 02 November 2011 specify she was mobilized as a "new hire."

4.2.  Income Taxation of Meals and Lodging in Afghanistan

4.2.1.  The Plaintiff was provided meals and lodging in Afghanistan.

Normally, the U.S. Internal Revenue code requires taxation of meals and lodging provided by an employer. According to IRS Publication 54 – *Tax Guide for U.S. Citizens and Resident Aliens Living Abroad*:[7]

"If you receive fringe benefits in the form of the right to use your employer's property or facilities, the fair market value of that right is earned income."

4.2.2.  The meals and lodging arrangement provided to the Plaintiff in Afghanistan were not added to the Plaintiff's taxable wages, an exclusion authorized by the U.S. Internal Revenue Code and related Treasury regulations when the arrangements are for the benefit of the employer (i.e., the Defendants).[8]

Treasury Regulation §1.119-1 Meals and lodging furnished for the convenience of the employer.

(1) In general. The value of meals furnished to an employee by his employer shall be excluded from the employee's gross income if two tests are met:

(i) The meals are furnished on the business premises of the employer, and

(ii) the meals are furnished for the convenience of the employer. The question of whether meals are furnished for the convenience of the employer is one of fact to be determined by analysis of all the facts and circumstances in each case. If the tests described in subdivisions (i) and (ii) of this subparagraph are met, the exclusion shall apply irrespective of whether under an employment contract or a statute fixing the terms of employment such meals are furnished as compensation.

4.2.3.  IRS Publication 54 discusses the requirements: "convenience of employer" and "condition of employment."

"Convenience of employer. Whether meals or lodging are provided for your employer's convenience must be determined from all the facts and circumstances. Meals furnished at no charge are considered provided for your employer's convenience if there is a good business reason for providing them, other than to give you more pay.

On the other hand, if your employer pro-vides meals to you or your family as a means of giving you more pay, and there is no other business reason for providing them, their value is extra income to you because they aren't furnished for the convenience of your employer.

Condition of employment. Lodging is provided as a condition of employment if you must accept the lodging to properly carry out the duties of your job. You must accept lodging to properly carry out your duties if, for example, you must be available for duty at all times or you could not perform your duties if the lodging wasn't furnished."

4.2.4.  For purposes of my analysis, I have assumed that meals and lodging are excluded under U.S. IRC §119 and therefore the value of such meals and lodging do not reduce the foreign income exclusion. If I were

---

[7] IRS Publication 54 – *Tax Guide for U.S. Citizens and Resident Aliens Living Abroad*, page 17.

[8] Reg. § 1.119-1. Meals and lodging furnished for the convenience of the employer.

to receive evidence that the Defendant's meals and lodging do not meet the conditions under U.S. IRC §119, I will submit revised calculations.[9]

4.2.5. Meals and lodging were furnished to the Plaintiff for the "convenience of the employer" on premises provided by Plaintiff through contractual arrangements under LOGCAP IV. Counting meals and lodging as damages would constitute an economic windfall for the Plaintiff at the Defendants' expense, therefore I do not believe this claim for damages is valid.

4.3. Foreign Earned Income Exclusion (from Taxable Income) for Expatriate Status in Afghanistan

U.S. citizens or resident aliens living abroad generally are taxed on their worldwide income. However, employees may qualify for an exclusion of foreign earnings or an exclusion or deduction for certain foreign housing amounts.[10] Employers do not need to withhold federal income taxes from wages paid to employees whose wages they reasonably expect will be excluded from income under IRC §911.

*Table 2- Foreign Income Exclusion*

| Year | Amount |
|------|--------|
| 2013 | $ 97,600 |
| 2014 | 99,200 |
| 2015 | 100,800 |
| 2016 | 101,300 |
| 2017 | 102,100 |
| 2018 | 104,100 |

4.3.1. Requirements. To claim the IRC §911 exclusion or the foreign housing cost deduction, employees must have foreign earned income, their tax home must be in a foreign country, and they must be one of the following:

(i) A U.S. citizen who is a bona fide resident[11] of a foreign country or countries for an uninterrupted period that includes an entire tax year. Generally, a foreign country is any territory (including the air space and territorial waters) under the sovereignty of a government other than the U.S. Territories and possessions of the U.S. are not foreign countries.[12] A U.S. resident alien who is a citizen or national of a country that has an

---

[9] Also, meals and lodging excluded from the Defendants' W-2 are not eligible to be treated as foreign earned income for purposes of claiming the foreign income exclusion.

[10] IRC §§911(a) and (b).

[11] The bona fide residence test applies to U.S. citizens and resident aliens who are citizens or nationals of a country that has an income tax treaty in effect with the U.S. [IRC §911(d)(1)(A); Reg. §1.911-2(c)] An employee's bona fide residence is not necessarily the same as his or her domicile. A domicile is the employee's permanent home (i.e., the place where an employee always returns or intends to return even though currently residing elsewhere).

[12] See IRS Pub. 54 – *Tax Guide for U.S. Citizens and Resident Aliens Abroad* and Treas. Reg. §1.911-2(a).

income tax treaty in effect with the U.S. and who is a bona fide resident of a foreign country or countries for an uninterrupted period that includes an entire tax year.[13]

    (ii)    A U.S. citizen or a U.S. resident alien who is physically present in a foreign country or countries for at least 330 full days during any period of 12 consecutive months.

**4.3.2.**   <u>Expected duration</u>. If employment away from home in a single location is expected to last, and does last, for one year or less, it is <u>temporary</u> (for purposes of the foreign earned income exclusion) unless facts and circumstances indicate otherwise. If employment away from home is expected to last for more than one year, it is <u>indefinite</u> (for purposes of the foreign earned income exclusion). If employment away from home is originally expected to last for one year or less, but at some later date becomes expected to last longer than one year, it is temporary (in the absence of facts and circumstances indicating otherwise) until the expectation changes.

**4.3.3.**   <u>Deductible and non-deductible expenses</u>. The location of an employee's tax home normally depends on whether his or her work assignment is expected to be temporary or indefinite. Any employee expecting to be temporarily absent from his or her U.S. tax home may be able to deduct (or be reimbursed on a tax-free basis for) his or her away-from-home expenses (for travel, meals, and lodging) but his or her wages would not qualify for the foreign earned income exclusion. Alternatively, if an employee's work assignment is expected to be for an indefinite period, the employee's place of employment becomes his or her tax home, and the employee cannot deduct (or be reimbursed on a tax-free basis for) any away-from-home expenses.

**4.3.4.**   <u>Physical presence test</u>. The physical presence test applies to both U.S. citizens and resident aliens. Employees meet the physical presence test if they are physically present in a foreign country or countries 330 full days during a period of any 12 consecutive months.

**4.3.4.1.**   <u>330 qualifying days</u>. The 330 qualifying days do not have to be consecutive.[14] The physical presence test is concerned only with how long an employee stays in a foreign country or countries. This test does not depend on the kind of residence established, intentions about returning, or the nature and purpose of the stay abroad. For example, employees do not have to be in a foreign country only for employment purposes, they can be on vacation time. However, intentions with regard to the nature and purpose of the stay abroad are relevant in determining whether employees meet the tax home test.

**4.3.5.**   <u>Full day</u>. A full day is a period of 24 consecutive hours, beginning at midnight.[15] An employee must spend each of the 330 full days in a foreign country. When the employee leaves the U.S. to go directly to a foreign country or returns directly to the U.S. from a foreign country, the time spent on or over international waters does not count toward the 330-day total.

**4.3.6.**   <u>Less than 330 Full Days</u>. To meet the physical presence test, an employee generally must be physically present in a foreign country or countries for at least 330 full days during the 12-month period. If illness, family problems, a vacation, or employer's orders cause an employee to be present for less than 330 full days, the physical presence test is not met. However, employees can be physically present in a foreign

---

[13] See Rev. Rul. 91-58.

[14] IRC §911(d)(1)(B); Reg. §1.911-2(d).

[15] Treas. Reg. §1.911-2(d)(2).

country or countries for less than 330 full days and still meet the physical presence test if they are required to leave a country because of war or civil unrest.

4.3.7. <u>Foreign Move</u>. Employees can move from one place to another within a foreign country or to another foreign country without losing full days. Also, an employee who is physically present in the U.S. for less than 24 hours while in transit between two points outside the U.S. is not treated as present in the U.S. during the transit. Instead, the employee is treated as traveling over areas not within any foreign country. However, if any part of the travel is not within a foreign country or countries and the travel takes 24 hours or more, full days are lost.

4.3.8. Plaintiff's U.S. individual tax returns for 2013 through 2014 report her eligibility for the foreign earned income exclusion at 93.2% and 91.5%, respectively.

4.3.9. The foreign earned income exclusion is an income tax provision based on statutory authorization and subject to conditions. The employee's potential income tax benefit: is not bargained with the employer (i.e., Defendants); is not awarded by the employer; is not based on an employer's compliance. Therefore, counting this conditional income tax benefit as damages would constitute an economic windfall for the Plaintiff at the Defendants' expense. I believe this conditional income tax benefit lacks nexus to Plaintiff's allegations.

## 5. DAMAGES CALCULATIONS

5.1. <u>General Assumption</u>

My damages calculations reflect the assumption that the court has determined wages are recoverable. I have <u>not</u> formed an opinion that the Plaintiff is entitled to recover damages.

5.2. <u>Probability-weighted calculation of putative damages.</u>

During the general period when the Plaintiff was demobilized there was a trend for private workforce reductions under the LOGCAP IV program. As the number of employees were reduced the probability was growing that Plaintiff would be demobilized from her assignment in Afghanistan. Therefore, I weighted the estimated earnings differences for periods during which total (mobilized) employee counts have been published to account for the increasing likelihood of demobilization for exogenous factors.

5.3. <u>Putative damages related to earnings differences.</u>

I have projected the ongoing earnings as if Plaintiff's mobilization continued and measured the differences after demobilization June 2018. I also estimated Plaintiff's actual earnings after her demobilization. The differences[16] represent putative damages.

5.4. <u>Conclusion of putative damages.</u>

---

[16] I have also included the employer's matching 401(k) matching contribution at 5% of the earnings-only difference.

5.4.1. My calculation of putative damages based on the probability-weighted difference in earnings, recognizing the demobilization trend after February 2012 is $157,200.[17]

Respectfully submitted,

_____

James F. Joyner III, CPA, CVA/ABV, CPC, AIFA®, CRM, CPVA

31 July 2018

---

[17] In this and all other damages calculations reported herein, I have not discounted the amounts to present value because the more influential factor during the analyzed period is an individual's probability of demobilization.

## APPENDIX A - EXPERT QUALIFICATIONS OF JAMES FORREST JOYNER III

James Joyner was born in Louisburg, NC, was raised in Southern Pines, NC, and currently is a resident of Spartanburg, SC. He currently serves as managing member of business valuation and litigation support services of Integra Valuation Consulting LLC, based in Spartanburg, SC. He is also the managing member of Integra Benefits Consulting LLC and the Joyner Burnette CPA Firm. Joyner previously served as a Member in the Western Carolinas Practice Unit of Dixon Hughes PLLC, a regional Certified Public Accounting and professional services firm.

In addition to coordination of tax compliance and consulting services, Joyner's areas of focus include business valuation, litigation support and employee benefit plans. He has performed business valuations and litigation support services for purposes of equitable distributions, estate matters, gifting matters, employee stock ownership plans, equity, debt instruments, intellectual property, shareholder disputes, damages to business operations, damages to intellectual property, and others.

Mr. Joyner received his B.S. in Accounting from Bob Jones University and received his Certified Public Accountant (CPA) license in 1981, and Certified Valuation Analyst (CVA) designation in 1995. He is Accredited in Business Valuations (ABV – 2007) by the AICPA and has earned designations as a Certified Pension Consultant (CPC – 2004), an Accredited Investment Fiduciary Auditor® (AIFA ®– 2004), Certified in Risk Management (CRM – 2013) and a Certified Patent Valuation Analyst (CPVA – 2014).

His professional affiliations include memberships in the American Institute of Certified Public Accountants, the South Carolina Association of Certified Public Accountants, the American Society of Pension Actuaries, The Appraisal Foundation, the National Association of Certified Valuation Analysts, The Institute of Business Appraisers, and he is an Associate Member of the American Society of Appraisers. In the past, he has served as Board member of a variety of not-for-profit boards and was a co-founding director of the Spartanburg Children's Advocacy Center and the Healthy Smiles of Spartanburg. He also served as a director of the Mary Black Foundation from its inception, until the hospital was sold in 1996 and on the MBF Investment Committee from 1996 through June 2013.

**APPENDIX B – SELECTED DATA REVIEWED FOR THIS REPORT**

| |
|---|
| Selected Fluor payroll registers for Tara Taylor |
| Fluor Corporation Employees' Savings Investment Plan – Summary Plan Description |
| Travel History per PATS (for Tara Taylor) |
| Publication 54 – Tax Guide for U.S. Citizens and Resident Aliens Abroad |
| Power Point deck Rock Island Contracting Center, dated 15 June 2011 |
| Form W-2s for Tara Taylor, 2012-2016 |

## EXHIBIT 1 – DEMOBILIZATION TRENDS

Taylor v. Fluor et al

Civil Action No. 6:17-cv-01875-DCC-KFM

Demobilization Trends – Management & Administration

| | Feb-12 | Jun-12 | Sep-12 | Dec-12 | Mar-13 | Jun-13 | Sep-13 | Dec-13 | Mar-14 | Jun-14 | Sep-14 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Estimated base earnings | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 |
| Inflation factor | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Estimated annual earnings | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 | 248,000 |
| Months between reported M&A count | | 4 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 | 3 |
| Assumed weeks | | 18 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 |
| Estimated pro-rated earnings during mobilization | | | 62,700 | 62,000 | 62,000 | 62,000 | 62,700 | 62,700 | 61,300 | 62,000 | 62,700 |
| M&A count | 3,805 | 3,354 | 3,091 | 3,213 | 3,213 | 2,630 | 2,290 | 2,002 | 1,837 | 1,480 | 1,344 |
| Month-to-month change | - | -11.85% | -7.84% | 3.95% | 0.00% | -18.15% | -12.93% | -12.58% | -8.24% | -19.43% | -9.19% |
| Cumulative change in mobilization after Feb 2012 | - | -11.85% | -18.76% | -15.56% | -15.56% | -30.88% | -39.82% | -47.39% | -51.72% | -61.10% | -64.68% |
| Probability of mobilization after Sep 2014 | | 88.15% | 81.24% | 84.44% | 84.44% | 69.12% | 60.18% | 52.61% | 48.28% | 38.90% | 35.32% |

## EXHIBIT 2 – PROBABILITY-WEIGHTED EARNINGS DIFFERENCE

Taylor v. Fluor et al

Civil Action No. 6:17-cv-01875-DCC-KFM

Demobilization Trends – Management & Administration

| | Dec-14 | Mar-15 | Jun-15 | Jun-16 | Jun-17 | Jun-18 | TOTAL |
|---|---|---|---|---|---|---|---|
| Estimated base earnings | 248,000 | 248,000 | 248,000 | 248,000 | 250,100 | 255,500 | |
| Inflation factor | 0.00% | 0.00% | 0.00% | 0.85% | 2.17% | 2.97% | |
| Estimated annual earnings | 248,000 | 248,000 | 248,000 | 250,100 | 255,500 | 263,100 | |
| Months between reported M&A count | 3 | 3 | 3 | 12 | 12 | 12 | |
| Assumed weeks | 13 | 13 | 13 | 52 | 52 | 52 | |
| Estimated pro-rated earnings during mobilization | 62,700 | 61,300 | 62,000 | 250,100 | 255,500 | 263,100 | |
| M&A count | 1,148 | 1,043 | 941 | 941 | 941 | 941 | |
| Month-to-month change | -14.58% | -9.15% | -9.78% | 0.00% | 0.00% | 0.00% | |
| Cumulative change in mobilization after Feb 2012 | -69.83% | -72.59% | -75.27% | -75.27% | -75.27% | -75.27% | |
| Probability of mobilization after Sep 2014 | 30.17% | 27.41% | 24.73% | 24.73% | 24.73% | 24.73% | |
| | | | | | | | |
| Estimated hourly pay rate after demobilization | 41.15 | 41.97 | 44.23 | 44.23 | 48.03 | 49.46 | |
| Assumed weekly hours | 40 | 40 | 40 | 40 | 40 | 40 | |
| Assumed weeks | 13 | 13 | 13 | 52 | 52 | 52 | |
| Estimated earnings after demobilization | 21,600 | 21,600 | 23,000 | 92,500 | 100,200 | 103,200 | |
| Earnings difference | 41,100 | 39,700 | 39,000 | 157,600 | 155,300 | 159,900 | |
| 401k matching contribution at 5% | 2,100 | 2,000 | 2,000 | 7,900 | 7,800 | 8,000 | |
| Earnings difference + 401k match | 43,200 | 41,700 | 41,000 | 165,500 | 163,100 | 167,900 | |
| Probability-weighted earnings difference | 13,000 | 11,400 | 10,100 | 40,900 | 40,300 | 41,500 | $157,200 |

FOR MEDIATION PURPOSES                    DRAFT 31 JULY 2018